**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

ERIN ANGELO, NICHOLAS ANGELO, AND
CYNTHIA WILSON, on behalf of themselves
and all others similarly situated,

        Case No.: 1:20-cv-00484

       Plaintiff,

v.

        **CLASS REPRESENTATION
        JURY TRIAL DEMANDED**

CENTENE MANAGEMENT COMPANY, LLC,
CELTIC INSURANCE COMPANY,
SUPERIOR HEALTHPLAN, INC., and
CENTENE COMPANY OF TEXAS, L.P.,

       Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs Erin Angelo, Nicholas Angelo and Cynthia Wilson ("Plaintiffs") bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), individually and on behalf of all similarly-situated persons, who purchased Defendants' "Ambetter" insurance policies sold in the State of Texas from January 1, 2014 to the present.  As detailed below, Defendants Centene Management Company, LLC ("Centene Management"), Celtic Insurance Company ("Celtic Insurance"), Centene Company of Texas, LP ("Centene Texas"), and Superior HealthPlan, Inc. ("Superior Health") ("Centene" or "Defendants") collectively engaged in and continue conduct which constitutes a breach of their contracts with policyholders by failing to provide the coverage promised under Ambetter.  Plaintiffs' allegations are based on information and belief, except for allegations about Plaintiffs' own circumstances.

1

# I.   PARTIES

1.    Plaintiffs Erin Angelo and Nicholas Angelo, husband and wife (the "Angelos" or "Angelo Plaintiffs"), are residents of Austin, Texas.  The Angelos purchased Superior Health's Ambetter health insurance policy in December 2016, and maintained  that coverage through 2017.

2.    Plaintiff Cynthia Wilson ("Wilson" or "Plaintiff Wilson") is a resident of Waco, Texas.  Plaintiff Wilson purchased an Ambetter health insurance policy from Superior Health for coverage in January 2017 and maintained that coverage until December 31, 2017.

3.    Defendant Centene Management Company, LLC ("Centene Management") is a member-managed Wisconsin corporation with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. The sole member of Centene Management is Centene Corporation, a holding company, itself having no employees, which is the corporate pinnacle of a set of wholly-owned subsidiaries who, collectively, constitute one of, and hold themselves out to the public as one of, the nation's largest insurers providing coverage through the ACA and which has steadily been expanding its operations around the country. Centene Management, is the corporate entity through which Centene Corporation effectuates the nationwide policies, procedures, and guidelines that are used to control coverage decisions of its state insurer subsidiaries through which insurance is offered by the "Centene" entity across the nation. Here, Centene Management effectuates, controls, and handles Superior Health, so that Celtic Insurance, Centene Texas and Superior Health are each a shell and alter ego of Centene Management, and Centene Management, Celtic Insurance, Centene Texas and Superior Health operate so in concert and together in a common enterprise and through related activities so the actions of one may be imputed to the other and/or that their corporate formalities should be disregarded for purposes of attributing their unlawful conduct to Centene

2

Management.  In sum, the activities of Celtic Insurance, Centene Texas, and Superior Health have been abdicated to Centene Management.  In light of the inter-relatedness of these entities, "Centene" shall refer to the joint activities of Centene Management Company, LLC, Celtic Insurance Company, Centene Corporation of Texas, LP and Superior HealthPlan, Inc.

4.      Defendant Celtic Insurance Company, ("Celtic Insurance") is an Illinois corporation with its principal place of business at 7700 Forsyth Blvd. Suite 800, St. Louis, MO 63105. Celtic Insurance is licensed to sell health insurance in the State of Texas. Celtic Insurance is a wholly-owned subsidiary of Centene Corporation and operates in concert with Superior Health as the "Centene" presence in the State of Texas with the Ambetter insurance product.

5.      Defendant Superior HealthPlan, Inc. ("Superior Health") is a Texas corporation with its principal place of business at 2100 South IH-35, Suite 202, Austin, Texas 78704.  Superior Health is licensed by the Texas Department of Insurance and is a Qualified Health Plan issuer in the Texas Health Insurance Marketplace.  Superior Health is a wholly-owned subsidiary of Centene and operates as Centene's managed care presence in the state of Texas offering Centene's Ambetter insurance product.

6.      Defendant Centene Company of Texas, LP ("Centene Company") is a Texas limited partnership located at 7700 Forsyth Blvd. Suite 800, St. Louis, MO 63105.  Superior maintains a third-party management agreement with Superior Health to support many operational functions, including utilization management and claims processing.  Centene Company holds the required Texas utilization review agent license.

## II. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least one member of the proposed class is a citizen of a state other than one of the Defendants' states of citizenship.

