# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| ERIN ANGELO, NICHOLAS ANGELO, AND CYNTHIA WILSON, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:20-cv-00484-RP |
| v. | ) ) | |
| CENTENE MANAGEMENT COMPANY, LLC, CELTIC INSURANCE COMPANY, SUPERIOR HEALTHPLAN, INC., and CENTENE COMPANY OF TEXAS, L.P., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**EXPERT REPORT OF SIMON F. HAEDER, PhD, MPA**

September 30, 2022

HIGHLY CONFIDENTIAL

REDACTED

## Table of Contents

I.   Executive Summary ................................................................................. 1

II.  Qualifications, Assignment, and Conclusions ...................................... 2

General Academic and Professional Background................................2

Expertise Relevant to this Case.............................................................4

Assignment and Summary of Conclusions ...........................................7

Compensation...........................................................................................9

Other Expert Testimony During the Previous 4 Years .........................9

III. Background on Provider Networks...................................................... 9

Importance of Accurate Provider Networks .........................................9

Provider Directory Accuracy and Network Adequacy under the ACA
..................................................................................................13

IV.  Data and Analytical Methodology ...................................................... 16

Provider Directory Data Analysis .......................................................16

Data and Procedure...................................................................16

Provider Directory Data Analysis for 2016 .............................18

Provider Directory Data Analysis for 2017 .............................19

Provider Directory Data Analysis for 2018 .............................21

Provider Directory Data Analysis for 2019 .............................22

Provider Directory Data Analysis for 2020 .............................23

Provider Directory Data Analysis for 2021 .............................24

Claims Data Analysis.............................................................................26

Data and Procedure...................................................................26

Claims Data Analysis for 2016................................................27

Claims Data Analysis for 2017................................................28

Claims Data Analysis for 2018................................................29

Claims Data Analysis for 2019................................................31

Claims Data Analysis for 2020................................................32

Claims Data Analysis for 2021................................................33

Statewide Network Analysis................................................34

Data and Procedure................................................34

Statewide Provider Directory Network Analysis 2016 .............39

Statewide Provider Directory Network Analysis 2017 .............40

Statewide Provider Directory Network Analysis 2018 .............40

Statewide Provider Directory Network Analysis 2019 .............41

Statewide Provider Directory Network Analysis 2020 .............41

Statewide Provider Directory Network Analysis 2021 .............42

Rating Area-based Network Analysis................................................42

Texas ACA Rating Areas .............42

Data and Procedure................................................43

Rating Area-based Network Analysis 2016 .............48

Rating Area-based Network Analysis 2017 .............49

Rating Area-based Network Analysis 2018 .............50

Rating Area-based Network Analysis 2019 .............51

Rating Area-based Network Analysis 2020 .............53

Rating Area-based Network Analysis 2021 .............54

V.    Damages ............................................................................................. 56

Data and Methodology ........................................................................ 56

Estimates of Damages ........................................................................ 58

# I.    Executive Summary

I was retained by counsel for the Plaintiffs, Erin Angelo, Nicholas Angelo, and Cynthia Wilson ("Plaintiffs") on behalf of themselves and a class of similarly situated consumers, for my professional expertise related to the provider network for Ambetter policies from Centene Management Company, LLC, Celtic Insurance Company, Centene Company of Texas LP, and Superior HealthPlan, Inc. ("Centene").

Provider networks are the crucial intermediary step between having insurance coverage and accessing medical care. They are the most immediate way consumers gain knowledge of their network at the time of purchase as well when seeking medical care. Inaccurate provider directory information has substantial implications for the ability of consumers to access medical care and may lead to negative effects on their finances and health.

As an expert on provider networks with a large number of academic publications on provider networks and consumer access, I conducted a detailed monthly analysis of Centene's provider directory, claims, and enrollment data described in detail below. These analyses indicate that Texas consumers purchasing Ambetter policies from Centene on the ACA marketplace were promised access to list of providers that was presented to them in the form of a provider directory. Consumers selected their plans and paid the premiums purchasing access to a provider network of the size represented on Centene's website. My analyses of Centene's data related to their provider directory and actual network indicate that thousands of providers listed in the Centene provider directory are, indeed, not active participants in the network, and do not provide care to Centene's beneficiaries. In short, the benefits received by Centene's consumers are materially less than the benefits promised to them. These damages are present for each and every consumer who purchased

1

an ACA marketplace plan from Centene because Centene uses only a single provider directory and a single provider network to serve all its consumers.

To establish the amount of damages incurred, I applied the health economics literature's estimate of the economic relationship between the size of a provider network and consumer premiums. Based on the data available, I estimated the value lost, and thus the appropriate damages, to Centene's consumers at **$1,234,896,342**.

## II.    Qualifications, Assignment, and Conclusions

**General Academic and Professional Background**

I am an Associate Professor of Public Health in the Department of Health Policy & Management in the School of Public Health at Texas A&M University. I have a Ph.D. in Political Science with an emphasis on methodology and statistical methods and computation with a minor in Applied Economics as well as a master's degree in Public Administration. In addition to my duties as an Associate Professor of Public Health at Texas A&M, I am a faculty affiliate at the Center for Health Care and Policy Research at the Pennsylvania State University, which focuses on helping researchers develop services and programs to improve people's health by creating and disseminating new scientific knowledge that will help private and public decision-makers to develop cost effective services and programs that improve people's health.

Prior to my current academic appointment, I served an assistant professor of public policy in the School of Public Policy at The Pennsylvania State University (2019-2022), as well as an assistant professor in the John D. Rockefeller IV School of Policy and Politics at West Virginia University (2016-2019).

2

I am a graduate of the Interdisciplinary Research Leaders Program, a national fellowship program focused on leadership development supported by the Robert Wood Johnson Foundation to equip teams of researchers and community partners in applying research to solve real community problems. I was also part of the inaugural cohort of the American Enterprise Institute's Emerging Poverty Scholars program focused on ameliorating material poverty while identifying and driving the public policy innovations needed to increase economic and social prosperity for still-struggling individuals, families, and communities.

Prior to my academic career, I worked for more than two years as a project manager at Fresno Healthy Communities Access Partners (2008-2010) where my focus was on systemic health policy change, the implementation of telemedicine projects, farm worker health care, and access to care. I also served as a Certified Application Assistor. Certified Application Assistors provide in-person counseling and assistance to consumers who need help applying for insurance programs like Covered California and Medi-Cal. I was also part of the team that managed One-e-App for Fresno County. One-e-App is a Web-based system that lets families and individuals apply for multiple health, social service and other support programs from one location. One-e-App is used by consumers themselves or by staff who assist families and individuals at community clinics, hospitals, state and county agencies, food banks and other locations. The system allows individuals to apply for a range of programs such as Medicaid, CHIP, Food Stamps (SNAP), Earned Income Tax Credit, Child Tax Credit, utility assistance, local health insurance expansion programs and more.

I also worked for Central California Legal Services and their Health Consumer Center (2008). Central California Legal Services is a private, not-for-profit, public interest law firm established for the purpose of providing free civil legal assistance to low-income individuals, families,

3

organizations and communities. Their Health Consumer Center helps people get health care by contacting insurance companies, and doctors, hospitals, and other health care providers, to make sure they give patients essential treatment as the law requires. The Health Consumer Center assists people who are sued for medical debt, working with the debt collectors or going to court as needed and helps with Medi-Cal (including Medi-Cal Estate Recovery), Medicare, and Covered California issues.

**Expertise Relevant to this Case**

The bulk of my research focuses on issues surrounding health care access and disparities therein. I explore these issues by focusing on health access for vulnerable populations, the impact of provider networks on health access, and school-based health access. In addition, I also work on issues related to regulatory policymaking and rulemaking with increasing connections to my work on healthcare issues.

Overall, I have authored more than 50 publications in academic journals across numerous fields, including the Health Affairs, the Journal of the American Medical Association, the Journal of Adolescent Health, American Political Science Review, the Journal of Public Administration Research and Theory, Public Administration Review, and the Journal of Health Politics, Policy and Law.

The major strand of my research has focused on provider networks, which serve as the pathway between insurance coverage and health access. This work has focused on diverse markets, medical specialties, and geographies. Here, my work has pioneered the integration of geospatial and provider quality information. Several of my articles have focused on the particular challenges in network design and access for rural populations. I have also utilized my expertise in regulatory

4

policymaking to study the effectiveness of current regulatory approaches and measurement. The body of my work has repeatedly highlighted regulatory shortcomings and implications for access. Novel data sets will allow unprecedented analyses of network adequacy regulations, consumer responses to inadequate networks, and grievance mechanisms. I am also at the forefront of assessing how problems with provider networks affect consumers' financial and physical well-being. A recently published paper in the journal Health Economics, Policy and Law showed how Americans' knowledge of and experience with surprise medical bills, a side effect of provider network issues, shape support for federal policy action. I am also working on several large grant-funded projects on this issue.

I have established expertise in provider networks and have published extensively on this topic. Overall, I have published 19 peer- and editor-reviewed articles on provider networks:

a. Haeder, Simon F., Burman, Abigail, and Wendy Y. Xu. 2023. "Provider Directory Inaccuracy and Timely Access for Mental Health Care" American Journal of Managed Care XX(X): XXX-XXX.

b. Burman, Abigail and Simon F. Haeder. 2022. "Directory Accuracy and Timely Access to in Mammograms in California." Women & Health 62(5): 421-429.

c. Burman, Abigail and Simon F. Haeder. 2022. "Directory Accuracy and Timely Access to in Maryland's Medicaid Managed Care Program." Journal of Health Care for the Poor and Underserved 33(2): 597-611.

d. Haeder, Simon F. and Abigail Burman. 2022. "Potemkin Protections: Assessing Provider Directory Accuracy and Timely Access for Four Specialties in California." Journal of Health Politics, Policy and Law 47(3): 319-349.

e. Haeder, Simon F. & Abigail Burman. 2021. "Without a Dedicated Enforcement Mechanism, New Federal Protections are Unlikely to Improve Provider Directory Accuracy." Health Affairs Blog, November 5.

f.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2021. "Mixed Signals: The Inadequacy of Provider-per-Enrollee Ratios for Assessing Network Adequacy in California (and Elsewhere)." World Medical & Health Policy 13(3): 414-435.

g.  Haeder, Simon F. 2020. "Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Epidemic." World Medical & Health Policy 12(3): 282-290.

h.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2020. "Going the Extra Mile? How Provider Network Design Increases Consumer Travel Distance, Particularly for Rural Consumers." Journal of Health Politics, Policy and Law 45(6): 1107-1136.

i.  Haeder, Simon F. 2020. "Quality Advantage? Provider Quality and Networks in Medicare Advantage." Journal of Public and Nonprofit Affairs 6(2): 138-158.

j.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2020. "Integrating Travel Distance into Assessments of Provider Networks Using a Dyadic Approach: The Case of California's Affordable Care Act Marketplace." SAGE Research Methods Cases: Medicine and Health.

k.  Haeder, Simon F. 2019. "Proceed With Caution: Medicare Advantage and Access to High-Quality Specialists." SAGE Journals Blog. November 8.

l.  Haeder, Simon F., David L. Weimer & Dana B. Mukamel. 2019. "Surprise Billing: No Surprise In View Of Network Complexity." Health Affairs Blog. June 5.

m.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2019. "A Consumer-Centric Approach to Network Adequacy: Access to Four Specialties in California's Marketplace." Health Affairs 31(11): 1918-1926.

n.  Haeder, Simon F. 2019. "A Tale of Two Programs: Access to High Quality Providers for Medicare Advantage and Affordable Care Act Beneficiaries in New York State." World Medical & Health Policy 11(3): 212-230.

o.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2019. "A Knotty Problem: Consumer Access and the Regulation of Provider Networks." Journal of Health Politics, Policy and Law 44(6): 937-954.

p.  Haeder, Simon F. 2019 "Quality Regulation? Access to High Quality Specialists for Medicare Advantage Beneficiaries in California." Health Services Research & Managerial Epidemiology (6).

q.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2016. "California Secret Shoppers Find Access To Physicians And Network Accuracy Are Lacking For Those In Marketplace And Commercial Plans ." Health Affairs 35(7):1160-1166.

r.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2015. "Network Adequacy Standards and Health Insurance." JAMA: The Journal of the American Medical Association 314(22):2414-2415.

s.  Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2015. "California Marketplace Hospital Networks Are Narrower Than Commercial Plans, But Access And Quality Are Comparable." Health Affairs 34(5): 741–748.

My work has been further recognized by the support of multiple grants on provider networks from the nation's premier health care funder, the Robert Wood Johnson Foundation.

A full copy of my CV is attached as Appendix A.

## Assignment and Summary of Conclusions

First, I was asked by counsel for the Plaintiffs to illustrate the role provider networks play for consumers making choices about insurance plans as well as accessing health care. Second, I was also asked to assess which percentage of providers listed in Centene's provider network directory are actually in-network. Third, I was asked to assess the reduction in value to consumers due to misrepresentations of provider networks to consumers.

