**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

Erin Angelo et al.,

       Plaintiffs,

    v.

Centene Management Company, LLC,
Celtic Insurance Company,
Superior HealthPlan, Inc., and
Centene Company of Texas, L.P.,

       Defendants.

Case No. 1:20-cv-00484-RP

District Judge Robert Pitman

ORAL ARGUMENT REQUESTED

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## Table of Contents

Preliminary Statement...............................................................................................................1

Background ..............................................................................................................................3

      A.      The relevant insurance. ...........................................................................3

      B.      The relevant insurance policies.................................................................4

      C.      The provider database. ..............................................................................5

      D.      Named Plaintiffs' allegations....................................................................6

Legal Standard .......................................................................................................................7

This Case Should Not Be Expanded Into a Class Action .....................................................8

I.      No Standing:  The Putative Class Consists Entirely of People Who Were Not Injured by the Alleged Promise and Have No Standing. ......................................8

      A.      Plaintiffs' class-wide theory of injury from an alleged promise regarding the number of providers cannot confer standing, because Superior made no such promise. ..................................................................8

      B.      Plaintiffs' expert's class-wide damages model hinges on a promise that was not made and does not fit the facts of the case. ...............................9

      C.      The presence of uninjured persons in the putative class also precludes certification. ...........................................................................................12

II.      No Predominance:  Common Issues Do Not Predominate Over Highly Individualized Issues.........................................................................................13

      A.      Determining breach-of-contract would require highly individualized analysis, customer-by-customer..................................................................14

      B.      Determining damages, if any, would require highly individualized analysis, customer by customer. ..............................................................16

III.      No Superiority:  A Class Is Not Superior To Resolving Issues Via Contractual Remedy Provisions and the Regulated Process for Dispute Resolution...........................17

      A.      A class action is not superior to utilizing the dispute-resolution process set forth in the insurance contract..................................................................18

      B.      A class action is not superior to utilizing the Texas Department of Insurance's health insurance assistance program. .................................20

Conclusion ............................................................................................................................20

## Table of Authorities

### Federal Cases

*Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-cv-2800, 2007 WL 1771498
(S.D.N.Y. June 18, 2007)........................................................................................................17

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................................14

*Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002) .........................................15

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) .......................................................16

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)............................................................18

*Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347 (S.D. Tex. 2006)......................................................18

*Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240 (5th Cir. 2020) ...........................................13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......................................................10

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .........................................................12

*Earl v. Boeing Co.*, 53 F.4th 897 (5th Cir. 2022) ...........................................................................9

*Flecha v. Medicredit, Inc.*, 946 F.3d 762 (5th Cir. 2020)...........................................................7, 12

*Harvey v. Centene Mgmt. Co.*, 2020 WL 2411510 (E.D. Wash. May 12, 2020) ....................17, 20

*In re Asacol*, 907 F.3d at 53–55....................................................................................................17

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018)..............................................................12

*In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133 (N.D. Tex. 2014).......................................8

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) ...........................12

*In re Phenylpropanolamine Prod. Litig.*, 214 F.R.D. 614 (W.D. Wash. 2003)............................18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) .....................12

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*, ML9-2074, 2016 WL
6645789 (N.D. Cal. July 19, 2016)........................................................................................17

*Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572 (E.D. Va. 2015).......................................16

*Libertarian Party of Erie Cnty. v. Cuomo*, 300 F. Supp. 3d 424 (W.D.N.Y. 2018)......................16

*Lujan v. Defenders of Wildlife*, 540 US. 555 (1992) ......................................................................7

*Norwood v. Raytheon Co.*, 237 F.R. D. 581 (W.D. Tex. 2006).......................................................18

*Olean Wholesale Grocery v. Bumble Bee Foods*, 31 F.4th 651 (9th Cir. 2022)...........................12

*Pattillo v. Schlesinger*, 625 F.2d 262 (9th Cir. 1980)...................................................................19

*Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021)...................................................................10

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) ..........................................16

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ....................................................................7

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ...............................................................14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .....................................................7, 10, 14, 15

*Warth v. Seldin*, 422 U.S. 490 (1975).............................................................................................7

*Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011) ..............................................................19

## Other Authorities

Affordable Care Act........................................................................................................... *passim*

Fed. R. Civ. P. 23(a) .......................................................................................................8, 14

Fed. R. Civ. P. 23(b)(3)..................................................................................2, 7, 8, 10, 14, 18

Federal Rule of Evidence 702.............................................................................................10

7AA Wright & Miller, *Federal Practice and Procedure* § 1779 (3d ed. 2008)...........................18

## Exhibits

Example Insurance Policy from 2021.............................................................................Exhibit 1

Expert Report of Brian Hoyt........................................................................................Exhibit 2

Declaration of Michael Diel..........................................................................................Exhibit 3

Ambetter Online Provider Guide ..................................................................................Exhibit 4

