HIGHLY CONFIDENTIAL

**Exhibit 2**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

ERIN ANGELO, et al.

     Plaintiffs

v.

CENTENE MANAGEMENT COMPANY,
LLC, CELTIC INSURANCE COMPANY,
SUPERIOR HEALTH PLAN, INC., and
CENTENE COMPANY OF TEXAS, L.P.
Superior Community Health Plan, Inc.

     Defendants

Case No. 1:20-CV-00484

**EXPERT REPORT OF BRIAN E. HOYT**
**ON BEHALF OF DEFENDANTS**

**December 5, 2022**

**HIGHLY CONFIDENTIAL**

**Table of contents**

I.    Introduction                                                                          1

   A.    Qualifications                                                              1

   B.    Compensation                                                              2

   C.    Case Overview                                                            2

   D.    Assignment                                                                3

   E.    Materials Relied Upon                                               3

II.    Summary of Opinions                                                            4

III.    Dr. Haeder Is Wrong in Alleging that Superior Made a "Misrepresentation" to Its ACA Customers Regarding the Number of Providers in its ACA Provider Network.    4

   A.    No "Representation" Regarding the Number of Providers in the Network on the Health Insurance Marketplace.    5

   B.    No "Representation" Regarding the Number of Providers in the Network by Superior in its ACA Plan Documents or Contracts.    11

   C.    No "Representation" Regarding the Number of "Active" Providers in the Network by Superior.    12

IV.    Dr. Haeder Is Wrong in Alleging that 49% of Superior's ACA Providers Are Not "Actually In-Network."    14

   A.    Implementation of Dr. Haeder's Methodology Would Violate State and Federal Regulations Related to Provider Directories.    14

   B.    Dr. Haeder's Methodology Ignores the Effect of Superior's ACA Expansion into New Counties During Relevant Years.    15

   C.    Dr. Haeder's Methodology Wrongly Characterizes the Vast Majority of Dental and Vision Providers as Not In-Network.    18

   D.    Dr. Haeder's Methodology Wrongly Characterizes All Individual Providers Billing Under Their Group NPI as Not In-Network.    19

   E.    Dr. Haeder's Methodology Wrongly Characterizes All Providers Billing Under a Supervising Physician's NPI as Not In-Network.    20

   F.    Dr. Haeder's Methodology Wrongly Characterizes Providers Who Bill Claims in Other Years as Not In-Network.    22

   G.    Dr. Haeder's Methodology Wrongly Characterizes Providers Contracted by Superior as Not In-Network.    22

V.    Dr. Haeder's Methodology Misapplies the Economic Literature in Calculating Damages.    23

VI.    Superior's Complaint Log Shows that Very Few Superior ACA Customers Had Issues Finding In-Network Healthcare Services    27

VII.    Conclusion                                                                       31

**HIGHLY CONFIDENTIAL**

## I.      Introduction

### A.      Qualifications

1.      My name is Brian E. Hoyt. I have close to 30 years of professional experience providing economic, financial, and data analysis consulting services primarily to clients in the healthcare industry. I graduated from George Washington University with a Bachelor's degree in Economics. I earned a Master's in Business Administration with a concentration in Finance from the University of Colorado. A copy of my curriculum vitae is included as Appendix A.

2.      I am a Managing Director in the Health Analytics practice at Berkeley Research Group ("BRG"). BRG is a global consulting firm comprised of experts, industry leaders, academics, data scientists, and other professionals with extensive experience in a broad array of specialties and industries. BRG experts consult with clients throughout the United States and abroad on a wide range of topics, including the complex regulatory, contractual, and financial environments in which healthcare organizations operate. BRG experts provide independent and objective analysis and opinions related to disputes in the healthcare industry, including commercial disputes and class action litigation. BRG's Health Analytics practice is comprised of experts skilled in analyzing financial, clinical, operations, and transactional data maintained by healthcare payers, healthcare providers, pharmaceutical manufacturers, and government entities.

3.      I have spent my professional career focused on data analytics, economic and financial modeling, evaluation of business processes and practices, and regulatory compliance on projects involving a wide array of issues, with a particular focus on the healthcare industry. Most of the projects and studies that I have conducted involved issues pertaining to managed care, including formation, management, and adequacy of provider networks; submission and payment of claims for healthcare services and products; underwriting and rating; enrollment and billing; utilization management; provider data and directories; and pharmacy benefits and pricing.

4.      My clients often require my expertise related to the Patient Protection and Affordable Care Act and to federal healthcare programs including Medicare, Medicaid and the Federal Employees Health Benefits Program.

1

**HIGHLY CONFIDENTIAL**

5.      I have been selected as an independent monitor of enforcement decrees and have testified as an expert witness on issues related to managed care, network adequacy and provider directories.

**B.      Compensation**

6.      In preparing this report I have been assisted by staff at BRG working under my supervision. BRG bills for professional services rendered based on actual hours incurred at contractually agreed-upon rates per hour. My billing rate is $750 per hour. Neither my nor BRG's compensation in this matter is dependent on, or in any way contingent upon, my findings or opinions or the outcome of the litigation.

**C.      Case Overview**

7.      I understand that plaintiffs in this case make three basic allegations:

    a.  *First*, that defendants (collectively, "Superior") misrepresented to its Affordable Care Act customers the size of the network of providers available to see these customers by telling these customers that the network is 49% larger than it truly is. Plaintiffs' expert, Dr. Simon F. Haeder, alleges: "Overall, the Centene provider network directory published for Ambetter Policyholders contains on average 49% practitioners who are not active network participants."[1]

    b.  *Second*, based on Superior's alleged misrepresentation about how many providers are in its provider network, Superior's ACA customers paid 14% more for their Affordable Care Act insurance than they otherwise would have paid.  Plaintiffs appear to base their "14% overcharge" calculation on literature, which plaintiffs assert shows a causal relationship between the number of providers in a network and customers' willingness to pay. Dr. Header alleges: "[a] 1% increase in network breadth corresponds to a 0.29% increase in premiums."[2]

---

[1] Expert Report of Simon F. Haeder, September 30, 2022, p. 39. ("Haeder Report").

[2] Haeder Report, p. 57 (49% "not active" x 0.29% "elasticity of demand" = 14.21% alleged overcharge).

2

**HIGHLY CONFIDENTIAL**

    c. *Third*, based on their 14% overcharge calculation, plaintiffs are asking the Court to order Superior to pay roughly 14% of insurance premiums to members of a putative class. Dr. Header alleges: "The foregoing network inaccuracies translate to a gross premium overcharge paid by Class members calculated to be $1,234,896,342."[3]

8. Plaintiffs submitted an expert report – dated September 30, 2022 – by Dr. Simon F. Haeder in support of the above allegations.

### D. Assignment

9. I have been retained by counsel for Superior to review Dr. Haeder's report and supporting materials to ascertain whether the opinions in that report are supported by the facts.

### E. Materials Relied Upon

10. In completing this assignment, I have reviewed materials including Dr. Haeder's report and its backup materials, documents produced in this litigation, economic literature, various publicly available material, and additional material that I requested from Superior. The full list of materials I have relied on to form my opinions are listed in Appendix B and this report's footnotes.

11. The opinions in this report are my own and are based upon my education, professional experience, the references cited in this report, and examination of the documents and other information provided by the parties in this litigation. My opinions are based on currently available information and analyses as presented in the Haeder Report. To the extent that new information or data become available, or Dr. Haeder presents new opinions or analyses, I reserve the right to update my analyses and opinions. Should Dr. Haeder decline to offer his opinions at trial, I reserve the right to offer my opinions affirmatively.

12. Additional demonstrative exhibits may be prepared for use at trial to summarize my opinions and analyses.

---

[3] Haeder Report, p. 8.

3

**HIGHLY CONFIDENTIAL**

## II.    Summary of Opinions

13.    Based on my work in this matter, I conclude that (a) Superior did not make any representation (or misrepresentation) regarding how many providers are in its ACA network; (b) Dr. Haeder's methodology is unreliable and he is wrong in alleging that 49% of Superior's network is not "actually in-network"; (c) Dr. Haeder's methodology is unreliable and he is wrong in how he applied the economic literature, which does not establish a causal relationship between network size and premiums and does not support his elasticity of demand model; and (d) very few, if any, of Superior's customers were harmed by the issues raised by Dr. Haeder, and an individualized analysis regarding each of these customers would be required to ascertain which customer was harmed, the cause, the fault, and whether the issue has already been remedied.

## III.    Dr. Haeder Is Wrong in Alleging that Superior Made a "Misrepresentation" to Its ACA Customers Regarding the Number of Providers in its ACA Provider Network.

14.    Dr. Haeder opines that Superior misrepresented to its customers the number of providers in its provider network, which he says caused customers to select Superior's ACA health insurance and pay more for it.  Dr. Haeder writes: "[c]onsumers selected their plans and paid the premiums purchasing access to a provider network of the size represented on Centene's website."[4] He further opines that, because some providers were not "active participants" in the Superior network, the "benefits received by Centene's consumers are materially less than the benefits promised to them."[5]

15.    To evaluate his opinions, I reviewed the information that is available to customers on the Health Insurance Marketplace® website, on Superior's website and provider directory, and in various documents that Superior provides to its customers.

16.    Based on my review of the available information, I found no evidence that Superior makes either of these representations to its customers regarding the number of providers in its provider network (i.e., the "size") – and how many are "active" in seeing Superior's ACA customers in a given calendar year.

---

[4] Haeder Report, p.1.

[5] Haeder Report, p.1.

4

**HIGHLY CONFIDENTIAL**

**A.    No "Representation" Regarding the Number of Providers in the Network on the Health Insurance Marketplace.**

17.    The number of providers in Superior's ACA provider network is not information that is made available to customers on Health Insurance Marketplace® website at www.HealthCare.gov ("HealthCare.gov"), where customers – and prospective customers – shop for ACA health insurance plans based on plan-specific information, including premiums, deductibles, and customer cost share amounts. The government determines what information is available to customers on HealthCare.gov, which does not include the number of providers in a health insurance company's ACA provider network.[6]

18.    The information available to customers on HealthCare.gov is shown below, which includes information regarding premiums, deductibles, and patient copays—but does not include information regarding the number of providers in the ACA provider network. *See* Exhibit 1.[7]

---

[6] The Superior plans at issue are the "Ambetter from Superior HealthPlan" health insurance plans made available under the Patient Protection and Affordable Care Act ("ACA"). These plans are marketed and sold in certain counties in the state of Texas on the Health Insurance Marketplace® website at https://www.HealthCare.gov. As a Qualified Health Plan ("QHP") available through the ACA marketplace, Superior is subject to the certification process described at: https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/qhp.

[7] For this purpose, using the search functionality on HealthCare.gov, I selected Gold Ambetter plans available in ZIP Code 78701. For these exhibits, I chose plans with a deductible of approximately $2,000. The search options and filters on HealthCare.gov do not include an option to search by network size.

**HIGHLY CONFIDENTIAL**

**Exhibit 1: HealthCare.gov Plan Listing for Ambetter from Superior HealthPlan**



19.     Similarly, the number of providers in other health insurance companies' ACA provider networks is not made available to customers on HealthCare.gov. Instead, it appears that companies offering ACA insurance in Texas use standard language to describe their provider networks. This language is prescribed by CMS and is indicative of the highly-regulated

**HIGHLY CONFIDENTIAL**

environment in which ACA issuers operate when selling plans on the Health Insurance Marketplace. *See* Exhibit 2.[8]

**Exhibit 2: HealthCare.gov Plan Listing for Blue Cross and Blue Shield of Texas**



20.     The information made available to customers (or potential customers) for other ACA insurance offered to customers in Texas includes premiums, deductible, and customer cost share amounts—similar to the information provided with respect to Superior's ACA offerings.

21.     This demonstrates that the number of providers in the network is not made available for any ACA offering in Texas. Thus, logically it could not be a factor that causes customers to select a certain ACA insurance plan or to pay higher premiums. Based on this, I conclude that Dr. Haeder's methodology is unreliable in that it leads him to conclude that customers paid more based on information that they do not have. Moreover, the premiums

---

[8] For this purpose, using the search functionality on HealthCare.gov, I selected Gold Blue Cross and Blue Shield of Texas plans available in ZIP Code 78701. For these exhibits, I chose plans with a deductible of approximately $2,000. The search options and filters on HealthCare.gov do not include an option to search by network size.

**HIGHLY CONFIDENTIAL**

charged by ACA health insurance plans in Texas are regulated, and customers cannot choose to pay more or less; instead, they simply decide to purchase the insurance or not.[9]

22.    ACA health plans in Texas do not advertise (or even publicize to customers) the number of providers in their respective networks because the number of providers scales with the number of customers and is largely driven by the number of customers in the plan and the geographical area in which the plan is offered.  For this reason, even if customers had the information, it may not be relevant to their selection of which ACA insurance plan to purchase. For example, the total number of providers in the network in the state of Texas largely is irrelevant to a particular customer who may live in Houston.

