*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

THE VIDEOGRAPHER:  Good morning.

We are going on the record at 9:32 on January 25, 2023.

Please note that the microphones are sensitive and may pick up whispering an private conversations.  Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record this is Media Unit 1 of the video-recorded deposition of Brian Hoyt in the matter of Angelo Erin v. Centene Management Company, LLC, et al.

The location of the deposition is Williams & Connolly.  My name is Glen Fortner representing Veritext and I am the videographer.  The court reporter is Bonnie Russo from the firm Veritext. I am not related to any party in this action nor am I financially interested in the outcome.  If there are any objections to proceeding please state them at the time of your appearance.  Counsel and all presently including remotely will now state their appears and affiliations for the record beginning with the noticing attorney?

MR. BRIGHT:  Thomas Bright of Cera LLP representing the plaintiffs.

MR. CADY:  Steve Cady representing the defendants.

1

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and then counsel may proceed.

BY MR. BRIGHT:

Q.  Good morning Mr. Hoyt?

A.  Good morning.

Q.  I'm Thomas bright.  I introduced myself to you earlier.  Thank you for coming today.  I appreciate it?

A.  Happy to be here.

Q.  Can you please spell your name for the record?

A.  Brian B R I A A N middle E Hoyt H O Y T.

Q.  And where do were reside Mr. Hoyt?

A.  I reside in Virginia.

Q.  Okay.  Have you ever had your deposition taken before?

A.  I have.

Q.  How many times?

A.  Three previous times.

Q.  When was the last time you had your deposition taken?

A.  Some time later 2022, the end of 2022.  I don't remember the exact date.

Q.  I will go over some ground rules to make sure we are upon the same page about how this is going proceed today?

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

A.   I do not know.

Q.   Do you know whether superior contacted each of its providers in its directory to negotiate a fee schedule for Ambetter policy holders?

A.   I don't know.

Q.   Is it accurate to say that you disagree with Dr. Haeder using claims data to determine in network providers?

A.   No, I don't think that's inaccurate.   I don't disagree with Dr. Haeder's approach to use claims data to determine network status.

Q.   Okay.

A.   For providers.

Q.   So the approach of using claims data to determine network status you don't have a problem with as a methodology?

A.   I do not, no.

Q.   Okay.  How do you define an available provider?

MR. CADY:  Mr. Hoyt high don't you listen to that question again because it is not consistent with your report.  Say it again.

MR. BRIGHT:  I'm sorry.

MR. CADY:  Using claims data to determine who is actually under contract and in the network I think that was your question.  I disagree with that.

100

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

Q.  I said is it accurate -- the first question and I can go to the other iterationing if you rather but the first one is it accurate to say that you disagree with Dr. Haeder using claims data to determine in network providers?

A.  Yeah I don't disagree with that methodology, but I don't believe it's sufficient to determine the network stat us.

Q.  Okay.  Can you expand upon that please?

A.  Right because those data the claims data are informed from you know other information right specifically they are a manifestation of the fact that that provider has a network participation agreement a contract with superior to provide networks in network healthcare services.  So to the extent that the data that Dr. Haeder received from the plan from superior that indicated not I believe it was noncontracted or contracted those data they are not they don't stand on their own.  They are based on the fact that there is a contract that bring that identifies that provider as a network provider.

Q.  Okay.  Are you aware that the am better agreements with the providers are automatically renewing?

A.  I understand that some of those agreements are.

101

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

not have its own provider network for all service areas in the United States?

Do you see that?

A.  I do.

Q.  Can you explain to me in like I am five years old how that works?

A.  Yes.  So if a health insurer offers health insurance in states in which they haven't contracted with build their own provider network right they can leverage other companies that have formed their provider networks that have the performed a product network that that company then leases that network out to health insurers to allow the health insurers to expands its network out into other service areas.

Q.  Did Superior health ever do that?

A.  I don't know.  I didn't look into that.

Q.  And then in the following paragraph, you cite a 2014 McKinsey study and you state toward the second penultimate sentence study suggests that the cost for such ultra narrow networks are 13 percent lower?

