



# PROVIDER DIRECTORIES:
## LITIGATION, REGULATORY, AND OPERATIONAL CHALLENGES



**WHITE PAPER | MARCH 2015**

Prepared By:

**BRIAN HOYT**
bhoyt@thinkbrg.com
202.480.2762

Copyright ©2015 by Berkeley Research Group, LLC. Except as may be expressly provided elsewhere in this publication, permission is hereby granted to produce and distribute copies of individual works from this publication for non-profit educational purposes, provided that the author, source, and copyright notice are included on each copy. This permission is in addition to rights of reproduction granted under Sections 107, 108, and other provisions of the U.S. Copyright Act and its amendments.

Disclaimer: The opinions expressed in this publication are those of the individual author and do not represent the opinions of BRG or its other employees and affiliates. The information provided in the publication is not intended to and does not render legal, accounting, tax, or other professional advice or services, and no client relationship is established with BRG by making any information available in this publication, or from you transmitting an email or other message to us. None of the information contained herein should be used as a substitute for consultation with competent advisors.

**Berkeley Research Group** | 1800 M Street NW, Second Floor | Washington, DC | 20036

# 1   Executive Summary

Since the implementation of the Affordable Care Act (ACA), millions of consumers have signed up for health insurance coverage through the Health Insurance Marketplace.[1] Additionally, employer groups both large and small are increasingly asking health insurers to create health insurance products specific to their employees. As a result, health plans are creating new, contracted network offerings at an unprecedented rate. These health plan networks range from higher-cost PPO products with broad provider networks to products with narrow or tiered networks that boast lower premiums but provide limited choices of providers.

As the volume and variety of health insurance products increase to accommodate an expanding market, so do concerns about whether the contracted provider networks adequately serve their target patient population. Further, some consumers have complained that the provider network information provided to them by health plans is misleading and inaccurate. As a result, federal and state regulations have added more specificity around what constitutes an adequate provider network and have defined the information that a health plan is required to provide to consumers.

These regulations require health insurers to maintain and provide consumers with an accurate listing of providers—both facilities and physicians—participating in their networks. This includes information about their location, specialty, hospital affiliation, and languages spoken. Consumers are entitled to have access to these provider directories both in hard-copy printed format and via a Web-based provider search portal on a health insurer's website. Although these regulations are intended to ensure that consumers are relying on accurate provider information, recent studies and reports indicate that health plans struggle to maintain accurate provider directories.

The repercussions of inaccurate provider directories can be significant, posing risks to both consumers and health plans. Inaccurate directory information may limit a consumer's ability to verify if a preferred doctor is in-network or to know how many and what types of providers would have to be accessed under a particular product offering. Additionally, the consumer may be at risk of being charged higher out-of-network rates when providers are erroneously listed as being in-network. These inaccuracies also put health plans at greater risk of litigation, government penalties and investigations, and significant administrative costs associated with rectifying inaccurate directories.

The primary purpose of this white paper is to provide health plan stakeholders with information on provider directories. These stakeholders include the executives, managers, and analysts within health insurance companies that evaluate provider network contracts, in addition to those directly involved in maintaining the company's provider directories. The first section of the paper includes a critical review of the guidelines and regulations around provider directories. The next section discusses some of the operational challenges that health plans encounter in maintaining accurate provider directories. This is followed by an assessment of the risks posed by inaccurate provider directories to both consumers and health plans. The paper concludes with a case study and a discussion of the future of provider directories, including the recent guidance from the Centers for Medicare and Medicaid Services (CMS).

---

1   J. Levy, "In U.S., Uninsured Rate Sinks to 12.9%," Gallup (January 7, 2015), accessed at: http://www.gallup.com/poll/180425/uninsured-rate-sinks.aspx

BERKELEY RESEARCH GROUP | **WHITE PAPER**

# 2    Guidelines and Regulations for Provider Directories

Various entities, including the federal government, state governments and departments of insurance, independent accreditation organizations, and trade associations, have provided recommendations and guidelines related to provider directories. Given that regulations around directories are still evolving and vary greatly, it is important to understand the rules in place for maintaining accurate provider directories. The following provides an overview of some rules.

## 2.1    Provider Directory Review during Health Plan Accreditation

The health plan accreditation process typically includes a review of provider directory accuracy and maintenance procedures. Accreditation is a comprehensive evaluation process in which an impartial, external organization reviews a health plan's systems, processes, and performance to ensure that it is conducting business in a manner that meets predetermined criteria and is consistent with national standards.[2] The ACA mandates accreditation to ensure quality in the managed healthcare sector,[3] and Qualified Health Plans (QHPs) sold on the Health Insurance Marketplace must go through the accreditation process. Additionally, more than 45 states use accreditation as part of their regular health insurance evaluations. The National Committee for Quality Assurance (NCQA), the nation's largest accreditation body, includes questions specific to provider directories as part of its accreditation process, including:[4]

- Does the organization provide a searchable Web-based directory of its physicians and hospitals?

- Does the physician and hospital directory contain the most current information?

- Does the plan test the directory for understanding and member ease of use?

- Is the directory available in other formats (e.g., printed, by telephone)?