8.      Venue is appropriate under 28 U.S.C. § 1391(b) and (d) because Defendants reside in this district and are subject to personal jurisdiction in this district.

9.      This Court has personal jurisdiction over Defendants because they conduct business throughout the State of Texas.

10.      The Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## I.      FACTUAL ALLEGATIONS

### A.    The Centene Business Model.

11.      Ambetter is offered by Centene Corporation in 18 states. Those states include: Arkansas, Arizona, Florida, Georgia, Illinois, Indiana, Kansas, Mississippi, Missouri, New Hampshire, Nevada, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Washington.

12.      Ambetter "is [Centene's] suite of health insurance product offerings for the Health Insurance Marketplace." The "family" of "Ambetter Health Plans" are certified as Qualified Health Plan issuers in the Health Insurance Marketplace." https://www.ambetterhealth.com/about-us.html.

13.      According to Centene Corporation's combined and consolidated financial statements, the Centene entities collectively earned over $48 billion in 2017, and their revenues

continue to increase each year. Centene earned between $73.6 billion to $74.2 billion in 2019 and its projected revenues in 2020 are expected to be $78.6 billion to $79.4 billion.

14.     In the State of Texas, as throughout the rest of the country, the Centene business model is to target low-income customers who qualify for substantial government subsidies while simultaneously providing coverage that is well below both what is required by law and what Centene represents it is providing to customers in its contract of insurance.

15.     Ambetter policyholders around the nation report strikingly similar experiences: after purchasing an Ambetter insurance plan, they learn that the provider network that Centene represented was available to Ambetter policyholders was in material measure, if not largely, fictitious. Members have difficulty finding medical providers, and often cannot find any, who will accept Ambetter insurance.

16.     Centene identifies the number, location, and existence of purported providers who participate in their network by listing physicians and medical groups in their insurance contract materials, available on-line.  However, many of these providers do *not* accept Ambetter (and, in some cases, have specifically asked to be removed from the Ambetter provider network) and do not participate in their network. In some areas, Defendants have even copied entire physician directories into their purported network lists, and have even listed medical students as part of their primary care provider network.

17.     Ambetter policyholders learn of the limitations on available providers only after they purchase the Ambetter policy. Centene also does not consistently provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services.

18. Defendants also fail to reimburse medical providers' legitimate claims, routinely citing "insufficient diagnostic" evidence as the reason. As a result of Centene's failing to pay providers for legitimate claims, a large number of medical providers reject Ambetter insurance, further reducing the provider network available to Ambetter's members.

19. Centene has been sued by medical providers and by shareholders for failing to fulfill its legal responsibilities, and this lawsuit seeks to compel redress from Centene for its failure to comply with the law and the terms of its contracts on behalf of Ambetter policyholders.

20. To be clear, Plaintiffs and the Class are not challenging the reasonableness of the rates filed with the Texas Department of Insurance. Had Centene actually delivered the insurance services for which its filed rates were approved by the Texas Department of Insurance, Plaintiff and the Class would not be bringing this lawsuit. But the coverage Centene actually provided by its Ambetter policy, did not deliver the insurance services for which the Department of Insurance approved its filed rates. Centene therefore breached its insurance contracts with Plaintiff and the Class by failing to deliver the insurance services promised.

**B.    Centene Management Controls Celtic Insurance and Superior Health.**

21. The "Centene" companies, together as collectively presented to the public, are or have been the largest Medicaid Managed Care Organization in the country. The "Centene" companies have described themselves as a "platform for government-sponsored programs" serving low-income populations, including some of the nation's most vulnerable people. When the ACA Exchanges became operational in 2014, Centene expanded the operations of the Centene Corporation owned entities by introducing the Ambetter insurance product, developed specifically for the ACA.

6

22.     The Centene companies insure more than one million people through the ACA's state-based health insurance exchanges. About 90% of the marketplace enrollees are eligible for subsidies. The federal government pays cost-sharing subsidies directly to the insurer.

23.     Centene's remarkable growth and profitability in the ACA marketplace is due largely to its use of the ACA subsidy program and other government support, while failing to provide the minimal coverage required and by failing to pay timely claims.

24.     On the ACA exchanges, it is expected that a number of customers will switch in and out of eligibility or will change insurance providers yearly while shopping for policies. This phenomenon is known as "churn." Consequently, every year will bring Defendants new patients unfamiliar with the shoddy nature of Ambetter coverage. "Our game plan was churn. That's it[.]", according to Centene Corporation's CEO. In addition, some customers will not need to utilize medical practitioners in any given year. These customers may unwittingly continue to purchase Ambetter, discovering its inferior coverage only when they need to obtain medical care.