Based on my review of the evidence available to me, my expertise on the Affordable Care Act, insurance regulation, provider networks, and consumer access, I conclude as follows:

7

1. The Centene provider network lists for its Ambetter policy published on the ACA Marketplace in Texas are the same ones used by all policyholders in the State of Texas. That is, there is only one network list provided to all Ambetter Policyholders no matter where they live.

2. On a monthly basis, the Centene provider network directory published for Ambetter Policyholders contains on average 49% practitioners who are not active network participants. The monthly averages range from 39% and 68%. That is, a large number of providers listed in Centene's provider directory are not actively providing medical care to consumers.

3. A portion of every Ambetter policyholders' premium represents payment for availability of the providers published as the Ambetter provider network. To the extent that published list is inaccurate, each policyholder has been overcharged for their premium.

4. The health economics literature has established a relationship between network size and overall premium. That is, the value of the benefit is proportional to the premium and it has been determined that every 1% change in network size is associate with a 0.29% change in policy premium.

5. The foregoing network inaccuracies translate to a gross premium overcharge paid by Class members calculated to be **$1,234,896,342**. This compares to an estimated amount of premiums collected of $8,686,590,241. On a year-to-year basis the overcharges are as follows:

   a. March to December 2016: $ 24,710,113

   b. January to December 2017: $ 119,164,188

   c. January to December 2018: $ 171,186,153

   d. January to December 2019: $ 256,424,408

   e. January to December 2020: $ 311,526,512

   f. January to December 2021: $ 351,884,968

My work on this matter is ongoing. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to Defendants' expert(s) and any additional information I may receive.

**Compensation**

I am being paid $300 per hour for my services in this case. My compensation is not dependent on the outcome of this matter.

**Other Expert Testimony During the Previous 4 Years**

None.

## III.    Background on Provider Networks

**Importance of Accurate Provider Networks**

Provider networks are the crucial intermediary step between having insurance coverage and accessing medical care. They are the most immediate way consumers gain knowledge of their network. At a minimum, accuracy entails knowing what providers are in the network, their specializations, their phone numbers, and their locations.[1] Because of this crucial role, directory

---

[1] Haeder, S. F., et al. (2019). "A Knotty Problem: Consumer Access and the Regulation of Provider Networks." Journal of Health Politics, Policy and Law 44(6): 937-954.

9

inaccuracies, also known as "ghost networks[2]" or "phantom networks,[3]" are more than a mere inconvenience for consumers, with the potential to cause significant consequences for consumers' wellbeing and finances.

From a consumer perspective, there are two primary roles that provider directories play. First, consumers can then use their understanding of the network, as shaped by these directories, to inform their health choices, beginning with the selection of their insurance plan.[4] For some beneficiaries the directory is their sole tool for choosing a plan.[5]. Inaccuracies in how networks are represented to consumers may have detrimental effects on consumer access because consumers may select plans during open enrollment that do not meet their medical needs, for example, because their current provider is not in the network or because providers for their medical conditions may work further away from their home than they are willing or able to travel.

Equally important, once enrolled in a plan, consumers rely on their provider directories to search out medical providers and to obtain in-network care. Thus, provider networks, as experienced through provider directories, play a critical role in ensuring that health plan consumers can actually enjoy the benefits of their coverage.[6]

---

[2] Busch, S. H., & Kyanko, K. A. (2020). Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills: An examination of the role inaccurate provider directories play in out-of-network mental health treatment and surprise bills. Health Affairs, 39(6), 975-983.

[3] Holstein, R., & Paul, D. P. I. (2012). 'Phantom Networks' of Managed Behavioral Health Providers: An Empirical Study of Their Existence and Effect on Patients in Two New Jersey Counties. Hospital Topics, 90(3), 65-73.

[4] Drake, C. (2019). What Are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence From Covered California. Journal of Health Economics, 65, 63-77.

[5] Department of Health Care Services. (2019). Millions of Children in Medi-Cal Are Not Receiving Preventive Health Services. Department of Health Care Services.

[6] Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019b). A Knotty Problem: Consumer Access and the Regulation of Provider Networks. Journal of Health Politics, Policy and Law, 44(6), 937-954. https://doi.org/10.1215/03616878-7785835

Given the vital role that provider directories and provider networks play in connecting consumers to care, inaccurate provider directories harm both the health and financial wellbeing of consumers. Inaccuracies may impose administrative burdens on consumers that may lead to delayed or forgone care.[7] Most obviously, there is the time-intensive, administrative burden of combing through faulty directory entries and calling offices to find in-network doctors.[8]

For one, they may force consumers to either delay needed health care or forgo it entirely, unable to overcome the often cumulative limitations imposed by incorrect phone numbers and addresses as well as the listing of providers who are not actually in network, not currently seeing patients, or not accepting new patients.[9,10,11,12] At the very least, inaccuracies impose additional costs that may often exceed actual out-of-pocket costs.[13]

[7] Herd, P., & Moynihan, D. (2020). Administrative Burdens in Health Policy. Journal of Health & Human Services Administration, 43(1).

[8] Ray, K. N., Chari, A. V., Engberg, J., Bertolet, M., & Mehrotra, A. (2015). Opportunity Costs of Ambulatory Medical Care in the United States. American Journal of Managed Care, 21(8), 567-574.

[9] Kim, J., Norton, E. C., & Stearns, S. C. (2009). Transportation Brokerage Services and Medicaid Beneficiaries' Access to Care. Health Services Research, 44(1), 145-161.

[10] Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019b). A Knotty Problem: Consumer Access and the Regulation of Provider Networks. Journal of Health Politics, Policy and Law, 44(6), 937-954. https://doi.org/10.1215/03616878-7785835

[11] Kim, J., Norton, E. C., & Stearns, S. C. (2009). Transportation Brokerage Services and Medicaid Beneficiaries' Access to Care. Health Services Research, 44(1), 145-161.

[12] Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2020a). Going the Extra Mile? How Provider Network Design Increases Consumer Travel Distance, Particularly for Rural Consumers. Journal of Health Politics, Policy and Law, 45(6), 1107-1136. https://doi.org/10.1215/03616878-8641591

[13] Ray, K. N., Chari, A. V., Engberg, J., Bertolet, M., & Mehrotra, A. (2015). Opportunity Costs of Ambulatory Medical Care in the United States. American Journal of Managed Care, 21(8), 567-574.

11

For consumers who do manage to seek care despite these shortcomings, inaccuracies may impose significant and often unexpected additional financial costs by forcing consumers, unknowingly, to seek care from out-of-network providers, thus contributing to surprise billing issues.[14,15]

Consumers may also face instances of "coerced billing," when consumers knowingly receive out-of-network care because, despite their best efforts, they cannot find appointments at an in-network provider or because they reside in an artificial provider desert created by the carrier's insufficient network.[16,17,18]

Importantly, directory inaccuracies may affect consumers in a highly inequitable fashion due to language, transportation, or other resource limitations.[19,20]

From a consumer perspective, then, even the best benefit designs, low premiums, low co-pays, and low coinsurance are useless to consumers if they cannot find an in-network provider or if none of the in-network providers are taking appointments.

---

[14] Busch, S. H., & Kyanko, K. A. (2020). Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills: An examination of the role inaccurate provider directories play in out-of-network mental health treatment and surprise bills. Health Affairs, 39(6), 975-983.

[15] Syed, S. T., Gerber, B. S., & Sharp, L. K. (2013). Traveling Towards Disease: Transportation Barriers to HealthCare Access. Journal of Community Health, 38, 976-993.

[16] Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019a). A Consumer-Centric Approach to Network Adequacy: Access to Four Specialties in California's Marketplace. Health Affairs, 38(11), 1918-1926. https://doi.org/10.1377/hlthaff.2019.00116

[17] Burman, A. (2021). Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories. Yale Law & Policy Review, 40(1), 78-148.

[18] Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019c, June 5). Surprise Billing: No Surprise In View Of Network Complexity. Health Affairs Blog

[19] Blumenberg, E., & Agrawal, A. W. (2014). Getting Around When You're Just Getting By: Transportation Survival Strategies of the Poor. Journal of Poverty, 18, 355-378.

[20] Brown, E. J., Polsky, D., Barbu, C. M., Seymour, J. W., & Grande, D. (2016). Racial Disparities In Geographic Access To Primary Care In Philadelphia. Health Affairs, 35(8), 1374-1381.

**Provider Directory Accuracy and Network Adequacy under the ACA**

In the United States, the regulation of commercial health insurance has traditionally been the domain of the states.[21] However, the Affordable Care Act (ACA) significantly changes the American healthcare system in numerous ways and it directly affects the operation of state insurance markets through its various provisions.[22] One of the most visible areas of this most recent federal initiative is the requirement that health plans sold in insurance marketplaces must fulfill a number of requirements to ensure that consumers gain access to adequate protections when purchasing insurance.

The establishment of the ACA marketplaces and their intention to provide consumers with an informed shopping experience goes hand in hand with additional provisions of the ACA.

With regards to provider directory accuracy, the federal government specifically required the following under 45 CFR 156.230 (b):

*(2)(b)Access to provider directory.*

(1) A [Qualified Health Plan ] QHP[23] issuer must make its provider directory for a QHP available to the Exchange for publication online in accordance with guidance from HHS and

---

[21] Klein, R. W. (2009). The Insurance Industry and Its Regulation: An Overview. In M. F. Grace & R. W. Klein (Eds.), The Future of Insurance Regulation in the United States (pp. 13-51). Brookings Institutions Press.

[22] Haeder, S. F. (2012). Beyond Path Dependence: Explaining Healthcare Reform and Its Consequences. Policy Studies Journal, 40(S1), 65-86. https://doi.org/10.1111/j.1541-0072.2012.00446.x

[23] The Centers for Medicare and Medicaid Services defines a QHP as follows: "The Qualified Health Plan (QHP) Application is available to issuers applying for certification to participate in the Federally-facilitated Marketplaces (FFMs). Health plans, including dental, must meet a number of standards in order to be certified as QHPs. As defined in the Affordable Care Act (ACA), a QHP is an insurance plan that is certified by the Health Insurance Marketplace, provides essential health benefits (EHBs), follows established limits on cost sharing, and meets other requirements outlined within the application process."

13

to potential enrollees in hard copy upon request. In the provider directory, a QHP issuer must identify providers that are not accepting new patients.

(2) For plan years beginning on or after January 1, 2016, a QHP issuer must publish an up-to-date, accurate, and complete provider directory, including information on which providers are accepting new patients, the provider's location, contact information, specialty, medical group, and any institutional affiliations, in a manner that is easily accessible to plan enrollees, prospective enrollees, the State, the Exchange, HHS and OPM. A provider directory is easily accessible when

   (i) The general public is able to view all of the current providers for a plan in the provider directory on the issuer's public Web site through a clearly identifiable link or tab and without creating or accessing an account or entering a policy number; and

   (ii) If a health plan issuer maintains multiple provider networks, the general public is able to easily discern which providers participate in which plans and which provider networks.

The federal government further highlights the need to be transparent with consumers in general:

   (b)(2)(i)The general public is able to view all of the current providers for a plan in the provider directory on the issuer's public Web site through a clearly identifiable link or tab and without creating or accessing an account or entering a policy number; and

   (b)(2)(ii) If a health plan issuer maintains multiple provider networks, the general public is able to easily discern which providers participate in which plans and which provider networks;

And when it comes to provider transitions under 45 CFR 156.230(d)

   *(2)(d)Provider transitions.* A QHP issuer in a Federally-facilitated Exchange must -

14

(1) Make a good faith effort to provide written notice of discontinuation of a provider 30 days prior to the effective date of the change or otherwise as soon as practicable, to enrollees who are patients seen on a regular basis by the provider or who receive primary care from the provider whose contract is being discontinued, irrespective of whether the contract is being discontinued due to a termination for cause or without cause, or due to a non-renewal;

(2) In cases where a provider is terminated without cause, allow an enrollee in an active course of treatment to continue treatment until the treatment is complete or for 90 days, whichever is shorter, at in-network cost-sharing rates.

(i) For the purposes of paragraph (d)(2) of this section, active course of treatment means:

(A) An ongoing course of treatment for a life-threatening condition, defined as a disease or condition for which likelihood of death is probable unless the course of the disease or condition is interrupted;

(B) An ongoing course of treatment for a serious acute condition, defined as a disease or condition requiring complex ongoing care which the covered person is currently receiving, such as chemotherapy, radiation therapy, or post-operative visits;

(C) The second or third trimester of pregnancy, through the postpartum period; or

(D) An ongoing course of treatment for a health condition for which a treating physician or health care provider attests that discontinuing care by that physician or health care provider would worsen the condition or interfere with anticipated outcomes.

(ii) Any QHP issuer decision made for a request for continuity of care under paragraph (d)(2) of this section must be subject to the health benefit plan's internal and external grievance and appeal processes in accordance with applicable State or Federal law or regulations.