Ambetter Notice that Network Changes Throughout the Year .........................................Exhibit 5

Article by Dafney regarding Network Size .....................................................................Exhibit 6

Article by Polsky regarding Network Size .....................................................................Exhibit 7

**Preliminary Statement**

Superior offers Affordable Care Act ("ACA") health insurance to Texans under the Ambetter Health brand. Superior is a subsidiary of Centene, one of the nation's largest ACA insurers. Thousands of Texans benefit from Superior's coverage, and the vast majority have no complaint about its service. Plaintiffs enrolled in ACA insurance from Superior and allegedly had various difficulties finding in-network doctors to meet their unique medical needs near where they live. Despite the inherently individualized nature of health care, Plaintiffs seek to certify a class of everyone who purchased Superior's ACA insurance since 2014—more than 400,000 people— ostensibly based on Superior's contractual commitment to provide a current provider directory. Plaintiffs' attempt to certify the enormous putative class fails for three reasons.

*First*, no standing. Plaintiffs' motion and expert report advance a class-wide injury theory: Superior promised 49% more doctors and other providers in its ACA network of providers than it delivered, causing customers to overpay by 14%. But Superior made no such promise. Superior does not promise a specific number of providers. The Complaint does not allege that the named Plaintiffs or anyone else received such a promise, and neither Plaintiffs' motion or expert report quotes such a promise. Because Plaintiffs' damages model is based solely on this invalid theory, which does not fit the facts of the case, they fail to establish the concrete injury in fact required to establish Article III standing.

*Second*, no predominance of common issues. Because Plaintiffs' theory of class-wide injury is invalid, they are left with highly individualized allegations of difficulties searching the provider database or getting medical care. Those allegations cannot be adjudicated on a class-wide basis. Even if some customers received inaccurate results when they searched Superior's provider database for certain types of doctors near them, that fact cannot justify a class of everyone who enrolled in Superior's ACA health insurance, because the provider database shows

1

customized results for each search based on where the customer lives and what they searched. The database is updated daily. Even assuming that Superior's provider database contained some errors, ascertaining which customers saw those errors and whether it caused them injury would require a highly individualized analysis for each class member regarding what medical care the customer needed, what they searched, whether the search result contained an error, whether the error caused injury, and damages. Plaintiffs' own allegations regarding their unique difficulties demonstrate how individualized this inquiry would need to be. Superior's customer complaint log shows that far fewer than 0.1% of Superior's ACA customers complained of any such difficulty. And because Superior's policy is to hold its customers harmless from costs that they incur because of an error in its provider database, these individualized inquiries likely would show that very few customers have damages. Thus, Rule 23(b)(3)'s requirement of predominance of common issues is not met.

*Third*, no superiority. Superior offers multiple superior means for customers to address issues with finding health care, including simply contacting Superior's customer assistance team at 1-877-687-1196; contacting the Department of Insurance at 1-800-252-3439; and seeking external third-party review, where Superior agrees to abide by the decision of an independent review organization. These superior means are explained in the insurance policies. *See* **Exhibit 1** (example insurance policy).[1] As a result, the proposed class is not superior to other readily available and regulated means of resolving the alleged problems. Thus, Rule 23(b)(3)'s requirement of superiority is not met.

For these reasons, Plaintiffs' motion to expand this case into a class should be denied.

---

[1] *See, e.g.*, 2021 Superior ACA insurance policy at pp. 3 & 87–88, available on Superior's website at https://api.centene.com/EOC/2021/29418TX014.pdf (attached as Ex. 1).

## Background

### A.    The relevant insurance.

Superior's Ambetter Health insurance is highly regulated insurance offered under the Affordable Care Act.   It is sold through the government's ACA Marketplace, located at healthcare.gov.  Healthcare.gov provides customers with information that the government deems important for customers to have when choosing between ACA offerings by various insurance companies.  The information includes price (which often is subsidized by the government), co-pay amounts, deductibles, and the ability to search the provider database—but does not include the number of providers in the network.  Superior's expert, Brian Hoyt, explained how customers purchase ACA insurance in his expert report, and he included this screenshot from healthcare.gov at page 6 of his report (attached as **Exhibit 2** (Hoyt Report)) showing information available to customers:



3

**B.       The relevant insurance policies.**

The insurance policies (i.e., contracts) at issue change each year, including based on input from the Department of Insurance, but generally provide that Superior will make available to customers a "listing of network providers" that a customer can search to "produce a list of providers based on your search criteria." *See*, *e.g.*, Ex. 1 (2021 insurance contract) at 9. They state that the customer has a right to "[a] current list of network providers." *Id*. at 91. The policies do not, however, promise a specific number of in-network providers. *See* Hoyt Report (Ex. 2) at 11; Declaration of Michael Diel (**Exhibit 3)** ¶ 3. Nor do the policies promise that customers will experience friction-free health care or a perfect provider database. With tens of thousands of providers in the network, an occasional error—often caused by providers' mistakes, *see* Hoyt Report (Ex. 2) ¶ 86—is virtually inevitable, although any errors are de minimis, *id.* ¶ 85; Diel Decl. (Ex. 3) ¶ 4.