23.    Based on my review, it appears that the only information provided to customers regarding the number of providers in Superior's ACA provider network (as well as other ACA provider networks) is high-level information that is visible in the "Access to Doctors and Hospitals" drop-down menu under the "Plan Details" on HealthCare.gov. This high-level information characterizes provider networks as "larger than", "about the same" or "smaller than" the "other plans in similar areas." *See* Exhibit 3.

---

[9] ACA plans on the Health Insurance Marketplace submit an "Individual Rate Filing" each year that includes: Part I Unified Rate Review Template, Part II Written Justification of Rate Increase, and Part III Actuarial Memorandum. In Texas, this information is "intended for use by the Texas Department of Insurance, the Center for Consumer Information and Insurance Oversight (CCIIO), and health insurance consumers in Texas to assist in the review" of the individual rate filings for ACA plans. *See* https://ratereview.healthcare.gov/files-cjn/935721_TX_PY21PartIIJustification_v1_20200528.pdf.

8

**HIGHLY CONFIDENTIAL**

**Exhibit 3: HealthCare.gov "Access to Doctors and Hospitals" for Ambetter from Superior HealthPlan**



24.     These characterizations are not explained on HealthCare.gov, but they appear to be an indication of the relative network size compared to other plans in "similar areas." It is unclear whether the "other plans" comparison is to only ACA plans, or to a wider variety of plans, and it is unclear whether "similar areas" means the same county, or in counties/regions of similar population density. CMS does not describe how it performs these comparisons and does not define the terms, and Dr. Haeder does not refer to these network comparisons in his report.

25.     I reviewed these network comparisons for all Superior ACA health insurance plans available for plan year 2023 on HealthCare.gov and found that Superior's ACA networks were all characterized as either "about the same" or "smaller than" the "other plans in similar areas," whereas some other ACA health insurance plan networks were characterized as "larger than other plans in similar areas."[10] *See* Exhibit 4. Further, I confirmed that these network comparisons do not include any representation regarding the actual number providers in any of the ACA provider networks.

---

[10] I was not able to determine how long these comparisons have been available on HealthCare.gov, nor was I able to determine whether any customers or potential customers navigated to this sub-menu and saw one of these comparisons.

**HIGHLY CONFIDENTIAL**

**Exhibit 4: HealthCare.gov "Access to Doctors and Hospitals" for Blue Cross and Blue Shield of Texas**



26.     I also reviewed the Summaries of Benefits and Coverage ("SBCs") that are available to customers at HealthCare.gov for any "representation" of the number of providers in ACA provider networks offered in Texas. As with the plan listings described above, the SBCs also use prescribed language to describe the provider network and do not make any representation regarding the number of providers in the ACA provider networks. This is true for Superior plans and for all other ACA plans available in the state of Texas on HealthCare.gov.[11] *See* Exhibits 5[12] and 6.[13]

**Exhibit 5: Summary of Benefits and Coverage: Ambetter from Superior HealthPlan**

| Will you pay less if you use a network provider? | Yes. See https://ambetter.superiorhealthplan.com/findadoc or call 1-877-687-1196 (Relay Texas/TTY 1-800- | This plan uses a provider network. You will pay less if you use a provider in the plan's network. You will pay the most if you use an out-of-network provider, and you might receive a bill from a provider for the difference between the provider's charge and what your plan pays (balance billing). Be aware, your network provider might use an out-of-network provider for some services (such as lab work). Check with your provider before you get services. |

---

[11] Summary of Benefits and Coverage Instruction Guide for Individual Health Insurance Coverage, p. 8, available at: https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/Individual-Instructions-508-MM.pdf.

[12] *See* https://api.centene.com/SBC/2023/87226TX0070012-01.pdf

[13] *See* https://www.bcbstx.com/sbc/ind/sbc-ghsa71bavitxp-tx-2023.pdf.

**HIGHLY CONFIDENTIAL**

**Exhibit 6: Summary of Benefits and Coverage: Blue Cross and Blue Shield of Texas**

| Will you pay less if you use a network provider? | Yes. See www.bcbstx.com/go/bahmo or call 1-888-697-0683 for a list of Participating providers. | This plan uses a provider network. You will pay less if you use a provider in the plan's network. You will pay the most if you use an out-of-network provider, and you might receive a bill from a provider for the difference between the provider's charge and what your plan pays (balance billing). Be aware, your network provider might use an out-of-network provider for some services (such as lab work). Check with your provider before you get services. |
| --- | --- | --- |

27.    Based on my review of this information, I found no instance where the Health Insurance Marketplace indicates the number of providers in Superior's provider network. It makes sense to me that information regarding the number of providers in an ACA provider network is not made available to customers, because the economic literature show that, in general, customers purchase ACA insurance based on premiums, deductibles, and copays—not based on the overall number of providers in the network in the state.[14] Moreover, network size in part is driven by the number of customers in the health insurance plan in a given area, and it is well known that provider networks change frequently as providers retire and new providers join the network.[15]

**B.    No "Representation" Regarding the Number of Providers in the Network by Superior in its ACA Plan Documents or Contracts.**

28.    The number of providers in Superior's ACA provider network also is not information that Superior makes available to customers in its plan documents, including its Evidence of Coverage documents ("EOC" or "insurance contract"), its website,[16] or its online provider directory.[17] Based on my review of these materials, Superior does not make a representation regarding the number of providers in its ACA provider network (i.e, the size of the network). Rather, Superior states in its materials that it is "committed" to "[p]roviding access to *covered services* and *our network providers*" and that it will work to cover out-of-network care provided to a customer if no in-network provider is available to provide the

---

[14] Gunja, M. Z., Collins, S. R., Doty, M. M., & Beutel, S. (2016). Americans' Experiences with ACA Marketplace Coverage, Affordability and Provider Network Satisfaction. Issue Briefs (Commonwealth Fund), available at: https://www.commonwealthfund.org/publications/issue-briefs/2016/jul/americans-experiences-aca-marketplace-coverage-affordability-and.

[15] Ndumele, C. D., Staiger, B., Ross, J. S, & Schlesinger M. J. (2018). Network Optimization and the Continuity of Physicians in Medicaid Managed Care. Health Affairs, 36(7), p. 929, available at: https://www.healthaffairs.org/doi/10.1377/hlthaff.2017.1410.

[16] *See* https://ambetter.superiorhealthplan.com/.

[17] *See* https://guide.ambetterhealth.com/.

11

**HIGHLY CONFIDENTIAL**

needed care, and it provides its toll-free number to help its customers get care when they need it.[18]

### C.   No "Representation" Regarding the Number of "Active" Providers in the Network by Superior.

29.   Dr. Haeder separately opines that, because certain providers do not bill a claim in a particular calendar year, they are not "active" in the network – and he says that Superior made a misrepresentation regarding how many in-network providers are "active" as he defines it.

30.   Critically, Dr. Haeder defines his test for whether a provider is "active" in the network as: whether the provider has billed a claim under his or her individual practitioner National Provider Identifier ("NPI") number in a calendar year. Individual practitioner NPIs are unique numbers assigned to each individual doctor and other provider of health care in the United States, including Physicians' Assistants, Nurse Practitioners, and provider groups such as behavioral health provider groups. For his analysis, Dr. Haeder used "monthly lists of practitioners who had filed one or more claims for services" provided to Superior customers.[19] Dr. Haeder attempted to use this dataset to identify those providers that were not "active network participants" in Superior's ACA provider network, meaning in his view that they did not bill a claim under their individual NPI in a particular calendar year.

31.   Dr. Haeder's methodology deems all providers who did not bill a claim under their individual NPI in a calendar year as not "active" – regardless of whether the provider is in-network and *available* to see customers when they need care, or is actively seeing customers but billing under a different NPI. His methodology is unsound for a variety of reasons, including because it assumes that any provider not actively seeing a Superior ACA customer in a particular year is not available to see a customer – and he wrongly asserts that Superior made a representation to its customers regarding how many providers are "active," as he defines it.

32.   To evaluate Dr. Haeder's assertion that Superior misled its customers regarding the number of "active" providers in Superior's network (per Dr. Haeder's definition), I reviewed

---

[18] *E.g.*, SW000808, pp. 14, 15, 85 (emphasis in original).

[19] Haeder Report, p.26.

**HIGHLY CONFIDENTIAL**

the information described above to see whether in fact Superior makes any representation regarding how many providers are in its ACA network are "actively" seeing customers.

33.    Based on my review of these documents, Superior does not make any representation as to how "active" its network providers are – or will be – in seeing customers or billing claims, or how many providers in its network are "active" (as defined by Dr. Haeder) in seeing customers within a certain period.[20] Dr. Header alleges generally that Superior made such a representation, but he cites no source for the allegation, and he does not quote the alleged representation. In my search, I found no such representation made by Superior.

34.    In conclusion, my thorough review of materials from CMS and Superior shows that Superior does not make any representation (or misrepresentation) regarding the number of providers in its network, nor does it make any representation (or misrepresentation) regarding the number of providers in its network that "actively" billed a claim in a given calendar year. CMS provides a high-level network comparison in the Plan Details drop-down menu on HealthCare.gov, but this information is not sufficient for customers to ascertain the number of providers in the Superior provider network or how "active" those providers are.

35.    Based on this information, it is implausible that a customer would develop any expectations regarding – much less assign a "value" to – the number of providers in Superior's provider network or how "active" those providers are in providing healthcare services in a given year. As a result, Dr. Haeder's opinion that Superior misrepresented its provider network is not supported by the facts and is contradicted by the information available to customers on HealthCare.gov and by the information that Superior provides to customers and potential customers. Moreover, Dr. Haeder's methodology in assigning a "value" to a representation that Superior did not make is unreliable.

---

[20] As required by regulations, the Superior provider directory indicates which providers are accepting new patients. This is widely regarded as a measure of how "accessible" a provider is to plan customers and does not indicate how "active" a provider is.

**HIGHLY CONFIDENTIAL**

IV.    **Dr. Haeder Is Wrong in Alleging that 49% of Superior's ACA Providers Are Not "Actually In-Network."**

36.    As part of his assignment, Dr. Haeder says that he was asked to "assess which percentage of providers listed in [Superior's] provider network directory are *actually in-network*."[21] Dr. Haeder opines that the "provider network directory published for Ambetter Policyholders contains on average 49% practitioners who are not active network participants."[22]

37.    His analysis relies nearly entirely on his opinion that providers are *not* "actually in-network" if they do not bill a claim under their own individual practitioner NPI in a calendar year.[23] Dr. Haeder makes this determination by comparing Superior's monthly provider network spreadsheets to certain claims data showing which individual practitioner NPI billed a medical insurance claim that month.[24] He considers providers who billed no claims under their individual practitioner NPIs in a calendar year as inaccurately listed as an in-network provider because they are not "active."

38.    Dr. Haeder calls these providers "not active network participants," and his methodology deems them not "actually in-network" and "inaccurately listed" in the Superior provider directory.[25]

39.    Dr. Haeder's methodology suffers from multiple flaws, each of which renders his analysis unreliable and not supported by the facts.

A.    **Implementation of Dr. Haeder's Methodology Would Violate State and Federal Regulations Related to Provider Directories.**

40.    Dr. Haeder acknowledges that ACA health plans "must fulfill a number of requirements" when selling plans on the ACA Health Insurance Marketplace at HealthCare.gov.[26] In fact, he includes the relevant federal regulations governing ACA provider

---

[21] Haeder Report, p. 7 (emphasis added).

[22] Haeder Report, p. 8.

[23] Haeder Report, pp. 37-39.

[24] Haeder Report, pp. 37-39.

[25] Haeder Report, pp. 8, 37.

[26] Haeder Report, p. 13.

14

**HIGHLY CONFIDENTIAL**

directories in the body of his report.[27] Nevertheless, implementation of Dr. Haeder's methodology would result in a violation of these rules, which require Superior and other ACA insurers to list in their provider directories the providers that are in-network.[28] Dr. Haeder appears to advance the argument – without support – that only "active network participants" (as he defines it, i.e., providers who billed a claim under their individual practitioner NPI in a calendar year) should be listed in the directory. This is simply not correct.

41.    Based on my review of the relevant rules and requirements pertaining to provider directories, there are no requirements to list only recently "active" network participants in the directory. Texas does not have such a requirement, and neither does the federal government. Instead, Texas law requires Superior to list its in-network providers in its provider directory.[29] This makes sense, because some types of providers – or specialties – are needed more frequently than other specialties, and it would not make sense to remove from the directory – or deem them not "actually in-network" – all providers who do not bill a claim in a given calendar year, without regard to whether the provider is *available* to provide care when customers need it.

42.    Because Dr. Haeder's methodology would have Superior violate federal and state law by removing in-network providers from the directory if they are not actively billing claims in Dr. Haeder's chosen timeframe, Dr. Haeder's methodology is unreliable, nor is it supported by the facts or permitted by the regulations. Thus, he is wrong that 49% of the providers listed in Superior's provider directory are not "actually in-network."