A.  I see that.

Q.  Are you -- is this study suggesting there is a correlation or are you suggesting that -- strike that.

Start again.

Is it your conclusion from this study that

140

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

the cost of ultra narrow networks are 13 percent lower.

A. It is not my conclusion. That's the -- that's how I summarize the finding from the study and I would need to refresh my memory on the study to figure out kind of what they -- what that study was looking at, what their methodology was and so forth.

Q. Did you disagree with that when you wrote this?

A. I didn't have a reason or a basis to agree or disagree. I was just summarizing, you know, for the reader the results of that study.

Q. Okay. What is an ultra narrow network?

A. Similar to the academic papers that Dr. Haeder cites to this McKinsey study categorizeed the breathed of provider networks and these categories came to be known as or they are defined by the network breathed which is the same network breathed that we talk about earlier which is the percentage of products in the area of which a health plan contracts right so this ultra narrow network I believe was a threshold of that the plan contracted with ten percent or less of the available providers in a contracting area. Look I say I would have to refresh my memory on the study but that was the threshold was 10 percent or less or something that range.

Q. Then go to the first sentence under 3.2.

141

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

Q.  Okay.

A.  Yes.

Q.  So that is not applicable to what we are talking about?

A.  No.

Q.  And then you say however consumers are finding they exert greater influence over health plans by filing complaints with state regulators or joining class actions against health insurers?

Do you see that?

A.  I do.

Q.  Was that true in 2018?

A.  Again you know this term greater influence I'm not sure -- I would imagine I felt it was true so I included it in 2018.

Q.  Do you have any doubt about it today as of 2018?

A.  I don't think so as of 2018 I don't think so.

Q.  Do you think the same thing holds for 2019?

A.  I mean as I as I pointed out you know in our discussion of the 2015 study you know there are there are other remedies right that especially Superior members can pursue rather than joining class actions or complain to the regulator.  They can call the plan as my review of the complaint log showed that they did do.

Q.  But you don't mention that here, correct?

160

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

A.  No, I did not mention that here.

Q.  You didn't mention?

A.  Because I wasn't working only behalf of Superior at that point.

Q.  Well I am talk about you don't mention the concept regardless of who the insurer is of calling the person who or the entity from whom you bought your policy.  You don't mention that in this paper do you?

A.  I would need to review the pap near more detail. As I said about the 2015 study I think I may have mentioned calling the plan or filing a complaint with the plan.  I don't recall.

Q.  But as we sit here you can't direct me to that, correct?

A.  No.  Not without further review of the paper.

Q.  Understood.  I am not trying to play a trick on you.  I honestly don't think it's in there, but I can't tell you that for certain myself.

A.  Got you.

Q.  Then on Page 14.  2.3  /(  you put last a health plan is at an increased risk of litigation with its provider when its provider directories have errors. True?   On 2018.

A.  Yes.  True.

Q.  True today?

161

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

dose not submit complaints?

A.  I'm not familiar with those literature, no.

Q.  Okay.  Does at the surprise you?

A.  I probably need more information to say will it registers a surprise or not.

Q.  Is that something you ever looked into?

A.  It is not.

Q.  Okay.  Besides calling Superior health are you aware of other place where complaints about Ambetter may be found?

A.  I believe Dr. Haeder provides some other examples of complaints about Ambetter that were filed in other locations besides with the plan.

Q.  So in this case you said that you reviewed the complaint log provided to you by superior; is that correct?

A.  That is correct.

Q.  Okay.  Did you look at any complaints about the Ambetter policy outside of the complaint log provided to you by Superior health?

A.  I did not.

Q.  Okay.  Did you look at the -- so you been look at the better business burr site?

A.  I did not.

Q.  Did you make an attempt to look anywhere else

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

other than the complaint log that was provided to you by Superior health?