NCQA also requires that accredited plans validate provider information for directories on at least an annual basis.[5]

## 2.2    Provider Directories under the Affordable Care Act

The ACA specifically addresses the need for increased regulation around health plan network adequacy and provider directory accuracy. The ACA requires that the Department of Health and Human Services (HHS) establish criteria for the certification of QHPs that aim to ensure:[6]

- A sufficient choice of providers

- Access to information regarding the availability of in-network and out-of-network providers

- Inclusion of essential community providers serving low-income and medically underserved enrollees within health plan networks

---

2    National Conference of State Legislatures, *Accreditation to Approve Health Plans and Providers* (April 2011), 1–2, accessed at: http://www.ncsl.org/documents/health/HRHealthPlans.pdf

3    Section 1311(c)1, "Affordable Choices of Health Benefit Plans and Section 1001," as amended by Section 10101 of the Patient Protection and Affordable Care Act (PPACA), Pub. L. 111–148, adds Section 2719 to the Public Health Service Act.

4    National Committee for Quality Assurance, *2014 NCQA Health Plan Accreditation Requirements* (2014), 1–11, accessed at: http://www.ncqa.org/Portals/0/Programs/Accreditation/2014 NCQA HP requirements and HEDIS Measures-2.pdf

5    National Committee for Quality Assurance, Network Adequacy & Exchanges (2011), 1–7, accessed at: http://www.ncqa.org/Portals/0/Public Policy/Exchanges&NetworkAdequacy_2.11.13.pdf

6    Patient Protection and Affordable Care Act Section 1311(c).

CMS's "Final 2016 Letter to Issuers in the Federally-facilitated Marketplaces" also details additional measures specific to QHP provider directories. These guidelines require QHPs to provide online access to provider directory information, provide hard-copy provider directories upon request, and identify when a listed provider is no longer accepting new patients.[7] Additionally, CMS guidance sets forth minimum standards for the type of information that should be reported in a provider directory, which includes the following participating provider information:

- Provider licensure or credentials;

- Specialty;

- Contact information; and,

- Accommodations for individuals with limited proficiency in the English language and/or for those with disabilities.[8, 9]

The recent CMS 2016 rules and letters are discussed in more detail in Section 6.1 below.

## 2.3  State-Level Provider Directory Oversight

The National Association of Insurance Commissioners (NAIC) advocates for network adequacy standards to be set at the state level. In a letter to the Center for Consumer Information and Insurance Oversight—the federal agency charged with implementing much of the ACA—the NAIC argued that "federal regulation of network adequacy standards will lead to conflicting standards between state and federal requirements and that network adequacy regulation will be most effective at the state level where the needs of consumers, the cost of care, and the standards of the area, can best be evaluated." As such, several states have established their own network adequacy rules that include language pertaining to provider directory requirements.

### 2.3.1  Provider Directory Standards Development: Key Considerations

One element that states define when developing provider directory requirements is the breadth and type of information that health plans are required to include in a provider directory. Beyond what is required by federal law, additional information may be required, such as:[10, 11]

- Provider gender

- Residency information

- Hospital and/or group affiliations

- Languages spoken or interpretation services available

- Telemedicine access

- Quality metrics

---

7   45 CFR 156.230.

8   45 CFR 155.205.

9   45 CFR 155.230.

10  L. Blumberg, R. Peters, E. Wengle, and R. Arnesen, *Physician Network Transparency: How Easy Is It for Consumers to Know What They Are Buying?*, Urban Institute (2014), 1–20, accessed at: http://www.rwjf.org/content/dam/farm/reports/reports/2014/rwjf415098

11  Claire McAndrew and Sinsi Hernandez-Cancio, *Network Adequacy and Health Equity: Improving Private Health Insurance Provider Networks for Communities of Color*, FamiliesUSA (2014), accessed at: http://familiesusa.org/sites/default/files/product_documents/ACT_Network Adequacy Brief_final_082214_web.pdf

BERKELEY RESEARCH GROUP | **WHITE PAPER**

- Patient-centered medical home recognition status

Another important point of consideration is the timeliness of the update cycle. Consumers typically use provider directory information to make decisions in real time; however, the frequency with which health plans update their provider directories varies significantly. Many states only require an annual update, which often makes it more difficult for those viewing a provider directory to ensure its information is current. Additionally, states must decide what, if any, penalties should be imposed on health plans when directories have errors, particularly when patients incur out-of-network costs because of it. Regulators may also require health plans to allow consumers to re-enroll in a new health plan if their current one has been misrepresented in a provider directory.

### 2.3.2    *Variation in State-Level Provider Directory Policies*

Since states are allowed to develop their own standards around provider directories, regulations end up varying widely across states as they attempt to keep pace with new and evolving health plan designs.[12] Appendix A details state-specific regulatory guidelines for plan provider directories; however, states generally fall into one of four categories:

- Tier 1: These states impose the most stringent rules related to provider directories. When a provider leaves a network or its information changes, these states allow up to a month, and frequently less time, for health plans to adjust the provider directory to reflect a change. In some cases, plans must take extra verification steps. For example, New Jersey managed-care plans must confirm if a provider is still in-network if the provider has not submitted a claim for 12 months or has stopped communicating with the plan.[13]

- Tier 2: These states allow more leeway in terms of provider directory update cycles. State regulations require updates at least annually, with some states requiring updates on a quarterly or semi-annual basis.