25.     The day-to-day operations of the various Centene entities, including Defendants Celtic Insurance and Superior Health, are controlled by and through Centene Management, down to the details. For example, the subsidiaries' web sites each contain language describing Ambetter in substantially the same language, and often verbatim.

26.     On the universal Ambetter web site (as opposed to the state-specific sites that each subsidiary posts), it is represented that "Our Ambetter products are offered by Centene Corporation . . .on a local level." https://www.ambetterhealth.com/about-us.html.

**C.     The ACA's Statutory Scheme Governing Health Insurance.**

27.     The ACA was enacted by the United States Congress in March 2010 expressly to provide affordable health care coverage to all citizens, regardless of their pre-existing health conditions or other barriers to coverage. 42 U.S.C. § 18001, et seq. As part of its overhaul of health insurance, the ACA enacted provisions aimed at ensuring minimum levels of health care coverage, termed the "Patient's Bill of Rights." The requirements include, among other things, giving patients the right to choose a doctor, the provision of no-cost preventive care, and the ending of pre-existing condition exclusions. 42 U.S.C. §§ 300gg-1- 300gg-19a, https://www.cms.gov/CCIIO/Programs-and-Intitiatives/Health-Insurance-Market-Reforms/Patients-Bill-of-Rights.html; see also 45 C.F.R. Part 147 (Department of Health and Human Services implementing regulations for these rights).

28.     Under the ACA, a Health Insurance Exchange ("HIE") also known as the Health Insurance Marketplace ("HIM"), is a platform through which plans that meet ACA requirements are sold to consumers, 42 U.S.C. § 18031(b). A Qualified Health Plan ("QHP"), as defined in the ACA, is a major medical health insurance plan that covers all the mandatory benefits of the ACA and may be sold through a state HIM. A QHP is also eligible to be purchased with cost-sharing and premium tax credit subsidies.

29.     All QHPs offered in the Marketplace must cover 10 categories of "essential health benefits" with limited cost-sharing, including:

      a.   Ambulatory patient services (outpatient care one can get without being admitted to a hospital);

      b.   Emergency services;

      c.   Hospitalization (surgery; overnight stays, etc.)

    d.   Pregnancy, maternity, and newborn care;

    e.   Mental health and substance use disorder services, including behavioral health treatment;

    f.   Prescription drugs;

    g.   Rehabilitative and habilitative services and devices (services and devices for people with injuries, disabilities, or chronic conditions);

    h.   Laboratory services;

    i.   Preventative and wellness services and chronic disease management; and

    j.   Pediatric services, including oral and vision care (excluding adult dental and vision).

42 U.S.C. § 18022; 42 U.S.C. § 300gg-13.

30.    These "essential health benefits"- including their limitations on "cost sharing" (deductibles, coinsurance, copayments, and similar charges) are minimum requirements for all Marketplace plans. 42 U.S.C. § 18022.

**D.    Other ACA Requirements and Prohibitions.**

31.    To help ensure that plans offered on the ACA marketplaces serve the needs of enrollees, the ACA established a national standard for network adequacy. 42 U.S.C. § 18031(c)(1)(B); 45 C.F.R. § 147.200(a)(2)(i)(K). Marketplace plans must maintain "a network that is sufficient in number and types of providers" so that "all services will be accessible without unreasonable delay," and insurers must disclose their provider directories to the marketplace for online publication. 45 C.F.R. § 156.230(b)(2). In addition, the health law requires marketplace plans to include within their networks a sufficient number and geographic distribution of "essential

community providers" that serve predominantly low-income, medically-underserved individuals. 42 U.S.C. § 156.235.

32.     A health insurance issuer offering individual health insurance coverage must also provide a current and accurate summary of benefits and coverage to individuals covered under the policy upon receiving an application for any health insurance policy. The required summary must provide:

a.     A description of the coverage, including cost sharing, for each category of benefits identified by the Secretary in guidance;

b.     The exceptions, reductions, and limitations of the coverage;

c.     Coverage examples, reductions, and limitations of the coverage;

d.     An internet address with a list of providers; and

e.     An internet address providing information about prescription drug coverage.

45 C.F.R. § 147.200(a)(2).

33.     The ACA does not displace state laws that impose stricter requirements on health care service plans than those imposed by the ACA, and it expressly preserves state laws that offer additional consumer protections that do not "prevent the application" of any ACA requirement.

34.     Texas law prohibits deceptive marketing of insurance plans and the failure to provide adequate insurance benefits.

35.    Texas law requires that no health insurance company should issue health insurance policy that is unfair, inequitable, ambiguous, misleading, inconsistent, deceptive, contrary to law or to the public policy of this State.  (Tex. Ins. Code § 541.003.)[1]

**E.    Defendants' Insufficient Provider Network.**

36.    Continually and systematically, at all relevant times, as noted above, Ambetter has failed to ensure that it has sufficient doctors and other medical professionals to provide for the medical care for its insured that it undertakes when it has entered into Ambetter insurance policies in the State.