## IV.   Data and Analytical Methodology

**Provider Directory Data Analysis**

**Data and Procedure**

I was provided with all provider directory data produced by Centene in this litigation. The data were inconsistent in terms of important aspects like variables, variable names, and formatting and contained numerous errors. The data for provider directories was provided through a number of files in xlsx or csv format on a month-by-month basis from March 2016 through December 2021. Variables contained in the data, amongst other items, contained first and last name of the practitioner as well as their NPI. For some practitioners, the geo-location in latitude and longitude was also included. I note that the longitude information was consistently signed wrongly, that is, coordinates were signed a "+" when they should be signed "-" for locations in North America. Where geo-location information was not provided, I used the provider Batch Geocoder CSV2GEO operated by the Scale Campaign to obtain the longitude and latitude for practitioner addresses. This product is used by companies like Amazon, Google, and UPS as well as by researchers for geocoding purposes. I then used ArcGIS Pro 2.9.3 to locate the providers on a map. ArcGIS Pro is a" powerful single desktop GIS application [… that] supports data visualization; advanced analysis; and authoritative data maintenance in 2D, 3D, and 4D" to draw the locations on a map of the United States.

Data cleaning and analysis were conducted using Stata/MP 17.0 for Mac (Apple Silicon, Revision 28 Jul 2022).[24]

---

[24] Data "cleaning" involved such tasks as relabeling variables or reformatting variables from numeric to string variables to ensure consistency across the various files provided by Centene. These are standard procedures to allow subsequent analyses of the data. Stata was then used to provide the estimates presented below.

In order to establish the unique number of practitioners in the provider directories Centene presents to its consumers I relied on the variable labeled Practitioner NPI or various different iterations of it such as Prac NPI or prac npi by Centene. NPIs, or National Provider Identifier, are operated by the U.S. Centers for Medicare and Medicaid Services (CMS), and uniquely identify providers of healthcare services in the United States.

Per the Centers for Medicare and Medicaid Services (CMS),

> The NPI is a unique identification number for covered health care providers. Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under Health Insurance Portability and Accountability Act of 1996. The NPI is a 10-position, intelligence-free numeric identifier (10-digit number). This means that the numbers do not carry other information about healthcare providers, such as the state in which they live or their medical specialty. The NPI must be used in lieu of legacy provider identifiers in the HIPAA standards transactions.

NPI information is stored in the NPPES, the National Plan and Provider Enumeration System. I note that for a very small subset of cases,[25] the Practitioner NPI was missing. I removed those providers from the analysis.

As mentioned above, I relied on the Practitioner NPI to establish Centene's provider directories on a monthly basis from March 2016 through December 2021. Specifically, I

1. Established a count of practitioners listed overall for each month

2. Established a count of unique practitioners for each month

3. Establish a count of the unique practitioner/location combinations for each month.

---

[25] While the exact number varied per month, the count was generally between 5 and 10 providers who either completely lacked a valid NPI or the NPI was listed as "0000000000."

17

Item 1 is straightforward. I converted the respective csv or xlsx file into Stata files for analysis and simply counted the individual listings.

To establish Item 2, the unique practitioners, I eliminated any duplications of a Practitioner's NPI using the State command "distinct." The distinct command displays the number of distinct observations with respect to a variable; here the variable is Practitioner NPI

To establish Item 3, I created a new variable that combines Practitioner NPI as well as the first line of the Practitioner's address (generally labeled ADDR1). This variable identified all unique locations where a specific practitioner is supposed to be practicing. This information establishes which practitioners' offices are located in which of Texas' 26 rating area. This information will be applied to various analyses below.

Lastly, I also combined monthly directories into a yearly file. I then established Items 2 and 3 referenced above for the entire year. That is, I eliminated any duplications of a Practitioner's NPI to find the total number of unique Practitioner NPIs for a given year and I identified all unique locations where a specific practitioner is supposed to be practicing for a given year.

**Provider Directory Data Analysis for 2016**

The data for 2016 are listed below. Data were available from March 2016 through December 2016. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."

18



**Provider Directory Data Analysis for 2017**

The data for 2017 are listed below. Data were available from January 2017 through December 2017. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data

provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."

Table 2: Analysis of Provider Directory Data for 2017



**Provider Directory Data Analysis for 2018**

The data for 2018 are listed below. Data were available from January 2018 through December 2018. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."

Table 3: Analysis of Provider Directory Data for 2018



████████████████████████████

██████████████████████

**Provider Directory Data Analysis for 2019**

The data for 2019 are listed below. Data were available from January 2019 through December 2019. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."





**Provider Directory Data Analysis for 2020**

The data for 2020 are listed below. Data were available from January 2020 through December 2020. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."



[REDACTED]

**Provider Directory Data Analysis for 2021**

The data for 2021 are listed below. Data were available from January 2021 through December 2021. The column "Year & Month" identifies the year and month for the specific analysis. The variable "Provider Directory Listings" presents the number of providers included in the data provided by Centene (including potential duplicates). The column "Unique NPI/Address" presents the data at the Practitioner NPI/Location level whereas "Unique NPI" presents the data at the Practitioner NPI level with all duplicates removed. Within each of these categories, I present both the count as well as the percentage compared to "Provider Directory Listings."

24

Table 6: Analysis of Provider Directory Data for 2021



**Claims Data Analysis**

**Data and Procedure**

I was provided with access to all cumulative claims data produced by Centene in this litigation. This means that I was provided with a monthly list of practitioners who had filed one or more claims for services rendered to Centene beneficiaries. The data were provided in one large xlsx file. The file contained information on practitioner claims from January 2015 through December 2021. Information provided included, amongst other items, the practitioner's NPI, the name of the service provider (i.e. the practitioner), the number of paid and unpaid claims, and the network status (either "contracted" or "NON-contracted").

Data cleaning and analysis for the claims data were conducted using Stata/MP 17.0 for Mac (Apple Silicon, Revision 28 Jul 2022).[26]

In order to establish which practitioners saw patients insured by Centene I relied on the variable labeled NPI representing the service provider. As mentioned above, NPIs, or National Provider Identifier, are operated by the U.S. Centers for Medicare and Medicaid Services (CMS), and uniquely identify provider of healthcare services in the United States.

I proceeded as follows:

1. I identified the unique practitioners filing claims for a given month. I eliminated any duplications of a Practitioner's NPI using the State command "distinct." The command identifies the number of unique observations. This number presents the number of unique practitioners providing services in a given month for Centene's insured population

---

[26] As described above, data "cleaning" involved such tasks as relabeling variables or reformatting variables from numeric to string variables to ensure consistency across the various files provided by Centene. Stata was then used to provide the estimates presented below.

2. Because there were a number of duplicates, I combined the respective paid services counts as well as the denied services counts for each unique practitioner. This provides the total number of services for each unique practitioner.

3. I used the variable "Network_Status" to determine which providers Centene deemed in-network ("contracted") or out-of-network ("NON-contracted").

4. For a given month, a number of practitioners contained duplicate entries with different entries for "Network_Status." That is, some practitioners were considered "contracted" for some claims and "NON-contracted" for other claims. These changes appear to indicate a change in contracting status during the respective month. In order to provide conservative estimates, I deemed every practitioner who was deemed "contracted" at least once in a given month as contracted for the entire month

The results for the years 2016 through 2021 are provided below.

**Claims Data Analysis for 2016**

The data for 2016 are listed below. While data were available from January 2016 through December 2016, I only present the data from March 2016 through December 2016 to match the data available for provider directories described above. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."

27

Table 7: Analysis of Provider Claims Data for 2016



## Claims Data Analysis for 2017

The data for 2017 are listed below. Data were available from January 2017 through December 2017. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-

Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."

Table 8: Analysis of Provider Claims Data for 2017



**Claims Data Analysis for 2018**

The data for 2018 are listed below. Data were available from January 2018 through December 2018. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI

included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."



30

**Claims Data Analysis for 2019**

The data for 2019 are listed below. Data were available from January 2019 through December 2019. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."

Table 9: Analysis of Provider Claims Data for 2019



**Claims Data Analysis for 2020**

The data for 2020 are listed below. Data were available from January 2020 through December 2020. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."

Table 10: Analysis of Provider Claims Data for 2020





**Claims Data Analysis for 2021**

The data for 2021 are listed below. Data were available from January 2021 through December 2021. The column "Year & Month" identifies the year and month for the specific analysis. The column "Total NPI Claims" presents the number of unique providers as identified by their NPI included in the data provided by Centene. The column "Contracted NPI Claims" contains the number of unique practitioners as identified by their NPI who were deemed as "contracted" by Centene at least once for a given month. I provide both a count of the practitioners as well as a percentage of the total number of practitioners who have filed a claim. Lastly, the column "Non-Contracted NPI Claims" contains the number of practitioners as identified by their NPI who were consistently determined by Centene to be "NON-contracted."

Table 11: Analysis of Provider Claims Data for 2021



**Statewide Network Analysis**

**Data and Procedure**

In order to assess provider network accuracy, secret shopper surveys are the commonly used approach. This means that callers go through a provider directory and randomly call some of the listed providers whether they actually are listed correctly. However, this approach is only possible

34

when current insurance plans and provider directories are evaluated. A secret shopper approach is thus not plausible for the period in question, 2016 through 2021.

The health services literature provides a solution to the issue of assessing past insurance plans and provider directories. The approach used to assess the accuracy of past provider directories relies on establishing provider networks based on the claims filed by practitioners for a specific health plan and then comparing these data to the provider directory presented to consumers .[27] The articles in question consider a provider to be in-network if "they were associated with any medical claims filed for at least five unique beneficiaries enrolled in that CCO during the study period," with the study period being a specific year. As the authors' note, "this threshold was chosen for its clinical relevance and tested for robustness using alternative thresholds of one and ten." Any providers that do not meet this threshold are considered "phantom providers." As the authors put it, these networks are made up of providers who "do not see patients in a given plan […] In essence, such networks may satisfy network adequacy requirements in paper but not in practice." In short then, the literature on provider networks considers a provider to be in-network if they file claims for at least five beneficiaries in a given plan year.

I applied a conservative version of this approach to the data provided by Centene. Above, I have described both the provider directory data as well as the claims data presented by Centene. In order to assess the accuracy of the provider directories presented by Centene to its consumers I first set up the claims data described above as follows.

---

[27] Zhu, J. M., Charlesworth, C. J., Polsky, D., Levy, A., Dobscha, S. K., & McConnell, K. J. (2022). Characteristics of Specialty Mental Health Provider Networks in Oregon Medicaid. Psychiatric Services, appi. ps. 202100623.

Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access In Oregon Medicaid: Study examines phantom networks of mental health care providers in Oregon Medicaid. Health Affairs, 41(7), 1013-1022.

First, I use Centene's claim data to determine which providers were in Centene's network.

1. On a month-to-month basis, I first established a list of practitioners from the Centene claims data who were deemed "contracted or "NON-contracted." That is, Centene determined that these providers were either part their existing network or not in a given month and listed this information in their data. As described above, I take a conservative approach here and designate any provider who has at least one entry in the claims data designated as "contracted" as in-network for the entire month. I note that being listed in the claims data provided by Centene means that the respective practitioner, whether in- or out-of-network, filed at least one claim with Centene for a given month.

2. For a given year, I combined these monthly data sets just described. These combined data presented all practitioners who have filed at least one claim with Centene for services rendered to Centene's insured population in a given year.

3. I then designate any practitioner who is listed as "contracted" at least once during the entire year as in-network for the entire year. That is, the provider could be in network for merely a single month in a given year, but I still consider the practitioner in-network for the entire year. This, again, is a conservative approach that underestimates the degree of inaccuracy for a given month. This provides me with two sets of information

    a. Providers designated "contracted" by Centene for the year

    b. Providers designated "NON-contracted" by Centene for the year

4. Providers not included in these data have not filed a single claim with Centene for Centene's insured population for the entire given year. Based on the literature, this means that these providers, i.e. those who did not file a single claim in a given year, are not active members of Centene's network because they do not provide "realized access" to consumers ..[28] I note here that this is a conservative

---

[28] Zhu, J. M., Charlesworth, C. J., Polsky, D., Levy, A., Dobscha, S. K., & McConnell, K. J. (2022). Characteristics of Specialty Mental Health Provider Networks in Oregon Medicaid. Psychiatric Services, appi. ps. 202100623.

Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access In Oregon Medicaid:

application of the literature which require that a provider, in order to be considered in-network, must file claims for at least five unique beneficiaries.

In order to ascertain the number of providers listed in Centene's directory who are not part of Centene's actual network I then proceeded as follows:

1. I used the practitioner directory data for a given month and merged the data with the list of practitioners designated as "contracted" by Centene. These practitioners are considered as *accurately listed*. As a reminder, this is a conservative approach because I consider a practitioner to be "contracted" for the entire year even if they were, in fact, only contracted for part of a single month.

2. I then took the remaining provider directory listings for a given month and merged in the list of practitioners designated as "NON-contracted" by Centene. These practitioners are considered to be *inaccurately listed*.

3. I then took the remaining provider directory listings for a given month (those not determined to be "contracted" or "NON-contracted") and merged in the list of practitioners who filed at least a single claim in a given year. These practitioners are considered to be *accurately listed*.

4. All remaining practitioners, that is those who were not designated by Centene as "contracted" at least once in a given year and those who have not filed a single claim in a given year, are considered *inaccurately listed*.