The policies anticipate that some customers may have difficulty finding the right health care providers, and offer help from a Customer Service representative at 1-877-687-1196, *see* Insurance Policy (Ex. 1) at 9, and Superior's website describes in detail how to get help, https://ambetter.superiorhealthplan.com/need-help/help-center.html. The policies state that if a customer relies on an inaccurate provider listing, they may be entitled to be made whole. Ex. 1 at 92. It has been Superior's policy throughout the putative class period to make customers whole in such situations. Diel Decl. (Ex. 3) ¶ 5.

The policies also explain that if customers are not happy with Superior's ACA insurance or service, they can request help from the Texas Department of Insurance. Ex. 1 at 89. The policies include the phone number for the Department of Insurance (1-800-252-3439), as well as the Department's website and address. *Id.* The policies further state: "Any person, including persons who have attempted to resolve complaints through our complaint system process and who are

dissatisfied with the resolution, may report an alleged violation to the Texas Department of Insurance electronically at www.tdi.texas.gov or by phone at 1-800-252-3439. . . .  The Commissioner of Insurance shall investigate a complaint against us to determine compliance." *Id.* at 89.

### C.    The provider database.

The provider guide is available at https://guide.ambetterhealth.com.  *See* **Exhibit 4** (Provider Guide).  The insurance policies explain that the guide uses a search engine that customizes lists of in-network providers for each customer based on where the customer lives and what type of doctor the customer searches.  The policies explain that the customer sees only a "list of providers" that are tailored to the customer's "search criteria" and location.  *See* Ex. 1 at 9:

> A listing of *network providers* is available online at Ambetter.SuperiorHealthPlan.com. *We* have plan *providers and hospitals* who have agreed to provide *you* with *your* healthcare services.  *You* may find any of *our network providers* on *our* website.  There *you* will have the ability to narrow *your* search by *provider* specialty, zip code, gender, languages spoken and whether or not they are currently accepting new patients.  ***Your* search will produce a list of *providers* based on *your* search criteria** and will give *you* other information such as name, address, phone number, office hours, specialty and board certifications.

*Id.* (emphasis added).  The online provider guide explains that the provider network changes frequently as providers enter and exit the network:

> **Throughout the year, the providers available in-network may change.  It is important that you review the provider directory for the latest information on whether or not the provider you are planning to see is in-network**.  If a provider does not accept Ambetter insurance, they are referred to as out-of-network.  If you receive non-emergency services from an out-of-network provider, you may be responsible for the entire cost of the medical bill, unless otherwise required by state or federal regulations.  To take full advantage of your Ambetter coverage, it is important to only use in-network providers.  For more information, please review your Evidence of Coverage (EOC) or contact Member Services.

https://www.ambetterhealth.com/disclaimer.html (emphasis added) (attached as **Ex. 5**).[2]

---

[2]  The policies do not promise that providers that are in Superior's network when customers purchase their insurance will still be in network at any later time.  The policies do, however, state

Superior's policies also explain that a customer should call Superior if they have difficulty locating a doctor or other provider: "At any time, *you* can contact Customer Service to request a Provider Directory, or for assistance in finding a *provider*." Ex. 1 at 9. The policies include Superior's toll-free phone number on nearly every page. *See generally* Ex. 1.

### D.    Named Plaintiffs' allegations.

The named Plaintiffs make individualized allegations specific to their medical circumstances. Plaintiffs Erin and Nicholas Angelo allege that Superior improperly refused to pay claims related to Ms. Angelo's pregnancy. Am. Compl. (ECF 19) ¶¶ 60–65. The Angelos allege that Ms. Angelo's specialist was listed as in-network before they purchased the insurance, but that sometime after enrolling she was told that he stopped accepting Ambetter insurance. *Id*. ¶ 61. They allege that they incurred out-of-network expenses by seeing the original provider after Ms. Angelo rejected a referral to a different specialist. E. Angelo Decl. (ECF 62-5) ¶ 6. The Angelos are no longer Ambetter members, and Superior is unaware of any unresolved out-of-pocket costs, but would address them in accordance with the make-whole provision in the insurance policy.

Plaintiff Cynthia Wilson alleges that she faced difficulty locating an in-network primary care provider. Ms. Wilson alleges that she consulted Superior's provider database prior to purchasing her insurance, but does not allege that she relied on any specific listing. She also alleges that she later learned that Superior's database included "the entire list of providers for the Providence hospitals in Waco even though most, or all, of them either did not accept the Ambetter policy or were in the process of discontinuing acceptance of the policy." Am. Compl. ¶ 67. But

---

that if a customer needs care from a provider who has left the network, Superior will continue to cover the provider's services under certain circumstances. *See* Ex. 1 at 37. The policies also provide for out-of-network care in certain circumstances, such as emergencies or when no in-network provider is available to see the customer. Ex. 1 at 15–16.