**B.    Dr. Haeder's Methodology Ignores the Effect of Superior's ACA Expansion into New Counties During Relevant Years.**

43.    Dr. Haeder acknowledges that Superior expanded the counties in Texas in which it offered ACA insurance during the years that he analyzed.[30] Superior issued press releases in this regard, which show the following expansion of its ACA offering:

---

[27] Haeder Report, pp. 13-15.

[28] Texas Ins. Code § 1451.504; 45 CFR § 156.230(b).

[29] Tex. Ins. Code § 1451.504.

[30] Haeder Report, p. 44 (showing Superior's ACA offering expanding over time into new Ratings Areas).

**HIGHLY CONFIDENTIAL**

    a.   November 1, 2017 press release: 41 counties in which Superior offers ACA insurance in 2018.[31]

    b.   November 1, 2018 press release: 44 counties in which Superior offers ACA insurance in 2019.[32]

    c.   November 6, 2019 press release: 48 counties in which Superior offers ACA insurance in 2020.[33]

    d.   October 26, 2020 press release: 138 counties in which Superior offers ACA insurance in 2021.[34]

    e.   November 16, 2021 press release: 145 counties in which Superior offers ACA insurance in 2022.[35]

    f.   November 1, 2022 press release: 149 counties in which Superior offers ACA insurance in 2023.[36]

44.    The expansion into new counties is evident in the customer data that Superior provided in this case.

45.    To effectuate an expansion from offering ACA insurance in roughly 25 counties in 2015 to 149 counties in 2023, Superior had to add in-network providers in parts of the state in which it was not yet offering ACA insurance. This was necessary so in-network providers would be available to see customers in the expansion counties once Superior started offering ACA insurance in those counties. The Texas Department of Insurance regulates this process and

---

[31] *See* https://www.prnewswire.com/news-releases/open-enrollment-for-ambetter-from-superior-healthplan-begins-november-1-300546841.html.

[32] *See* https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-available-in-more-texas-counties-in-2019-300741858.html.

[33] *See* https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-available-in-48-texas-counties-in-2020-300952468.html.

[34] *See* https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-adding-90-texas-counties-to-insurance-coverage-area-for-2021-301159190.html.

[35] *See* https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-insurance-coverage-available-in-145-texas-counties-301425086.html.

[36] *See* https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-coverage-available-in-149-texas-counties-301664427.html.

**HIGHLY CONFIDENTIAL**

evaluates whether the insurer has an adequate provider network in place in each county before authorizing the insurer to offer ACA insurance there.[37]

46.    Because Superior was expanding its ACA offering into new counties during the period analyzed by Dr. Haeder, there naturally are providers that are in-network in these expansion counties that are not actively seeing Superior's ACA customers (thus actively billing claims to Superior) because Superior is not yet offering ACA insurance in those counties. Dr. Haeder's methodology counts these providers as not "actually in-network" because they were not billing claims during that time. However, the reality is that they *were* "actually in-network" and *available* to see Superior's ACA customers and were added as part of Superior's expansion of ACA offering into additional counties in recent years.

47.    This methodological error caused Dr. Haeder to wrongly characterize thousands of providers as not in-network. To quantify the extent of this error, I performed a county-by-county analysis that provides insight into those counties in which Superior was pre-building its ACA provider network in anticipation of offering ACA insurance in that county in the future.

48.    *First*, I calculated provider-to-enrollee ratios at the county level. To do so, I calculated the number of providers in the Superior provider directory for each year in each county relative to the Superior enrollment for each year in that county. Using the press releases described above that showed when Superior entered certain counties, I compared the provider-to-enrollee ratios for each county in the year *prior to* Superior's expansion into each county to the ratios in the year *of* Superior's expansion.[38] As expected, the ratios were higher in the year *prior to* entry compared to the *year of* entry. In fact, the provider-to-enrollee ratios dropped from an average of 7X in the year prior (i.e., seven-times more providers than customers) – when Superior is preparing to expand into a new county – to around .2X in the year of – when Superior has entered the expansion county and enrolled customers there.

49.    *Second*, I looked at the number of providers that Dr. Haeder had identified as not "actually in-network" in these expansion counties, again comparing the totals in the year *prior to* expansion to the year *of* expansion. Based on this analysis, I was able to determine that a

---

[37] 28 Tex. Admin. Code §3.3709, §11.1610.

[38] As noted above, I could locate publicly available press releases only for plan years 2018 through 2023. Thus, this analysis only includes plan years 2018—2021.

**HIGHLY CONFIDENTIAL**

material portion of the 49% of providers that Dr. Haeder's methodology determined are not "actually in-network" are in fact in-network and located in counties in which Superior was expanding its ACA offering into. Specifically, in the year *prior to* expansion, Dr. Haeder's methodology deemed more than 14,500 individual practitioner NPIs as not "actually in-network," which comprises approximately 60% of all providers in the directory for the expansion counties. As expected, this percentage drops in the year of expansion to approximately 46%, and to 37% in the *year after* expansion as more customers enroll in Superior's ACA insurance and the build-up in in-network providers plateaus.

50.    These trends are not surprising, as I would fully expect low utilization of in-network providers in counties in which Superior does not yet offer ACA insurance. Dr. Haeder's methodology, on the other hand, observes this low utilization and wrongly assumes that these providers are not "actually in-network." His methodology here is flawed because there is no requirement to list only "active" (i.e., billing) providers in the directory and it materially contributes to his erroneous conclusion that 49% of providers are not "actually in-network."

### C.    Dr. Haeder's Methodology Wrongly Characterizes the Vast Majority of Dental and Vision Providers as Not In-Network.

51.    In reviewing the list of providers that comprise the 49% of providers that Dr. Haeder deems as not "actually in-network," [39] I noticed that it includes thousands of dental and vision providers. In looking further, I determined that Dr. Haeder's methodology led him to deem nearly every dental and vision provider as not "actually in-network," which is a facially inaccurate allegation.

52.    Dr. Haeder's methodology appears to have led him to the erroneous conclusion that approximately 11,500 dental and vision providers are not "actually in-network" because – per his methodology – he looked for the individual practitioner NPIs for these dental and vision providers in the medical claims data. This is a flawed methodology, because it does not account

---

[39] Dr. Haeder identified these individual practitioner NPIs in yearly files named DATA NonClaims [yyyy].dta. For the purposes of this report, I refer to the inclusive list of all of these NPIs as the "49% List."

HIGHLY CONFIDENTIAL

for the fact that dental and vision coverage is an add-on option to the typical Superior ACA plan and is billed and administered differently than medical claims.

53.    This flaw in Dr. Haeder's methodology materially affects his analysis and causes him to overstate the number of providers that he deems not "actually in-network" by wrongly characterizing nearly every dental and vision practitioner as not "actually in-network."

54.    Based on my analysis, dental and vision providers comprise approximately 27% of Dr. Haeder's "49% List."  *See* Table 1.

**Table 1: Dental and Vision Providers on Haeder's "49% List"**

| Provider Specialty | Distinct NPIs from 49% List | % of Total |
|---|---|---|
| Dental | 8,867 | 20.8% |
| Vision | 2,804 | 6.6% |

### D.    Dr. Haeder's Methodology Wrongly Characterizes All Individual Providers Billing Under Their Group NPI as Not In-Network.

55.    Dr. Haeder's methodology wrongly assumes that providers bill claims only under their own individual practitioner NPIs. This flawed assumption caused Dr. Haeder to make another error: to count as not "actually in-network" all providers who billed claims under their group NPIs.

56.    Often, providers submit claims under their own individual practitioner NPI. Individual practitioner NPIs are unique numbers assigned to each individual doctor and other provider of health care in the United States, including Physicians' Assistants, Nurse Practitioners, and provider groups such as behavioral health provider groups.[40] Dr. Haeder's analysis wrongly assumes that providers *always* bill claims under their own individual practitioner NPIs, and thus he assumed that any individual practitioner NPI without a claim in a calendar year is not "actually in-network."

57.    The problem with Dr. Haeder's methodology is that not all providers submit claims under their own individual practitioner NPI. It is common practice in the industry for providers to submit claims through an organizational – or group – NPI, rather than their own

---

[40] *See* https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand.

19

**HIGHLY CONFIDENTIAL**

individual practitioner NPI. In fact, Zhu *et al.* (2022) recognize this as a limitation of their study – which Dr. Haeder's methodology relies heavily upon – saying "[i]n such cases, although the providers are available to patients, services may be billed under an organizational NPI or might not show up in claims at all."[41]

58.     Based on my analysis, this was the case for thousands of providers that Dr. Haeder wrongly characterized as not "actually in-network" who belonged to groups that were actively billing claims under the group NPI (i.e., the provider group with which the individual provider is affiliated). In fact, the data show hundreds of thousands of claims billed under organizational – or group – NPIs. *See* Table 2.

**Table 2: Individual NPIs On Haeder's "49% List" Affiliated with Groups that Actively Submitted Claims**

| Year | NPIs from 49% List Affiliated with Group | Claims Submitted by Group |
|---|---|---|
| 2016 | 2,264 | 68,215 |
| 2017 | 2,231 | 159,161 |
| 2018 | 3,612 | 161,212 |
| 2019 | 2,959 | 213,291 |
| 2020 | 3,276 | 244,129 |
| 2021 | 3,230 | 231,532 |

59.     Dr. Haeder's methodology and analysis are materially impacted by his flawed assumption that providers only bill claims through their individual NPIs. Thus, he is wrong to claim that providers are not "actually in-network" if they did not submit a claim under their own individual practitioner NPI in a calendar year.

### E.     Dr. Haeder's Methodology Wrongly Characterizes All Providers Billing Under a Supervising Physician's NPI as Not In-Network.

60.     Dr. Haeder's methodology of characterizing every individual practitioner NPI as not in-network if a claim was not billed under that individual NPI in a calendar year caused Dr.

---

[41] Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid. Health Affairs, 41(7), p. 1015, available at: https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052.

**HIGHLY CONFIDENTIAL**

Haeder to make another error: to count as not "actually in-network" all providers who billed claims under the name of a supervising physician.

61.     Dr. Haeder's methodology led him to characterize more than 7,000 Non-Physician Practitioners as not in-network. But it is not uncommon for non-physician practitioners including Physicians' Assistants, Nurse Practitioners, and other advanced practitioners to bill claims under the supervising physician's individual NPI, rather than their own individual NPI. [42]

62.     Provider groups bill claims for Physicians' Assistants, Nurse Practitioners and other advanced practitioners under the supervising physician's individual NPI to maximize the amount paid on the claim, because claims billed under a physician's NPI often result in a higher amount paid on the claim. [43]

63.     Dr. Haeder's methodology wrongly assumes that providers *always* bill claims under their own individual practitioner NPIs, and thus he assumed that any individual practitioner NPI without a claim in a calendar year is not really in-network. This flawed assumption materially contributed to Dr. Haeder's calculation by adding more than 7,000 Non-Physician Practitioners to his "49% List."

---

[42] "To run a cost-effective, efficient practice and to be successful in this paradigm shift, the need to use Non-Physician Practitioners (NPP) is greater than ever before. NPPs include Physician Assistants (PA), Nurse Practitioners (NP), Certified Registered Nurse Anesthetics (CRNA), Clinical Nurse Specialists (CNS), Certified Nurse Midwives (CNM) and those of similar training who practice in collaboration with physicians or under a physician's supervision. The services provided by NPPs are often "incident-to" or shared services. Per the Medicare Benefit Policy Manual, Chapter 15, Section 60, "incident-to a physician's professional services means that the services or supplies are furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness." (See §60.1). These services, even though not performed by the physician, are billed under the physician's National Practitioner Identification (NPI) number to Medicare as if it was the physician who performed them, and paid accordingly." *Survival Guide: How to Stay Compliant with the "Incident To" Rule*, June 30, 2019, available at https://www.mgma.com/MGMA/media/files/fellowship%20papers/Survival-Guide-How-to-Stay-Compliant-With-the-Incident-To-Rule.pdf.

[43] *See* https://www.aapc.com/blog/44912-seven-incident-to-billing-requirements/ ("Incident-to billing allows non-physician providers (NPPs) to report services as if they were performed by a physician. The advantage is that, under Medicare rules, covered services provided by NPPs typically are reimbursed at 85 percent of the pro fee schedule amount; whereas, services properly reported incident-to are reimbursed at the full pro fee schedule value.").

**HIGHLY CONFIDENTIAL**

**F.     Dr. Haeder's Methodology Wrongly Characterizes Providers Who Bill Claims in Other Years as Not In-Network.**

64.     While certain individual practitioner NPIs did not submit a claim in a particular calendar year, thousands of them billed claims either before or after the calendar year that Dr. Haeder took issue with. *See* Table 3.