A.  I did not.

Q.  And why was that?

A.  The complaint logs in my estimation or my view are -- the complaints logs as maintained in the format in which I received them from Superior you know that provides certain information that allows me to identify specific complaints related to the topics that you know I was addressing in my report and specifically here I am talking about you know complaints related to the directory or to the network.

Q.  But if you didn't look at other platforms or places her-

Her Ambetter policy holders submit complaints how would you know that the information that you were looking for wouldn't be there.

A.  I wouldn't know.

Q.  Were you instructed to look only at the complaint log?

A.  I was not.

Q.  Okay.  Were you instructed to look anywhere else?

A.  I was not.

Q.  Prior to this assignment were you aware of health insurance company policy holders logging complaints in

174

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

found no evidence that Superior makes either of these representations to its customers regarding the number of products in its provider network I E the size and how many respect active in seeing Superior's ACA customers in a given calendar year.

Q.   And if you could in Exhibit 104 can you read the web address that in the top right-hand corner?

A.   H T T P S.   Slash slash W W W.  Superior health plan.com forward slash about oaf us forward slash just owe the-facts dot HTML.

Q.   Did you visit this particular page of the Superior health plan.com website before you prepared or while you were preparing your report?

A.   I don't recall specifically.  I may well have, yes.

Q.   Okay.  Under "just the facts" if you look on the second page I believe of the exhibit or just behind it.

A.   Yes.

Q.   It says how many providers and specialists are there in the Superior network.

Do you see that?

A.   I do.

Q.   /(  did you look at this when you -- before during the preparation of your report?

A.   Again I may have viewed this page or seen this

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

page in preparing my report.  I looked at a lot of pages on their website so I don't recall all of them.

Q.  Okay.  And then it's says Superior has the largest provider network of all M C Os?

Do you see that sentence?

A.  I see that.

Q.  What is an M C O?

A.  This refers to a managed care organization and specifically a Medicaid managed care organization.

Q.  So this provider and specialist and Superior network are specific to Medicaid?

A.  That is my understanding of this, yes.

Q.  And how do you come to that conclusion?

A.  There are several signals that would lead me to reach that conclusion.  First of all this page Superior health plan is talking about Medicaid in specific and everybody in the section that you reference about the number of products in the network it mentions you know on more than one occasion that is it Medicaid that it is related to Medicaid network as opposed to the Ambetter nether.

Q.  I'm sorry when you say -- where does it the mention Medicaid?

A.  Consolidate on the first page under just the facts.

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

yes related to Medicaid business.

Q.  Okay?

A.  Yeah.

Q.  So it is specifically limited to Medicaid?

A.  Typically, yes.

Q.  And how do you know that.  Well that is how I use the term?

Q.  Right but how do you know?

A.  You know in the 30 some odd years I have been in healthcare that is how I have come to use the term.

Q.  Right.  And then when you find this here this just the facts on Superior health this is not in a section that is dedicated to Medicaid, is it?

A.  I -- it doesn't.

Q.  If you know.

A.  I don't know.  I mean based on the -- I don't know.

Q.  Okay.  So if I am a -- don't have the -- which I certainly don't have the healthcare experience that you have  /(  let's say I am just a regular Ambetter policy holder is there a chance I'm going to know that M C O is limited to Medicaid?

A.  You may not know that M C O is limited to Medicaid but I think an as that person read on as they further investigated these questions presumably they are

184

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

going to this page because they have questions they would like the get answered.

Q.  They are looking for just the facts?

A.  Right so they can expand on these questions and they can see that these questions relate to the Medicaid program.

Q.  Let's go to the next question?

A.  Yes, sir.

Q.  How does Superior health plans serve members in the Medicaid program.  That's an example of what you are talking about correct?

A.  Correct.

Q.  Because that relates only the Medicaid?

A.  I think so just based on the headline there based on the title yes.

Q.  How does state award Medicaid contracts to M C Os?

        MR. CADY:  If you want to look at the actual version present out that may be helpful.  You can see the drop downs.  It provides a little more context.