- Tier 3: Regulations in these states are more ambiguous and simply state that directories should be up to date and that any updates should occur in a "timely" or "prompt" manner.

- Tier 4: These states have not yet detailed parameters for provider directories beyond what is required by federal network adequacy regulations or national accreditation entities.

---

12   C. Barber et al., *Ensuring Consumers' Access to Care: Network Adequacy State Insurance Survey Findings and Recommendations for Regulatory Reforms in a Changing Insurance Market* (2014), accessed at: http://www.naic.org/documents/committees_conliaison_network_adequacy_report.pdf

13   B. Herman, "Insurers draw heat for error-riddled provider directories," *Modern Healthcare* (November 19, 2014), accessed at: http://www.modernhealthcare.com/article/20141119/NEWS/311199972

**Figure 1: Groupings of States according to Provider Directory Oversight[14]**



| Tier | Color | States |
|---|---|---|
| 1 | | Provider directory updates at least on a monthly basis, with potential additional provider validation requirements |
| 2 | | Provider directory updates required between a quarterly and an annual basis |
| 3 | | Provider directories required to be "up to date" or updated in a timely manner |
| 4 | | No additional state-level guidance found specific to provider directory adequacy and/or that differs from federal regulations |

Figure 1 summarizes regulations that apply to health plan products at the broadest level. However, variation also exists across health plan types, with HMOs being the most regulated with respect to network adequacy, followed by PPOs and EPOs.[15]

# 3   Provider Directory Operational Challenges

Inaccuracies in health plans' provider directories are garnering greater attention, with several recent reports in the media and professional journals, as well as studies performed by CMS and other regulatory entities. These reports indicate widespread inaccuracies in health plans' provider directories. In a study published by JAMA Dermatology and reported in the Wall Street Journal, "researchers at the University of California, San Francisco, tried contacting [...] 4,754 dermatologists listed in the three largest Medicare Advantage plans in 12 metro areas. Nearly half of the names were duplicates, and only about half the remaining—26% of the total—were at the listed address, accepted the plan and were offering appointments."[16]

Further, the California Department of Managed Health Care (DMHC) performed a survey of Blue Shield of California showing that "a significant percentage (18.2%) of the physicians listed in the directory were not at the location listed in the Provider Directory and that a significant percentage (8.8%) were not willing to accept patients enrolled in the Plan's Covered California products, despite being listed on the website as doing so."[17] A similar DMHC study of Anthem Blue Cross showed these

---

14  See Appendix A.

15  Barber et al. (2014).

16  M. Beck, "Insurers' Listings of In-Network Doctors Often Out of Date," *The Wall Street Journal* (November 25, 2014), accessed at:
    http://www.wsj.com/articles/insurers-listings-of-in-network-doctors-often-out-of-date-1416953787

17  Department of Managed Health Care, *Final Report: Non-Routine Survey of Blue Shield of California, A Full Service Health Plan* (2014), 1–43, accessed at:
    http://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/043fsnr111814.pdf

BERKELEY RESEARCH GROUP | **WHITE PAPER**

percentages as 12.5 percent and 12.8 percent.[18] These results may explain the high number of consumer complaints received by the health plan related to provider directories. Anthem customers filed 176 complaints on network issues between January 1 and August 31, 2014, and Blue Shield saw 130 complaints.[19]

Lastly, a study into the availability of providers in the Medicaid Managed Care program performed by the Department of Health and Human Services' Office of Inspector General offers perhaps the most glaring results. The OIG study found the following:

> Forty-three percent of providers were not participating in the Medicaid managed care plan at the listed location and could not offer appointments. Notably, 35 percent of providers could not be found at the location listed and were therefore not participating at the location listed by the plan. In these cases, callers were sometimes told that the practice had never heard of the provider or that the provider had practiced at the location in the past but had retired or left the practice. Some providers had left months or even years before the time of the call. Another 8 percent of providers were at the location listed but said that they were not participating in the plan. In some cases, these providers had participated in the plan in the past; in other cases, the providers had never participated in the Medicaid managed care plan.[20]

**Figure 2: Accuracy Distribution of Provider Directory Reporting on Availability of Providers[21]**



These reports indicate that health plans have struggled to maintain accurate participating provider information in their provider directories. Health plans find it increasingly difficult to maintain accurate participating provider information in their provider directories for reasons including:

- Inherent and increasing complexity in the insurance products being offered to customers

- The dynamic nature of participating provider information

- Limited resources to adequately execute and maintain provider directories

### 3.1  Complexity of Provider Directory Maintenance

The health insurance business is inherently complex. Some complexity lies in how a health plan contracts with providers—facilities, provider groups, and physicians—to construct its provider networks. Contracting relationships define, among other

---

18  Department of Managed Health Care, Final Report: Non-Routine Survey of Anthem Blue Cross, A Full Service Health Plan (2014), 1–58, accessed at:
http://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/303fsnr111814.pdf

19  C. Terhune, S. Poindexter, and D. Smith, "Obamacare doctor networks to stay limited in 2015," Los Angeles Times (September 28, 2014), accessed at:
http://www.latimes.com/business/la-fi-0928-obamacare-doctors-20140928-story.html#page=1

20  HHS, Office of Inspector General, *State Standards for Access to Care in Medicaid Managed Care*, Washington (2014).

21  Adapted from Figure 1 of HHS OIG (2014).

things, whether providers directly or indirectly contract with the health plan, how providers are divided up among the insurance products offered by the health plan, and whether a provider participates in these products in multiple specialties and/or from multiple locations. Each complexity is discussed in greater detail below.