37.    Defendants describe Ambetter as a Qualified Health Plan as defined in the ACA, which requires that the plan cover all the ACA's mandatory benefits. Defendants specifically represent to prospective and existing customers that "Ambetter Health Plans are certified as Qualified Health Plan issued in the Health Insurance Marketplace" and represent that the plan complies with the ACA. https://www.ambeterhealth.com/about-us.html.

38.    Defendants market to prospective customers that "no matter which Ambetter plan you choose, you can always count on access to high quality, comprehensive care that delivers services, support and all of your Essential Health Benefits." Of the three Ambetter plans offered, Bronze, Silver, and Gold, Defendants assure potential customers that "the only difference between these plans is how much premium you'll pay each month and how much you'll pay for certain medical services."

---

[1] Plaintiffs intend to assert Defendants' violations of the Texas Deceptive Trade Practice Act in an amended complaint.  Plaintiffs have sent the statutory notice to Defendants as required by the Texas Deceptive Trade Practice Act and will amend this Complaint once the statutory waiting period for alleging that cause of action expires. Texas Business and Commerce Code section 17.41 et seq.

39.     Defendants state that Ambetter provides "Complete medical coverage that meets your medical needs and contains all of the Essential Health Benefits." Defendants explained these purported benefits and coverage in brochures provided to the public on their websites. Defendants assure the public in those materials that the promised coverage will be provided to customers.

40.     Defendants also describe their "Provider Network" in advertising Ambetter on the website they dedicate to the plan. Specifically, Defendants state in their marketing material:

> The Ambetter network includes healthcare providers to deliver all of the services that the Affordable Care Act describes as Essential Health Benefits. These include:
>
> Preventive care Hospitalization coverage Emergency services
> And more (refer to your Evidence of Coverage (EOC) for the full list of benefits)
>
> To accomplish these goals, Ambetter contracts with a full range of
> Practitioners and providers such as:
>
> Primary care doctors
> Behavioral health practitioners
> Specialty physicians, such as cardiologists, neurologists, etc. Providers, including hospitals, pharmacies, medical equipment companies, etc.
>
> Ambetter makes sure practitioners and providers of all types are available within a certain geographic mileage or driving time from each of our members' homes to ensure you receive quality care in a timely manner.
>
> Ambetter contracts with providers who accept our contract terms, meet our credentialing criteria, and agree to our reimbursement terms. We regularly review the provider network and make decisions about which providers remain in the network and if additional Providers are needed, based on relevant factors that could include:

The availability of certain types of practitioners or hospitals in your area.

The ability of practitioners to meet our credentialing criteria, including a valid license to practice, applicable education and training, appropriate work history, etc.

Assessment of facilities such as hospitals, to ensure they are appropriately licensed and accredited.

Monitoring of the quality of care and service provided by individual practitioners and providers, which includes complaints from members and patient safety concerns.

https://www.ambetterhealth.com/find-a-provider/provider-network-design.html.

41.     Defendants advertise that potential customers can use Defendants' websites to see the providers they represent as in their provider network. Specifically, Defendants' websites offered, and continue to offer, a feature allowing potential enrollees to search Defendants' networks of providers. This feature is available to all potential Ambetter customers across the country. *See* https://providersearch. ambetterhealth.com/.

42.     However, Defendants' Provider Directory is woefully inaccurate and repeatedly lists providers that do not accept Ambetter policies or inaccurately list the location or specialty of the medical care provider.  As a result, policyholders cannot rely on the Provider Network because it is so inaccurate.

43.     Defendants' online brochures and other materials available to members further represent that members' grievances will be diligently documented by Defendants and promptly addressed.

44.     Indeed, in patent disregard of its contractual and legal obligations to ensure a sufficient network of medical professionals, and in an effort to appear to have more professionals

13

than it does so as to be able to market its policies, Ambetter routinely lists, on its provider lists, individuals who are *not* in its network.

45.     Defendants appear to have copied contact information about various physicians from lists or medial directories and listed those providers as being part of their network even though those providers were not actually part of the provider network for Ambetter. In some areas, Defendants have simply copied into their purported network an entire physician directory. In some cases, Defendants have even listed the cellular telephone number of physicians not in the Ambetter network.