5. I combined the number of practitioners from Items 2 and 4 to establish the total number of inaccurately listed practitioners for a given month

Study examines phantom networks of mental health care providers in Oregon Medicaid. Health Affairs, 41(7), 1013-1022.

Data cleaning and analysis for the claims data were conducted using Stata/MP 17.0 for Mac (Apple Silicon, Revision 28 Jul 2022).[29]

In each of the tables below, the column "Year & Month" identifies the year and month for the specific analysis. The column "Unique Practitioners" is number of practitioners uniquely identified via their NPI from the provider directory for a given month. The column "Contracted" is number of unique practitioners listed in the provider directory and identified as "Contracted" based on claims filed. The column "NON-contracted" is the number of unique practitioners listed in the provider directory and identified as "NON-contracted" based on claims filed for that specific month. The column "NON-contracted Year" is the number of unique practitioners listed in the provider directory and identified as "NON-contracted" based on claims filed for the entire year. I again note that providers are designated as "contracted" if there is a single instance of Centene designating them as such across the claims filed for the entire year. The column "No Claims" is the number of unique practitioners who did not file a single claim in a given month but were listed in the provider directory for that specific month. The column "No Claims Year" is the number of unique practitioners who did not file a single claim in a given year but were listed in the provider directory for that specific month. The column "NON-Contracted Year + No Claims Year" combines the columns "NON-contracted Year" and "No Claims Year." Lastly, the column "Percentage of Providers Listed but not Active Part of Network" is percentage of practitioners who fell into the "NON-Contracted Year + No Claims Year" as compared to the "Unique Practitioners" category.

---

[29] As described above, data "cleaning" involved such tasks as relabeling variables or reformatting variables from numeric to string variables to ensure consistency across the various files provided by Centene. Stata was then used to provide the estimates presented below.

38

Data presented are for the entire year, on a monthly basis, with the exception of 2016. Data were only available from March 2016 through December 2016 because provider directory data were not available for January and February 2016.

Overall, the Centene provider network directory published for Ambetter Policyholders contains on average 49% practitioners who are not active network participants. The monthly average ranges from 39% and 68%. Thus, as a whole, Centene provider directory is highly inaccurate throughout the entire period of analysis.

**Statewide Provider Directory Network Analysis 2016**

Table 12: Analysis of the Accuracy Provider Listing 2016



**Statewide Provider Directory Network Analysis 2017**

Table 13: Analysis of the Accuracy Provider Listing 2017



## Statewide Provider Directory Network Analysis 2018

Table 14: Analysis of the Accuracy Provider Listing 2018



**Statewide Provider Directory Network Analysis 2019**

Table 15: Analysis of the Accuracy Provider Listing 2019



**Statewide Provider Directory Network Analysis 2020**

Table 16: Analysis of the Accuracy Provider Listing 2020



41

**Statewide Provider Directory Network Analysis 2021**

Table 17: Analysis of the Accuracy Provider Listing 2021



**Rating Area-based Network Analysis**

**Texas ACA Rating Areas**

Centene and all other insurers do not have to sell their ACA insurance products all across Texas. Instead, they can choose to market their products in only some of the 26 so-called rating areas of the state. Premiums are community-rated as required by the ACA. This means that for a given product in a given rating area insurance premiums only vary by age and smoking status. Texas rating areas are displayed in Figure 1 for reference. Please note that the vast majority of Texas falls into Rating Area 26, which covers areas outside of metropolitan statistical areas.

42



Figure 1: Texas ACA Rating Areas

**Data and Procedure**

In order to obtain estimates for provider directory inaccuracies at the rating area level, I first determined which rating areas were served by Centene in a given year.

I note that I was unable to determine which rating areas were served by Centene in a given year from the documents provided. Instead, I relied on information provided from the HIX Compare data repository. This repository is funded by the Robert Wood Johnson Foundation, the nation's premier healthcare foundation, and contains information on ACA marketplaces. Specifically,

> HIX Compare now includes nearly every plan in the ACA-Compliant individual and small group markets and is used widely by researchers, government, journalists, advocates and industry to better understand these insurance markets.

43

The rating areas served by Centene from 2016 through 2021 are displayed in Table 18 and Figure 2.

Table 18: Texas Ratings Areas Served by Centene, by Year

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| | | | | | TX02 | TX02 |
| | TX03 | TX03 | TX03 | TX03 | TX03 | TX03 |
| | | | | | | TX04 |
| | TX05 | TX05 | TX05 | TX05 | TX05 | TX05 |
| | | | TX06 | TX06 | TX06 | TX06 |
| | | | | | TX07 | TX07 |
| | | TX08 | TX08 | TX08 | TX08 | TX08 |
| | TX09 | TX09 | TX09 | TX09 | TX09 | TX09 |
| | | | TX10 | TX10 | TX10 | TX10 |
| **Rating Areas Served by Centene** | TX11 | TX11 | TX11 | TX11 | TX11 | TX11 |
| | | | | | TX12 | TX12 |
| | | | | | | TX13 |
| | TX15 | TX15 | TX15 | TX15 | TX15 | TX15 |
| | | | | | | TX18 |
| | TX19 | TX19 | TX19 | TX19 | TX19 | TX19 |
| | | | | | | TX20 |
| | | | | | | TX22 |
| | | | | | | TX23 |
| | TX24 | TX24 | TX24 | TX24 | TX24 | TX24 |
| | TX26 | TX26 | TX26 | TX26 | TX26 | TX26 |

44



Figure 2: Rating Areas Served by Centene

Next, I used Centene's geospatial information listed in their provider directories to determine the longitude and latitude of each provider. These data were available for most providers. When they were not, as mentioned above, I used the provider Batch Geocoder CSV2GEO operated by the Scale Campaign to obtain the longitude and latitude for practitioner addresses. This product is used by companies like Amazon, Google, and UPS as well as by researchers for geocoding purposes. I then used ArcGIS Pro 2.9.3[30] to locate the providers on a map.

Consumers, while their home is located in a given rating area, may seek medical care outside their rating area. This is possible because Centene's network is not restricted to specific areas of the state and beneficiaries from any location across the state can access any provider in Centene's network. Indeed, Centene acknowledges that often it is not able to meet Texas Department of

---

[30] As noted above, ArcGIS Pro 2.9.3 he latest professional desktop GIS application that allows the analysis of geospatial data.

Insurance access requirements and thus has to make up for these limitations by providing access

to providers further away from consumers. To realistically model consumer behavior in accessing

care, I used ArcGIS Pro 2.9.3 to create 60-mile zones around the rating areas served by Centene.[31]

An example of these buffer zone for rating area 8 is included below as Figure 3.



Figure 3: Sample of Rating Area with 60-mile Radius

---

[31] I utilized the 60 mile radius because it has been previously used in the analysis of provider networks and is a reasonable approximation of consumer behavior in accessing medical care. See Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019a). A Consumer-Centric Approach to Network Adequacy: Access to Four Specialties in California's Marketplace. Health Affairs, 38(11), 1918-1926. https://doi.org/10.1377/hlthaff.2019.00116

Next, I identify all providers listed in Centene's provider directory for a given month who have practice locations within the 60-mile radius of each rating area. I establish how many unique providers are within the 60-mile radii by using practitioners' NPIs.

The process to establish whether a provider listed in the directory is actually part of the network is then analogous as described above at the statewide level using Centene's claim data.

Data cleaning and analysis for the data were conducted using Stata/MP 17.0 for Mac (Apple Silicon, Revision 28 Jul 2022) as well as ArcGIS Pro 2.9.3.

The results for the available data from March 2016 through December 2021 are displayed below. For each month, I present the number of providers listed in Centene's directory, the number of providers who could be determined to be in-network using the methodology described above, and the percentage of providers listed inaccurately for each rating area. Because Centene expanded into different rating areas over time, the number of rating areas displayed increases over time.

47

**Rating Area-based Network Analysis 2016**
Table 19: Analysis of the Accuracy Provider Listing, by Rating Area, 2016

| | | Rating Area | | | | | | | |
| --- | --- | 3 | 5 | 9 | 11 | 15 | 19 | 24 | 26 |

**Rating Area-based Network Analysis 2017**
Table 20: Analysis of the Accuracy Provider Listing, by Rating Area, 2017

|  |  | Rating Area | | | | | | | | |
|--|--|--|--|--|--|--|--|--|--|--|
|  |  | 3 | 5 | 8 | 9 | 11 | 15 | 19 | 24 | 26 |

49

**Rating Area-based Network Analysis 2018**
Table 21: Analysis of the Accuracy Provider Listing, by Rating Area, 2018



**Rating Area-based Network Analysis 2019**
Table 22: Analysis of the Accuracy Provider Listing, by Rating Area, 2019





**Rating Area-based Network Analysis 2020**
Table 23: Analysis of the Accuracy Provider Listing, by Rating Area, 2020

| | 2 | 3 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 15 | 19 | 24 | 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Rating Area-based Network Analysis 2021**
Table 24: Analysis of the Accuracy Provider Listing, by Rating Area, 2021

| | Rating Area | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |



# V.    Damages

**Data and Methodology**

When members signed up for Centene's insurance plans, they did so assured that they would be able to access medical care from its provider network. That is, that they would be able to rely on the accuracy of the listings in the provider directory because that directory would list the providers to be considered in-network. This is important because seeking care outside of one's provider networks comes at significant financial costs because the insurers contribute nothing or only very little to the cost of out-of-network care.

In my analyses described above, I have established that a substantial number of listed providers were not actively seeing patients for Centene. This finding is consistent geographically and persists for the entire time period of analysis.

Every Centene beneficiary selected their plan and paid monthly premiums based on the understanding that they could access medical care when needed from the providers listed in the directory. However, the benefits purchased by Centene's consumers was substantially less than the benefit that was presented to them. That is, the economic value to be received was much lower than the value they in fact received. The reduction of value applies to every single consumer who purchased a health plan from Centene.

Because consumers pay premiums on a monthly basis and because networks fluctuate from month to month, compensation for lost value should be estimated at a monthly level.

56

The health economics literature presents estimates for the elasticity of demand for ACA network breadth.[32,33] Both estimates are essentially similar and determine that a 1% increase in network breadth corresponds to a 0.29% increase in premiums. Damages can thus be calculated based on the proportion by the which the actual active network size differed, i.e. was lower, than the network size presented by Centene in its provider directory.

The data and analysis for provider directories, claims, and networks have been described above. The estimates from the network analysis provide a specific comparison between the network advertised by Centene in its provider directories as compared to its actual active network for the stated rating areas.

In order to establish the amount of monthly premiums paid, I used enrollment data provided from Centene. Consumers were considered to be enrolled during the period from "Eligibility Begin Date" and "Eligibility End Date." The data also contained the gross premium per month. I prorated premiums as appropriate for specific cases where "Eligibility Begin Date" and "Eligibility End Date" did not contain a full month. The home rating area of each consumer was identified via the variable "County." This allows me to apply the specific reduction in network size determined in my analyses above for that specific rating area. For consumers whose address was listed as outside one of Centene's served rating areas including those outside of Texas, the statewide value was used.

Data for these estimates were available from March 2016 through December 2020. Enrollment data were not available for 2014 and 2021; provider directory data were not available from January

---

[32] Dafny, L. S., Hendel, I., Marone, V., & Ody, C. (2017). Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth. Health Affairs, 36(9), 1606-1614.

[33] Polsky, D., Cidav, Z., & Swanson, A. (2016). Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks. Health Affairs, 35(10), 1842-1848.

57

2014 through February 2016; claims data were not available from January 2014 through December 2015.

Because damages occurred in the past, adjustments for inflation are required. I used the U.S. Bureau of Labor Statistics Inflation Calculator tool to determine the monthly adjustments necessary. I used the most recently available date as a reference point, August 2022. The Bureau of Labor Statistics is the principal fact-finding agency for the Federal Government in the broad field of labor economics and statistics. The individual adjustments are listed below.

The specific methodology for assessing damages is then as follows:

1. Determine whether and for how many days a consumer was enrolled in a particular month

2. Apply the rating area specific reduction in benefit based on the formula that a 1 % reduction in network size amounts to a 0.29% reduction in premium

3. Adjust for inflation

4. Sum all damages for a specific month for all enrolled members

The monthly results for the damages are presented below. I also include the amount of estimated premiums collected by Centene as well as the estimated number of consumers enrolled in a Centene plan.

**Estimates of Damages**

Table 25: Estimate of Damages by Month, At Least One Claim

| Month | Damages for Month | Premiums Collected for Month | Members Enrolled |
|---|---|---|---|
| | | | |

| Month | Damages for Month | Premiums Collected for Month | Members Enrolled |
|---|---|---|---|



| Month | Damages for Month | Premiums Collected for Month | Members Enrolled |
|---|---|---|---|



Next, I summed the estimated monthly damages by year. The results are presented below.