6

she does not allege that she sought to see any doctor at the Providence hospitals. Nor does she allege that she incurred any out-of-pocket costs associated with these allegations. She does aver that Superior denied a claim for her care at an urgent care clinic, but she makes clear that her belief that the clinic was in-network was based on the clinic's statement, not Superior's database. Wilson Decl. (ECF 62-4) ¶ 6. Ms. Wilson is no longer an Ambetter member. *Id.* at ¶ 10. Superior is unaware of any unresolved out-of-pocket costs with respect to Ms. Wilson, but would address them in accordance with the make-whole provision in the insurance policy.

None of the named Plaintiffs allege that Superior made to them a representation regarding the number of providers that are in the network.

### Legal Standard

Standing—an injury in fact traceable to the defendant's conduct—is a fundamental requirement imposed by Article III. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). A plaintiff "must demonstrate standing with the 'manner and degree of evidence required at the successive stages of litigation.'" *Id.* at 2208 (quoting *Lujan v. Defenders of Wildlife*, 540 US. 555, 561 (1992)). A named plaintiff must have standing to represent a class of other allegedly injured persons. *See Warth v. Seldin*, 422 U.S. 490, 501–02 (1975). If the class representative presents a standing problem, that issue must be addressed prior to deciding class certification. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "After all, if the class representative lacks standing, then there is no Article III suit to begin with—class certification or otherwise." *Id.* In addition, even if the named plaintiffs have standing, the presence of an overwhelming number of uninjured persons within the putative class also raises Article III concerns and counsels against certification. *See TransUnion*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").

Plaintiffs also bear the burden of demonstrating that this case meets the requirements of Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

"Rule 23 does not set forth a mere pleading standard." *Id.*  A party seeking class certification "will face a rigorous analysis by the federal courts, will not be afforded favorable presumptions from the pleadings or otherwise and must be prepared to prove *with facts*—and by a preponderance of the evidence—their compliance with the requirements of Rule 23."  *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 139 (N.D. Tex. 2014).  Among other things, Rule 23 requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

**This Case Should Not Be Expanded Into a Class Action**

I.    **No Standing:  The Putative Class Consists Entirely of People Who Were Not Injured by the Alleged Promise and Have No Standing.**

A.    **Plaintiffs' class-wide theory of injury from an alleged promise regarding the number of providers cannot confer standing, because Superior made no such promise.**

The linchpin of Plaintiffs' motion is the theory that all Superior customers overpaid because Superior promised a network with a certain number of providers but delivered a network with fewer.  But Superior did not promise any particular number of providers in its network.  Thus, the sole theory of injury that Plaintiffs have presented is invalid, and therefore they have failed to establish that they have Article III standing.[3]

Superior's insurance policies do not specify the number of providers in Superior's network—nor could they, because the size changes frequently.  *See* Hoyt Report (Ex. 2) ¶ 27; Diel

---

[3]  Plaintiffs' theory of class-wide injury also bears no relationship to the named Plaintiffs' actual allegations.  None of the named Plaintiffs allege receiving any representation about network size.  Instead, they describe various unique difficulties getting care for their specific needs.  *See, e.g.*, Plaintiffs' Declarations (ECF 62-4 & ECF 62-5).  For this additional reason, this class is unworkable.  Fed. R. Civ. P. 23(a)(3) (class is appropriate only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class").

Decl. (Ex. 3) ¶ 3.  Nor does Superior elsewhere make representations regarding the number of providers in its network, or even publish information from which a consumer could calculate the size of the network.  Hoyt Report ¶¶ 14–35; Diel Decl. (Ex. 3) ¶¶ 3–4.  Moreover, Superior does not guarantee that a provider displayed in a provider search on Monday will still be there on Tuesday.  Superior specifically disclaims any such representation.  *See* Provider Guide Notice (Ex. 5) ("Throughout the year, the providers available in-network may change.").  No reasonable customer could believe that a network of providers is static, because it is common knowledge that doctors enter practice, retire from practice, sometimes move practices, and may be in-network with an insurer for a time but not indefinitely.

Allegations of overpayment can sometimes establish standing, but not when the allegation is based on implausible or incorrect assumptions.  The Fifth Circuit recently applied that principle in *Earl v. Boeing Co.*, 53 F.4th 897 (5th Cir. 2022) (rejecting overpayment standing allegations).  It is axiomatic that because Superior did not promise a network with a particular number of providers, customers cannot be injured by Superior's failure to provide a network with that number of providers.  Therefore, the proposed class fails Article III and cannot be certified.

### B.      Plaintiffs' expert's class-wide damages model hinges on a promise that was not made and does not fit the facts of the case.