**Table 3: Individual NPIs on Haeder's "49% List" with Claims in Other Years**

| Year | Count of NPIs on 49% List by Year | Number of those NPIs that billed a claim in prior years | Percentage of those NPIs that billed a claim in prior years | Number of those NPIs that billed a claim in subsequent years | Percentage of those NPIs that billed a claim in subsequent years |
|---|---|---|---|---|---|
| 2016 | 13,437 | 353 | 3% | 5,341 | 40% |
| 2017 | 9,817 | 619 | 6% | 3,993 | 41% |
| 2018 | 11,227 | 1,822 | 16% | 4,687 | 42% |
| 2019 | 11,881 | 1,896 | 16% | 4,242 | 36% |
| 2020 | 20,381 | 2,786 | 14% | 3,536 | 17% |
| 2021 | 19,741 | 3,387 | 17% | N/A | N/A |

65.     The fact that the majority of providers on Dr. Haeder's "49% List" of providers who he says are not "actually in-network" in fact billed claims in proximate years shows that Dr. Haeder's analysis is wrong, and these providers in fact are in-network.

**G.     Dr. Haeder's Methodology Wrongly Characterizes Providers Contracted by Superior as Not In-Network.**

66.     The fatal flaw in Dr. Haeder's methodology is that it disregards the fact that the providers in Superior's ACA provider network have agreed to participate in Superior's ACA provider network and have entered into participation agreements to that effect. To verify that Superior in fact has network participation agreements with the providers listed as in-network in Superior's directory, I selected a random sample of 100 providers from Dr. Haeder's "49% List" and asked Superior to provide me with copies of their provider contracts so I could verify that they were – in fact – in-network.

67.     In response, Superior provided me with provider contracts for a very high percentage of the providers in my sample, 95 in total.[44] It is my understanding that the 5

---

[44] Includes 31 providers that are contracted under vendor Services Agreements for Dental (DentaQuest), Vision (Envolve) and Behavioral Health (Cenpatico) services. The sample of 100 providers is included with the contract documents in Appendix C.

**HIGHLY CONFIDENTIAL**

providers for which Superior could not promptly locate a provider contract were, at the time I drew my sample, no longer a part of Superior's ACA provider network.

68.     In summary, Dr. Haeder's methodology for determining whether a provider is "actually in-network" is unreliable for multiple independent reasons, and his conclusion that 49% of providers in the directory are not in-network is simply wrong.

**V.     Dr. Haeder's Methodology Misapplies the Economic Literature in Calculating Damages.**

69.     Dr. Haeder opines that Superior's customers overpaid premiums because they received a lesser benefit (as he defines it, i.e., a network of providers that are not "actually in-network") than was allegedly represented by Superior. His methodology assumes that the amount overpaid by customers can be "calculated based on the proportion by which the actual active network size differed, i.e., was lower than the network size presented by [Superior]."[45]

70.     As discussed above, Dr. Haeder is wrong that Superior represented (or misrepresented) its network size to its customers. But even if it were true that Superior made such representations, Dr. Haeder's methodology is unreliable because it misapplies the economic studies on which he relies in three ways.

71.     *First*, Dr. Haeder's methodology uses as its economic basis two studies that Dr. Haeder alleges establish "a relationship between network size and overall premium."[46] Both studies define network size as the "percentage of physicians in a service area participating in a network."[47] However, Dr. Haeder's methodology did not require him to calculate the percentage of physicians in Superior's service areas that participate in Superior's ACA network. Instead, his methodology calculates a completely different measure of network size by looking at whether claims were billed under each individual practitioner's NPI in the network. Quite simply, because the literature uses a benchmark that Dr. Haeder does not calculate for Superior's ACA provider network, Dr. Haeder's methodology misapplies the literature and is

---

[45] Haeder Report, p.57.

[46] Haeder Report, p.8.

[47] Polsky, D., Cidav, Z., & Swanson, A. (2016). Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks. Health Affairs, 35(10), p. 3, available at: https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2016.0693. ("Polsky").

unreliable. As a result, Dr. Haeder is wrong to rely on, or apply, any findings from the economic literature in his analysis.

72.    *Second*, Dr. Haeder's methodology makes no attempt to determine how Superior's network compares to Superior's competitors' provider networks. And it makes no attempt to determine how Superior's premiums compare to Superior's competitors' premiums. A methodology that does not consider the context or market for provider networks or premiums is unreliable, because conclusions about premiums cannot be drawn in a vacuum.

73.    *Third,* Dr. Haeder's methodology requires the two studies that underpin the methodology to present "estimates for the elasticity of demand for ACA network breadth."[48] Dr. Haeder's methodology assumes that these demand elasticity "estimates are essentially similar and determine that a 1% increase in network breadth corresponds to a .29% increase in premiums."[49]

74.    But neither of the studies that underpin Dr. Haeder's methodology actually presents estimates for elasticities of demand.[50]

75.    Dr. Haeder appears to overlook – and certainly does not acknowledge – the limitations of these two studies noted by the authors themselves. The studies do not establish a causal link between network size and premiums. Specifically, Dafny *et al.* (2017) "could not establish a causal effect of changes in [network] breadth on premiums, nor could we detect the mechanisms that generated the estimates we obtained."[51] Notably, "the correlations we measured might not reflect a causal relationship between premiums and provider network

---

[48] Haeder Report, p.57.

[49] Haeder Report, p.57.

[50] Haeder Report, p. 57. ("Elasticity of demand" is a "concept devised to indicate the degree of responsiveness of Q[uantity] demanded to changes in market P[rice]." Samuelson, P., Economics, 9th Edition, p. 380. In fact, Polsky noted that "Further work is needed to determine whether lower premiums reflect lower value on the demand side for these products or whether narrow networks generate supply-side savings." Polsky, p. 4.)

[51] Dafny, L .S., Hendel, I., Marone, V., & Ody, C. (2017). Narrow Networks On The Health Insurance Marketplaces: Prevalence, Pricing, And The Cost Of Network Breadth. Health Affairs, 36(9), p. 6, available at: https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2016.1669. ("Dafny").

breadth." Dafny also acknowledged that "researchers have not provided a definitive answer to the question of how much cheaper narrow-network plans are."[52]

76.     Polsky *et al.* (2016) expressed similar limitations, noting that their "estimated relationship of network size and premiums might have picked up unmeasured and correlated factors" and that "premiums might reflect not only the size of the network but also the quality of the providers in the network."[53] Polsky also only "describes the relationship between premiums and network size, instead of identifying the mechanism generating lower premiums"[54]

77.     Both studies refer to the "mechanisms" that "may have contributed" to the lower premiums observed in narrow networks, none of which are acknowledged by Dr. Haeder or his methodology.[55] Dafny describes "three primary mechanisms through which this shift to narrow provider networks may have contributed to lower premiums."[56]

> First, insurers may realize lower total medical spending by identifying and contracting only with providers that are efficient – that is, those that agree to low reimbursement rates or that generate medical savings by performing only necessary services […] Second, narrow-network plans may be able to negotiate lower prices from providers in return for steering greater patient volume to them, and plans could then pass these savings on to consumers in the form of lower premiums. Third, the threat of exclusion should motivate providers to become more efficient – which in turn should reduce total medical expenditures and therefore premiums.[57]

---

[52] Dafny, p. 3.

[53] Polsky, p. 4. (Polsky describe their regression model as a "log model, the standard hedonic price model specification" in which "log premium" was their dependent variable. Polsky p. 3. Here, Polsky appears to be acknowledging that their model may be exhibiting "multicollinearity," a "situation where the explanatory variables are highly intercorrelated" where it "becomes difficult to disentangle the separate effects of each of the explanatory variables on the explained variable." Maddala, G. S., Introduction to Econometrics, p. 223.)

[54] Polsky, p. 4.

[55] Dafny, p. 3.

[56] Dafny, p. 3.

[57] Dafny, p. 3.

**HIGHLY CONFIDENTIAL**

78.     Polsky described similar mechanisms and added that by "removing providers that high-cost beneficiaries prefer could lead to favorable risk selection for the plan because the healthier and less costly beneficiaries would be more likely to select the plan."[58]

79.     Here, the authors of the studies that underpin Dr. Haeder's methodology recognize that insurance premiums are reflective of the "providers' and insurers' bargaining positions" related to expected utilization and reimbursement rates.[59] Additionally, premiums are directly impacted by the customer cost share (i.e., the amount of the cost that is borne by the ACA insurance customer). Polsky found that "higher deductibles, the presence of coinsurance, and higher copays were associated with lower premiums."[60]

80.     Essentially, health insurance plans that have lower premiums relative to other plans do so by design. That is, premiums are reflective of the amount of actuarial risk that the health plan is taking on, regardless of the size of the network. Health plans mitigate their risk – in part – by negotiating lower reimbursement rates with providers (via participation agreements) and sharing a greater portion of the expected cost with their customers (via customer cost share). These mechanisms are intended to lower overall medical spend by the insurance plan, which ultimately translates into lower premiums. To assume that a plan would have lower premiums simply because it allegedly has a smaller network than what was "represented" disregards all the mechanisms that impact health insurance premiums. For that reason, a provider network could be large and still be associated with low premiums (as is typical for Medicaid networks), or a provider network could be smaller and be associated with higher premiums (as would be expected in a health insurance plan that has very expensive providers in-network).

81.     Per Dr. Haeder's methodology, the only variable that purportedly changes is the "size" of the provider network (i.e., benefits, customer cost share, etc. all remain the same), even though Dr. Haeder did not demonstrate that the actual network of *contracted*, in-network providers is smaller. Dr. Haeder misinterprets these studies to say that a network that was allegedly found to be smaller would result in lower premiums, all else equal. That is, his

---

[58] Polsky, p. 2.

[59] Dafny, p. 13.

[60] Polsky, p. 7.

**HIGHLY CONFIDENTIAL**

methodology relies on *causation* between network size and premiums, even when the studies' authors expressly stated that they could *not* determine a causal effect.

82.    For all these reasons, the findings from these studies cannot be applied as Dr. Haeder does – that is, to calculate premiums, *ex post facto* – for a network that is purportedly smaller than what Superior represented to its customers. To do so belies the mechanisms that determined the original premium rates observed in the studies (e.g., negotiated reimbursement rates, assumed customer utilization rates, customer cost share levels, etc.) – and the approval of ACA health insurance premiums by the Texas Department of Insurance.

## VI.    Superior's Complaint Log Shows that Very Few Superior ACA Customers Had Issues Finding In-Network Healthcare Services

83.    In his report, Dr. Haeder points out several challenges that customers *may* face when confronted with directory inaccuracies.[61] I note that the insurance contract has remedies in place for these challenges, which include calling Superior's toll-free phone number to get assistance if a customer has difficulty finding a provider. Superior appears to include its toll-free phone number on most pages of its insurance contract, and instructs customers to call if they have difficulty.

84.    To evaluate Dr. Haeder's opinion that customers were harmed by Superior's directory, I asked Superior to provide me with a log of complaints by customers regarding the provider network or directory.[62]

85.    Based on my review of the log there are 191 complaints made in the past approximately 5 years. More than one third of these were instances where the customer had difficulty locating an in-network provider and Superior responded by providing the customer with a list of in-network providers or confirming the provider was in-network.[63] In most instances, the customers contacted Superior prior to receiving healthcare services, either

---

[61] Haeder Report, pp. 10-12.

[62] SW029721 - Ambetter Access Complaints 2015-11.2021 - Highly Confidential Redacted.xlsx. ("Network Complaints Log").

[63] *E.g.,* Network Complaints Log, Complaint IDs MMKTTX-4786, MMKTTX-4543, M172362, and MMKTTX-3365.

**HIGHLY CONFIDENTIAL**

because they wanted to avoid seeing an out-of-network provider, or they wanted to obtain approval to see an out-of-network provider, as described in the insurance contract.[64]

86.    In some instances, it may be the case that a member of the provider's staff incorrectly told Superior's customer that the provider was not in-network for Superior's ACA plan. In my experience, errors like this are not uncommon, because providers are often in-network with multiple insurance plans and this can lead to mistakes – especially regarding whether the provider is in-network for smaller plans, newer plans, or plans with less brand recognition. When this happens, plans often perform provider education to help inform the provider's staff of the correct in-network status.

87.    When an in-network provider cannot be located, Superior will often enter into a Single Case Agreement ("SCA") with an out-of-network provider to provide services to a specific customer, covered by Superior. SCAs effectively bring providers in-network to provide healthcare services to specific customers and are one way that Superior can make sure that customers are able to receive the care that they need. The complaint log indicates that SCAs were attempted, accomplished, or suggested on multiple occasions.[65]

88.    Dr. Haeder states that inaccurate provider directories "may impose significant and often unexpected additional financial costs by forcing consumers, unknowingly, to seek care from out-of-network providers, thus contributing to surprise billing issues."[66] He fails to consider that Superior holds its customers harmless in instances where a customer receives out-of-network care if the provider directory erroneously listed a provider as in-network.[67] An example of Superior covering an out-of-network claim to protect a customer is demonstrated in the complaint log. In this example, a Superior customer received care from an out-of-network provider who had previously been in-network at a prior practice. Superior paid the claim

---

[64] SW000808 – 2020 Superior Ambetter EOC, p. 36.

[65] Network Complaints Log, Complaint IDs M160491, 1225, MMKTTX-2001, MMKTTX-2161, MMKTTX-3496, and MCRC-213071.