        MR. CADY:  If that is okay.

        MR. BRIGHT:  No problem.  Let me pull mine up then.

A.  Uh-huh.

Q.  Steve while we are doing this are you on Steve's

185

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

could bill under his group only?

A.   That is true as is acknowledged as a limitation in one of the studies that Dr. Haeder cites to.

Q.   Okay.  So let's say you have -- Dr. Cady bills only under Williams & Connolly group NPI?

A.   Yes.

Q.   In that situation did you go back to other billers in that group NPI that bill under the same group NPI that Dr. Cady does did you go back to see if they bill individually?

A.   Been I can't line up wife individual practitioners are actually because I don't have the rendering and the submitting provider on the claim line.

Q.   Understood.

A.   Do you understand.  Yeah so here.

Q.   The answer to the question is no?

A.   The answer to the question is no and I think that individual practitioner NPI of a provider that very well may be billing under the group NPI organizational NPI that practitioner NPI would appear on Dr. Haeder's 49 percent list and what I am -- what this table summarizes the number the thousands of providers NPIs individual practitioner NPIs that based on my analysis also belong to a group and those groups are submitting claims in the hundred s of thousand per year.

232

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

Q.  Right I understand that.  Yeah.  But the answer to my question is no which is you can't tell me if other members of that group whether they billed exclusively under group or under individual?

A.  That's correct.

Q.  And if you -- let's assume you are correct and you wiped all these people out of Dr. Haeder's analysis, you reduced his not in network number by these people, let's assume that every single person that billed by group NPI only and not by individual happened to be in the network?

A.  Uh-huh.

Q.  How would that affect this percentage, do you know?

A.  I didn't perform that calculation.

Q.  Okay and why not?

A.  It wasn't part of my assignment.  I wasn't being asked to restate Dr. Haeder's damages.

Q.  Okay.  So you don't know?

A.  I didn't perform the calculation so I don't know.

Q.  Okay.  Let's look to Page 22.  It's a very small section in number paragraphs.  It is probably -- I am not trying to denigrate how hard I was to get this together.  I just don't understand this.  Can you help me with this.

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

Q.  Doesn't have access to the contracts.  They don't know whether that person is contracted or not --

A.  Right.

Q.  -- they just see the directory?

A.  So they see the directory.  If it turns out that that member sees the provider and for whatever reason that provider is not in network whether they've terminated their contract as we were talking about earlier terminating the contract or Ambetter has terminated the contract whatever it is if as I stated before the Superior policy is to hold that member harmless if they relied on an inaccurate directory.

Q.  Understood.

A.  Right.

Q.  And when you say hold harmless I believe you are referencing -- I think you mentioned that in Paragraph 88 of your report?

A.  Yes.

Q.  And you have a Footnote 67.

A.  Yes.

Q.  And this is -- I mean, let's be fair.  You say for example, right?

A.  Yes.

Q.  And then it goes on to say in is a quote from the evidence of coverage.  That's policy correct?

239

*ROUGH*ROUGH*ROUGH*CONFIDENTIAL*

A.  That's correct.

Q.  It says if you relied on materially inaccurate directory information you may be entitled to have an out-of-network claim paid at the in-network level of benefits correct?

A.  Correct.

Q.  It say may right.  That says may yes?

Q.  It doesn't say shall?

A.  The word shall does not appear.

Q.  Correct.  Okay.  Let's go to Paragraph 80, please?

A.  Okay.

Q.  It says:  Essentially health plan -- health insurance plans that have lower premiums relative to other plans do so by design, and you don't have a citation there.

What does that mean?

A.  Well, as I describe further in the paragraph the health insurance premiums are arrived at by performing by make certain actuarial assumptions that involve looking ahead to say what is our expected utilization and at what rates to simplify.

So to the extent that health insurance plans arrive at different premium amounts is it really based on those what the academic study that Dr. Haeder cites

240