First, health plans will often contract directly with providers to meet the needs of the members in a service area. This contacting relationship typically places the responsibility on the health plan to ensure that the participating provider information for each directly contracted provider is accurate and up to date. However, for its national PPO products, a health plan will often lease a provider network, since it does not have its own provider network for all service areas in the United States. This arrangement typically places the responsibility of obtaining accurate participating provider information on the rental network company, which will then pass along this verified provider information to the health plan, attesting to its accuracy.

Second, health plans are attempting to lower costs by constructing provider networks that include only certain providers within a health system. A 2014 McKinsey study of products being sold on the ACA health insurance exchanges describes what it refers to as "partial health system participation." The study found, "Forty-four percent of [ultra-narrow, silver-tier products] exclude at least one hospital from every single participating health system… Another 31 percent of the products exclude at least one hospital from at least one health system." The study suggests that the costs for such ultra-narrow networks are 13 percent lower. However, these types of arrangements add complexity to the process of capturing the relevant information in a health plan's provider system and ensuring that these data are propagated correctly to its provider directories.

Third, a provider practicing multiple specialties or at multiple locations may be participating, or "par," with a health plan for only one specialty or at one location. This occurs when a provider has completed the credentialing process with the health plan for one specialty or location and not others; the specialties or locations for which the provider has not been credentialed would need to be excluded from the health plan's provider directories or identified as being out of network. This adds further complexity to the task of obtaining and maintaining accurate participating provider information.

## 3.2 Dynamic Nature of Provider Directories

Consumers rely on provider directories to ensure that the provider that they intend to see is participating in the health insurance product that they have purchased from the health plan. As mentioned earlier, provider directories are usually provided in printed form and via a Web-based provider search portal on the health insurer's website. A difficulty in providing these directories to consumers is that any time one piece of information for a provider listed in a health plan directory changes, then that entire directory is technically inaccurate until it is updated with the accurate information.

Provider directories are typically required to provide, at a minimum, the provider's name (including facilities), address(es), telephone number(s), specialty area(s), hospital affiliation, language(s) spoken, and whether new patients are being accepted. Additionally, provider directories should indicate the provider network(s) (or health insurance products) in which a provider is participating. Some of this information will change frequently, and any change to the participating provider information that is displayed in a directory—either printed or online—should be updated according to the requirements of the relevant state and federal regulations.

Clearly, updated provider information takes longer to reach a consumer in a printed directory than in an online directory, which increases the likelihood that a consumer using a printed directory is relying on inaccurate, outdated information. Presenting directories in either format requires the health plan to aggregate significant amounts of data into its provider system, develop efficient systems and processes for soliciting changes to these data, and ensure that the accurate, current information is propagated correctly to the directories within the timeframes set forth in relevant state and federal regulations.

BERKELEY RESEARCH GROUP  |  **WHITE PAPER**

### 3.3  Resource Limitations

The process required by a health plan to maintain accurate participating provider information in its provider directories is complex and requires substantial resources. At the most basic level, a health plan must implement a system that allows it to store and maintain information related to its provider networks. The health plan is further required to obtain participating provider information from its provider networks, ensure that this information is published correctly in its directories, verify this information on a regular basis, and publish changes in a timely manner. All of this must be performed by health plan resources that are often limited and subject to medical loss ratio (MLR) requirements.

Often, a health plan stores provider information across multiple systems. It may maintain provider contracting and credentialing data in a system apart from the system in which it maintains its participating provider information. The health plan must ensure that information obtained from providers is entered correctly into these systems. The health plan must also ensure that this information is propagated accurately to its provider directories. This involves querying the provider system(s) in such a way that maintains the integrity of the data as they flow from the information systems through the process of publishing a printed directory or feeding the underlying data sources for the online search portal.

Once the health plan has implemented these processes, it needs to develop a reliable process to verify its participating provider information on a basis consistent with relevant state and federal regulations, including in some cases obtain an affirmative response every twelve months from all directly contracted providers in its networks. Health plans with large provider networks often need to perform this outreach and verification on a constant basis throughout the year.

Further, after learning of a change in its participating provider information either through its verification process or through direct contact from a provider, the health plan is required to update its provider directories within a timeframe specified by state regulations. For example, the state of New York requires that health plans update provider directories within 15 days of receiving a change in participating provider information.[22]

These processes must be implemented and carried out by health plan resources that are constrained by MLR requirements. The ACA establishes minimum MLRs of 80 percent for small-group (from 1 to 100 workers) and individual markets, and 85 percent for the fully insured large-group market. Most simply, these percentages dictate the percentage of premiums that health plans must spend on non-administrative functions, including the health insurer's incurred claims plus the "insurer's expenditures for activities that improve health care quality."[23] The costs associated with "developing and executing provider contracts and fees associated with establishing and managing a provider network" do not fall under these categories and therefore are considered an administrative expense under MLR rules.[24] As the state and federal regulations impose new requirements around maintaining accurate provider directories, health plans are required to comply with these requirements with increasingly limited resources.