46.     Defendants' provider network was and is so limited that holders of Ambetter policies would have to travel long distances to see a medical provider, if one legitimately within Defendants' network could be found. Or, lacking the ability to find an in-network provider, policyholders have had to go out-of-network.  Adding insult to injury, Defendants then charge their insureds higher out-of-network costs for that care than the insureds would have paid had they received care from an in-network provider—which Ambetter falsely represented it had in its network, or simply refuses to pay the out-of-network provider costs caused by Defendants' own malfeasance.  The circumstances of the named Plaintiffs, as set forth below, illustrate Defendants' deceptive conduct, their failure to provide for accurate provider lists, and the impact of such insufficiencies and failures on an insured, like the named Plaintiff.

47.     The Centers for Medicare and Medicaid Services ("CMS") audited Centene's Medicare operations from May 16, 2016 through May 27, 2016. CMS auditors reported that (1) Centene failed to comply with Medicare requirements related to Part D formulary and benefit administration and coverage determinations, appeals, and grievances, and that (2) Centene's failures

were systemic and adversely affected enrollees. According to CMS, the enrollees experienced delayed or denied access to covered benefits, increased out-of-pocket costs, and/or inadequate grievance or appeal rights. https://ww.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/Centene_Corporation_CMP_1-12-17.pdf.

48.    Further evidence of Ambetter's wrongful and illegal actions is captured by the Washington State Office of the Insurance Commissioner's order of December 12, 2017 requiring Coordinated Care, a wholly-owned subsidiary of Centene Corporation, operating as the "Superior Health" analogue in the State of Washington, including offering the Ambetter insurance product, to stop selling the Centene 2018 Ambetter plans. The Insurance Commissioner intervened after receiving over 100 consumer complaints regarding a lack of doctors in the Ambetter policy network and other deficiencies and after doing its own investigation.

49.    On December 15, 2017, Coordinated Care entered into a consent order with the Washington Insurance Commissioner. The order states that "[b]ased upon the number of consumer complaints and information gathered by the Insurance Commissioner's staff in investigating the consumer complaints, there was sufficient evidence to indicate that the Company failed to monitor its network of providers, failed to report its inadequate network to the Insurance Commissioner, and failed to file a timely alternative access delivery request to ensure that consumers receive access to healthcare providers."

50.    The order also states that Coordinate Care is legally required to provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services. The Insurance Commissioner stated that the order required that Centene and Coordinated Care no longer send customers "surprise" bills, including charges for out-of-network care. The Consent Order

requires Centene and Coordinated Care to confirm that erroneous billing of customers is corrected and provides for ongoing monitoring.

51.     The Washington Insurance Commissioner levied a $1.5 million fine with $1 million suspended pending no further violations over the next two years.

52.     Following the order, Centene issued a press release stating that it was addressing the problems identified by the Washington Insurance Commissioner.

53.     The same Centene network adequacy issues that the Washington Office of Insurance Commissioner identified are present in Texas and in other states throughout the United States.

**F. Defendants' Failure to Pay Claims, Resulting in Even Smaller Networks and Lack of Benefits and Coverage.**

54.     Defendants routinely deny coverage for medical services, claiming that the provider did not show sufficient diagnostic evidence that the care was necessary. Centene and a subsidiary were sued in 2016 by a group of providers who alleged that Defendants wrongfully denied claims of their members within the scope of the members' Ambetter policies.

55.     In a case filed in the Eastern District of Texas in 2019 by a group of emergency medicine service providers, the allegations are typical: According to the Court in its order denying Centene's motion to dismiss, after medical care was provided to Ambetter-insured patients, Centene "either did not pay or underpaid [Plaintiff] at least $638,803.11".

56.     As a result of Defendants' systemic practice of denying legitimate claims, many providers will not accept patients insured by Ambetter, making it even more difficult for Ambetter members to locate providers for services which Centene represents that it provides, and has a duty to provide, in-network.

**G. Plaintiffs' and Class Members' Experiences with Ambetter.**

57.     Plaintiffs Erin Angelo, Nicholas Angelo, and Cynthia Wilson viewed the public information supplied by Centene, Superior Health, and Celtic Insurance through www.ambetter.Superiorhealthplan.com prior to enrolling.   The Ambetter Evidence of Coverage represents the "contract" for services between Plaintiffs and Ambetter (the "Ambetter Contract"). After reviewing the Ambetter Contract and other information on this website, Plaintiffs purchased Centene's Ambetter Health insurance policy from Superior Health that is insured by Centene-owned Celtic Insurance, on the Texas Benefit Health Exchange effective January 1, 2017.

58.     Under the section entitled Quality Improvement, the Ambetter Contract states: "*We* are committed to providing quality healthcare for *you* and *your* family.  Our primary goal is to improve your health program and help you with any illness or disability.  *Our* program is consistent with National Committee on Quality Assurance (NCQA) Standards. To help promote safe, reliable, and quality healthcare, our programs include: 1. Conducting a thorough check on *physicians* when they become part of the *network*. 2. Monitoring *member* access to all types of healthcare services. . . . 5. Monitoring the quality of care and developing action plans to improve the healthcare *you* are receiving." (Emphasis in original).