Table 26: Estimate of Damages by Year, At Least One Claim

| Year | Damages |
|---|---|
| 2016 | $24,710,113 |
| 2017 | $119,164,188 |
| 2018 | $171,186,153 |
| 2019 | $256,424,408 |
| 2020 | $311,526,512 |
| 2021 | $351,884,968 |
| Total | $ 1,234,896,342 |

I note that the estimates presented above were developed by using a more conservative approach

then presented in the health economics literature because I counted practitioners as active network

60

participants if they filed at least one claim in a given year whereas the literature use a threshold that required at least five unique beneficiaries.[34] Because I do not have access to Centene's detailed claims data, I cannot fully replicate that approach. However, I can approximate it with counting practitioners as active network members if they filed at least five unique claims. I emphasize that this is also conservative compared to the literature because these five claims may all come from the same beneficiary. This approach increases the estimated damages to a total of $1,873,989,280 from March 2016 to December 2021.

Table 27: Estimate of Damages by Year, Five Claims or More

| Year | Damages |
|------|---------|
| 2016 | $29,727,658 |
| 2017 | $191,988,240 |
| 2018 | $212,310,016 |
| 2019 | $427,786,144 |
| 2020 | $510,196,448 |
| 2021 | $501,980,768 |
| Total | $ 1,873,989,274 |

Because Centene did not provide sufficient data, I could not derive estimates for 2014, 2015, and January to February 2016.

---

[34] Zhu, J. M., Charlesworth, C. J., Polsky, D., Levy, A., Dobscha, S. K., & McConnell, K. J. (2022). Characteristics of Specialty Mental Health Provider Networks in Oregon Medicaid. Psychiatric Services, appi. ps. 202100623.

Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access In Oregon Medicaid: Study examines phantom networks of mental health care providers in Oregon Medicaid. Health Affairs, 41(7), 1013-1022.

All of my opinions expressed herein are to a reasonable degree of professional and economic certainty based on the information known and available to me as of the date of this report. I reserve the right to amend my opinions should additional information become known, or to the extent it is necessary to respond to any opinions offered by any other party or witness to this litigation.

62

Appendix A: CV

A-1

# SIMON F. HAEDER

Associate Professor of Public Health
Texas A&M University
School of Public Health
Department of Health Policy and Management
sfhaeder@tamu.edu
@SimonFHaeder
ORCID 0000-0003-0077-6047

## APPOINTMENTS & EDUCATION

| | |
|---|---|
| **Associate Professor** | **Texas A&M University**, July 2022-<br>School of Public Health<br>Department of Health Policy & Management |
| **Assistant Professor** | **The Pennsylvania State University**, July 2019-June 2022<br>School of Public Policy |
| Faculty | Graduate School |
| Faculty Affiliate | Center for Health Care and Policy Research |
| **Fellow** | **Robert Wood Johnson Foundation**, 2018-2021<br>Interdisciplinary Research Leaders Program |
| **Assistant Professor** | **West Virginia University**, July 2016-June 2019<br>John D. Rockefeller IV School of Policy & Politics<br>Department of Political Science |
| **Ph.D.** | **University of Wisconsin–Madison**, Political Science, 2016<br>Fields: American Politics, Political Methodology<br>Minor: Applied & Agricultural Economics |
| **M.A.** | **University of Wisconsin–Madison**, Political Science, 2011 |
| **M.P.A.** | **California State University, Fresno**, Public Administration, 2010<br>With Distinction |
| **Fellow** | **University of Oklahoma**, 2007–2008<br>Carl Albert Congressional Research and Studies Center |
| **M.A.** | **California State University, Fresno**, International Relations, 2007<br>With Distinction |
| **B.A.** | **California State University, Fresno**, Political Science, 2006<br>Minor: History; Summa cum laude, Phi Kappa Phi, |
| **A.A.** | **College of the Desert,** Palm Desert, CA Political Science, 2004<br>Summa cum laude |

## ACADEMIC PUBLICATIONS

Haeder, Simon F., Burman, Abigail, and Wendy Y. Xu. 2023. "Provider Directory Inaccuracy and Timely Access for Mental Health Care" American Journal of Managed Care *XX*(X): XXX-XXX.

Burman, Abigail and Simon F. Haeder. 2022. "Directory Accuracy and Timely Access to in Mammograms in California." Women & Health *62*(5): 421-429.

Haeder, Simon F. and Jacqueline Chattopadhyay. 2022. "The Power of a Tweet? Social Media, Presidential Communication, and the Politics of Health." *Presidential Studies Quarterly* 52(2): 436-473.

Burman, Abigail and Simon F. Haeder. 2022. "Directory Accuracy and Timely Access to in Maryland's Medicaid Managed Care Program." *Journal of Health Care for the Poor and Underserved* 33(2): 597-611.

Haeder, Simon F. and Abigail Burman. 2022. "Potemkin Protections: Assessing Provider Directory Accuracy and Timely Access for Four Specialties in California." *Journal of Health Politics, Policy and Law* 47(3): 319-349.

Haeder, Simon F. Emily Maxfield, Kara Ulmen, and Sara Amadon. 2022. "When A Schools Is More Than Just a School: Improving School-Based Health in the Wake of COVID-19." *World Medical & Health Policy* 14(1): 150-177.

Callaghan, Timothy H., Simon F. Haeder, Steven Sylvester. 2022. "Past Experiences with Surprise Medical Bills Drive Issue Knowledge, Concern, and Attitudes Towards Federal Policy Intervention." *Health Economics, Policy and Law* 17(3): 298-331.

Haeder, Simon F. and Susan W. Yackee. 2022. "Handmaidens of the Legislature? Understanding Regulatory Timing." *Journal of Public Policy* 42(2): 298-322.

Best Poster Award from the American Political Science Association's Public Administration Section

Sylvester, Steven, Simon F. Haeder, and Timothy H. Callaghan. 2022. "Just Say No? Public Attitudes about Supportive and Punitive Policies to Combat the Opioid Epidemic." *Journal of Public Policy* 42(2): 270-297.

Leonard S. Robins Award for the best paper on health politics and policy presented at APSA

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2021. "Mixed Signals: The Inadequacy of Provider-per-Enrollee Ratios for Assessing Network Adequacy in California (and Elsewhere)." *World Medical & Health Policy* 13(3): 414-435.

Haeder, Simon F. 2021 "Joining the Herd? U.S. Public Opinion and Vaccination Requirements Across Educational Settings During the COVID-19 Pandemic." *Vaccine:* 39(17): 2375-2385.

Haeder, Simon F., Steven Sylvester, and Timothy H. Callaghan. 2021. "Lingering Legacies: Public Attitudes About Medicaid Beneficiaries and Work Requirements." *Journal of Health Politics, Policy and Law* 46(2): 305-355.

Haeder, Simon F., Steven Sylvester, and Timothy H. Callaghan. 2021. "Shared Stigma: The Effect of LGBT Status on Attitudes about the Opioid Epidemic." *World Medical & Health Policy* 13(3): 414-435.

Haeder, Simon F. and Sarah E. Gollust. 2020. "From Poor to Worse: Health Policy and Politics Scholars' Assessment of the U.S. COVID-19 Response and Its Implications." *World Medical & Health Policy* 12(4): 454-481.

Anderson, Sara A. Caseman, Kelli. Haeder, Simon F. Mathur, Ambika, and Ulmen, Kara. 2020. "When Adolescents are in School during COVID-19, Coordination Between School-Based Health Centers and Education is Key." *Journal of Adolescent Health* 67(6) 745-746.

Haeder, Simon F. 2020. "Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Epidemic." *World Medical & Health Policy* 12(3): 282-290.

Haeder, Simon F. and Susan Webb Yackee. 2020. "Out of the Public's Eye? Lobbying the President's Office of Information and Regulatory Affairs." *Interest Groups & Advocacy* 9(3) 410-424.

Haeder, Simon F. and Susan Webb Yackee. 2020. "A Look Under the Hood: Regulatory Policymaking and the Affordable Care Act." *Journal of Health Politics, Policy and Law* 45(5): 771-786.

Haeder, Simon F. and Susan Webb Yackee. 2020. "Policies that Bind? The Use of Guidance Documents by Federal Agencies." *Journal of Health and Human Services Administration* 43(2): 87-100.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2020. "Going the Extra Mile? How Provider Network Design Increases Consumer Travel Distance, Particularly for Rural Consumers." *Journal of Health Politics, Policy and Law* 45(6): 1107-1136.

Haeder, Simon F. 2020. "Quality Advantage? Provider Quality and Networks in Medicare Advantage." *Journal of Public and Nonprofit Affairs* 6(2): 138-158.

Haeder, Simon F. 2020. "Political Science and U.S. Health Policy in the Era of the Affordable Care Act." *Policy Studies Journal* 48(S1): S14-S32.

Carlson, Deven, Simon F. Haeder, Hank Jenkins-Smith, Joseph T. Ripberger, Carol L. Silva, David L. Weimer. 2020. "Monetizing Bowser: A Contingent Valuation of the Statistical Value of Dog Life." *Journal of Benefit-Cost Analysis* 11 (1), 131-149.

> Winner, Best Original Article in the *Journal of Benefit-Cost Analysis* in 2020

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2020. "Integrating Travel Distance into Assessments of Provider Networks Using a Dyadic Approach: The Case of California's Affordable Care Act Marketplace." *SAGE Research Methods Cases: Medicine and Health*.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2019. "A Consumer-Centric Approach to Network Adequacy: Access to Four Specialties in California's Marketplace." *Health Affairs* 31(11): 1918-1926.

Haeder, Simon F. 2019. "A Tale of Two Programs: Access to High Quality Providers for Medicare Advantage and Affordable Care Act Beneficiaries in New York State." *World Medical & Health Policy* 11(3): 212-230.

> Recognized as a top cited article in *World Medical & Health Policy*

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2019. "A Knotty Problem: Consumer Access and the Regulation of Provider Networks." *Journal of Health Politics, Policy and Law* 44(6): 937-954.

Haeder, Simon F. 2019 "Quality Regulation? Access to High Quality Specialists for Medicare Advantage Beneficiaries in California." *Health Services Research & Managerial Epidemiology* (6).

Haeder, Simon F. 2019. "The Demise of Community Responsibility: Unintended Consequences of Coverage Expansions on California Public Hospitals." *Journal of Health Politics, Policy and Law* 44(2): 173-219.

> Second most read article in the *Journal of Health Politics, Policy and Law* in 2019.

Haeder, Simon F. and Susan Webb Yackee. 2018. "Presidentially Directed Policy Change: The Office of Information and Regulatory Affairs as Partisan or Moderator?" *Journal of Public Administration Research and Theory* 28(4): 475-488.

Rocco, Phillip and Simon F. Haeder. 2018. "How Intense Policy Demanders Shape Post-Reform Politics: Evidence from the Affordable Care Act." *Journal of Health Politics, Policy and Law* 43(2): 271-304.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2016. "California Secret Shoppers Find Access To Physicians And Network Accuracy Are Lacking For Those In Marketplace And Commercial Plans ." *Health Affairs* 35(7):  1160-1166.

Haeder, Simon F. and Susan Webb Yackee. 2015. "Influence and the Administrative Process: Lobbying the U.S. President's Office of Management and Budget." *American Political Science Review* 109(3): 507–522.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2015. "Network Adequacy Standards and Health Insurance." *JAMA: The Journal of the American Medical Association* 314(22):2414-2415.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2015. "California Marketplace Hospital Networks Are Narrower Than Commercial Plans, But Access And Quality Are Comparable." *Health Affairs* 34(5): 741–748.

Haeder, Simon F. and David L. Weimer. 2015. "Inching towards Universal Coverage: State-Federal Healthcare Programs in Historical Perspective." *Journal of Policy History* 27(3): 746–770.

Haeder, Simon F., David L. Weimer, and Dana B. Mukamel. 2015. "Narrow Networks and the Affordable Care Act." *JAMA: The Journal of the American Medical Association* 314(7): 669-670.

Haeder, Simon F. and David L. Weimer. 2015. "You Can't Make Me Do It; But I Can Be Persuaded: A Federalism Perspective on the Affordable Care Act." *Journal of Health Politics, Policy and Law*. 40(2): 281–323.

Haeder, Simon F. 2014. "Balancing Adequacy and Affordability? Essential Health Benefits under the Affordable Care Act." *Health Policy* 118(2): 285–291.

Mukamel, Dana B., Simon F. Haeder, and David L. Weimer. 2014. "Top-Down and Bottom-Up Approaches to Health Care Quality: The Impacts of Regulation and Report Cards." *Annual Review of Public Health* 35(1): 477–497.

Haeder, Simon F. 2013. "Making the Affordable Care Act Work: High-Risk Pools and Health Insurance Marketplaces." *The Forum* 11(3): 499–511.

Haeder, Simon F. and David L. Weimer. 2013. "You Can't Make Me Do It: State Implementation of Insurance Exchanges under the Affordable Care Act." *Public Administration Review* 73(s1): S34–S47.

Haeder, Simon F. 2012. "Beyond Path Dependence: Explaining Healthcare Reform and Its Consequences." *Policy Studies Journal* 40(S1): 65–86.