Plaintiffs attempt to support their sweeping class by offering an expert report by a political scientist, Dr. Simon F. Haeder.  Dr. Haeder's class-wide damages model attempts to calculate the percentage of doctors listed in Superior's database who were not in fact in-network, and then assigns a monetary value to that difference.  Dr. Haeder's theory is that Superior misrepresented the number of providers in its network, and customers were willing to pay more as a result.  *See* Haeder Report (ECF 62-2) at 57 ("Damages can thus be calculated based on the proportion by the which the actual active network size differed, i.e. was lower, than the network size presented by

9

Centene in its provider directory."). But Dr. Haeder's model is irrelevant because it entirely is based on a promise regarding the number of providers in Superior's network that Superior never made—and which neither the Complaint nor the named Plaintiffs alleges was made. Superior's provider database does not display a count of the number of providers in the database. Superior promises only a current directory, which is not the same thing as a specific number of providers; Dr. Haeder's model purports to address only the latter. Dr. Haeder's model also includes fatal methodological flaws that render it fundamentally unreliable, as well as obvious errors that undermine its conclusions.[4]

In *Comcast v. Behrend*, the Supreme Court made clear that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to" a valid theory of liability; "[i]f the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. 27, 35 (2013). In addition, it is equally well established that Federal Rule of Evidence 702 requires an expert's opinion to "fit" the facts of the case. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Expert testimony that does not fit the facts of the case is irrelevant and thus inadmissible. *Id.* Moreover, "if an expert's opinion would not be admissible at trial, it should not pave the way for certifying a proposed class." *Prantil v. Arkema Inc.*, 986 F.3d 570, 575–76 (5th Cir. 2021). These principles are dispositive of Dr. Haeder's opinion, and thus Plaintiffs' motion for class certification.

Dr. Haeder's opinion falls apart because Superior did not make the promise that he says caused customers to overpay. But even if Superior had promised a specific number of providers

---

[4] The Court should consider these errors now. Scrutiny of purported expert testimony is necessarily a part of the rigorous analysis required at the class-certification stage. *See Wal-Mart*, 564 U.S. at 350; *Comcast*, 569 U.S. at 35–36.

in its network, Dr. Haeder's opinion still would fail to support class certification as a viable class-wide damages model because Dr. Haeder misapplies the only support for his damages model: the two economics articles upon which he relied.  Dr. Haeder asserts that these two articles establish that "a change in network size of 1% **results in** a premium change of 0.29%."  Haeder Report (ECF 62-2) at 57 fn. 32 & 33 (citing Dafney (2017) and Polsky (2016) articles).  But this mischaracterizes the two articles, because it confuses *correlation* with *causation*.

Neither article relied on by Dr. Haeder establishes a causal link between network size and premiums.  *See* Hoyt Report (Ex. 2) at 23–27 (explaining Dr. Haeder's error).  The first article, Dafney, states: "**we could not establish a causal effect of changes in [network] breadth on premiums, nor could we detect the mechanisms that generated the estimates we obtained**."  **Exhibit 6** (Dafney) at 1609 (emphasis added).  That article also states that "**the correlations we measured might not reflect a causal relationship between premiums and provider network breadth**."  *Id.* at 1610–1611 (emphasis added).  The second article, Polsky, had similar limitations, noting that the "estimated relationship of network size and premiums might have picked up unmeasured and correlated factors" and that "premiums might reflect not only the size of the network but also the quality of the providers in the network."  **Exhibit 7** (Polsky) at 1844.

The fact that the literature does not support Dr. Haeder's opinion is not surprising, because customers are not told the number of providers in Superior's ACA provider network.  Superior makes no such promise, nor is that information available on government's ACA marketplace, healthcare.gov.  Customers cannot base payment decisions on information that they do not have.  *See* Hoyt Report (Ex. 2) ¶ 21.  In *Earl v. Boeing*, the Fifth Circuit recently rejected an expert witness's conclusion of overpayment because it was based on implausible and counterfactual assumptions.  53 F.4th at 902–03 ("[P]laintiffs' theory of injury rests on two unsupportable

11

inferences."). The same result is warranted here. Because Dr. Haeder's methodology is flawed and unreliable, it cannot support class certification, and Plaintiffs are left with no class-wide damages model.

### C. The presence of uninjured persons in the putative class also precludes certification.

Even if the named Plaintiffs had standing to pursue damages for their individualized difficulties using the provider database or getting health care, certification should be denied because Plaintiffs do not and cannot show that all members of the putative class had similar difficulties. "[N]o class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). Although the Fifth Circuit has left open whether this showing must be made prior to class certification, other courts have so held. *See, e.g., In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192–94 (3d Cir. 2020); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624–25 (D.C. Cir. 2019); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47, 51–58 (1st Cir. 2018).[5] Here, even assuming that provider database inaccuracies concretely injured some customers, it is self-evident (and data shows, *see* Hoyt Report at 27–28) that the vast majority of customers never encountered any such problem.