[66] Haeder Report, p. 12.

[67] For example, the Evidence of Coverage states: "If *you* relied on materially inaccurate directory information, *you* may be entitled to have an out-of-network claim paid at the in-network level of benefits." SW000808 – 2020 Superior Ambetter EOC, p. 87.

**HIGHLY CONFIDENTIAL**

submitted by the out-of-network provider, and let the customer know that he/she was entitled to a refund for any amount that he/she had paid to the provider.[68]

89.     Health plans often look to the complaint log as a means to help improve their provider directories and they encourage customers to submit any discrepancies that they discover. There are several instances where Superior used information from the complaint log to update its provider directory.[69] In addition to updating their provider directories, health plans use this information to update records in other systems when necessary, such as making adjustments to allow an out-of-network, emergency hospital claim to be paid.[70]

90.     Superior also prompts its customers to notify it if they discover an error in the directory or have other issues finding care. The EOC includes a toll-free number on nearly every page, so customers can call Superior if they have a problem, and the EOC informs customers how to contact the Texas Department of Insurance if the customer would like assistance from the regulator with getting coverage.[71]

91.     I also examined Superior's ACA online provider directory, and I identified a link on every directory listing that allows users (including customers, providers, or anyone else) to report errors in the directory. *See* Exhibit 7.

---

[68] Network Complaints Log, Complaint ID M20160318.U90479057.

[69] Network Complaints Log, Complaint ID's MMKTTX-3281, MMKTTX-4200, M175337 and M181075.

[70] Network Complaints Log, Complaint ID M20160523.U90515125.

[71] *E.g.,* SW000808 – 2020 Superior Ambetter EOC.

**HIGHLY CONFIDENTIAL**

**Exhibit 7: Report a Problem**[72]



92.    The only other potential customer harm identified by Dr. Haeder in his report is with respect to a few providers that he says were listed in the directory but appeared as "non-contracted" in the claims data.[73] It would take a claim-by-claim individualized analysis to determine the cause and final resolution of the claims, whether they were denied, whether the denial was proper, whether the customer received a bill from the provider, whether the customer contacted Superior to address the issue (as directed by the insurance contract), etc. – none of which is accounted for in Dr. Haeder's methodology. Rather, Dr. Haeder's methodology incorrectly assumes that these providers' non-contracted status resulted in harm to Superior's customers. Moreover, other than these few providers that may have been out of network at the time of a claim, which could have been caused by a variety of reasons (e.g., the provider recently exiting the network), Dr. Haeder has not identified any actual inaccuracies in Superior's provider directory, much less any harm that Superior's customers suffered because of any inaccuracies.

---

[72] *See* https://www.superiorhealthplan.com/find-a-doctor/report-inaccurate-information.html.

[73] Haeder Report, p. 37.

**HIGHLY CONFIDENTIAL**

## VII.    Conclusion

93.    Based on all of the above, I conclude that (a) Superior did not make any representation (or misrepresentation) regarding how many providers are in its ACA network; (b) Dr. Haeder's methodology is unreliable and he is wrong in alleging that 49% of Superior's network is not "actually in-network"; (c) Dr. Haeder's methodology is unreliable and he is wrong in how he applied the economic literature, which does not establish a causal relationship between network size and premiums and does not support his elasticity of demand model; and (d) very few, if any, of Superior's customers were harmed by the issues raised by Dr. Haeder, and an individualized analysis regarding each of these members would be needed to ascertain which member was harmed, the cause, the fault, and whether the issue already has been remedied.

Respectfully submitted,

Brian E. Hoyt
December 5, 2022

APPENDIX A

CURRICULUM VITAE OF BRIAN E. HOYT

**Curriculum Vitae**



**BRIAN E. HOYT, MBA**

Managing Director, BRG Health Analytics

BERKELEY RESEARCH GROUP, LLC
1800 M Street NW, Second floor | Washington, DC 20036

Direct: 202.480.2762
Mobile: 720.979.4465
bhoyt@thinkBRG.com

## SUMMARY

Brian E. Hoyt is a Managing Director in the BRG Health Analytics practice. Mr. Hoyt's consulting career spans nearly 30 years and has focused on the healthcare industry. He provides thorough analysis that identifies and establishes meaningful connections, often across disparate datasets, departments, and documents. Combining this approach with his healthcare industry expertise, he provides insight-driven strategies that give clients the confidence to advance to what lies ahead.

Throughout his career, Mr. Hoyt has provided data analytics, economic and financial modeling, evaluation of business processes, and regulatory compliance services to entities across the healthcare continuum, including hospitals and health systems; health insurers, managed care organizations, and other third-party payers; pharmacy benefit managers; pharmaceutical manufacturers; healthcare technology companies; and regulators.

Most of the projects and studies that Mr. Hoyt has conducted involved issues pertaining to managed care, including formation, management, and adequacy of provider networks; submission and payment of claims for healthcare services and products, including prescription drugs; underwriting and rating; enrollment and billing; utilization management; provider data and directories; and pharmacy benefits and pricing. Mr. Hoyt's clients often require his expertise related to the Patient Protection and Affordable Care Act and to federal healthcare programs including Medicare, Medicaid, and the Federal Employees Health Benefits Program (FEHBP).

He has been selected as an independent monitor of enforcement decrees and has testified as an expert witness on issues related to managed care and damages.

## PROFESSIONAL EXPERIENCE

*Independent Auditor and Monitor*



- Selected as an independent auditor pursuant to an enforcement action being conducted by a state department of insurance against a health insurer involving alleged form filing violations. Appointed to conduct an audit of the health insurer's issued major medical accident and health policies and HMO contracts.

- Appointed by the Office of Attorney General of the State of New York, Health Bureau Section (OAG) as the independent monitor of a settlement between the OAG and a New York health insurer related to reported inaccuracies in the health insurer's online provider directory. Appointed to review the activities and processes undertaken by the health insurer as required by the terms of the settlement. Determined whether the health insurer complied with the terms of the settlement, and prepared and submitted to the OAG an independent audit report of his findings.

- Selected as part of an Independent Review Organization pursuant to a Corporate Integrity Agreement (CIA) entered into by the HHS OIG and a Medicare Advantage organization (MAO). Selected to perform a review of the MAO's provider and facility network in accordance with the requirements of the CIA, including a review of the MAO's provider directories and the data used to determine the adequacy of its provider networks.

*Litigation and Dispute Matters*

- Prepared expert damages report and provided expert testimony in an antitrust matter related to health insurers' payments for prescription drugs dispensed to their enrollees.

- Prepared expert reports and provided expert testimony in disputes involving health insurers' provider directory and provider networks.

- Provided expert services in number payer/provider reimbursement disputes involving in-network and out-of-network claims, inpatient, outpatient, emergency department, facility, surgical monitoring, transportation, pharmacy, and laboratory services.

- Engaged as an expert consultant in numerous pharmaceutical pricing disputes involving pharmacy benefit managers (PBMs), pharmacies, and health plans. These disputes often involve in-depth analyses of prescription drug claims and payment.

- Provided expert services in a dispute between a Medicaid managed care organization and the state department of Medicaid services related to the actuarial soundness of capitation rates implemented under the contract.

- Provided expert services in a dispute between a health insurer and a hospital involving allegations of underpayments related to an alleged "silent PPO".

- Performed analyses of amounts paid by the Office of Personnel Management related to health plans' participation the FEHBP. Named as an expert witness.

2



- Provided expert advice and consulting services to a health plan to resolve multiple payment disputes with its insurance brokers.

- Provided expert advice to a PBM related to demands for arbitration brought by more than 80 independent pharmacies alleging prompt pay violations.

- Provided advice to counsel in matters pursuant to settlement discussions and mediation.

*Public Policy and Regulatory Reviews*

- Conducted extensive research into regulations and guidance established by the federal government and all fifty states regarding provider directories. Provided written authoritative studies based on this research.

*Compliance Matters and Investigations*

- Developed a cloud-based data platform that provided competitive intelligence and risk mitigation to dental manufacturers and distributors. The platform merges multiple data sources on dental practitioners, including claims data from federal healthcare programs, CMS Open Payments, and state licensure agencies.

- Engaged by a PBM to perform a study of pharmacy dispensing fees as defined and required by a state statute that entailed calculating the pharmacies' usual charges for commonly prescribed drugs.

- Appointed by a state AG as an independent monitor to perform a compliance review of a settlement between the AG and a health plan related to reported inaccuracies in the health plan's online provider directory.

- Developed a compliance solution that allowed the client to monitor and manage all the regulations and guidance – both federal and state – that pertained to health plan provider directories and cost calculator tools.

- Conducted internal investigations and analyses for health insurers related to rate setting and calculation of insurance premiums. Assisted in-house counsel through the analysis of information and preparation of reports resulting in voluntary disclosures.

- Provided expert analysis and advice to a health plan related to the premium stabilization programs (i.e., risk adjustment, risk corridors and reinsurance, also referred to as the "3 Rs") instituted under the Patient Protection and Affordable Care Act.

- Provided expert services and reports related to federal investigations of health systems, providers, and specialty pharmacies.

3

- Provided expert services, advice, and analysis to a PBM and its specialty pharmacy related to multiple government investigations, including Civil Investigative Demands and qui tam actions, involving allegations related to the False Claims Act, Anti-Kickback Statute, Federal Trade Commission Act, and Title I of ERISA.

*Healthcare Performance Improvement*

- Provided process improvement consulting services to a pharmaceutical manufacturer related to its global HCP engagement process.

- Assisted multiple health systems in the development of clinically integrated provider networks.

- Provided expert analysis and consulting to health plans to improve internal processes related to participation in the FEHBP, including coordination of benefits with other federal healthcare programs, termination of subscribers, and tabulation of subscriber contracts.

## EDUCATION

- MBA, University of Colorado (Finance), 2008
- Certificate, Ohio State University (Six Sigma Black Belt, Healthcare), 2005
- BA, George Washington University (Economics), 1992

## PRESENT POSITION

- Managing Director, Berkeley Research Group, Health Analytics Practice (2013–present)

## PREVIOUS POSITIONS

- Co-Founder and President, Fountainhead, LLC (2002–2013)
- National Consulting Practice Leader, King, Pagano & Harrison (1999–2002)
- Manager, Arthur Andersen (1994–1999)
- Consultant, Price Waterhouse (1993–1994)

## TESTIMONY EXPERIENCE

In addition to being designated as an expert witness in cases that were resolved prior to his testimony, Mr. Hoyt has provided testimony in the following cases:

- *Misty Duff, et al.* v. *Centene Corporation, et al.* (United States District Court for the Southern District of Ohio, Western Division, Case No. 19-cv-750)

4



- *Peter Staley, et al* v. *Gilead Sciences, Inc., et al* (United States District Court for the Northern District of California, Case No. 3:19-cv-02573-EMC)
- *Laura Briscoe, Kristin Magierski and Emily Adams, et al* v. *Health Care Service Corporation and Blue Cross and Blue Shield of Illinois* (United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:16-CV-10294)

## PROFESSIONAL AFFILIATIONS

- American Health Lawyers Association
- American Bar Association – Health Law Section

## PUBLICATIONS

- *Don't You (Forget About Me) – Recent Requirements for Provider Directories in an Era of Consumer-Directed Health Care*, Health Law Weekly, American Health Lawyers Association, April 2022

- *Making Provider Directories Accurate is Hard. Finding a Solution Could Solve a Lot of Problems,* FierceHealthcare, February 2019

- *Finding a Doctor is too Hard; California Wants to Fix That,* Thinkset magazine, Fall 2018

- *Provider Directories: Litigation, Regulatory, and Operational Challenges: 2018 Update*, BRG whitepaper, March 2018

- *Provider Directories: Litigation, Regulatory, and Operational Challenges*, FC&S Legal, August 2015

## SPEAKING ENGAGEMENTS

- "No Surprises? An Updated Look at the Current State of NSA Implementation," American Bar Association podcast, November 2021

- "Keeping Up with Surprise Billing and Price Transparency – The Impact on Health Plans, Providers and Patients," Texas Health Law Conference, Texas Bar Association, October 2021

- "CMS's New Interoperability and Patient Access Requirements for Health Plans and Providers," BRG/Reed Smith Webinar, April 2021

- "Surprise Bills: When Will this Issue be Solved?" Managed Care Institute, American Bar Association, November 2020



- "There is an API for That: EHI Interoperability & Access," AHLA Health Plan Law & Compliance Institute, November 2020

- "Surprise! A Look at the Hottest Topic in Health Care 2020: Network Adequacy and Surprise Billing," American Bar Association Webinar, January 2020

- "Big Data, Big Problems, Big Promises: A Road Map for Addressing Data Challenges in Health Care," Texas Association of Health Plans Texas Covered Health Care Conference, November 2019

- "Narrow and Tiered Provider Networks from a Legal and Data Analytics Perspective," BlueCross BlueShield National Summit, April 2019