## 4    Risks Associated with Provider Directory Errors

When a health plan's provider directory contains inaccurate participating provider information, it poses risks to both consumers and the health plan itself. First, consumers are at risk because they are making decisions based on faulty or incomplete information. This impacts their decision making when both choosing a health plan and deciding which provider to go to for services. Second, the health plan faces several organizational risks, including financial costs arising from penalties and sanctions,  additional administrative costs, and an increased risk of litigation.

---

22  State of New York, Senate-Assembly, Bill S6914, A9205 (2014).

23  45 CFR 158.221(b).

24  45 CFR 158.150(c)(9).

## 4.1  Risks to Consumers

When selecting a health plan, consumers often consult the provider directories provided by the health plans that they are considering. This is often the case in both the individual and employer markets. In either case, a consumer is interested in understanding which providers are considered in-network, especially if the consumer has a prior history with a particular provider that they would like to continue to see. Around 71 percent of enrollees have doctors, hospitals, and other healthcare providers that they would like to see in their health plan network.[25] Additionally, a consumer may want to find a provider that is in close proximity to his workplace. If the provider directory has inaccurate location information and the consumer selects the health plan to have access to this provider, then the consumer is at risk of not having access to that provider at a location that is convenient.

When the provider directory lists the wrong address, this mostly poses an inconvenience to the consumer. However, when the health plan incorrectly lists its in-network providers, this potentially presents a financial risk to the consumer. This type of directory error can occur in a number of ways. For example, the health plan may indicate that a provider is part of a particular network when he actually is not. Alternatively, a health plan may list a provider in its provider directories as being par at multiple locations, when in actuality that provider is par at only one location. Regardless of how this error manifests itself in a health plan's provider directory, the impact on the consumer is the same. When the consumer receives services from an out-of-network provider, he will likely be responsible for paying the out-of-network rates, which are often substantially higher than the in-network rates.

Clearly, errors related to in-network participation present to a consumer a different form of risk than an incorrect address. However, consumers are finding that they are able to exert greater influence over health plans by filing complaints with state regulators or by joining class actions against health insurers. As a result, health plans should be aware that, regardless of the nature of the error(s) in its provider directories, these inaccuracies present organizational risks, which are discussed further in the next section.

## 4.2  Risks to the Health Plan

In 2010, the Health Bureau Section of the New York Office of Attorney General (OAG) reached a settlement (referred to as an assurance of discontinuance, or AOD) with several health plans in the New York service area. These settlements were a direct result of complaints that the OAG received from health plan consumers alleging that the health plans' provider directories contained inaccurate information related to providers' information and participation status. Per the terms of these public settlements, each health plan had to comply with several requirements, including paying a fine, verifying the participating provider information and participation status for every provider in its networks on an annual basis, offering restitution to members that had been billed out-of-network charges as a result of the inaccuracies, performing internal audits of their provider directories and reporting these results to the OAG, and being monitored by an independent auditor. These settlements present a microcosm of the operational risks posed to health plans by inaccurate provider directory information. These risks and their associated burden to the health plan are discussed in greater detail below.

First, there is a financial risk posed to a health plan by having inaccurate participating provider information in its provider directories. The federal regulations pertaining to Medicare Advantage Organizations (MAOs) allow CMS to impose intermediate sanctions and civil monetary penalties for reported provider directory deficiencies. The intermediate sanctions may include:

- Suspension of the MA[O]'s enrollment of Medicare beneficiaries.

---

25  Liazon Corporation, *Medical Plan Preferences in an Environment of Choice* (2014), 1–8, accessed at: http://www.liazon.com/wp-content/uploads/Liazon-White-Paper-Medical-Plan-Preferences-in-an-Environment-of-Choice-November-2014.pdf

BERKELEY RESEARCH GROUP | **WHITE PAPER**

- Suspension of payment to the MA[O] for Medicare beneficiaries enrolled after the date CMS notifies the organization of the intermediate sanction.

- Suspension of all marketing activities to Medicare beneficiaries by an MA[O].[26]

The sanctions can continue "until CMS is satisfied that the deficiencies that are the basis for the sanction determination have been corrected and are not likely to recur."[27]

CMS may also impose civil monetary penalties on MAOs for each deficiency that is identified. The regulations take many factors into account when determining the amount of the penalty, such as the nature of the deficiency, the degree of "culpability" of the MAO, the financial condition of the MAO, and the MAO's history of prior offenses.[28] If a deficiency has "directly adversely affected (or has the substantial likelihood of adversely affecting) one or more MA[O] enrollees," then CMS may impose a civil monetary penalty of up to $25,000 for each determination.[29]

CMS may also impose civil monetary penalties on QHPs if it is determined that the QHP has engaged in an activity that has "adversely affected or has a substantial likelihood of adversely affecting one or more enrollees in the QHP offered by the QHP issuer."[30] These regulations contemplate mitigating factors similar to those for MAOs when determining the amount of the civil monetary penalties. The maximum penalty "for each violation is $100 for each day for each QHP issuer for each individual adversely affected by the QHP issuer's non-compliance."[31] Some states have established similar penalties. For example, health plans in New Mexico may be charged a "penalty for any material violation" of the state regulations governing provider directories.[32] Additionally, several states require that plans must make patients whole from extra expenses incurred due to directory inaccuracies.