59.     The Member Handbook also states:

> FINDING THE RIGHT CARE
>
> We're proud to offer you quality care. Our local provider network is the group of doctors, hospitals and other healthcare providers who have agreed to provide you with your healthcare services.
>
> To search our online Provider Directory, visit Ambetter.SuperiorHealthPlan.com/findadoc and use our Find a Provider tool. This tool will have the most up-to-date

> information about our provider network, including
> information such as name, address, telephone numbers,
> hours of operation, professional qualifications, specialty,
> and board certification.

60.     Plaintiffs Erin Angelo and Nicholas Angelo, husband and wife ("Angelo Plaintiffs"),

are residents of Austin, Texas.  The Angelos purchased Superior Health's Ambetter health insurance

policy in December 2016.  Their monthly premium was $ 679.30 per month. At the time of the

purchase of the Ambetter policy, Erin was pregnant with twins in a single amniotic sac, an extremely

high-risk pregnancy, and required the care of a maternal-fetal medicine specialist.

61.     One reason the Angelos purchased their Ambetter policy was because Erin Angelo's

obstetrician, a high-risk pregnancy obstetrician (a maternal-fetal medicine specialist), was listed as an

in-network Ambetter provider.  Shortly after purchasing the policy, the Angelo's were notified that

their maternal-fetal medicine specialist had stopped accepting Ambetter insurance due to Ambetter's

poor payment record.

62.     From January thru March 2017 plaintiff Erin Angelo called Superior Health several

times per week in order to obtain a new high-risk obstetrician.  Nonetheless, Superior Health was

unable to provide the Angelo Plaintiffs with another Ambetter in-network high-risk obstetrician in the

Austin area. Instead, she was offered a maternal-fetal medicine specialist in Houston.  She rejected

that referral as it was approximately a four-hour drive from her home.  Accordingly, the Angelos were

forced to use their initial maternal-fetal medicine specialist and pay out-of-pocket for his services.

63.     On or about March 2017, Ambetter referred her to the North Austin Maternal-Fetal

Medicine Clinic.  Erin received care at this clinic for several months but Ambetter refused to pay the

bill of $1,644.00.  Accordingly, the clinic would not deliver her babies.

64.      Ambetter next referred the Angelos to an obstetrician at a free clinic.   This obstetrician delivered her twins in June 2017 at an Ambetter in-network hospital. The twins were premature and required treatment in the hospital's neonatal intensive care unit (NICU).   The bill for the neonatologists was $20,311.97.  Ambetter never paid the bill from Pediatrix, the neonatal group. Ambetter disputed the billings alleging that it was duplicate billing despite its knowledge that the bills were for twins.  Ambetter delayed sending its denial letter to the group until it only had one week to respond.  Ambetter then claimed that the NICU responded too late and that it consequently owed the neonatologists nothing.

65.      The unpaid invoice from Pediatrix was sent to collections and the Angelos were forced to dispute it for approximately two years.  Eventually, the group wrote off all but $5500 of the bill and the Angelos then negotiated a settlement requiring them to pay $1500.

66.      Plaintiff Cynthia Wilson is a resident of Waco, Texas.  Upon moving to Waco in late 2016, Wilson purchased an Ambetter health insurance policy from Superior Health in January 2017 after reviewing the online documents.  The policy was for coverage until December 31, 2017.  At the time, Plaintiff Wilson was 63-years old and self-employed as the owner of a janitorial service.  Ms. Wilson is a breast cancer patient who has had surgery, radiation, and chemotherapy.  About mid-year, Ambetter assigned her a primary care physician.

67.      Prior to purchasing the Ambetter policy, Wilson reviewed the in-network providers listed by Superior Health and selected the Ambetter policy based in material part on that list of in-network providers.   Her monthly premium was $ 511.83 per month. Plaintiff later learned that Superior Health had simply published the entire list of providers for the Providence hospitals in Waco

even though most, or all, of them either did not accept the Ambetter policy or were in the process of discontinuing acceptance of the policy due to non-payment by Ambetter.

68.     In late 2017, Mrs. Wilson developed shingles, a very painful medical condition. Because of the severity of the pain, she went to an urgent care clinic which supposedly took Ambetter insurance.  The urgent care clinic gave her medications and told her to follow-up with her primary care provider.  The clinic also told her that her Ambetter-assigned primary care physician was a pediatrician, a type of doctor who could not reasonably meet the primary care medical needs of an adult female with her medical history.  Plaintiff called Superior Health repeatedly in an effort to obtain another primary care provider.  She called many physicians listed on the Ambetter network and none of them actually accepted Ambetter insurance.  Her calls to Superior Health were thus to no avail and she constantly was confronted with delay and confusion by the representatives on the phone.