**GRANTS AND CONTRACTS**

**Robert Wood Johnson Foundation**. 2022-2023
   Consumer Access Project Supplement
   Principal Investigator
Total Value: $51,438

**Robert Wood Johnson Foundation**. 2022-2023
   Consumer Access Project
   Principal Investigator
   Total Value: $1,061,287

**Commonwealth of Pennsylvania: Insurance Department.** 2021-2022
   Health Insurance Technical Assistance: Insurance and Equity Market Scan
   Co-Investigator (Principal Investigators: Joel Segel & Dennis Scanlon)
   Total amount: $160,775 (15% coverage)

**Grant & Eisenhofer P.A. and Bradley Bernstein Sands LLP.** 2021-

Expert Legal Consulting.

**McCourtney Institute for Democracy**, The Pennsylvania State University. 2021
McCourtney Institute Research Grant
Principal Investigator
Total amount: $3,000

**Robert Wood Johnson Foundation**. 2020.
IRL Community Support Grant
Co-Principal Investigator
Total amount: $6,500

**Robert Wood Johnson Foundation**. 2018-2021
Interdisciplinary Research Leaders Fellowship & Grant
Co-Principal Investigator
Total amount: $350,000

**Robert Wood Johnson Foundation**. 2018.
Interdisciplinary Research Leaders Mini-Grant.
Co-Principal Investigator
Total amount: $500

**West Virginia Center for Budget and Policy**. 2018.
Medicaid Program in West Virginia. Policy Report.
Co-Principal Investigator
Total amount: $10,000

**The Milken Institute.** 2018, 2019
Policy Reports.
Principal Investigator
Total amount: $18,000.

**Harmon Parker Law**. 2017-2018
Expert Legal Consulting

**Eberly College of Arts and Sciences**. 2016, 2017, 2018
Travel Grant
Total amount: $1,500 per year

**The University of Texas at Austin Center for Politics & Governance**. 2017
Working Paper Contract
Co-Principal Investigator
Total amount: $5,000.

**The University of Texas at Austin Center for Politics & Governance**. 2017.
White Paper Contract
Co-Principal Investigator
Total amount: $5,000.

**University of Wisconsin–Madison**, Office of Diversity, Inclusion and Funding, Graduate School, 2016
Student Research Funding
Principal Investigator
Total amount: $1,200

**Charles Koch Foundation**. 2015-2016
Dissertation Grant

A 5

Principal Investigator
Total amount: $5,000

**Midwest Political Science Association**. 2015
Harrell Rodgers Graduate Student Travel Scholarship.
Total amount: $500

**University of Wisconsin-Madison**, Department of Political Science, 2014 & 2016
Summer Initiative Funding
Total amount: $2,000 per year

### OTHER ACADEMIC AND POLICY-RELATED WRITING

Haeder, Simon F. Forthcoming. "Medicare Advantage Provider Networks May Pose Significant Access Challenges for American Seniors." *Health Affairs Blog*, XXX.

Haeder, Simon F. & Abigail Burman. 2021. "Without a Dedicated Enforcement Mechanism, New Federal Protections are Unlikely to Improve Provider Directory Accuracy." *Health Affairs Blog*, November 5.

Haeder, Simon F. 2021. "As Schools Reopen, It's Time To Increase Funding for School-Based Health Centers." *Health Affairs Blog*, August 20.

Haeder, Simon F., Steven Sylvester, and Timothy H. Callaghan. 2021. "Americans are divided on Medicaid work requirements, but it depends on recipients' circumstances." London School of Economics' *American Politics and Policy Blog*, March 2.

Haeder, Simon F., Sara Anderson, & Kelli Caseman. 2021. "School-Based Health Centers & Mental Health in West Virginia." Interdisciplinary Research Leaders Program, Robert Wood Johnson Foundation.

Haeder, Simon F. & Sara Anderson. 2021. "School-Based Health Centers in West Virginia Primer." Interdisciplinary Research Leaders Program, SHAPE West Virginia.

Haeder, Simon F. & Sara Anderson. 2021. "School-Based Health Centers and Primary Care." Interdisciplinary Research Leaders Program, SHAPE West Virginia.

Haeder, Simon F. & Sara Anderson. 2021. "School-Based Health Centers and Dental Health." Interdisciplinary Research Leaders Program, SHAPE West Virginia.

Haeder, Simon F. & Sara Anderson. 2021. "School-Based Health Centers and Behavioral Health." Interdisciplinary Research Leaders Program, SHAPE West Virginia.

Haeder, Simon F. and Susan Webb Yackee. 2020. "OIRA's Impact on Rulemaking." The Regulatory Review. November 3.

Haeder, Simon F., Steven Sylvester, and Timothy H. Callaghan. 2020. "Why Racism Matters to the Future of Medicaid." *3Streams* October 14.

Haeder, Simon F. and Susan Webb Yackee. 2020. "How (Uneven) Lobbying a Small Gatekeeper Agency Impacts Regulation." *3Streams* September 22.

Haeder, Simon F. and Susan Webb Yackee. 2020. "Regulation, Delegation, and the Affordable Care Act." *The Regulatory Review*. August 4.

Haeder, Simon F. and Susan Webb Yackee. 2020 "While Congress sits on its hands, Presidents are making policy by regulation." London School of Economics' *American Politics and Policy Blog*, July 27.

A 6

Haeder, Simon F. 2020. "The U.S. Response to the Coronavirus." *Social Sciences Press of China*. April 18.

Haeder, Simon F. 2020. "Public Hospitals and the Development of the U.S. Healthcare System." *Academic Minute*, March 31.

Haeder, Simon F. and Susan Webb Yackee. 2020. "How Long is Too Long for Legislative Delegation?" *The Regulatory Review*. March 3.

Haeder, Simon F. 2020. "Thinking the Unthinkable: Buying and Selling Human Organs." *The Milken Institute Review* 22(3): 44-52.

Haeder, Simon F. 2020. "Can the Public Option Heal the U.S. HealthCare System?" *The Milken Institute Review*. 22(2): 46-55.

Haeder, Simon F. 2019. "Life and Politics: Beyond the Affordable Care Act." *The Milken Institute Review* 21(4): 5-15.

Haeder, Simon F. 2019. "Tangled Up in Side Effects. Saving Medicaid from Work Requirements." *The Milken Institute Review* 21(2): 52-61.

Haeder, Simon F. 2019. "Proceed With Caution: Medicare Advantage and Access to High-Quality Specialists." *SAGE Journals Blog*. November 8.

Haeder, Simon F., David L. Weimer & Dana B. Mukamel. 2019. "Surprise Billing: No Surprise In View Of Network Complexity." *Health Affairs Blog*. June 5.

Haeder, Simon F. 2018. "Would State-Based Single-Payer Health Insurance Cure What Ails?" *The Milken Institute Review* 20(4): 43-53.

Haeder, Simon F. 2018. "Making Medicaid Work in West Virginia? An Assessment of the Effect of Work Requirements for Medicaid Beneficiaries in West Virginia." Rockefeller School of Policy and Politics, West Virginia University.

Haeder, Simon F. 2018. "Pre-existing Conditions in West Virginia." Policy Brief. Rockefeller School of Policy and Politics, West Virginia University.

Haeder, Simon F. and Chris Plein. 2018. "The Successes of Children's Health Insurance in West Virginia and the Challenges that Lie Ahead." *West Virginia KIDS COUNT*. Issue Brief No. 2.

Haeder, Simon F. and Susan Webb Yackee. 2018. "Despite Electoral Losses, Don't Expect the Trump Administration to Give Up on Its Objectives." *Osservatorio AIR,* November 28.

Haeder, Simon F. and Philip Rocco. 2018 "Despite Democrats' takeover of the House, don't expect Republicans to give up on undoing Obamacare." London School of Economics' *American Politics and Policy Blog*, November 13.

Haeder, Simon F. and Susan Webb Yackee. 2018. "When US presidents push for regulatory reform, liberal agency rules may be first in the firing line." London School of Economics' *American Politics and Policy Blog*, September 11.

Haeder, Simon F. and Susan Webb Yackee. 2018. "The Trump administration might be deregulating more than you know (or could know)." The Washington Post's *Monkey Cage*, August 24.

Haeder, Simon F. 2017. "Lessons from the Past on Healthcare." *Academic Minute*, WAMC Northeast Public Radio, September 25.

Haeder, Simon F. and Susan Webb Yackee. 2017. "Presidentially Directed Policy Change." The University of Texas at Austin Center for Politics & Governance *Working Paper Series*.

Haeder, Simon F. and Susan Webb Yackee. 2017. "Lobbying the US President's Office of Management and Budget." The University of Texas at Austin Center for Politics & Governance *White Paper Series*.

Haeder, Simon F. 2016. "Insurance Coverage Doesn't Guarantee Timely Access to Care." *Care for Your Mind* Blog, September 20.

Haeder, Simon F. 2015. "Obamacare: A Stepping Stone?." *healthinsurance.org* Blog, November 9.

Haeder, Simon F. and Susan Webb Yackee. 2015. "Lobbying, But Not Who You Think: Targeting the U.S. President's Office of Information and Regulatory Affairs." *Osservatorio AIR,* September 10.

Haeder, Simon F. and Susan Webb Yackee. 2015. "The Lobbying You Have Never Heard Of: Targeting the U.S. President's Office of Information and Regulatory Affairs." London School of Economics' *American Politics and Policy Blog*, September 2.

Haeder, Simon F. and Susan Webb Yackee. 2015. "Psst, wanna change the law? Lobby this little-known government office after it's passed." The Washington Post's *Monkey Cage*, July 27.

## BOOK REVIEWS

Haeder, Simon F. 2021. Review of Medical Necessity: Health Care Access and the Politics of Decision Making by Daniel Skinner (2019). Minneapolis, MN: University of Minnesota Press. Political Science Quarterly 136(2): 381-382.

Haeder, Simon F. 2015. Review of *Why Government Fails So Often: And How It Can Do Better* by Peter H. Schuck. (2014). Princeton; NJ: Princeton University Press. *American Review of Public Administration* 45(4): 496-498.

Haeder, Simon F. 2007. Review of A*nd I Haven't Had a Bad Day Since: From the Streets of Harlem to the Halls of Congress.* Charles B. Rangel with Leon Wynter. (2007). New York City; NY: Thomas Dunne Books. *American Political Science Association Legislative Studies Section Newsletter* 31(1): 3.

Haeder, Simon F. 2007. Review of *Forty Years a Legislator: Elmer Thomas*. Edited by Richard Lowitt and Carolyn G. Hanneman. (2007). Norman; OK: University of Oklahoma Press. *American Political Science Association Legislative Studies Section Newsletter* 31(1): 9.

## THE CONVERSATION

"Why letting Medicare negotiate drug prices won't be the game-changer for health care Democrats hope it will be." August 17, 2022.

"How much for an amputation or checkup? It takes a complex formula and a committee of doctors to set the price for every possible health care procedure." July 6, 2022.

"7 things President-elect Biden can achieve on health care." November 16, 2020.

"Poor US pandemic response will reverberate in health care politics for years, health scholars warn." November 3. With Sarah E. Gollust.

"If the Supreme Court strikes down the Affordable Care Act, Trump's health care order is not enough to replace it." October 6, 2020.

"If Obamacare goes away, here are eight ways your life will be affected." September 24, 2020.

"Prescription drug costs would have been a major campaign issue, so what will happen now that coronavirus is center stage?" May 20, 2020.

"Obamacare's insurance safety net protects many of the millions losing their employer-provided health insurance – but not all." May 15, 2020.

A 8

"Experts agree that Trump's coronavirus response was poor, but the US was ill-prepared in the first place." March 17, 2020.

"What the Trump budget says about the administration's health priorities?" February 21, 2020.

"Insurance companies and Big Pharma are fighting. And you're left holding the bag." January 14, 2020.

"Universal coverage, single-payer, 'Medicare for All': What does it all mean for you?" January 7, 2020.

"How undoing 'Obamacare' would harm more than the health of Americans." December 20, 2019.

"As rural Americans struggle for health care access, insurers may be making things worse." December 13, 2019.

"What's the value of your dog's life, and why it matters." December 1, 2019. With Carlson, Deven, Hank Jenkins-Smith, Joseph T. Ripberger, Carol L. Silva, David L. Weimer.

"Americans bankrupted by health care costs: 4 questions answered." November 22, 2019.

"Why thousands are getting hit with unexpected medical bills." May 30, 2019.

"The US could have ended up with a British-style health care system: Here is why it didn't." May 17, 2019.

"Medicaid work requirements: Is there a path forward that could help the poor, not harm them?" March 29, 2019.

"Boeing 737 Max: The FAA wanted a safe plane – but didn't want to hurt America's biggest exporter either." March 22, 2019. With Susan Webb Yackee.

"The struggle for coal miners' health care and pension benefits continues." March 5, 2019.

"Why the US has higher drug prices than other countries." February 7, 2019.

"Why the Texas ruling on Obamacare is on shaky legal ground." December 17, 2018. With Valarie Blake.

"Medicaid work requirements: Where do they stand after the blue wave." December 4, 2018.

"The votes have been counted, the results are (mostly) in: What's next for health care?" November 7, 2018.

"Short-term health plans: A junk solution to a real problem." August 14, 2018.

"Born in the USA: Having a baby is costly and confusing, even for a health policy expert." July 16, 2018.

"Why the extreme reaction to Obamacare could be the new normal in American politics." April 9, 2018. With Philip Rocco.