Dr. Haeder's opinion does not change that conclusion. Even if he were correct that 49% of the providers in Superior's provider database are not "actually in-network" because they are not "actively" seeing customers, that conclusion simply does not establish that all class members encountered such a problem and were injured by it. *See Asacol*, 907 F.3d at 54 (rejecting

---

[5]  A minority of courts have disagreed. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). Superior submits that their reasoning is unpersuasive. *See Flecha*, 946 F.3d at 70–71 (Oldham, J., concurring) ("If anything, I'd think our standing analysis would be particularly rigorous at this stage, given the transformative nature of the class-certification decision.").

certification despite expert opinion that 90% of class members were injured; opinion not "sufficient to prove that any given individual class member was injured").

In any event, Dr. Haeder's opinion is not correct. As Superior's expert demonstrates, Dr. Haeder calculated his 49% error rate by wrongly assuming that providers who did not submit a health insurance claim under their individual provider NPI number during a calendar year are not "actively" seeing customers—and thus, he assumes, are not actually in the network during that calendar year. Hoyt Report (Ex. 2) ¶ 31. There are many reasons why in-network providers might not submit a claim under their individual provider NPI number during a year yet still be in-network, including that some providers bill their claims under their group NPI numbers or under supervising physician NPI numbers, and that Superior has tripled the number of counties it serves throughout the relevant period, and consequently added providers in parts of the state in which it was not yet offering ACA insurance. *See* Hoyt Report (Ex. 2) ¶¶ 36–68 (extensive analysis of Dr. Haeder's massive miscalculation); *see also* Diel Decl. (Ex. 3) ¶ 4 (Superior updates its provider database daily, and promptly fixes errors upon discovery). Thus, Dr. Haeder methodology is irreparably flawed and cannot establish that all—or any—class members were injured. Moreover, because Superior makes its customers whole if they incurred out-of-pocket costs as a result of an inaccurate provider listing, it is unlikely that more than a de minimis number of the more than 400,000 customers could have unaddressed injuries in connection with any errors in the provider database.

## II.    <u>No Predominance:</u>  Common Issues Do Not Predominate Over Highly Individualized Issues.

"[P]laintiffs seeking class certification . . . must . . . present a damages model 'establishing that damages are capable of measurement on a classwide basis.'"  *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast*, 569 U.S. at 34). Because Plaintiffs' theory of class-wide damages fails for the reasons described in Section I *supra*, they are left with

highly individualized allegations that cannot survive Rule 23(b)(3)'s requirement "that the questions of law or fact common to class members predominate over any questions affecting only individual members." It would take a highly individualized customer-by-customer analysis to find who had difficulty with the provider search engine or with out-of-pocket costs, whether that difficulty has not yet been addressed, and whether it amounts to a breach of the insurance contract.

Courts must give "careful scrutiny to the relation between common and individual questions," and may not certify a class unless the "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). This test is "far more demanding" than Rule 23(a)(2)'s commonality requirement, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997), which itself is not satisfied by just any common question, but only by a question the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). If there is no method of measuring damages on a class-wide basis, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast Corp.*, 569 U.S. at 34. Here, individualized issues permeate.

### A.   Determining breach-of-contract would require highly individualized analysis, customer-by-customer.

Superior's provider guide uses a search engine that customizes results based on what is searched and where the customer would like to see a provider. *See* Ex. 1 at 9 ("Your search will produce a list of providers based on your search criteria . . . ."). Search results could contain an inaccuracy displayed to one customer, but that would not establish that any other customer saw the same result or was harmed. For example, even if Ms. Angelo encountered an inaccurate listing of the specialist she sought in Austin for her specific needs in connection with her pregnancy, that

14

would not establish an actionable breach as to anyone who did not require that specialized care or who lived in another part of the state. It would take highly individualized inquiries into each class member to see whether they saw an inaccurate provider search result. *See Wal-Mart*, 564 U.S. at 350 (explaining that a common contention is one "capable of class-wide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 602–03 (E.D. La. 2002) (denying class certification where an individualized inquiry into each proposed class member's contract was necessary to determine breach).

If it were determined that a customer saw an inaccurate provider search result, another inquiry would then be needed to determine whether the customer relied on the result and suffered any damage, and to determine whether the situation amounted to a breach of the insurance contract. The cause could be Superior's mistake by erroneously including the provider in the database, but it might also have resulted from the provider's mistake in erroneously telling the customer that they did not take Superior's ACA insurance. This is not an uncommon occurrence; many providers participate in multiple networks, and their staffs can make mistakes. Hoyt Report (Ex. 2) ¶ 86. In addition, the cause could be the customer's mistake from assuming that a provider who was in network at time the customer enrolled in the health insurance was still in network at a later time.