- "Narrow and Tiered Provider Networks from a Legal and Data Analytics Perspective," American Health Lawyers Association Annual Meeting, June 2018

- "When CMS Comes Knocking: Reviews of Provider Directories and Network Adequacy," BlueCross BlueShield National Summit, May 2017

- "Network Adequacy Requirements: What You Need to Know," AHIP National Conference on Medicare, October 2016

- "Network Adequacy in a Nutshell", BlueCross BlueShield 2016 National Summit, April 2016

- "Managing Provider Data: Much Deeper than Directories," AHIP webinar, December 2015

- "New CMS Provider Directory Regulations: Are You Ready?" AHIP National Conferences on Medicare & Medicaid, October 2015

- "New CMS Provider Directory Regulations: Are You Ready?" Webinar sponsored by Healthsparq, July 2015

- "Network (In)Adequacy: Litigation, Regulatory, and Operational Challenges with Provider Directories," Blue National Summit, April 2015

6

APPENDIX B

MATERIALS RELIED UPON

**HIGHLY CONFIDENTIAL**

**Expert Report of Brian E. Hoyt**

**Materials Relied Upon**

I.        **Legal Documents**

- 2022-10-21 - Angelo Motion for Class Certification in Angelo v Superior.pdf
- 2020-07-08 -- Angelo FIRST AMENDED COMPLAINT.PDF

II.       **Expert Report and Supporting Materials**

- Expert Report of Simon F. Haeder, September 30, 2022.
- DATA NonClaims 2020.dta
- DATA NonClaims 2021.dta
- DATA NonClaims 2016.dta
- DATA NonClaims 2017.dta
- DATA NonClaims 2018.dta
- DATA NonClaims 2019.dta

III.      **Superior Data and Documents**

- SW000808
- SW029721 - Ambetter Access Complaints 2015-11.2021 - Highly Confidential Redacted.xlsx.
- SW030089
- SW030276
- SW030277
- SW030416
- SW030555
- SW030694
- SW030833
- SW031018
- SW031203
- SW031388
- SW031573
- SW031758
- SW031943
- SW032128
- SW032313
- SW032498
- SW032683
- SW032868
- SW033239
- SW033426
- SW033614
- SW033802
- SW033998

1

**HIGHLY CONFIDENTIAL**

- SW034194
- SW034390
- SW034586
- SW034782
- SW034978
- SW035174
- SW035369
- SW035565
- SW035761
- SW035957
- SW036153
- SW036349
- SW036352
- SW036545
- SW036738
- SW036931
- SW037124
- SW037317
- SW037510
- SW037703
- SW037896
- SW038089
- SW038282
- SW038475
- SW038668
- SW038861
- SW039054
- SW039247
- SW039440
- SW039633
- SW039829
- SW040022
- SW040215
- SW040408
- SW040697
- SW040986
- SW041275
- SW041564
- SW041853
- SW042142
- SW042431
- SW042720
- SW043009
- SW043298
- SW043587
- Case043876
- SW044165

**HIGHLY CONFIDENTIAL**

- SW039828

**IV.    Websites**

- https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/qhp.
- https://ratereview.healthcare.gov/files-cjn/935721_TX_PY21PartIIJustification_v1_20200528.pdf https://guide.ambetterhealth.com/
- https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/Individual-Instructions-508-MM.pdf
- https://www.ambetterhealth.com/disclaimer.html
- https://ambetter.superiorhealthplan.com/
- https://www.healthcare.gov
- https://api.centene.com/SBC/2023/87226TX0070012-01.pdf
- https://www.bcbstx.com/sbc/ind/sbc-ghsa71bavitxp-tx-2023.pdf
- https://www.commonwealthfund.org/publications/issue-briefs/2016/jul/americans-experiences-aca-marketplace-coverage-affordability-and.
- https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-available-in-more-texas-counties-in-2019-300741858.html
- https://www.prnewswire.com/news-releases/open-enrollment-for-ambetter-from-superior-healthplan-begins-november-1-300546841.html
- https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-coverage-available-in-149-texas-counties-301664427.html
- https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-available-in-48-texas-counties-in-2020-300952468.html
- https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-adding-90-texas-counties-to-insurance-coverage-area-for-2021-301159190.html
- https://www.prnewswire.com/news-releases/ambetter-from-superior-healthplan-insurance-coverage-available-in-145-texas-counties-301425086.html
- https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand
- https://www.aapc.com/blog/44912-seven-incident-to-billing-requirements

**V.    Public Documents**

- Polsky, D., Cidav, Z., & Swanson, A. (2016). Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks. Health Affairs, 35(10), p. 3, available at: https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2016.0693.
- Dafny, L .S., Hendel, I., Marone, V., & Ody, C. (2017). Narrow Networks On The Health Insurance Marketplaces: Prevalence, Pricing, And The Cost Of Network Breadth. Health Affairs, 36(9), p. 6, available at: https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2016.1669.
- Ndumele, C. D., Staiger, B., Ross, J. S, & Schlesinger M. J. (2018). Network Optimization and the Continuity of Physicians in Medicaid Managed Care. Health Affairs, 36(7), p. 929, available at: https://www.healthaffairs.org/doi/10.1377/hlthaff.2017.1410.
- Gunja, M. Z., Collins, S. R., Doty, M. M., & Beutel, S. (2016). Americans' Experiences with ACA Marketplace Coverage, Affordability and Provider Network Satisfaction. Issue Briefs (Commonwealth Fund), available at: https://www.commonwealthfund.org/publications/issue-briefs/2016/jul/americans-experiences-aca-marketplace-coverage-affordability-and.
- *Survival Guide: How to Stay Compliant with the "Incident To" Rule*, June 30, 2019, available at https://www.mgma.com/MGMA/media/files/fellowship%20papers/Survival-Guide-How-to-Stay-Compliant-With-the-Incident-To-Rule.pdf.

**HIGHLY CONFIDENTIAL**

- Zhu, J. M., Charlesworth, C. J., Polsky, D., & McConnell, K. J. (2022). Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid. Health Affairs, 41(7), p. 1015, available at: https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052
- Texas Ins. Code § 1451.504
- Texas Ins. Code 45 CFR § 156.230(b).
- Texas Administrative Code §3.3709.
- Texas Administrative Code §11.1610.
- Samuelson, Paul, Economics, 9th Edition, McGraw-Hill, (1973), p. 380.
- Maddala, G. S., Introduction to Econometrics, Macmillan Publishing Company, (1988), p. 223.

APPENDIX C

Hoyt Expert Report -- Appendix C -- Highly Confidential

**Angelo, et al v. Centene Management Company, LLC et al**
**Sample of Haeder's Non Claim Providers**

| Sample # | BRG ID | NPI | SPECIALTY | TIN 01 | NAME 01 | TIN 02 | NAME 02 | Contract Filename 1 | Contract Filename 2 | Contract Filename 3 | Contract Filename 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 85440 | 1942699087 | Orthopedics | 82-2547398 | PLLC | | | Contract | | | |
| 2 | 51595 | 1255977161 | Nurse Practitioner: Family | 75-2712096 | Neurosurgical Associates Medical Group | | | Neurosurgical Associates_TIN_752712096 - 03012019_419974_A4_ECM_79145.pdf | Neurosurgical Associates_TIN_752712096_ECM_79145.pdf | | |
| 3 | 47791 | 1063875029 | Hospitalist | 55-0853118 | Central Texas Community | 26-4562522 | Seton Family of Doctors... | Seton Family of Doctors_TIN_264562522 - Tri-County Practice Association_070114_Signed Contract_Delegate_TX_SHP.pdf | Seton Family of Doctors_TIN_264562522 - Tri-County Practice Association_090116_Amend_Delegate_Commercial Exchange_TX_SHP.pdf | | |
| 4 | 56745 | 1518111764 | Counselor: Professional | 46-2084498 | Brenda Whitfield, LPC | | | Brenda Whitfield, LPC_TIN_462084498 - PPA - SHP - 2-28-2019 12_18 AM-ECM_424657.pdf | | | |
| 5 | 64873 | 1912041104 | Hospitalist | 47-3523125 | Centric Physicians Group Pllc | | | Centric Physicians Group_TIN_473523125 - PPA - SHP - 6-25-2020 9_32 AM-ECM_488670.pdf | | | |
| 6 | 82013 | 1770571879 | Nurse Practitioner: Womens Health | 27-1789460 | Womens Health Texas | | | Central Texas OBGYN Associates, PLLC_TIN_271789460 - ECM_65584.pdf | Central Texas OBGYN Associates, PLLC_TIN_271789460 - EXCHANGEECM_65584.pdf | | |
| 7 | 59008 | 1629269774 | Internal Medicine: Medical Oncology | 75-2131429 | Texas Oncology PA*** | | | Texas Oncology_TIN_752131429 - 010114_Signed MOU Contract_Delegate_TX_SHP.pdf | Texas Oncology_TIN_752131429 - 060116_Amend2_Delegate_MOU Language_TX_SHP.pdf | Texas Oncology_TIN_752131429 - 090116_Amend3_Delegate_MOU Exchange_TX_SHP.pdf | |
| 8 | 30145 | 1619100427 | Counselor: Professional | 80-0121112 | Brightstar Counseling and Evaluation | | | Brightstar Counseling and Evaluation_TIN_800121112 - PPA - SHP - 3-19-2018 12_02 PM ECM_367951.pdf | | | |
| 9 | 22605 | 1932421252 | Physician Assistant | 45-3601491 | AIC Primary Care PLLC | 45-3583213 | Aic Urgent Care Pllc | AIC Primary Care, PLLC_TIN_453601491 - PPA - SHP - 3-22-2017 4_07 PM ECM_299021.pdf | Aic Urgent Care Pllc_TIN_45-3583213 - 469591 1.Pdf.pdf | | |
| 10 | 39975 | 1457648263 | Counselor: Mental Health | 76-0459500 | U T physicians | | | UT Physicians_TIN_760459500 - 060113_Signed Contract_Delegate_TX_SHP.pdf | UT Physicians_TIN_760459500 - 100119_Amend2_Delegate_Exchange_TX_SHP.pdf | | |
| 11 | 72572 | 1295350296 | Dentist: General Practice | 47-1255759 | MERCER, JAIDEN P | 46-2958435 | LYTLE PEDIATRIC DENTISTRY PLLC | Dental Network via Dental Vendor Contract | | | |
| 12 | 59728 | 1659895316 | Dentist: General Practice | 20-0214733 | WESTLAKES FAMILY DENTAL PA | | | Dental Network via Dental Vendor Contract | | | |
| 13 | 29584 | 1568454957 | Pediatrics | 74-2693173 | Abc Pediatrics | | | ABC Pediatrics_TIN_742693173 - ECM_48627.pdf | ABC Pediatrics_TIN_742693173 - 742693173_EIREEN H CHUA MD_Ambetter Regulatory Lang_10-1-2016 ECM_48627.pdf | | |
| 14 | 56299 | 1487892022 | Social Worker: Clinical | 27-2389923 | Alaniz Counseling and Behavioral Center. | | | San Antonio Counseling and Behavioral Center_TIN_272389923_ECM_207077.pdf | San Antonio Counseling and Behavioral Center_TIN_272389923_ECM_297356.pdf | | |
| 15 | 83753 | 1861696262 | Pediatrics: Neonatal-Perinatal Medicine | 75-2740653 | Magella Medical Assoc Medical Group | | | Magella Medical Assoc Medical Group_TIN_752740653 - 030109_Signed Contract_Delegate_TX_SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - Amend1_Delegate_Rates and Exchange Product add_TX_SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - 110120_Amend6_Delegate_Rates_TX_SHP.pdf | |
| 16 | 31475 | 1720538093 | Nurse Practitioner: Family | 20-5114071 | Greater Dallas Healthcare. | 20-3059260 | BHS Physicians Network INC | BHS Physicians Network INC_TIN_203059260 - Ex.Contract 01.15.12_ECM_148382.pdf | BHS Physicians Network INC_TIN_203059260 - Exchange Amendment_ECM_298297.pdf | | |
| 17 | 70738 | 1205015104 | Counselor: Professional | 27-2982712 | Chris Igwilo, Lpc | | | Behavioral Health Network via Behavioral Health Vendor Contract | | | |
| 18 | 63274 | 1831423854 | Thoracic Surgery (Cardiothoracic Vascular Surgery) | 30-0791563 | Baylor College Of Medicine PA | | | Baylor College of Medicine_TIN_300791563 - 110113_Signed Contract Delegate TX SHP.pdf | Baylor College of Medicine_TIN_300791563 - 010118_Amend3_Delegate_Commercial Exchange TX SHP.pdf | | |
| 19 | 13989 | 1053799825 | Optometrist | 26-1981534 | The Vision Center of West Texas | | | Vision Network via Vision Vendor Contract | | | |
| 20 | 73790 | 1356699755 | Dentist: General Practice | 75-2622808 | WEST SPRING DENTAL CARE | | | Dental Network via Dental Vendor Contract | | | |
| 21 | 32685 | 1841413457 | Counselor: Professional | 20-8362563 | Rhonda M Johnson PHD PLLC | | | Rhonda M Johnson PHD PLLC_TIN_208362563 dba Center for Counseling and Family Relatio.. ECM_323961.pdf | | | |
| 22 | 65157 | 1922151133 | Optometrist | 75-2624671 | Kleiman Evangelista Eye Centers of Texas | | | Vision Network via Vision Vendor Contract | | | |
| 23 | 25309 | 1184808933 | Pediatrics: Pediatric Pulmonology | 26-1891316 | Houston Pediatrics Speci | | | Houston Pediatrics Speci_TIN_261891316 - Southern Texas Physicians Network_110113_Signed Contract_Delegate_TX_SHP.pdf | Houston Pediatrics Speci_TIN_261891316 - Southern Texas Physicians Network_011313_Amend_Delegate_Exchange_TX_SHP.pdf | Houston Pediatrics Speci_TIN_261891316 - Southern Texas Physicians Network_100117_Amend1_Delegate_Exchange_TX_SHP.pdf | |
| 24 | 63805 | 1861421695 | Optometrist | 16-1735756 | Mekas Family Eyecare | | | Vision Network via Vision Vendor Contract | | | |
| 25 | 77447 | 1538716360 | Nurse Practitioner: Family | 45-3160569 | Offices of Family Medicine | | | Offices of Family Medicine_TIN_453160569 - TIOPA, Inc_010111_Signed Contract Delegate TX SHP.pdf | Offices of Family Medicine_TIN_453160569 - TIOPA, Inc_040116_Amend_Delegate_Exchange TX SHP.pdf | | |
| 26 | 50232 | 1194006478 | Dentist: General Practice | 75-2518300 | JDC HEALTHCARE PLLC | | | Dental Network via Dental Vendor Contract | | | |