Second, there is the administrative cost of having to comply with increasingly onerous state and federal regulations. Since 2010, when the ACA was passed, of the 27 states with state-specific provider directory guidelines, 25 states have created or updated their provider directory–specific regulations.[33] Additionally, many other states are considering changes in provider directory provisions in their forthcoming regulatory agendas. These regulations often dictate specific requirements for how often a health plan must verify the participating provider information for its networks and how that verification is performed. Further, upon learning of a change in its network, a health plan is required to ensure that verified information is propagated to its provider directories within a specific timeframe. Also, several states require health plans to proactively notify members that providers have terminated or left their network. As a result, the health plan needs to develop a robust internal "infrastructure" with sufficient systems and processes to comply with these requirements.

Lastly, a health plan is at an increased risk of litigation when its provider directories have errors. These errors can result in members being charged out-of-network rates, potentially making the health plan responsible for paying the difference between these rates and the in-network rates. If a health plan network actually turns out to be "narrower" than what is indicated in its provider directories, it could be at risk of not meeting network adequacy requirements in its service area. Within the last year, five class actions have been filed against California health plans, all of which touch on these issues. These actions are

---

26   42 CFR 422 Subpart O.

27   42 CFR 422.750(a).

28   42 CFR 422.760(a).

29   42 CFR 422.760(b)(1).

30   45 CFR 156.805(a)(2).

31   45 CFR 156.805(c).

32   N.M. Admin. Code Sections 13.10.22–23.

33   See Appendix A.

demanding the health plans to pay restitution, damages (plus interest), and "such other and further relief as the Court deems just and proper" to the class members.[34]

The organizational risks posed to health plans by inaccuracies in their provider directories are significant, although they are not all to be treated equally. Clearly, penalties and sanctions imposed on a health plan are more easily quantified and, as a result, might appear to be most costly. However, the administrative burden of complying with state and federal regulations and addressing directory inaccuracies gives a truer representation of the "costs" borne by a health plan. Finally, the uncertainties around litigation potentially pose the biggest risk of those discussed above.

# 5    Case Study: Impact of Provider Directory Errors in the State of California

California serves as an excellent example of the scope of complications that can originate from errors within a provider directory. California represents one of the largest health insurance markets in the world, with $111 billion in revenue in 2011,[35] and is closely regulated by agencies including the California Department of Insurance (DOI) and DMHC plans. However, multiple issues have been identified with provider directories in this state that highlight some of the challenges described above. To wit, the provider directories associated with the Covered California healthcare exchange were fraught with inaccuracies. These inaccuracies were not resolved even as consumer enrollment began, eventually resulting in Covered California removing the directories from the exchange.[36]

Additionally, regulators have seen a significant uptick in consumer complaints related to provider directories. About 50 percent of state complaint-tracking systems have specific complaint codes that relate to provider directory errors and have found that complaints related to network adequacy remain the most common way that regulators uncover provider directories issues.[37] Responding to consumer complaints, California regulators initiated off-cycle network adequacy compliance audits of health plan provider directories. The DMHC's review of Blue Shield of California and Anthem Blue Cross health plans found error rates within provider directories in the double digits.[38] Further, several lawsuits have been filed in California due to network adequacy issues, including provider directories:

- *Rebecca Lehman & Heather Womick* v. *Health Net of California Inc. et al.*

- *Kevin and Jane McCarthy et al.* v. *California Physicians' Service dba Blue Shield of California et al.*

- *Sheila Davidson et al.* v. *Cigna Health and Life Insurance Co. et al.*

- *Betsy Felser et al.* v. *Blue Cross of California, dba Anthem Blue Cross*

- *Samantha Berryessa Cowart* v. *Blue Cross of California, dba Anthem Blue Cross*

- *Brown* v. *Blue Cross of California*

---

34  Cowart v. Anthem, p. 12

35  California Healthcare Foundation, *California Health Plans and Insurers: A Shifting Landscape* (2013), accessed at: http://www.chcf.org/~/media/MEDIA LIBRARY Files/PDF/C/PDF CAHealthPlansInsurersAlmanac2013.pdf

36  Terhune, Poindexter, and Smith (2014).

37  Barber et al. (2014).

38  A. Brino, "Regulatory probe hits network adequacy," Healthcare Payer News (November 20, 2014), accessed at: http://www.healthcarepayernews.com/content/regulatory-probe-hits-network-adequacy#.VK1z7CvF-4I

BERKELEY RESEARCH GROUP | **WHITE PAPER**

- *Weiss* v. *Blue Shield of California*

- *Daum* v. *California Physicians' Service, dba Blue Shield of California*

This activity led to the DOI commissioner "emergency action" to amend sections of the California Code of Regulations with the intent of strengthening network adequacy requirements. The changes filed in the California Office of Administrative Law effective on January 30, 2015, included language meant to strengthen the regulations around provider directories, including:

- Online provider directories should be updated weekly

- Hard-copy directories should be updated quarterly and provided at no cost to enrollees

- Reasonable clarity should be provided around which provider networks apply to which insurance product offering

- Notice required regarding the availability of translation and interpreter services

- Notice required regarding whether a provider or staff are multilingual, and the languages spoken

- Notice required to be provided to all enrollees who saw the provider within the past year since the provider has left the network[39]