69.     Finally, in order to obtain relief from her severe medical condition, she consulted a physician who was a customer of her janitorial service.

70.     These experiences are similar to those of the Class, who consistently have encountered and continue to encounter difficulties in finding a medical provider willing to accept the Ambetter plan and who find that doctors listed in Ambetter's provider listings do not accept the insurance or have no availability.

**H.     Class Action Allegations**

76.   Plaintiffs brings this lawsuit as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and LR 23 (i) on behalf of the following class: All persons in the state of Texas who were insured by Defendants' Ambetter insurance product which was purchased through an ACA HIE from the date on which Ambetter policies were first sold in Texas to the present (the "Class"). Excluded from the Class are

Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to whom this case is assigned and the immediate family of the Judge(s) to whom this case is assigned.

This Class Definition may be amended or modified as warranted by discovery or other activities in the case hereafter.

77.     Numerosity: The Class encompasses thousands of individuals, which is so numerous that joinder of all members is impracticable. The Class is ascertainable from Defendants' records.

78.     Typicality: Plaintiffs' claims are typical of the claims of the Class, because Plaintiffs and the members of the Class each purchased a Centene Ambetter policy and were similarly damaged thereby. Plaintiffs and the other members of the Class also share the same interest in preventing Defendants from engaging in such activity in the future.

79.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other members of the Class in the maintenance of this class action. Plaintiffs have no relationship with Defendants except as a policyholders who entered into contracts with Defendants. Plaintiffs will vigorously pursue the claims of the Class.

80.     Existence and Predominance of Common Questions of Fact and Law: This case presents many common questions of law and fact that will predominate over questions affecting members of the Class only as individuals. The damages sustained by Plaintiffs and the Class's members flow from the common nucleus of operative facts surrounding Defendants' misconduct. The common questions include, but are not limited to:

a.  Whether Defendants' failure to provide the coverage required by the ACA violated Texas law as set forth herein;

b.  Whether Defendants breached their contracts with Plaintiffs and the Class by failing to provide the coverage promised and mandated through the conduct alleged herein;

c.  Whether Defendants or their agents pursued uniform policies and procedures in their Ambetter policy sales, customer service, and/or claims processing;

d.  Whether Defendants failed to comply with the terms of the Ambetter health insurance policies and thus breached their contract with their insureds;

e.  Whether Centene operated Superior Health as a shell or alter ego such that the law should disregard its separate corporate identities;

f.   Whether Centene operated Centene Texas as a shell or alter ego such that the law should disregard its separate corporate identities

g.  Whether Centene operated Celtic Insurance as a shell or alter ego such that the law should disregard its separate corporate identities; and

h.  Whether Plaintiffs and Class members are entitled to monetary damages or injunctive relief and/or other remedies and, if so, the nature of any such relief.

81.    Superiority:    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the members of the Class to individually seek redress from the wrongs done to them. Plaintiffs believe that members of the Class, to the extent they are aware of their rights against Defendants, would be unable to secure

counsel to litigate their claims individually because of the relatively limited nature of the individual damages, and thus, a class action is the only feasible means of recovery for these individuals. Even if members of the Class could afford such individual litigation, the court system could not efficiently handle all of these cases. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties and the court system, due to the complex legal and factual issues presented by this dispute. In contrast, the class action procedure presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

82.     In addition, or in the alternative, the Class may be certified because:

    a.   The prosecution of separate actions by individual members of the Class would create a risk of adjudications regarding them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and

    b.   Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final and injunctive relief regarding the Class. In addition, Plaintiffs has alleged, and intended to show, that any corporate formalities between the Defendants should be disregarded.

## COUNT I

## Breach of Contract

## (Against All Defendants)

83.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-82, as if fully set forth here verbatim.

84.     Plaintiffs and the members of the Class entered into valid and binding written contracts with Superior Health and Celtic Insurance for the purchase of Ambetter insurance policies.

85.     Defendants' policies state that, under the policy Plaintiffs and members of the Class have the "right to" (a) "A current list of Network Providers;" and (b) "Adequate access to qualified Physicians and Medical Practitioners and treatment or services regardless of. . . geographic location, health condition, national origin or religion."

86.     Defendants' policies further state that, "We and the Member shall comply with all applicable state and federal laws and regulations in performance of this Contract."

87.     For the reasons alleged above, Centene breached each of these provisions of the policies issued to Plaintiffs and members of the Class.