"Republicans attacking Obamacare, one more time." March 5, 2018. With Valarie Blake.

"Time to stop using 9 million children as a bargaining CHIP." January 18, 2018.

"How the tax bill opens wide a big back door to overhaul health care." December 4, 2017.

"US health care system: A patchwork that no one likes." September 21, 2017.

"Clock running out on health program for 9 million kids." September 21, 2017.

"How the latest effort to repeal Obamacare would affect millions." September 20." September 19, 2017.

"Why state-level single-payer health care efforts are doomed." August 16, 2017.

A 9

"Trump isn't letting Obamacare die; he's trying to kill it." July 24, 2017.

"How killing the ACA could lead to more opioid deaths in West Virginia and other Trump states." July 28, 2017.

"Why health savings accounts are a bust for the poor but a boost for the privileged." July 13, 2017.

"How bills to replace Obamacare would especially harm women." June 29, 2017.

"What happens when the federal government eliminates health coverage? Lessons from the past." June 23, 2017.

"Not just for the poor: The crucial role of Medicaid in America's health care system." June 7, 2017.

"Beyond the CBO score: How Trump Budget and the AHCA are dismantling America's safety net." May 25, 2017.

"How Trump and Tom Price can kill Obamacare without the Senate." May 23, 2017.

"How pre-existing conditions became front and center in health care vote." May 4, 2017.

"Mine wars: The struggle for coal miners' health care and pension benefits comes to a head." [Update] April 30, 2017.

"Mine wars: The struggle for coal miners' health care and pension benefits comes to a head." April 26, 2017.

"Essential health benefits suddenly at center of health care debate, but what are they?" March 24, 2017.

## OTHER SELECTED COLUMNS & PUBLICATIONS

### Pennsylvania Capital Star

"Guided by evidence, universities should lead the way on pandemic reopenings." April 1, 2021.

"We need to get creative to protect nursing home residents during a pandemic. Here's how." May 27, 2020.

"Why it's critical we keep our eyes on Pa's kids during the COVID-19 pandemic." April 3, 2020. With Kelli Caseman

"Obamacare Lawsuit: Why Pa. needs to prepare for the worst." January 3, 2020.

"It's time for Pa. to invest in public health by fighting Hep A." August 14, 2019.

"Republicans don't have a Plan B if the Affordable Care Act is struck down. And Pa. will suffer." July 31, 2019.

"Pa. can't rely on Washington to fix surprise spikes in medical bills." July 14, 2019.

"State's takeover of Obamacare marketplace is a win for Pa., but it's only the first step." July 11, 2019.

### Register-Herald (West Virginia)

"Keeping our eyes on kids during pandemic." April 3, 2020. With Kelli Caseman.

"There is no GOP back-up plan on healthcare." July 18, 2019.

"A lesson from Kentucky's poor response to hepatitis outbreak." March 29, 2019.

"Terrible idea: Adding more bureaucracy to Medicaid program." January 30, 2019. With Philip Rocco.

A 10

"Ours is more than an extraction state." January 30, 2019.

"Wanting a West Virginia idea." January 27, 2019.

"Proceed with great care." November 6, 2018.

"Pre-existing condition, healthcare on the ballot." October 10, 2018.

"West Virginia is first. Let's keep it that way." September 25, 2018. With Sara A. Anderson, Lisa M. Costello, Lindsay Allen and Valarie K. Blake

"Here is what a health agenda should look like." September 12, 2018.

"Where is the Health Leadership in West Virginia?" December 16, 2018.

"Protecting Social Security or Who Doesn't Love a Tax Cut." August 19, 2018.

"Time for state to restrict short-term health plans." August 1, 2018.

"Before Kavanaugh vote, a refresher. " August 1, 2018.

"Health at the heart of 3rd District." July 8, 2018.

"Many Challenges, But Hope for Foster Care in West Virginia." October 5, 2017.

**Charleston Gazette-Mail (West Virginia)**

"Work requirements are bad for everyone." March 26, 2019. With Philip Rocco.

"WVU profs: Time for better protection from diseases, anti-vaxers." January 31, 2019. With Lisa Costello, Sara A. Anderson, Lindsay Allen and Valarie K. Blake

"Proceed with great care on Medicaid work requirements." November 2, 2018 .

"Congratulations, Speaker Hanshaw. Here is what your health agenda should look like." September 23, 2018.

"Before Kavanaugh votes, senators must think of WV's wellbeing, health." July 27, 2018.

"We are done litigating the Affordable Care Act." March 8, 2018.

"Time for Congress to stop chipping away at health care." November 27, 2017.

"Health care precedents provide insight on current debate." July 15, 2017.

"Time to be honest, American Health Care Act bad for WV." May 13, 2017.

CONFERENCE PRESENTATIONS

American Political Science Association Annual Conference
    2015, 2016, 2018, 2019, 2020, 2021
Association for Politics and the Life Sciences Annual Conference
    2015
Association for Public Policy Analysis and Management Annual Conference
    2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021
Midwest Political Science Association Annual Conference
    2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021
Midwest Public Affairs Conference

A 11

2015
Public Management Research Conference
    2017
West Virginia University Children's Health Summit
    2017

POSTER PRESENTATIONS

American Political Science Association Annual Conference
    2015, 2016, 2017
Association for Public Policy Analysis and Management Annual Conference
    2014, 2015, 2017
Wisconsin Alumni Research Foundation 90 Year Celebration
    2015

INVITED TALKS

"Expanding School Based Health Centers in Pennsylvania." Testimony in front of the Pennsylvania State Senate Democratic Policy Committee. Harrisburg, PA. April 2022.

"Pathway to Care? An Exploration of How Provider Network Regulations Affect Consumers." Jonathan and Karin Fielding School of Public Health, University of California at Los Angeles. February 2022.

"Pathway to Care? An Exploration of How Provider Network Regulations Affect Consumers." School of Public Health, Texas A&M University. February 2022.

"Pathway to Care? An Exploration of How Provider Network Regulations Affect Consumers." Mailman School of Public Health, Columbia University. February 2022.

"Handmaidens of Congress? The Regulatory Implementation of the Affordable Care Act."
Duke University School of Law. October 2021

"Rethinking Consumer Access and Provider Networks."
School of Public Health. University of California Irvine. April 2021.

"Rethinking Consumer Access and Provider Networks."
Department of Health Policy & Administration. The Pennsylvania State University. March 2021.

"Medicaid Work and Children in West Virginia." Webinar.
West Virginia Think Kids. January 2021.

"Politics, Policy, and the Pandemic." Policy and the Pandemic Webinar Series.
School of Public Policy. The Pennsylvania State University. July 2020.

"Of Politics and Dogs: Partisanship, Policy, and the Value of a Dog's Life." Paterno Fellows Lunch with Honors Students. The Pennsylvania State University. September 2020.

"Medicaid Work Requirements in West Virginia." Webinar.
West Virginia Rural Health Association. January 2019.

"The Demise of Community Responsibility Unintended Consequences of Coverage Expansions on California Public Hospitals." Program in Public Policy. The Pennsylvania State University.

"Social Security and West Virginia."
West Virginia Press Association Convention. August 2018

"Inching Toward Universal Coverage: Health Policy in Historical Perspective." Politics, Perceptions, and the Presidential Election: What's Next for Health Policy?

A 12

Health Policy Institute of Ohio. October 2016.

"Side Effects: The Unintended Consequences of Health Reform on Public Hospitals." Department of Political Science, West Virginia University.

"Post-SCOTUS: What's Next for the Affordable Care Act."
Bowhay Institute for Legislative Leadership Development. August 2015.

"Health Policy in the United States." Guest Lecture for *Law, Politics, and Society,* University of Wisconsin-Madison, April 2014.

"The Affordable Care Act."
AHANA-MAPS Pre-Health Society seminar, University of Wisconsin-Madison, April 2013.

## TEACHING EXPERIENCE

### TEXAS A&M UNIVERSITY

Advanced Health Policy (doctoral). F 2022.

### THE PENNSYLVANIA STATE UNIVERSITY

The Policy Process (graduate). F 2019, 2021. S 2021

Policy & Program Evaluation (graduate). S 2020.

Policy and the Pandemic (undergraduate). S 2021.

Health Policy and Politics (undergraduate honors). F 2020.

Policy Making and Evaluation (undergraduate). S 2021

### WEST VIRGINIA UNIVERSITY

State and Local Government (undergraduate). F 2016, 2017.

Introduction to Policy Analysis (undergraduate). F 2016, 2017, SP 2017, 2018, 2019 SU 2018, 2019

Health Policy and Politics (undergraduate). SP 2017, 2018

## FELLOWSHIPS, AWARDS, AND SCHOLARSHIPS

Leonard S. Robins Award *for the best paper on health politics and policy presented at the 2018 APSA*, 2019

Emerging Poverty Scholar, American Enterprise Institute, 2019

Best Poster Award from the American Political Science Association's Public Administration Section, 2015

Leon Epstein Prize in American and British Politics, University of Wisconsin–Madison, Department of Political Science, 2015

www.healthinsurance.org Scholarship Competition Winner, 2014

Health Policy Leadership Program Scholarship, Central Valley Health Policy Institute, 2009–2010

Carl Albert Congressional Graduate Fellow, University of Oklahoma, 2007–2008

Graduate Dean's Medal, California State University, Fresno, Division of Student Affairs, 2007

Phyllis Watts Eudy Award, California State University, Fresno, 2007

Distinguished International Graduate Award, California State University, Fresno, 2007

Dan Quigley Graduate Studies Scholarship, Pi Gamma Mu Intl. Honor Society, 2006–2007

Harlan Hagen Memorial Scholarship, California State University, Fresno, 2005

International Students Scholarship, College of the Desert, 2004

Award for Excellence in Political Science, College of the Desert, 2004

Award for Outstanding Male Scholar Athlete, College of the Desert, 2004

## OTHER EXPERIENCE & TRAINING

Robert Wood Johnson Foundation. Write to Change the World Workshop. 2020.

Council Member, Gerson Lehrman Group (GLG), 2019-2021

Health Policy Leadership Program, Central Valley Health Policy Institute, 2009–2010

Project Manager, Fresno Healthy Communities Access Partners, Inc., Fresno, California, 2008–2010

Maddy Institute Costa Congressional Scholar, Congressman Dennis Cardoza, Washington, District of Columbia, Summer 2006

Fresno State *Leaders of Tomorrow* Program, California State University, Fresno, 2006

Legislative Intern, Office of Senator Dianne Feinstein, Fresno, California, Spring 2006

Legislative Intern, Office of State Senator Dean Florez, Fresno, California, 2005–2006

Special Assistant, Office of Member of the German Bundestag Josef Göppel, Berlin & Herrieden, Germany, Summer 2005

Maddy Institute Costa Congressional Scholar, Senator Barbara Boxer, Fresno, California, Spring 2005

## PROFESSIONAL SERVICE

### PROFESSIONAL ORGANIZATIONS

| | | |
|---|---|---|
| *Health Politics and Policy Section, American Political Science Association* | Treasurer | 2021-2023 |

### EDITORIAL BOARD

| | | |
|---|---|---|
| *Evidence & Policy* | Editorial Board | 2022- |
| *Journal of Health Politics, Policy, and Law* | Editorial Board | 2021- |
| *World Medical & Health Policy* | Editorial Board | 2017- |

### REVIEWER FOR ACADEMIC JOURNALS

| | |
|---|---|
| *Administration & Society* | *Critical Public Health* |
| *American Journal of Political Science* | *Evaluation & the Health Profession* |
| *American Journal of Preventive Medicine* | *Governing States and Localities* |
| *American Political Science Review* | *Governance* |
| *American Politics Research* | *Health Affairs* |
| *American Review of Public Administration* | *Health Communication* |
| *British Medical Journal (BMJ)* | *Health Economics, Policy and Law* |
| *California Journal of Politics and Policy* | *Health Services Review* |
| *Cancer* | *Inquiry* |

A 14

*Interest Groups & Advocacy*

*International Journal of Health Policy and Management*

*JAMA: Journal of the American Medical Association*

*JAMA Internal Medicine*

*Journal of Health Politics, Policy, and Law*

*Journal of Clinical Oncology*

*Journal of Health Care for the Poor and Underserved*

*Journal of Health Disparities Research and Practice*

*Journal of Policy History*

*Journal of Public Administration Research and Theory*

*Journal of Public Policy*

*Journal of Quality in Health Care*

*Journal of Rural Health*

*Journal of Women, Politics & Policy*

*Milbank Quarterly*

*Medical Care Research and Review*

*North American Actuarial Journal*

*PLOS ONE*

*Policy Sciences*

*Policy Studies Journal*

*Policy Studies Journal Yearbook*

*Politics and the Life Sciences*

*Politics, Groups, and Identities*

*Public Administration*

*Public Administration Review*

*Public Health*

*Publius: The Journal of Federalism*

*Race and Social Problems*

*Regulation & Governance*

*SAGE Open*

*Social Science Quarterly*

*Social Work in Health Care*

*State and Local Government Review*

*Vaccines*

*World Journal of Emergency Medicine*

*World Medical & Health Policy*

*World Journal of Emergency Medicine*

## AWARD COMMITTEES

| | | |
|---|---|---|
| *APSA-PA Section Best Paper Award* | Member | 2022 |
| *APSA-PA Section Simon Book Award Committee* | Member | 2020-2021 |