Even if the error was made by Superior, it likely would not amount to an actionable breach of contract because the insurance contract contemplates potential provider directory errors and provides a remedy for such errors. When a customer relies upon an error in Superior's provider search results, Superior makes the customer whole, including by paying an out-of-network claim that resulted from the customer seeing an out-of-network provider. *See* Insurance Contract, Ex. 1 at 92; Diel Decl. (Ex. 3) ¶ 5. And even if the inconvenience of having to make additional phone

15

calls to find an in-network provider could be actionable (it is not[6]), most putative class members did not encounter even that problem.  Data shows that fewer than 0.1% of Superior's ACA customers have complained about such issues.  *See* Hoyt Report (Ex. 2) ¶¶ 83–89 (only 191 complaints regarding the provider network or directory out of more than 400,000 customers).

This case is unworkable as a class because individualized inquiries would be necessary to determine which customers had unaddressed difficulties, the cause of the difficulty, and whether it amounted to an actionable breach.  Because of Superior's readily available means of addressing difficulties (including lodging a complaint), customers with unaddressed difficulties are likely to be few.  *See* Hoyt Report (Ex. 2) ¶ 83; *see also* Insurance Contract (Ex. 1) at 3, 9, 87–89, & 92.

### B. Determining damages, if any, would require highly individualized analysis, customer by customer.

Even if Plaintiffs could establish a breach of contract for some putative class members, an individualized inquiry would be required to determine whether there were damages, and if so in what amount.  The Fifth Circuit has repeatedly held that "where the issue of damages does not lend itself to . . . mechanical calculation, but requires separate minitrial[s] of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (quotation omitted); *see also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) ("[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class.").

---

[6]  Mere inconvenience is not an actual concrete injury.  *See, e.g., Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572, 583 (E.D. Va. 2015); *Libertarian Party of Erie Cnty. v. Cuomo*, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018).

16

Here, Plaintiffs have offered for no viable model, from Dr. Haeder or anyone else, for determining damages from unique difficulties on a class-wide basis. Nor could they. Such damages are inherently individualized and would depend on a myriad of factors including, among others, whether a customer actually incurred an out-of-pocket charge as a result of an inaccurate provider search result, the amount of the charge, whether she actually paid the charge, and whether she already has sought redress from Superior.[7] These questions predominate over any common questions, rendering class certification inappropriate. *See, e.g.*, *Harvey v. Centene Mgmt. Co.*, No. 2:18-cv-00012-SMJ, 2020 WL 2411510, at \*4 (E.D. Wash. May 12, 2020) (rejecting class certification in similar case because, inter alia, predominance not satisfied); *In re Asacol*, 907 F.3d at 53–55 (where "there are apparently thousands who in fact suffered no injury," the "need to identify those individuals will predominate and render an adjudication unmanageable."); *see also Bell Atlantic,* 339 F.3d at 302–03 (noting that class certification should be denied "where fact of damage cannot be established for every class member").

III.    **No Superiority:    A Class Is Not Superior To Resolving Issues Via Contractual Remedy Provisions and the Regulated Process for Dispute Resolution.**

There is no need for this Court to take on the individualized inquiries into medical needs presented by expanding this case into a class action. There are two superior alternative methods for customers to resolve their complaints: (1) utilizing the dispute-resolution procedure set forth

---

[7] An inaccurate provider listing could result in injury only if a customer paid costs because they saw a doctor they believed was in-network but who was not, leading to a "surprise" bill. *See, e.g.*, *In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*, ML9-2074, 2016 WL 6645789 (N.D. Cal. July 19, 2016) (health-insurance customers who did not incur monetary harm as result of allegedly unfair reimbursement formula suffered no injury and had no standing); *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-cv-2800, 2007 WL 1771498, \*19–20 (S.D.N.Y. June 18, 2007) (holding that mere disappointment of contractual expectation not sufficient to create standing in suit against health insurer). No named Plaintiff alleges that she paid a surprise bill or otherwise suffered actual pecuniary harm as a result of a specific provider listing inaccuracy, and if that did happen, Superior would remedy it pursuant to its insurance policy. Diel Decl. (Ex. 3) ¶¶ 5–7.

17

in the insurance contract, and (2) utilizing the Texas Department of Insurance program to help people with health insurance.

Under Rule 23(b)(3), the Court must "compare the possible alternatives to determine whether [a class action] is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action." 7AA Wright & Miller, *Federal Practice and Procedure* § 1779 (3d ed. 2008); *see also Norwood v. Raytheon Co.*, 237 F.R. D. 581, 604–05 (W.D. Tex. 2006) ("[N]umerous individual issues that would require adjudication weigh against class certification."); *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 380 (S.D. Tex. 2006) (same).