Hoyt Expert Report -- Appendix C -- Highly Confidential

Angelo, et al v. Centene Management Company, LLC et al
Sample of Haeder's Non Claim Providers

| Sample # | BRG ID | NPI | SPECIALTY | TIN 01 | NAME 01 | TIN 02 | NAME 02 | TIN 03 | NAME 03 | TIN 04 | NAME 04 | TIN 05 | NAME 05 | TIN 06 | NAME 06 | Contract Filename 1 | Contract Filename 2 | Contract Filename 3 | Contract Filename 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 71153 | 1225210958 | Nurse Practitioner: Family | 23-7087608 | Peoples Community Clinic Inc TX | | | | | | | | | | | Peoples Community Clinic_TIN_237087608 - ECM_139339.pdf | Peoples Community Clinic_TIN_237087608 - EXCHANGE_ECM_331019.pdf | | |
| 28 | 25338 | 1184991317 | Physician Assistant: Surgical | 47-3529613 | Dedicated Orthopedic Urgent Care | | | | | | | | | | | Dedicated Orthopedic Urgent Care_TIN_473529613 - 05092018_PPA_HB_ECM_332477.pdf | | | |
| 29 | 34520 | 1003174376 | Psychiatry & Neurology: Psychiatry | 74-2958277 | Scott & White Clinic | | | | | | | | | | | Sample from 2019, terminated from network in 2020 | | | |
| 30 | 35317 | 1073085270 | Nurse Practitioner: Family | 76-0459500 | U T physicians | | | | | | | | | | | UT Physicians_TIN_760459500 - 060113_Signed Contract_Delegate_TX_SHP.pdf | UT Physicians_TIN_760459500 - 100119_Amend2_Delegate_Exchange_TX_SHP.pdf | | |
| 31 | 86355 | 1992233282 | 006 Primary Care - Nurse Practitioner | 75-1047725 | Turn Center | | | | | | | | | | | Turn Center _TIN_751047725 - 411511 - PPA - SHP - 11-20-2018 9 23 AM-ECM 411511.pdf | | | |
| 32 | 85077 | 1922551431 | Psychologist: Clinical | 74-2870768 | Deer Oaks Consultation | | | | | | | | | | | DEER OAKS GERIATRIC SERVICES PC _ 742870768_06012018_ECM_348679.pdf | | | |
| 33 | 32501 | 1821355868 | Physician Assistant | 33-1043094 | Advanced Pain Care | | | | | | | | | | | Advanced Pain Care_TIN_331043094 - 304063_02012018.pdf | Advanced Pain Care_TIN_331043094 - 11012019_457640_AMENDMENT_HB.pdf | | |
| 34 | 9958 | 1730508094 | Counselor: Professional | 75-3213600 | Stonegate Behavioral Health | | | | | | | | | | | Stonegate Behavioral Health_TIN_753213600 - Contract 05.01.08 ECM 151482.pdf | Stonegate Behavioral Health_TIN_753213600 - Exchange_Amendment_ECM_160679.pdf | | |
| 35 | 77087 | 1528096229 | Specialist | 33-1012858 | Qadeer, Tahseen (Ob Gyn of Houston) | | | | | | | | | | | Ob Gyn of Houston LLP_TIN_331012858 - PPA - SHP - 5-22-2018 1_12 PM ECM 380146.pdf | | | |
| 36 | 32906 | 1861492324 | Podiatrist | 30-0791563 | Baylor College Of Medicine PA | | | | | | | | | | | Baylor College of Medicine_TIN_300791563 - 110113_Signed Contract Delegate TX SHP.pdf | Baylor College of Medicine_TIN_300791563 - 010118_Amend3_Delegate_Commercial Exchange TX SHP.pdf | | |
| 37 | 83705 | 1861492324 | Podiatrist | 30-0791563 | Baylor College Of Medicine PA | | | | | | | | | | | Baylor College of Medicine_TIN_300791563 - 110113_Signed Contract Delegate TX SHP.pdf | Baylor College of Medicine_TIN_300791563 - 010118_Amend3_Delegate_Commercial Exchange TX SHP.pdf | | |
| 38 | 47352 | 1043598055 | Urology | 75-2600873 | *YIGO*Shannon Clinic | | | | | | | | | | | Shannon Clinic_TIN_752600873 - 080111_Signed Contract Delegate TX SHP.pdf | Shannon Clinic_TIN_752600873 - 071520_Amend2_Delegate_Exchange TX SHP.pdf | | |
| 39 | 50620 | 1205971512 | Optometrist | 74-1864734 | DR Charles R Sturtevant Od | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 40 | 56439 | 1497784557 | Pediatrics: Pediatric Critical Care Medicine | 75-2740653 | Magella Medical Assoc Medical Group | | | | | | | | | | | Magella Medical Assoc Medical Group_TIN_752740653 - 030109_Signed Contract Delegate TX SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - Amend1_Delegate_Rates and Exchange Product add TX SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - 110120_Amend6_Delegate_Rates_ TX SHP.pdf | |
| 41 | 5018 | 1376698241 | Dentist: General Practice | | | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 42 | 16762 | 1336148329 | Internal Medicine: Geriatric Medicine | 75-6064033 | University of North Texa | | | | | | | | | | | Sample from 2017, terminated from network in 2017 | | | |
| 43 | 20197 | 1689717373 | Counselor: Professional | 33-1067154 | Solutions Counseling & Consulting PLLC | | | | | | | | | | | Solutions Counseling & Consulting PLLC_TIN_331067154 - ECM 293725.pdf | Solutions Counseling & Consulting PLLC_TIN_331067154 - Ex.Contract ECM 148414.pdf | | |
| 44 | 78344 | 1588714851 | Family Medicine | 81-3193170 | VillageMD of Southeast Texas PA | | | | | | | | | | | VillageMD of Southeast Texas PA_TIN_813193170 - 08012017_PPA_ECM_293994.pdf | VillageMD of Southeast Texas PA_TIN_813193170 - ECM_337739.pdf | | |
| 45 | 56641 | 1508808494 | Internal Medicine: Hematology & Oncology | 75-2131429 | Texas Oncology PA* | | | | | | | | | | | Texas Oncology_TIN_752131429 - 010114_Signed MOU Contract_Delegate_TX_SHP.pdf | Texas Oncology_TIN_752131429 - 060116_Amend2_Delegate_MOU Language_TX_SHP.pdf | Texas Oncology_TIN_752131429 - 090116_Amend3_Delegate_MOU Exchange_TX_SHP.pdf | |
| 46 | 72468 | 1295039535 | Physician Assistant | 45-0478290 | Pediatric Practice Assoc | | | | | | | | | | | Pediatric Practice Assoc_TIN_450478290 - 450478290_ECM_ 75237.pdf | Pediatric Practice Assoc_TIN_450478290 - AMEND_SHP_05012016_ECM_221455.pdf | Pediatric Practice Assoc_TIN_450478290 - Ambetter Regulatory Lang_10-1-2016_ECM_264573.PDF | |
| 47 | 18163 | 1477581700 | Psychologist: Clinical | 75-2925658 | East Texas Psychological Services PLLC | | | | | | | | | | | Behavioral Health Network via Behavioral Health Vendor Contract | | | |
| 48 | 82302 | 1780954404 | Counselor: Professional | 45-1801173 | Kimbra L Bishop | | | | | | | | | | | KIMBRA L BISHOP_451801173_06012019_40 9571_PPA_HB_ECM_409571.pdf | | | |
| 49 | 42854 | 1700058948 | Social Worker: Clinical | 32-0073615 | Ronald Morgan, Lpc | | | | | | | | | | | Ronald Morgan, Lpc_TIN_320073615 - EX.Contract 08.01.09_ECM_144475.pdf | Ronald Morgan, Lpc_TIN_320073615 - EX.DEEMER.1.25.13_Exchange_EC M_159863.pdf | | |
| 50 | 7245 | 1548231806 | Radiology: Diagnostic Radiology | 20-3856995 | Grace Clinic of Lubbock. | | | | | | | | | | | Sample from 2016, terminated from network in 2019 | | | |
| 51 | 14052 | 1063643591 | Optometrist | 81-2592988 | Capital Eye | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 52 | 47412 | 1043861610 | Dentist: General Practice | 27-1565534 | Round Rock Dental Group | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 53 | 19108 | 1578521779 | Ophthalmology | 74-2109903 | Retina Consultants of Houston PA | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 54 | 11758 | 1871804872 | Counselor: Professional | 45-0920279 | Rozana Contreras, Lpc | | | | | | | | | | | Behavioral Health Network via Behavioral Health Vendor Contract | | | |
| 55 | 183 | 1013142181 | Psychiatry & Neurology: Pain Medicine | 20-5114071 | Greater Dallas Healthcare. | | | | | | | | | | | Behavioral Health Network via Behavioral Health Vendor Contract | | | |