# 6 The Future of Provider Directory Policies

## 6.1 Federal Guidance

CMS is establishing significant requirements for QHPs, Medicaid Managed Care Organizations (MCOs), and MAOs. QHPs and MAOs are subject to the penalties and sanctions discussed in Section 4 above. For QHPs, CMS specifies what is required, including "information on which providers are accepting new patients, in a manner that is easily accessible to plan enrollees, prospective enrollees" and other QHP stakeholders. A provider directory is considered "easily accessible" when "the general public is able to view all of the current providers for a plan in a provider directory on the plan's public website through a clearly identifiable link or tab and without creating or accessing an account or entering a policy number."[40]

For MCOs, HHS is calling on CMS to "work with States to develop strategies for improving the accuracy of plan data." Further, when approving MCO contracts with states, "CMS should ensure that plans have controls to ensure that provider information is accurate and up to date."[41]

Finally, CMS's 2016 Advance Notice to MAOs provides additional guidance on existing regulations that may present considerable challenges to MAOs. This guidance requires MAOs to:

- "Establish and maintain a proactive, structured process that enables [MAOs] to assess, on a timely basis, the true availability of contracted providers"

- Perform an "analysis to verify continued compliance with applicable network access requirements"

---

39  California Department of Insurance Section 2240.6.

40  CMS, "Final HHS Notice of Benefit and Payment Parameters for 2016" (2015a).

41  HHS OIG (2014).

- Communicate regularly (i.e., at least quarterly) with providers to "ascertain their availability and, specifically, whether they are accepting new patients"

- Require contracted providers "to inform the plan of any changes…that affect [provider] availability"

- Develop a process to address "inquiries/complaints related to enrollees being denied access to a contracted provider with follow through to make corrections to the online directory"

- Update information in online directories on a "real-time" basis[42]

The Advance Notice offers further guidance on how CMS intends to monitor plans' adherence to the regulations, mentioning that it has "secured additional contractor funding to verify the accuracy" of directories, and a new audit protocol to be tested in CY2015. Further, CMS sets forth enforcement provisions for MAOs that do not maintain complete and accurate directories, including "civil monetary penalties or enrollment sanctions."[43]

CMS also signaled its intentions for CY2017 to "enhance the transparency of provider networks" in saying that it is considering "instituting a requirement for MAOs to provide, and regularly update, network information in a standardized, electronic format for eventual inclusion in a nationwide provider database." CMS is considering a similar requirement for QHPs in an effort to "make provider network data readily available … in a uniform format." CMS anticipates that this uniform format will provide for "greater interoperability across provider directories and more up-to-date information in provider directories maintained by health plans." This uniform format could also be "leveraged by application developers to create user-friendly search applications."

## 6.2  Additional Guidance

Various associations have taken up the issue of provider directories as part of their agendas, and their recommendations will likely play a role going forward in setting standards at the state and federal level. NAIC, for example, is in the process of revising its Managed Care Network Adequacy Model Act, which seeks "to establish standards for the creation and maintenance of networks by health carriers and to assure the adequacy, accessibility and quality of health care services offered under a managed care plan."[44] After significant state-level DOI research, NAIC's preliminary endorsements pertaining to provider directories include recommendations stating that:[45]

- Regulations should broadly apply to all health benefit plans, and not vary by health plan benefit design (e.g., HMO, PPO, EPO)

- Consumers must have access to information in a consumer-tested way that indicates how broad or narrow a network is when choosing a health plan for purchase

- Plans should develop and share protocols for maintaining, updating, and posting network provider directories

- Plans should update their provider directories monthly to reflect changes in provider availability, and enrollees should be notified when providers leave their network for any reason

---

42  CMS, "Advance Notice of Methodological Changes for Calendar Year (CY) 2016 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2016 Call Letter" (2015b).

43  CMS (2015b).

44  NAIC, "Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans; Exchange Standards for Employers" (1996), accessed at: http://www.gpo.gov/fdsys/pkg/FR-2012-03-27/pdf/2012-6125.pdf

45  Barber et al. (2014).

BERKELEY RESEARCH GROUP │ **WHITE PAPER**

- Directories with material errors, inaccuracies, or misrepresentation in their provider directories should be afforded a special enrollment period to allow for the purchase of a more adequate plan

Additionally, the National Community Pharmacists Association has been pushing CMS to issue more detailed guidelines around provider directories for Medicare Part D, given recent issues stemming from erroneous pharmacy network directories.

## 7    Conclusion

Provider directory inaccuracies represent a growing and significant risk to both consumers and health plans. Regulators at the state and federal levels continue to review and establish new methods of ensuring network adequacy and protecting consumers' access to affordable care, and provider directories are factoring more prominently into these efforts. Health plans should seek to be proactive about achieving and ensuring provider directory accuracy, despite the operational challenges involved in doing so. Given an environment that is increasingly regulatory, litigious, investigative, and putative, health plans should deploy organizational resources at a level that is commensurate with the level of risk that these inaccuracies can present.