88.     Plaintiffs and members of the Class suffered damages as a direct and proximate result of Superior Health and Celtic Insurance's breach of contract.

89.     Every contract contains an implied covenant of good faith and fair dealing.

90.     Defendants' conduct, including failing to provide accurate information regarding their provider network, failing to provide a sufficient network of providers, and collecting premiums while failing to provide an adequate network of providers, denying out-of-network claims when failing to provide an adequate network of medical providers, and denying proper in-network claims,

violated Plaintiffs and members of the Class' rights to receive the benefits of their contracts with Superior Health and Celtic Insurance.

91.     As a result of the foregoing, Plaintiffs and members of the Class are entitled to:

a.   An order requiring Superior Health and Celtic Insurance to perform their contract as they agreed to do; and

b.   Benefit-of-the bargain compensatory damages to Plaintiffs and members of the Class in a sum equivalent to performance of the contract that places Plaintiffs and Class members in the positions they would occupy if the contracts had been fulfilled rather than breached.

c.   Compensatory Damages for Out-Of-Pocket Expenses: damages incurred because of having to pay for services that should have been covered by the Ambetter policy, for the expenses incurred in having to spend time searching for in-network providers and traveling inordinate distances to treat with in-network providers, and for the travel expenses incurred in having to travel inordinate distances to treat with in-network providers; and

d.   A declaration that Defendants violated state and federal law, including the ACA.


**COUNT TWO**

**(Breach of Express Warranty)**

**(Against All Defendants)**

92.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-91, as if fully set forth here verbatim.

93.     Defendants have each breached express warranties as follows:

(a)   The warranty that Clients could access all the services that the Affordable Care Act describes as Essential Benefits.

(b)   The warranty that Clients could access specific Health Care Providers listed on their website as in-network providers.

### Prayer for Relief

94.      WHEREFORE, Plaintiffs, individually and behalf of the members of the Class, pray for relief as follows:

A.  Enter an order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as the Class representative, and designating the undersigned as Class counsel;

B.  An order awarding damages to Plaintiffs and the members of the Class, as well as all other monetary relief to which Plaintiffs and the Class are entitled;

C.  An order awarding restitutionary disgorgement to Plaintiffs and the Class;

D.  An order awarding non-restitutionary disgorgement to Plaintiffs and the Class;

E.  A declaration that Defendants have violated state and federal laws and an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to the marketing, administration, and claims processing of the Ambetter health insurance plan;

F.  An order awarding attorneys' fees and costs; and

G.  Such other and further relief as may be just and equitable.

### JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

26

Dated: <u>May 05, 2020</u>

By: <u>/s/ Mikal C. Watts</u>
     Mikal C. Watts
     State Bar No. 20981820
     mcwatts@wattsguerra.com
     Francisco Guerra, IV.
     State Bar No. 00796684
     fguerra@wattsguerra.com
     Mark A. J. Fassold
     State Bar No. 24012609
     mfassold@wattsguerra.com
     Meredith D. Stratigopoulos
     State Bar No. 24110416
     mdrukker@wattsguerra.com
     WATTS GUERRA, LLP
     Four Dominion Drive
     Bldg. 3, Suite 100
     San Antonio, Texas 78257
     Telephone: (210) 447-0500
     Facsimile: (210) 447-0501

     Mark Ravis, *Pro hac vice to be filed*
     mravis99@gmail.com
     David Martin, *Pro hac vice to be filed*
     dhmartin99@post.harvard.edu
     MARK RAVIS & ASSOCIATES
     1875 Century Park East, Suite 700
     Los Angeles, California 90067
     Telephone: (310) 295-4145

     Andres C. Pereira
     Texas Bar No. 00794440
     apereira@andrespereirapc.com
     ANDRES PEREIRA LAW FIRM, P.C.
     14709 Custer Court
     Austin, Texas 78734
     Telephone: 512-920-2425
     Facsimile 512-309-5861

     Kurt B. Olsen, *Pro Hac Vice to be filed*
     ko@klafterolsen.com
     KLAFTER OLSEN & LESSER LLP
     1250 Connecticut Ave., N.W.

Suite 700
Washington, D.C. 20036
Telephone: (202) 261-3553

Seth Lesser, *Pro Hac Vice to be filed*
Fran L. Rudich, *Pro Hac Vice to be filed*
seth@klafterolsen.com
fran@klafterolsen.com
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10514
Telephone: (914) 934-9200

Beth Terrell *Pro Hac Vice to be filed*
Jennifer Murray *Pro Hac Vice to be filed*
Elizabeth Adams *Pro Hac Vice to be filed*
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603

*Counsel for Plaintiffs*