## AT ACADEMIC CONFERENCES

| | |
|---|---|
| Organizer | Robert Wood Johnson Annual Leadership Institute 2020 |
| Program Chair | Association for Public Policy Analysis & Management 2021, 2022 |
| Section Chair | Midwest Political Science Association 2020 |
| Panel Chair | American Political Science Association 2020, 2022 |
| | Association for Public Policy Analysis & Management 2014, 2018 |
| | Association for Politics and the Life Sciences 2015 |
| | Midwest Political Science Association 2017, 2019, 2020 |
| | American Political Science Association 2020 |
| Roundtable | American Political Science Association 2020 |
| Panelist | Midwest Public Affairs Conference 2015 |
| | American Political Science Association 2016 |

A 15

| | | |
|---|---|---|
| Discussant | Association for Public Policy Analysis and Management 2015, 2018, 2019, 2020 | |
| | Midwest Political Science Association 2015, 2019, 2022 | |
| | American Political Science Association 2022 | |
| Reviewer | Association for Public Policy Analysis & Management 2021, 2022 | |

### AT THE PENNSYLVANIA STATE UNIVERSITY

| | |
|---|---|
| Speaker Series Committee, School of Public Policy | 2021-2022 |
| Faculty Search Committee, School of Public Policy | 2019-2020 |
| Graduate Studies Committee, School of Public Policy | 2019-2022 |
| Faculty Affiliate Committee | 2020-2021 |
| International Committee | 2021-2022 |
| Award Committee | 2021-2022 |
| Undergraduate Studies | 2020-2022 |

### AT WEST VIRGINIA UNIVERSITY

| | |
|---|---|
| John D. Rockefeller IV School of Policy & Politics Faculty Advisory Committee | 2016-2019 |
| Romine Award Committee *for best paper written for a Political Science class* | 2017 |
| Eberly College Medical Humanities & Health Studies Workshop | 2017 |
| West Virginia University Children's Health Summit Planning Group | 2016-2017 |

### MEMBERSHIPS

American Political Science Association (APSA)

American Public Health Association (APHA)

Association for Public Policy Analysis and Management (APPAM)

UNESCO Inclusive Policy Lab

Scholar Strategy Network (SSN)

A 16

## SELECT REFERENCES

**David L. Weimer**
Edwin E. Witte Professor of Political Economy
Department of Political Science & La Follette School of Public Affairs
University of Wisconsin–Madison
608.262.5713 or 608.263.2325
weimer@lafollette.wisc.edu

**Susan Webb Yackee**
Professor of Public Affairs and Political Science
Director, La Follette School of Public Affairs
Department of Political Science & La Follette School of Public Affairs
University of Wisconsin-Madison
608.265.6017
syackee@lafollette.wisc.edu

**Dana B. Mukamel**
Professor of Medicine, Public Health and Nursing
Department of Medicine
Division of General Internal Medicine
Director, iTEQC
University of California, Irvine
949.824.8873
dmukamel@uci.edu

**Sarah E. Gollust**
Associate Professor
Division of Health Policy and Management
School of Public Health
University of Minnesota
612.626.2618
sgollust@umn.edu

## VII.    Appendix B: Citations

Blumenberg, E., & Agrawal, A. W. (2014). Getting Around When You're Just Getting By: Transportation Survival Strategies of the Poor. *Journal of Poverty*, *18*, 355-378.

Brown, E. J., Polsky, D., Barbu, C. M., Seymour, J. W., & Grande, D. (2016). Racial Disparities In Geographic Access To Primary Care In Philadelphia. *Health Affairs*, *35*(8), 1374-1381.

Burman, A., & Haeder, S. F. (2021). Without A Dedicated Enforcement Mechanism, New Federal Protections Are Unlikely To Improve Provider Directory Accuracy. *Health Affairs Forefront*. https://doi.org/10.1377/forefront.20211102.706419

Burman, A., & Haeder, S. F. (2022a). Directory Accuracy and Timely Access to in Maryland's Medicaid Managed Care Program. *Journal of Health Care for the Poor and Underserved* *33*(2), 597-611.

Burman, A., & Haeder, S. F. (2022b). Provider Directory Accuracy and Timely Access to Mammograms in California. *Women & Health*, *62*(5), 421-429. https://doi.org/10.1080/03630242.2022.2083284

Busch, S. H., & Kyanko, K. A. (2020). Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills: An examination of the role inaccurate provider directories play in out-of-network mental health treatment and surprise bills. *Health Affairs*, *39*(6), 975-983.

Dafny, L. S., Hendel, I., Marone, V., & Ody, C. (2017). Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth. *Health Affairs*, *36*(9), 1606-1614.

Department of Health Care Services. (2019). *Millions of Children in Medi-Cal Are Not Receiving Preventive Health Services*. Department of Health Care Services.

Drake, C. (2019). What Are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence From Covered California. *Journal of Health Economics*, *65*, 63-77.

Haeder, S. F. (2012). Beyond Path Dependence: Explaining Healthcare Reform and Its Consequences. *Policy Studies Journal*, *40*(S1), 65-86. https://doi.org/10.1111/j.1541-0072.2012.00446.x

Haeder, S. F. (2019a). Quality Regulation? Access to High-Quality Specialists for Medicare Advantage Beneficiaries in California. *Health Services Research and Managerial Epidemiology*, *6*. https://doi.org/10.1177/2333392818824472

Haeder, S. F. (2019b). A Tale of Two Programs: Access to High Quality Providers for Medicare Advantage and Affordable Care Act Beneficiaries in New York State. *World Medical & Health Policy*, *11*(3), 212-230. https://doi.org/10.1002/wmh3.309

Haeder, S. F. (2020a). Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Pandemic. *World Medical & Health Policy*, *12*(3), 282-290. https://doi.org/10.1002/wmh3.357

Haeder, S. F. (2020b). Quality Advantage? Provider Quality and Networks in Medicare Advantage. *Journal of Public and Nonprofit Affairs*, *6*(2), 138-158. https://doi.org/10.20899/jpna.6.2.138-158

Haeder, S. F., & Burman, A. (2022). Potemkin Protections: Assessing Provider Directory Accuracy and Timely Access for Four Specialties in California. *Journal of Health Politics, Policy and Law*, *47*(3), 319-349.

Haeder, S. F., Burman, A., & Xu, W. Y. (Forthcoming). Provider Directory Inaccuracy and Timely Access for Mental Health Care. *American Journal of Managed Care*.

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2015a). California Hospital Networks Are Narrower In Marketplace Than In Commercial Plans, But Access And Quality Are Similar. *Health Affairs*, *34*(5), 741-748. https://doi.org/10.1377/hlthaff.2014.1406

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2015b). Narrow Networks and the Affordable Care Act. *Journal of the American Medical Association*, *314*(7), 669-670. https://doi.org/10.1001/jama.2015.6807

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2015c). Network Adequacy Standards and Health Insurance. *JAMA: The Journal of the American Medical Association*, *314*(22), 2414-2415. https://doi.org/10.1001/jama.2015.15076

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2016). Secret Shoppers Find Access To Providers And Network Accuracy Lacking For Those In Marketplace And Commercial Plans. *Health Affairs*, *35*(7), 1160-1166. https://doi.org/10.1377/hlthaff.2015.1554

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019a). A Consumer-Centric Approach to Network Adequacy: Access to Four Specialties in California's Marketplace. *Health Affairs*, *38*(11), 1918-1926. https://doi.org/10.1377/hlthaff.2019.00116

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2019b). A Knotty Problem: Consumer Access and the Regulation of Provider Networks. *Journal of Health Politics, Policy and Law*, *44*(6), 937-954. https://doi.org/10.1215/03616878-7785835

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2020a). Going the Extra Mile? How Provider Network Design Increases Consumer Travel Distance, Particularly for Rural Consumers. *Journal of Health Politics, Policy and Law*, *45*(6), 1107-1136. https://doi.org/10.1215/03616878-8641591

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2020b). Integrating Travel Distance Into Assessments of Provider Networks Using a Dyadic Approach: The Case of California's Affordable Care Marketplace. *SAGE Research Methods Cases: Medicine and Health*. https://doi.org/10.4135/9781529723021

Haeder, S. F., Weimer, D. L., & Mukamel, D. B. (2021). Mixed Signals: The Inadequacy of Provider-per-Enrollee Ratios for Assessing Network Adequacy in California (and Elsewhere). *World Medical & Health Policy*. https://doi.org/10.1002/wmh3.466

Holstein, R., & Paul, D. P. I. (2012). 'Phantom Networks' of Managed Behavioral Health Providers: An Empirical Study of Their Existence and Effect on Patients in Two New Jersey Counties. *Hospital Topics*, *90*(3), 65-73.

Kim, J., Norton, E. C., & Stearns, S. C. (2009). Transportation Brokerage Services and Medicaid Beneficiaries' Access to Care. *Health Services Research*, *44*(1), 145-161.

Klein, R. W. (2009). The Insurance Industry and Its Regulation: An Overview. In M. F. Grace & R. W. Klein (Eds.), *The Future of Insurance Regulation in the United States* (pp. 13-51). Brookings Institutions Press.

Polsky, D., Cidav, Z., & Swanson, A. (2016). Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks. *Health Affairs*, *35*(10), 1842-1848.

Ray, K. N., Chari, A. V., Engberg, J., Bertolet, M., & Mehrotra, A. (2015). Opportunity Costs of Ambulatory Medical Care in the United States. *American Journal of Managed Care*, *21*(8), 567-574.

Syed, S. T., Gerber, B. S., & Sharp, L. K. (2013). Traveling Towards Disease: Transportation Barriers to HealthCare Access. *Journal of Community Health*, *38*, 976-993.

Zhu, J. M., Charlesworth, C. J., Polsky, D., Levy, A., Dobscha, S. K., & McConnell, K. J. (2022). Characteristics of Specialty Mental Health Provider Networks in Oregon Medicaid. *Psychiatric Services*, appi. ps. 202100623.

Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access In Oregon Medicaid: Study examines phantom networks of mental health care providers in Oregon Medicaid. *Health Affairs*, *41*(7), 1013-1022.

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| ERIN ANGELO, NICHOLAS ANGELO, AND CYNTHIA WILSON, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:20-cv-00484-RP |
| v. | ) ) | |
| CENTENE MANAGEMENT COMPANY, LLC, CELTIC INSURANCE COMPANY, SUPERIOR HEALTHPLAN, INC., and CENTENE COMPANY OF TEXAS, L.P., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF ERRATA REGARDING
## THE EXPERT REPORT OF SIMON F. HAEDER, Ph.D.

PLEASE TAKE NOTICE that Dr. Simon F. Haeder has corrected the below listed items in the Expert Report of Simon F. Haeder, Ph.D. (hereafter "Haeder Report"). The changes set forth herein should be incorporated in the Haeder Report where indicated. These changes do not impact Dr. Haeder's damage methodology, or the data and materials relied upon by Dr. Haeder and produced concurrently with the Haeder Report.

| Location in Haeder Report | Reason for Change | Change |
|---|---|---|
| Page 26, first numbered paragraph, second sentence | Typographical error. | Replace "I eliminated any duplications of a Practitioner's NRI using the **State** command 'distinct'" with "I eliminated any duplications of a Practitioner's NRI using the **Stata** command 'distinct'" (emphasis added). |
| Page 56, third paragraph, third sentence | Typographical error. | Replace "That is, the economic value to be received was much ***lower*** than the value they in fact received." with "That is, the economic value to be received was much ***higher*** than the value they in fact received." (emphasis added). |

Dated: October 20, 2022

**CERA LLP**

By: /s/ Solomon B. Cera
Solomon B. Cera (admitted pro hac vice)
scera@cerallp.com
Thomas C. Bright (*pro hac vice* forthcoming)
tbright@cerallp.com
201 California Street, Suite 1240
San Francisco, California 94111
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

**WATTS GUERRA, LLP**
Mikal C. Watts
State Bar No. 20981820
mcwatts@wattsguerra.com
Francisco Guerra, IV.

1

State Bar No. 00796684
fguerra@wattsguerra.com
Mark A. J. Fassold
State Bar No. 24012609
mfassold@wattsguerra.com
Meredith D. Stratigopoulos
State Bar No. 24110416
mdrukker@wattsguerra.com
Four Dominion Drive
Bldg. 3, Suite 100
San Antonio, Texas 78257
Telephone: (210) 447-0500
Facsimile: (210) 447-0501

**ANDRES PEREIRA LAW FIRM, P.C.**
Andres C. Pereira
Texas Bar No. 00794440
apereira@andrespereirapc.com
14709 Custer Court
Austin, Texas 78734
Telephone: 512-920-2425
Facsimile 512-309-5861

– and –

**MARK RAVIS & ASSOCIATES**
Mark Ravis (admitted pro hac vice)
mravis99@gmail.com
1875 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 295-4145

*Attorneys for Plaintiffs*

2