The superiority analysis is not limited to comparing class actions to other forms of litigation such as individual lawsuits. The text of Rule 23(b)(3) refers broadly to "other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule's drafters recognized that "another method of handling the litigious situation may [have] greater practical advantages" than a class action. Fed. R. Civ. P. 23(b)(3) Advisory Committee Note. Accordingly, they chose language, including the expansive term "methods," that extends beyond judicial mechanisms. *See* Wright & Miller, *supra*, § 1779 ("The court need not confine itself to other available 'judicial' methods of handling the controversy in deciding the superiority of the class action."); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 n.24 (5th Cir. 1996) (noting that parties can turn to non-judicial methods including "mediation and arbitration to settle individual or aggregated cases.").

## A.    A class action is not superior to utilizing the dispute-resolution process set forth in the insurance contract.

Courts have concluded that a class action fails the superiority inquiry where a defendant itself offers a mechanism by which putative class members may obtain relief. *See, e.g.*, *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) (class

18

action not superior where "defendants maintain refund and product replacement programs"); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 504 (C.D. Cal. 2011) (class action not superior where defendant "allow[ed] consumers to obtain refunds for the garments, even without a receipt, and reimburse[d] consumers for out-of-pocket medical costs" allegedly defective product).

The insurance policies at issue here direct customers to contact Superior if they have a problem, such as inability to locate an in-network provider or incurring costs from an out-of-network provider when no in-network provider is available. Ex. 1 at 9, 87 & 92. The procedure in the policies is straightforward. Customers should call or write to Superior to seek assistance, including reimbursement when appropriate. *See id.* Superior will work to resolve the issue by analyzing the unique facts of each request. *Id.* at 87. If the customer is not satisfied with Superior's resolution, the customer can escalate the issue to an external review organization certified by the Department of Insurance, and have the matter reviewed; Superior will abide by the external review organization's decision. *Id.* at 88–89. The dispute-resolution process set forth in the contract has worked many times, and it leads to relatively efficient resolutions of out-of-network costs in nearly every instance in which a customer has used it. *See* Diel Decl. (Ex. 3) ¶ 6.

A class action offers no advantage over this process. Indeed, a class action is inferior to because "any claims paid through the class action procedures would be reduced by the costs of suit and attorneys' fees." *Pattillo v. Schlesinger*, 625 F.2d 262, 265 (9th Cir. 1980).

In a similar case filed against Centene in Washington, the court concluded that Centene's program for resolving customer difficulties was superior to a class action:

> Plaintiff argues that to deny class certification based on the availability of relief from Centene would mean "any defendant with a customer service department could defeat superiority by arguing that it should be allowed to handle complaints in house." **The Court disagrees. Unlike the average business that fields complaints from dissatisfied customers, Centene operates in a highly regulated industry, bound by a web of statutory and regulatory requirements over which**

19

**an independent state agency, the OIC, has enforcement authority.  Nor does the average business permit its customers to appeal adverse decisions to an outside agency, certified by state regulators, the decision of which it agrees to be bound by.  In short, the Court finds the putative class members have an adequate alternative to class litigation by requesting reimbursement for balance billing from Centene itself and, if dissatisfied, appealing to the IRO.**

*Harvey*, 2020 WL 2411510, at *4 (emphasis added).  The same conclusion applies here.

**B.**      **A class action is not superior to utilizing the Texas Department of Insurance's health insurance assistance program.**

A customer can also contact the Texas Department of Insurance if the customer incurs costs from seeing an out-of-network provider or otherwise believes that Superior has not followed the contract.  Ex. 1 at 89.  When a customer contacts TDI, it will work to resolve the issue.  *See* Consumer Information, https://www.tdi.texas.gov/consumer/index.html.  TDI's website notes that it has helped consumers "recover millions in claims and premium payments." *Id.*  This avenue of redress also is superior to a class action suit.  *See Harvey*, 2020 WL 2411510, at *4 ("given the availability of assistance from the [Office of Insurance Commissioner] and the relief it is capable of providing, Plaintiff has failed to show no realistic alternatives to a class action exist").  Thus, two overlapping mechanisms exist to address the alleged harm that Plaintiffs ask this court to adjudicate.  The usual rationale for class actions—that plaintiffs lack resources or sufficient incentive to pursue individual claims—does not apply here, where Superior's customers have multiple low-cost methods to address problems (including receiving reimbursement) and an Insurance Commissioner to advocate (and regulate) for their interests.  Because a class action is not superior to these alternative methods, class certification should be denied.

### Conclusion

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated:  December 19, 2022                              Respectfully submitted,

                                                      WILLIAMS & CONNOLLY LLP

20

By:   /s/ Steven M. Cady
Steven M. Cady (admitted *pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
T: (202) 434-5321
F: (202) 434-5029
scady@wc.com

– and –

Lorinda G. Holloway
Texas Bar No. 00798264
Timothy P. Ribelin
Texas Bar No. 24091055
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701-4093
Telephone:  (512) 479-1149
Facsimile:  (512) 479-1101
lorinda.holloway@huschblackwell.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing.

By:   /s/ Steven M. Cady
Steven M. Cady

21