**Angelo, et al v. Centene Management Company, LLC et al**
**Sample of Haeder's Non Claim Providers**

| Sample # | BRG ID | NPI | SPECIALTY | TIN 01 | NAME 01 | TIN 02 | NAME 02 | TIN 03 | NAME 03 | TIN 04 | NAME 04 | TIN 05 | NAME 05 | TIN 06 | NAME 06 | Contract Filename 1 | Contract Filename 2 | Contract Filename 3 | Contract Filename 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 56 | 6569 | 1487849535 | Dentist: General Practice | 80-0077966 | Tooth Time Family Dentistry | 61-1533581 | Toothtime Family Dentistry | 26-2893699 | Toothtime Family Dentistry | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 57 | 78445 | 1598096059 | Nurse Practitioner: Womens Health | 75-2405203 | Tate, Jeflyn | | | | | | | | | | | Special Health Resources for Texas Inc_TIN_752405203 - 12012019_ECM_457318.pdf | | | |
| 58 | 56459 | 1497836779 | Optometrist | 56-2288867 | Elite Vision Care Llc | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 59 | 30728 | 1669547568 | Nurse Practitioner: Family | 75-2541970 | ResourceCare | | | | | | | | | | | ResourceCare_TIN_752541970 - Shackelford County Community Resource Center - PPA - SHP - 2-22-2018 12_13 PM.pdf | | | |
| 60 | 19792 | 1649201260 | Nurse Practitioner: Adult Health | 38-3452013 | InPatient Consultants of Texas, PA | | | | | | | | | | | In Patient Consultants of Texas PA_TIN_383452013_ECM_87998.pdf | In Patient Consultants of Texas PA_TIN_383452013 - Ambetter Regulatory Lang_10-1-2016 ECM 269572 | | |
| 61 | 51766 | 1265871768 | Dentist: General Practice | 83-3000457 | BRIDENT DENTAL ASSOCIATES PC | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 62 | 48934 | 1124417340 | Counselor: Professional | 81-4531978 | Crystal Clear Behavioral Health INC | | | | | | | | | | | Crystal Clear Behavioral Health INC_TIN_814531978 - 03062018_342877_HB.pdf | | | |
| 63 | 77900 | 1568554772 | Dentist: General Practice | 83-1149987 | Luxx Dental PC | 76-0575910 | Ho, Lam G | 46-4346923 | Jones FM-1960 Dental PC | 27-2850540 | Ho, Lam G | 20-4882860 | Second Investment Group Inc | 13-4258679 | Ho, Lam G | Dental Network via Dental Vendor Contract | | | |
| 64 | 84855 | 1912525023 | Dentist: General Practice | 81-0733265 | RASHAD M ALTAWATY DDS PLLC | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 65 | 70434 | 1184634628 | Radiology: Diagnostic Radiology | 75-1292603 | Radiology Associates Of | | | | | | | | | | | Sample from 2021, terminated from network on 1/1/2022 | | | |
| 66 | 45239 | 1902860521 | Pediatrics: Pediatric Critical Care Medicine | 75-2740653 | MAGELLA MEDICAL ASSOCIATES BILLING INC | | | | | | | | | | | Magella Medical Assoc Medical Group_TIN_752740653 - 030109_Signed Contract_Delegate_TX_SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - Amend1_Delegate_Rates and Exchange Product add_TX_SHP.pdf | Magella Medical Assoc Medical Group_TIN_752740653 - 110120_Amend6_Delegate_Rates_TX_SHP.pdf | |
| 67 | 29787 | 1578801189 | Nurse Anesthetist, Certified Registered | 76-0482007 | US Anesthesia Partners of Texas, PA | | | | | | | | | | | US ANESTHESIA PARTNERS OF TEXAS P.A._760482007_11012016_ECM_288337.pdf | US ANESTHESIA PARTNERS OF TEXAS P.A._760482007 - Amendment One to LOA HF 04012020 Final Fully Executed ECM 173590.pdf | | |
| 68 | 40494 | 1508024464 | Pediatrics: Sports Medicine | 76-0459500 | U T physicians | | | | | | | | | | | UT Physicians_TIN_760459500 - 060113_Signed Contract_Delegate_TX_SHP.pdf | UT Physicians_TIN_760459500 - 100119_Amend2_Delegate_Exchange_TX_SHP.pdf | | |
| 69 | 13395 | 1992852362 | Internal Medicine | 38-3452013 | InPatient Consultants of Texas, PA | | | | | | | | | | | In Patient Consultants of Texas PA_TIN_383452013_ECM_87998.pdf | In Patient Consultants of Texas PA_TIN_383452013 - Ambetter Regulatory Lang_10-1-2016 ECM 269572 | | |
| 70 | 23609 | 1033198866 | Physician Assistant: Medical | 82-1809038 | Family Practice & Urgent Care Pa | | | | | | | | | | | Family Practice and Urgent Care PA_TIN_821809038 - 09012018_343030_PPA_HB.pdf | | | |
| 71 | 2341 | 1174712905 | Nurse Practitioner: Family | 45-4661758 | Practitioners on The Go LLC | | | | | | | | | | | PRACTITIONERS ON THE GO, LLC_454661758_PPA_SHP_100120 15.pdf | PRACTITIONERS ON THE GO, LLC_454661758_AMEND_SHP_02012016 ECM 190542.pdf | | |
| 72 | 59374 | 1649301136 | Internal Medicine: Cardiovascular Disease | 75-2674367 | Healthcare Associates Of Irving (Genesis Group) | | | | | | | | | | | Healthcare Associates Of Irving, Llp_TIN_752674367 - Genesis Physician Group, Inc_100110_Signed Contract_Delegate_TX_SHP.pdf | Healthcare Associates Of Irving, Llp_TIN_752674367 - Genesis Physician Group_050116_Amend4_Delegate_Exchange_TX_SHP.pdf | Healthcare Associates Of Irving, Llp_TIN_752674367 - Genesis Physician Group, Inc_100118_Amend6_Delegate_Exchange_TX_SHP.pdf | |
| 73 | 29742 | 1578590766 | Nurse Anesthetist, Certified Registered | 74-2582828 | Corpus Christi Obstetric Anesthesia Associates | | | | | | | | | | | Corpus Christi Obstetric Anesthesia Associates_TIN_742582828 - EXCHANGE DEEMER AMMENDMENT - ECM_88839.pdf | | | |
| 74 | 31080 | 1699271304 | Counselor: Professional | 75-1377658 | Abilene Regional MHMR Center | | | | | | | | | | | Abilene Regional MHMR Center_TIN_751377658 - 03012018_ECM_335214.pdf | | | |
| 75 | 42747 | 1699093625 | Obstetrics & Gynecology | 83-1739279 | Advanced Family Practice, PLLC | | | | | | | | | | | Advanced Family Practice, PLLC_TIN_831739279 - PPA - SHP - 2-5-2019 1_55 PM_ECM_420271.pdf | | | |
| 76 | 25834 | 1235237504 | Ophthalmology | 74-2883126 | VALLEY LASER CENTER PA | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 77 | 19210 | 1588626477 | Nurse Practitioner | 74-2648710 | H S EUGENE FUNG MD PA | 20-5220791 | LITTLE RIVER HEALTHCARE | | | | | | | | | LITTLE RIVER HEALTHCARE_TIN_205220791 - ROCKDALE BLACKHAWK LLC, DBA LITTLE RIVER 04012017 PPA SHP 286254.pdf | | | |
| 78 | 61074 | 1720178494 | Dentist: General Practice | 47-5200652 | SUCCESSFUL SMILES OF TEXAS | 47-4199791 | RICARDO C GUILLEN DDS PLLC | 32-7407063 | LESZEK J SAWICKI DDS | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 79 | 57418 | 1548496912 | Radiology: Diagnostic Radiology | 30-0791563 | Baylor College Of Medicine PA | | | | | | | | | | | Baylor College of Medicine_TIN_300791563 - 110113_Signed Contract_Delegate_TX_SHP.pdf | Baylor College of Medicine_TIN_300791563 - 010118_Amend3_Delegate_Commercial Exchange_TX_SHP.pdf | | |
| 80 | 54167 | 1386613461 | Pediatrics: Pediatric Emergency Medicine | 20-2313462 | Little Spurs Pediatric Urgent Care PLLC | | | | | | | | | | | Little Spurs Pediatric Urgent Care_TIN_202313462 - HB_202313462_05012018_ECM_367975.pdf | | | |
| 81 | 8262 | 1619288313 | Dentist | | | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 82 | 35756 | 1104886100 | Psychologist: Clinical | 74-2958277 | Scott & White Clinic ... | | | | | | | | | | | Behavioral Health Network via Behavioral Health Vendor Contract | | | |
| 83 | 83917 | 1871601351 | Dentist: General Practice | 74-2802915 | EVANS, JAMES F | | | | | | | | | | | Dental Network via Dental Vendor Contract | | | |

Hoyt Expert Report -- Appendix C -- Highly Confidential

**Angelo, et al v. Centene Management Company, LLC et al**
**Sample of Haeder's Non Claim Providers**

| Sample # | BRG ID | NPI | SPECIALTY | TIN 01 | NAME 01 | TIN 02 | NAME 02 | TIN 03 | NAME 03 | TIN 04 | NAME 04 | TIN 05 | NAME 05 | TIN 06 | NAME 06 | Contract Filename 1 | Contract Filename 2 | Contract Filename 3 | Contract Filename 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 84 | 13967 | 1053575647 | Ophthalmology | 74-1916103 | Trinity Vision Center | 74-1665466 | Ophthalmology Associates of San Antonio | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 85 | 67483 | 1033373113 | Dentist: Prosthodontics | 45-3655057 | AJLOUNI, KHALDOUN F | 27-2547484 | GRAND DENTAL | 20-3244119 | Davinci Dentistry | | | | | | | Dental Network via Dental Vendor Contract | | | |
| 86 | 888 | 1063617868 | Pediatrics: Pediatric Gastroenterology | 74-2800601 | Specially for Children YIHB | | | | | | | | | | | Dell Children's Medical Group_TIN_742800601 - 070114_Signed Contract_Delegate_TX_SHP | Dell Children's Medical Group_TIN_742800601 - 090116_Amend_Delegate_Commercial Exchange_TX_SHP.pdf | | |
| 87 | 30697 | 1669434908 | Internal Medicine | 82-3426999 | UTHealth East Texas Physicians | 75-2605821 | East Texas Medical Ctr H. Assoc | | | | | | | | | UTHealth East Texas Physician_TIN_823426999 - 100111_Signed Contract_MG_TX_SHP.pdf | UTHealth East Texas Physician_TIN_823426999 - 060117_Amend4_MG_Exchange_TX_SHP.pdf | East Texas Medical Center Associates_TIN_752605821 - ECM_85000.pdf | East Texas Medical Center Healthcare Associates_TIN_752605821 - MEDICAL PROVIDER CONTRACT_ECM_49542.pdf |
| 88 | 40927 | 1538581475 | Nurse Practitioner: Family | 81-3982550 | El Paso Specialty Physicians Group | | | | | | | | | | | EL PASO SPECIALTY PHYSICIANS GROUP HB _813982550_ECM_332337.pdf | | | |
| 89 | 57741 | 1568447175 | Ophthalmology | 75-1362336 | Texas Retina Association (Genesis Group) | | | | | | | | | | | Texas Retina Associates_TIN_751362336 - Genesis Physician Group, Inc_100110_Signed Contract_Delegate_TX_SHP.pdf | Texas Retina Associates_TIN_751362336 - Genesis Physician Group_050116_Amend4_Delegate _Exchange_TX_SHP.pdf | Texas Retina Associates_TIN_751362336 - Genesis Physician Group, Inc_100118_Amend6_Delegate_Exchange_TX_SHP.pdf | |
| 90 | 45847 | 1952707119 | Counselor: Professional | 23-1390618 | THE DEVEREUX FOUNDATION | | | | | | | | | | | Devereux Foundation_TIN_231390618 - ALL PRODUCTS .EXContract_ECM_150041.pdf | Devereux Foundation_TIN_231390618 - Devereux Texas Treatment Network- Texas_Exchange_ECM_297382.pdf | | |
| 91 | 32621 | 1831497288 | Nurse Practitioner: Family | 20-2386997 | *ZZDS*Vpa of TX Irving | | | | | | | | | | | VPA of Texas, PLLC_TIN_202386997 - USMM - National Contract-1st Signature Pages 1-253 12.21.2018 (1).pdf | VPA of Texas, PLLC_TIN_202386997 - USMM - National Contract-1st Signature Pages 254-527 12.21.2018 (1).pdf | | |
| 92 | 80970 | 1710905591 | Social Worker: Clinical | 58-5411047 | Julie Sheppard, Lcsw | | | | | | | | | | | Julie Sheppard, Lcsw_TIN_585411047 - EX.CONTRACT.10.1.12_ECM_157303.pdf | Julie Sheppard, Lcsw_TIN_585411047 - EX.DEEMER.1.25.13_ECM_160177.pdf | Julie Sheppard, Lcsw_TIN_585411047 - Exchange Amendment_ECM_298414.pdf | |
| 93 | 59724 | 1659875565 | Nurse Practitioner: Gerontology | 46-2456505 | Privia Medical Group Gulf Coast, PLLC | | | | | | | | | | | Privia Medical Group Gulf Coast, PLLC_TIN_462456505 - 110118_Signed Contract_Delegate_TX_SHP.pdf | | | |
| 94 | 7821 | 1588656938 | Pediatrics | 74-2693173 | Abc Pediatrics | | | | | | | | | | | ABC Pediatrics_TIN_742693173 - ECM_48627.pdf | ABC Pediatrics_TIN_742693173 - 742693173_EIREEN H CHUA MD_Ambetter Regulatory Lang_10-1-2016_ECM_48627.pdf | | |
| 95 | 50244 | 1194054627 | Social Worker: Clinical | 47-3605011 | Elite Counseling Services PC | 45-1511143 | Porscha Lawson | | | | | | | | | Porscha Lawson_TIN_451511143 - ICMSupportingDocuments_45351 3 1.Pdf.pdf | Porscha Lawson_TIN_451511143 - ECM 293747.pdf | | |
| 96 | 38194 | 1306324884 | Counselor: Professional | 45-0370859 | RICKY WALTER LPC | | | | | | | | | | | RICKY WALTER LPC_TIN_450370859 - 415363- PPA - SHP - 12-19-2018 5_14 PM-415363.pdf | | | |
| 97 | 51045 | 1235201609 | Pediatrics | 76-0482007 | US Anesthesia Partners of Texas, PA | | | | | | | | | | | US ANESTHESIA PARTNERS OF TEXAS P.A._760482007_11012016_ECM_288337.pdf | US ANESTHESIA PARTNERS OF TEXAS P.A._760482007 - Amendment One to LOA HF 04012020 Final Fully Executed_ECM 173590.pdf | | |
| 98 | 9595 | 1710128855 | Surgery | 74-2999557 | Vincent A Caldarola | 46-3371684 | Vr Surgical Associates P | | | | | | | | | Sample from 2016, terminated from network in 2018 | | | |
| 99 | 33675 | 1932102571 | Optometrist | 74-6001399 | UNIVERSITY OF HOUSTON, COLLEGE OPT | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |
| 100 | 69219 | 1124316146 | Optometrist | 84-2082825 | Memorial Eye Center-Rice Blvd | | | | | | | | | | | Vision Network via Vision Vendor Contract | | | |