## Appendix A: State-Level Regulations related to Provider Directories

| State | Plan Type | Required Update Frequency | Claim Submission Verification Requirement (Y/N) | Year Created or Revised | Online vs Paper | Source |
|---|---|---|---|---|---|---|
| **Tier 1** | | | | | | |
| **Arkansas** | All Health Plans | 14 Days | N | 2014 | | Arkansas Rule 106 |
| **California** | All Health Plans | Weekly | N | 2014 | Online Only | Emergency Regulation to Title 10 §2240.6 |
| **Colorado** | QHP | Monthly | N | 2014 | | Colorado PPACA Network Adequacy Filing Procedures for 2015 |
| **Georgia** | MCO | 30 days | N | 2010 | | GA §33-20A-5 |
| **Idaho** | QHP | Monthly | N | 2015 | Online Only | Your Health Idaho 2016 QHP Standard |
| **Maryland** | All Health Plans | 15 days | N | 2010 | Online Only | MD Ins Code §15-112 |
| **Nevada** | QHP | 30 days | N | 2014 | | NV LCB File No. R049-14 |
| **New Jersey** | MCO | 10 days | Y | 2014 | Online Only | NJAC 11 24C 4.5 4.6 |
| **New York** | HMO | 15 days | N | 2014 | Online Only | NY Emergency Medical Services and Surprise Bills |
| **Oregon** | MCO- Workers Comp | Monthly | N | 2013 | Online Only | OR 436-015-0030 Applying for Certification |
| **Washington** | All Health Plans | Monthly | N | 2014 | | WAC 284-43-220 (b) |
| **Tier 2** | | | | | | |
| **Connecticut** | MCO | Annually | N | 2011 | | CT §38a-478d |
| **Delaware** | QHP | Quarterly | N | 2014 | Online Only | Delaware State-Specific QHP Standards for Plan Year 2016 |
| **Florida** | EPO | Semi-Annually | N | 2012 | | FL §627.6472 |
| **Louisiana** | All Health Plans | Annually | N | 2013 | | LA Rev Stat §22:1019.2 |
| **Montana** | QHP | Annually | N | 2014 | | Advisory Memorandum- 2015 Health Plan Form Filings |
| **North Carolina** | All Health Plans | Annually | N | 2014 | | N.C. §58-3-245 |
| **Tennessee** | MCO | Annually | N | 2010 | | Tenn. Code Ann. §56-7-2356 |
| **Texas** | PPO, EPO, HMO | Quarterly | N | 2013 | | TX §3.3705(i); §843.2015 |
| **Vermont** | MCO | Semi-Annually | N | 2009 | | VT Reg-H-2009-03 |
| **Wisconsin** | HMO | Annually | N | 2010 | | Wisconsin Office of the Commissioner of Insurance- Managed Care/Defined Network Plans |
| **Tier 3** | | | | | | |
| **DC** | QHP | Up-to-date | N | 2014 | | DC Health Benefit Exchange Authority 2015 Carrier Reference Manual |
| **Illinois** | QHP | Up-to-date | N | 2014 | | IL CB-2014-15; Illinois Qualified Health Plans 2015 |
| **Kansas** | QHP | Up-to-date | N | 2014 | | Kansas Qualified Health Plan Submission Attestation Form |
| **Kentucky** | MCO | Up-to-date | N | 2000 | | KY Rev Stat §304.17A.590 |
| **Massachusetts** | MCO | Up-to-date | N | 2013 | | Division of Insurance Filing Guidance Notice 2013-C |
| **New Hampshire** | QHP | Up-to-date | N | 2014 | | NH INS-14-025-AB |

BERKELEY RESEARCH GROUP | **WHITE PAPER**

## **About** the Author

### *Brian Hoyt*

Brian Hoyt advises clients including Fortune 20 companies and Am Law 100 law firms in implementing a data-driven approach to identify and analyze critical business issues, to make informed, strategic decisions, and to respond to and resolve disputes and investigations. Mr. Hoyt combines healthcare industry expertise with analytical acumen to develop customized solutions to the complex challenges that participants in the healthcare system are facing. He works with clients to identify relevant data—from both proprietary and public sources—and provide them with a thorough analysis of those data that enables sound, data-based decisions.

Mr. Hoyt's consulting career spans more than 20 years and has focused on the healthcare industry. He has worked with more than 20 healthcare payers, including health insurers, managed care companies, and pharmacy benefit managers. He has served as a state-appointed monitor of a health insurer and has been designated as an expert witness in the Federal Employees Health Benefits Program (FEHBP) and in statistical sampling and analysis. Mr. Hoyt also served as interim CFO for one client.

Mr. Hoyt's previous engagements involved numerous other healthcare entities and the law firms representing them, including provider groups, IPAs, hospitals and health systems, government agencies and health programs, third-party administrators, and insurance brokers. Mr. Hoyt has provided consulting and expert services in contexts including pre-litigation, litigation, arbitration, mediation, trial, settlement, and internal client audits and government investigations.

## **About** Berkeley Research Group

Berkeley Research Group, LLC (www.thinkbrg.com) is a leading global strategic advisory and expert consulting firm that provides independent advice, expert testimony, authoritative studies, data analytics, and regulatory and dispute support to Fortune 500 corporations, government agencies, major law firms, and regulatory bodies around the world. BRG experts and consultants combine intellectual rigor with practical, realworld experience and an in-depth understanding of industries and markets. Their expertise spans economics and finance, data analytics and statistics, and public policy in many of the major sectors of our economy, including healthcare, banking, information technology, energy, construction, and real estate. BRG is headquartered in Emeryville, California, with offices across the United States and in Australia, Canada, Latin America, and the United Kingdom.