# Provider Directories: Litigation, Regulatory, and Operational Challenges

   

## UPDATE: MARCH 2018

**PREPARED BY:**

Brian E. Hoyt | bhoyt@thinkbrg.com | 202.480.2762

Copyright ©2018 by Berkeley Research Group, LLC. Except as may be expressly provided elsewhere in this publication, permission is hereby granted to produce and distribute copies of individual works from this publication for nonprofit educational purposes, provided that the author, source, and copyright notice are included on each copy. This permission is in addition to rights of reproduction granted under Sections 107, 108, and other provisions of the US Copyright Act and its amendments.

Disclaimer: The opinions expressed in this publication are those of the individual author and do not represent the opinions of BRG or its other employees and affiliates. The information provided in the publication is not intended to and does not render legal, accounting, tax, or other professional advice or services, and no client relationship is established with BRG by making any information available in this publication, or from you transmitting an email or other message to us. None of the information contained herein should be used as a substitute for consultation with competent advisors.



## 1.  Executive Summary

Since the implementation of the Affordable Care Act (ACA), millions of consumers have signed up for individual health insurance through the Centers for Medicare and Medicaid Services (CMS) Health Insurance Marketplace.[1] Additionally, employer groups both large and small are increasingly asking health insurers to create health insurance products specific to their employees. As a result, health plans are creating new, contracted network offerings at an unprecedented rate. These range from higher-cost preferred provider organization (PPO) products with broad provider networks to products with narrow or tiered networks that boast lower premiums but provide limited choices of providers.

As the volume and variety of health insurance products increase to accommodate an expanding market, so do concerns about whether the contracted provider networks adequately serve their target insured population. Further, some consumers have complained that the provider network information provided to them by health plans is misleading and inaccurate. Lawsuits have been filed against health plans making these allegations. As a result, federal and state regulations have added more specificity around what constitutes an adequate provider network and have defined the information that a health plan is required to provide to consumers.

These regulations require health insurers to maintain and provide consumers with an accurate listing of providers—both facilities and physicians—participating in their networks. This includes information about their location, specialty, hospital affiliation, and languages spoken. Consumers are entitled to have access to these provider directories both in hard-copy printed format and via a web-based provider search portal on a health insurer's website. Although these regulations are intended to ensure that consumers are relying on accurate provider information, recent studies and reports indicate that health plans struggle to maintain accurate provider directories.

The repercussions of inaccurate provider directories can be significant, posing risks to both consumers and health plans. Inaccurate directory information may limit a consumer's ability to verify if a preferred doctor is in-network or whether that provider is accepting new patients. Additionally, the consumer may be at risk of receiving a "surprise bill" with higher out-of-network charges when providers are erroneously listed as being in-network. These inaccuracies also put health plans at greater risk of litigation, government penalties and investigations, and significant administrative costs associated with rectifying inaccurate directories.

The primary purpose of this paper is to provide health plan stakeholders with information on provider directories.[2] These stakeholders include the executives, managers, and analysts within health insurance companies that evaluate provider network contracts, in addition to those directly involved in maintaining the company's provider directories. The first section of the paper includes a critical review of the guidelines and regulations around provider directories. The next section discusses operational challenges that health plans may encounter in maintaining accurate provider directories. This is followed by an assessment of the risks posed by inaccurate provider directories to both consumers and health plans. The paper concludes with a discussion on the future of provider directories, including recent guidance from the CMS.

## 2.  Guidelines and Regulations for Provider Directories

Various entities, including the federal government, state governments and departments of insurance, independent accreditation organizations, and trade associations, have provided recommendations and guidelines related to provider directories. Given that regulations around directories are still evolving and vary greatly, it is important to understand the rules in place for maintaining accuracy. The following provides an overview of some rules.

---

1   Jenna Levy, "In U.S., Uninsured Rate Sinks to 12.9%," Gallup (January 7, 2015), accessed at: http://www.gallup.com/poll/180425/uninsured-rate-sinks.aspx

2   For original paper, see Brian Hoyt, *Provider Directories: Litigation, Regulatory, and Operational Challenges*, Berkeley Research Group (March 2015), accessed at: http://www.thinkbrg.com/newsroom-publications-hoyt-provider-directories.html

BERKELEY RESEARCH GROUP

## 2.1 Provider Directory Review during Health Plan Accreditation

The health plan accreditation process typically includes a review of provider directory accuracy and maintenance procedures. Accreditation is a comprehensive evaluation process in which an impartial external organization reviews a health plan's systems, processes, and performance to ensure that it is conducting business in a manner that meets predetermined criteria and is consistent with national standards.[3] The ACA mandates accreditation to ensure quality in the managed healthcare sector,[4] and Qualified Health Plans (QHPs) sold on the Health Insurance Marketplace must go through the accreditation process. Additionally, more than forty-five states use accreditation as part of their regular health insurance evaluations.

### 2.1.1 The National Committee for Quality Assurance (NCQA)

The nation's largest accreditation body, NCQA, has included standards for Physician and Hospital Directories as part of its health plan accreditation guidelines. The scoring is based on several elements, including whether the organization:[5]

- Provides a Web-based physician directory with the following information
  - Name
  - Gender
  - Specialty
  - Hospital affiliations
  - Medical group affiliations
  - Board certification
  - Accepting new patients
  - Languages spoken by the physician or clinical staff
  - Office locations and phone numbers
- Updates the physician directory within 30 days of receiving new information from the physician
- Analyzes the accuracy of physician directories using sampling methodology
- At least annually, identifies opportunities and takes action to improve the accuracy of its provider directories
- For each listing in the directory, provides a source, frequency of validation, and limitations
- Includes search functions within its directory for certain physician information

NCQA also requires that accredited plans validate provider information for directories on at least an annual basis.[6]

---

3   National Conference of State Legislatures, "Accreditation to Approve Health Plans and Providers" (April 2011), 1–2, accessed at: http://www.ncsl.org/documents/health/HRHealthPlans.pdf

4   Section 1311(c)1, "Affordable Choices of Health Benefit Plans and Section 1001," as amended by Section 10101 of the Patient Protection and Affordable Care Act (PPACA), Pub. L. 111–148, adds Section 2719 to the Public Health Service Act.

5   NCQA, *HPA 2016 Standards and Guidelines Proposed Updates* (n.d.), 28–34, accessed at: https://hbx.dc.gov/sites/default/files/dc/sites/hbx/event_content/attachments/Summary-NCQAStandardsonNetworkAdequacy11-2014.pdf

6   NCQA, "Network Adequacy & Exchanges" (2013), 6, accessed at: http://www.ncqa.org/Portals/0/Public Policy/Exchanges&NetworkAdequacy_2.11.13.pdf

### 2.1.2 URAC

URAC was originally incorporated under the name Utilization Review Accreditation Commission, but shortened its name to URAC when it began accrediting other types of organizations such as health plans, pharmacies, and provider organizations.[7] URAC also includes requirements involving provider directories as part of its credentialing process, including the following:

- If an organization chooses to display a provider at a "contracted facility" in its provider directory, then that provider "must be credentialed regardless of whether or not the organization contracts directly" with that provider.[8]

- Once the contracting and credentialing process has been completed for a provider, the organization has forty-five days from the completion of that process to display the provider in the online provider directory and to "flag" that provider for inclusion in the hard-copy provider directories.[9]

- An organization has five business days to remove a provider from its online provider directory once it has determined that the provider "has not recredentialed for any reason or no longer meets the credentialing requirements."[10]

- If an organization determines that a provider is no longer participating in its network, it has forty-five days to remove the provider from its online directory and to "flag" for removal from the hard copies.[11]

URAC also requires organizations to have "written policies and/or documented procedures" around how quickly provider directories will be updated when "adding a participating provider previously removed from provider directories back into those directories"; and "updating a participating provider's contact information once the organization receives notification that this information has changed."[12] Organizations are also required to have a written Consumer Communications Plan that, among other things, describes how to access an up-to-date provider directory.[13] URAC also reiterates the requirements related to Qualified Health Plans, which are discussed in greater detail in the next section.

## 2.2  Federal Requirements for Provider Directories

The requirements around network adequacy and provider directories for federal health programs are established broadly by federal statutes and/or regulations. The subsequent guidance released periodically by CMS gives additional information on how those regulations are to be implemented. The recent guidance for QHPs, Medicare Advantage Organizations (MAOs), and Medicaid Managed Care Organizations (MCOs) are discussed in the sections that follow.

### 2.2.1 Qualified Health Plans

The Affordable Care Act established the federal requirements around health plan network adequacy and provider directory accuracy. The ACA requires that the Department of Health and Human Services (HHS) establish criteria for the certification of QHPs that:

- Ensure a sufficient choice of providers

- Provide information to enrollees and prospective enrollees on the availability of in-network and out-of-network providers

- Include essential community providers serving low-income and medically underserved enrollees.[14]

---

7    URAC, "Accreditation FAQs" (2018), accessed at: https://www.urac.org/about-urac/frequently-asked-questions/#acronym

8    URAC, "Health Plan with Health Insurance Marketplace v7.2 Accreditation" (June 2015), 10.

9    Ibid, 70.

10   Ibid.

11   Ibid, 71.

12   Ibid.

13   Ibid, 93.

14   Patient Protection and Affordable Care Act, Section 1311(c).

BERKELEY RESEARCH GROUP

The associated regulations require QHPs—including stand-alone dental plans—to provide online access to provider directory information, provide hard-copy provider directories upon request, and identify when a listed provider is no longer accepting patients.[15] The guidance issued by CMS specifies additional required information, including "information on which providers are accepting new patients, the provider's location, contact information, specialty, medical group, and any institution affiliations in a manner that is easily accessible to plan enrollees, prospective enrollees," among others.[16] A provider directory is considered "easily accessible" when "the general public is able to view all of the current providers for a plan in a provider directory on the issuer's public website through a clearly identifiable link or tab and without creating or accessing an account or entering a policy number."[17]

The recent CMS guidance also requires QHP issuers in federally facilitated marketplaces (FFMs) "to make this provider directory information publicly available on their websites in a machine-readable file and format specified by CMS" and to:

- Submit the data in compliance with the data requirements in the Information Collection for Machine Readable Data for Provider Network and Prescription Formulary Content for FFM QHPs (CMS-10558);

- Update this information at least monthly; and

- Submit the machine readable link at: https://marketplace.cms.gov/submission/[18]

CMS has made these machine-readable files available on its website as public use files.[19]

### 2.2.2 Medicare Advantage Organizations

The regulations for Medicare Advantage require MAOs to disclose "[t]o each enrollee electing an MA plan … in clear, accurate and standardized form … the number, mix, and distribution (addresses) of providers from whom enrollees may reasonably be expected to obtain services."[20] Further regulations—as well as the Medicare Marketing Guidelines—require MAOs to post an online provider directory on their websites.[21]

In recent policy updates, CMS emphasizes that its "core focus remains making sure provider directories are accurate."[22] CMS defers to the MAO on how best to ensure that its provider directory is up to date; however, CMS "believes that regular outreach to individual providers (e.g., quarterly) is the way to assist [MAOs] in ensuring data is accurate."[23] Regardless of how the MAO identifies a change to its provider directory, whether via provider outreach or via enrollee notification, CMS allows up to thirty calendar days for the MAO to update its provider directory. Further, provider directories must indicate or include:

- Providers that have current contracts with the MAO to participate in the network. If not current, then directory must list the effective date and/or termination date of the contract with the provider.

- Notation that identifies those providers that either are or are not accepting new patients.

---

15  45 CFR 156.230.

16  CMS, "2018 Letter to Issuers in the Federally-facilitated Marketplaces" (December 16, 2016) and "2018 Letter to Issuers in the Federally-facilitated Marketplaces" (updated February 17, 2017), 50, accessed at: https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Final-2018-Letter-to-Issuers-in-the-Federally-facilitated-Marketplaces-and-February-17-Addendum.pdf

17  Ibid.

18  Ibid, 51.

19  CMS, "The Center for Consumer Information & Insurance Oversight: Health Insurance Exchange Public Use Files (Exchange PUFs)" (updated January 26, 2018), accessed at: https://www.cms.gov/cciio/resources/data-resources/marketplace-puf.html

20  42 CFR 422.111(a) and (b).

21  42 CFR 422.111(h)(2) and Medicare Marketing Guidelines Section 100.2.2.

22  Kathryn A. Coleman, "Provider Directory Policy Updates" [memorandum], Washington, DC: Department of Health & Human Services, CMS (January 17, 2017).

23  Ibid.

- Notation of substantive restrictions on which enrollees can access a provider (e.g., Native American tribes, college health service, concierge medicine).

- Only those providers that enrollees can call and make an appointment to receive covered services (i.e., providers at a hospital location or on-call providers should not be included in the directory).

- The capacity in which the provider is practicing.

- Notation to indicate that a provider is a non-physician practitioner (e.g., nurse practitioner, physician's assistant, etc.)

- Location(s) where providers actually see patients.[24]

Further, CMS "strongly encourages" MAOs to provide a hotline number that allows enrollees to contact the MAO directly should the enrollee discover any inaccuracies in the provider directory, including whether a provider is accepting new patients or not.[25] Finally, should a provider terminate from or leave an MAO's network, the MAO should ensure that its network still meets network adequacy requirements.

The requirements for Medicare-Medicaid Plans (MMPs) take some of these listed above a step further. For example, in addition to specialty, an MMP's provider directory must list the "specific areas or conditions…in which a provider has training or experience."[26] Additionally, the MMP directory must indicate whether the provider's location is accessible by public transportation.[27]

### 2.2.3 Medicaid Managed Care Organizations

The 2016 Medicaid and CHIP Managed Care Final Rule specified that MCOs "must make available in paper form upon request and electronic form" the following information for physicians, hospitals, pharmacies, behavioral health providers, and LTSS providers (as appropriate):

- Provider's name and group affiliation; street address(es), telephone number(s); Web site URL; specialty; whether the provider is accepting new enrollees as patients; the provider's cultural and linguistic capabilities and training; and whether the provider location has accommodations for people with physical disabilities.[28]

Additionally, the MCO is required to:

- Update electronic directories within thirty (30) calendar days of receiving updated provider information; and,

- Post provider directories on their websites in a machine-readable file and format specified by the HHS Secretary.[29]

## 2.3  State-level Provider Directory Oversight

States are free to develop their own standards around provider directories in addition to what is already required under federal health programs. As a result, regulations and requirements tend to vary widely across states as they attempt to keep pace with evolving health plan designs.[30]

---

24  Ibid.

25  Ibid.

26  CMS, "Medicare-Medicaid Plan (MMP) Provider and Pharmacy Directory Monitoring Technical Assistance Call" (September 7, 2016), p. 8.

27  Ibid.

28  42 CFR 438.10(h)

29  Ibid.

30  C. Barber et al., *Ensuring Consumers' Access to Care: Network Adequacy State Insurance Survey Findings and Recommendations for Regulatory Reforms in a Changing Insurance Market*, Health Management Associates (November 2014), accessed at: http://www.naic.org/documents/committees_conliaison_network_adequacy_report.pdf

BERKELEY RESEARCH GROUP

The National Association of Insurance Commissioners (NAIC) advocates for network adequacy standards to be set at the state level. In a 2014 letter to the Center for Consumer Information and Insurance Oversight—the federal agency charged with implementing much of the ACA—the NAIC argued that "federal regulation of network adequacy standards will lead to conflicting standards between state and federal requirements and that network adequacy regulation will be most effective at the state level where the needs of consumers, the cost of care, and the standards of the area, can best be evaluated."[31] As such, for QHPs in those states "with the authority and means to conduct network adequacy reviews, CMS [will] no longer conduct these reviews."[32] Further, CMS has charged the states with developing network adequacy standards for MCOs.[33] Several states have established their own network adequacy rules that include language pertaining to provider directory requirements.

At its fall meeting in November 2015, the NAIC Executive Committee and Plenary adopted the Amendments to the 1996 Managed Care Plan Network Adequacy Model Act (#74). Among other changes, the Amendments added a section (Section 9) devoted to provider directories. This section specifies that health carriers shall post easily accessible electronic provider directories and update them at least monthly.[34] Similar to NCQA standards, the Model Act also requires periodic auditing of provider directories for accuracy from a reasonable sample size. This process is delegated to the state's insurance commissioner for development and oversight.

In their listings of healthcare professionals, health carriers should also include the following data elements in a searchable format:[35]

- Name
- Gender
- Participating office location(s)
- Specialty
- Medical group affiliations
- Facility affiliations
- Languages spoken other than English
- Whether accepting new patients

The Model Act also requires health carriers to include, in plain language, a description of the criteria the carrier has used to build its network and tier providers.[36]

### 2.3.1 Provider Directory Standards Development: Required Data Elements

An element that states define when developing requirements is the breadth and type of information that health plans are required to include in a provider directory. Beyond what is required by federal law, additional information may be required, such as:[37,38]

---

31   Adam Hamm et al., letter to Dr. Mandy Cohen, CMS chief operating officer and chief of staff for Oversight (April 23, 2014). TS.

32   CMS, "2019 Draft Letter to Issuers in the Federally-facilitated Marketplaces" (November 27, 2017), 13.

33   42 CFR 438.68(a)

34   NAIC, "Health Benefit Plan Network Access and Adequacy Model Act," revisions to Model #74 draft (October 12, 2015), 22, accessed at: http://www.naic.org/store/free/MDL-74.pdf

35   Ibid, 23.

36   Ibid, 22.

37   L. Blumberg, R. Peters, E. Wengle, and R. Arnesen, *Physician Network Transparency: How Easy Is It for Consumers to Know What They Are Buying?*, ACA Implementation—Monitoring and Tracking, Urban Institute (August 2014), 1–20, accessed at: http://www.rwjf.org/content/dam/farm/reports/reports/2014/rwjf415098

38   Claire McAndrew and Sinsi Hernandez-Cancio, *Network Adequacy and Health Equity: Improving Private Health Insurance Provider Networks for Communities of Color*, Families USA issue brief (August 2014), accessed at: http://familiesusa.org/sites/default/files/product_documents/ACT_Network Adequacy Brief_final_082214_web.pdf

- Provider gender

- Residency information

- Hospital and/or group affiliations

- Languages spoken or interpretation services available

- Telemedicine access

- Quality metrics

- Patient-centered medical home recognition status

### 2.3.2 Provider Directory Standards Development: Update Cycle Requirements

Another important point of consideration is the timeliness of the update cycle. Consumers typically use provider directory information to make decisions in real time; however, the frequency with which health plans update their provider directories varies significantly. Many states only require an annual update, which often makes it more difficult for those viewing a provider directory to ensure its information is current. Additionally, states must decide what, if any, penalties should be imposed on health plans when directories have errors, particularly when patients incur out-of-network costs as a result. Regulators may also require health plans to allow consumers to reenroll in a new health plan if their current one has been misrepresented in a provider directory.

States fall into one of four categories:

**TIER 1:** These states impose the most stringent rules related to provider directories. When a provider leaves a network or its information changes, these states allow up to a month for health plans to adjust the provider directory to reflect a change. In some cases, plans must take extra verification steps. For example, New Jersey managed care plans must confirm if a provider has submitted a claim within the last twelve months or has stopped communicating with the plan.[39]

**TIER 2:** These states allow more leeway in terms of provider directory update cycles. State regulations require updates at least annually, with some states requiring updates on a quarterly or semi-annual basis.

**TIER 3:** Regulations in these states are more ambiguous and simply state that directories should be up to date and that updates should occur in a "timely" or "prompt" manner.

**TIER 4:** These states have not yet detailed parameters for provider directories beyond what is required by federal network adequacy regulations or national accreditation entities.

Figure 1 summarizes regulations that apply to health plan products at the broadest level. However, variation also exists across health plan types, with HMOs being the most regulated with respect to network adequacy, followed by PPOs and EPOs.[40]

---

39  B. Herman, "Insurers draw heat for error-riddled provider directories," *Modern Healthcare* (November 19, 2014), accessed at: http://www.modernhealthcare.com/article/20141119/NEWS/311199972

40  Barber et al. (2014).

BERKELEY RESEARCH GROUP

**FIGURE 1:**

**State-Level Provider Directory Update Requirements**



| TIER | DESCRIPTION |
|---|---|
| 1 | Provider directory updates at least on a monthly basis with potential additional provider validation requirements |
| 2 | Provider directory updates required between a quarterly to an annual basis |
| 3 | Provider directories are required to be "up to date" or updated in a timely matter |
| 4 | No additional state-level guidance or requirements specific to provider directories |

# 3.  Provider Directory Operational Challenges

The regulatory requirements around provider directories present their own challenges to health plans. However, health plans also encounter operational challenges due to the complex and dynamic nature of the data that are used to populate provider directories. This section addresses these operational challenges, including:

- Inherent and increasing complexity in the insurance products being offered to customers

- The nature of participating provider information

- Limited resources to adequately execute and maintain provider directories

Each of these is discussed further in the sections that follow.

## 3.1  Complexity of Provider Directory Maintenance

The health insurance business is inherently complex. Some complexity lies in how a health plan contracts with providers—facilities, provider groups, and physicians—to construct its provider networks. Contracting relationships define, among other things, whether providers directly or indirectly contract with the health plan, how providers are divided among the insurance products offered by the health plan, and whether a provider participates in these products in multiple specialties, from multiple locations, or both. Each complexity is discussed in greater detail below.

First, health plans will often contract directly with providers to meet the needs of the members in a service area. This contacting relationship typically places the responsibility on the health plan to ensure that the participating provider information for each directly contracted provider is accurate and up to date. However, for its national PPO products, a health plan will sometimes lease a provider network, since it does not have its own provider network for all intended service areas. This arrangement typically places the responsibility of obtaining accurate participating provider information on the delegated entity, which will then pass along this verified provider information to the health plan, attesting to its accuracy.

Second, health plans are attempting to lower costs by building provider networks that include only certain providers within a health system. A 2014 McKinsey study of products being sold on the ACA health insurance exchanges describes what it refers to as "partial health system participation." The study found, "Forty-four percent of [ultra-narrow, silver-tier products] exclude at least one hospital from every single participating health system."[41] The study further suggests that "[a]nother 31 percent of the products exclude at least one hospital from at least one health system" and that the costs for such ultra-narrow networks are 13 percent lower.[42] However, these types of arrangements add complexity to the process of capturing the relevant information in a health plan's provider system and ensuring that these data are propagated correctly to its provider directories.

Third, a provider practicing multiple specialties or at multiple locations may be participating, or "par," with a health plan for only one specialty or at one location. This occurs when a provider has completed the credentialing process with the health plan for one specialty or location and not others; the specialties or locations for which the provider has not been credentialed would need to be excluded from the health plan's provider directories or identified as being out of network. This adds further complexity to the task of obtaining and maintaining accurate participating provider information.

## 3.2  Dynamic Nature of Provider Directories

Consumers rely on provider directories to ensure that the provider they intend to see is participating in the health insurance product that they have purchased from the health plan. As mentioned earlier, provider directories are usually provided in printed form and via a web-based provider search portal on the health insurer's website. A difficulty in providing these directories to consumers is that any time one piece of information for a provider listed in a health plan directory changes, that entire directory is technically inaccurate or deficient until it is updated with the accurate information.

Provider directories are typically required to provide, at a minimum, the provider's name (including facilities), address(es), telephone number(s), specialty area(s), hospital affiliation, language(s) spoken, and whether new patients are being accepted. Additionally, provider directories should indicate the provider network(s) (or health insurance products) in which a provider is participating. Some of this information will change frequently, and any change to the participating provider information that is displayed in a directory—either printed or online—should be updated according to the requirements of the relevant state and federal regulations.

Clearly, updated provider information takes longer to reach a consumer in a printed directory than in an online directory, which increases the likelihood that a consumer using a printed directory is relying on inaccurate, outdated information. Presenting

---

41  McKinsey & Co., "Hospital networks: Updated national view of configurations on the exchanges" (June 2014), 3.

42  Ibid, 13.

BERKELEY RESEARCH GROUP

directories in either format requires the health plan to aggregate significant amounts of data into its provider system; develop efficient systems and processes for soliciting changes to these data; and ensure that the accurate, current information is propagated correctly to the directories within the timeframes set forth in relevant state and federal regulations.

## 3.3 Resource Limitations

The process required by a health plan to maintain accurate participating provider information in its provider directories is complex and requires substantial resources. At the most basic level, a health plan must implement a system that allows it to store and maintain information related to its provider networks. The health plan is further required to obtain participating provider information from its provider networks, ensure that this information is published correctly in its directories, verify this information on a regular basis, and publish changes in a timely manner. All of this must be performed by health plan resources that are often limited and subject to federal medical loss ratio (MLR) requirements.

Often, a health plan stores provider information across multiple systems. It may maintain provider contracting and credentialing data in a system apart from the system in which it maintains its participating provider information. The health plan must ensure that information obtained from providers is entered correctly into these systems. The health plan must also ensure that this information is propagated accurately to its provider directories. This involves querying the provider system(s) in a way that maintains the integrity of the data as they flow from the information systems through the process of publishing a printed directory or feeding the underlying data sources for the online search portal.

Once the health plan has implemented these processes, it needs to develop a reliable process to verify its participating provider information on a basis consistent with relevant state and federal regulations, including in some cases obtaining an affirmative response every twelve months from all directly contracted providers in its networks. Health plans with large provider networks often need to perform this outreach and verification on a constant, rolling basis throughout the year.

Further, after learning of a change in its participating provider information through either its verification process or direct contact from a provider, the health plan is required to update its provider directories within a timeframe specified by state regulations. For example, New York requires that health plans update provider directories within fifteen days of receiving a change in participating provider information.[43]

These processes must be implemented and carried out by health plan resources that are constrained by MLR requirements. The ACA establishes minimum MLRs of 80 percent for small-group (from one to one hundred workers) and individual markets, and 85 percent for the fully insured large-group market. Most simply, these percentages dictate the percentage of premiums that health plans must spend on nonadministrative functions, including the health insurer's incurred claims plus the "insurer's expenditures for activities that improve health care quality."[44] The costs associated with "developing and executing provider contracts and fees associated with establishing and managing a provider network" do not fall under these categories and therefore are considered an administrative expense under MLR rules.[45] As the state and federal regulations impose new requirements around maintaining accurate provider directories, health plans are required to comply with these requirements with increasingly limited resources.

---

43  New York State Senate, Senate Bill S6914, Assembly Bill A9205 (2014–2015).

44  45 CFR 158.221(b).

45  45 CFR 158.150(c)(9).

# 4.   Risks Associated with Provider Directory Errors

The complex and dynamic nature of provider data, coupled with the resource constraints at health plans, increases the likelihood that health plans' provider directories contain errors. Such inaccuracies in health plans' provider directories have garnered greater attention, with several recent reports in the media and professional journals, as well as studies performed by CMS and other regulatory entities. These reports indicate widespread inaccuracies in health plans' provider directories.

For example, in early 2016, CMS "undertook a study that examined the accuracy of the information in MAOs' online directories over the course of three years [in which] CMS is reviewing approximately one-third of MAOs each year."[46] In the first year, or round, CMS reviewed fifty-four MAOs (including 5,832 providers at 11,646 locations) and found that approximately 45 percent of the provider locations were inaccurate.[47] In the second review round, CMS reviewed sixty-four MAOs (including 6,841 providers at 14,869 locations) and found that approximately 52 percent of the locations were inaccurate. All but two of the MAOs in the first round and one in the second round received some sort of notice of noncompliance from CMS.

When a health plan's provider directory contains inaccurate participating provider information, it poses risks to both consumers and the health plan itself. First, consumers are at risk because they are making decisions based on faulty or incomplete information. This impacts their decision making when both choosing a health plan and deciding which provider to go to for services. Second, the health plan faces several organizational risks, including additional administrative burden, potential cost of resolving out-of-network charges, an inaccurate picture of potential fraud and abuse, and an increased risk of litigation.

## 4.1  Risks to Consumers

In both the individual and employer markets, consumers often consult the provider directories provided by the health plans that they are considering. In either case, a consumer is interested in understanding which providers are considered in-network, especially if the consumer has a prior history with a particular provider. Around 71 percent of enrollees have doctors, hospitals, and other healthcare providers that they would like to see in their health plan network.[48] Additionally, a consumer may want to find a provider that is in close proximity to his or her workplace. If the provider directory has inaccurate location information and the consumer selects the health plan to have access to this provider, then the consumer is at risk of not having access to that provider at a convenient location.

When the provider directory lists the wrong address, this mostly poses an inconvenience to the consumer. However, when the health plan incorrectly lists its in-network providers, this potentially presents a financial risk to the consumer. For example, the health plan may indicate that a provider is part of a particular network when he actually is not. Alternatively, a health plan may list a provider in its provider directories as being par at multiple locations, when that provider is par at only one location. Regardless of how this error manifests itself in a health plan's provider directory, the impact on the consumer is the same. When the consumer receives services from an out-of-network provider, this may result in a "surprise bill" for out-of-network rates, which are often substantially higher than in-network rates.

Clearly, errors related to in-network participation present a different form of risk to a consumer than an incorrect address. CMS acknowledges this difference in its current review of MAO provider directories by assigning the highest significance, or "weight", to those deficiencies where a provider "should not be listed at any of the directory-indicated locations."[49] However, consumers are finding that they exert greater influence over health plans by filing complaints with state regulators or by joining

---

46  CMS, "Online Provider Directory Review Report" (2018), p. 1.

47  Ibid, p. 2.

48  Liazon Corporation, *Medical Plan Preferences in an Environment of Choice* (November 2014), 1–8, accessed at: http://www.liazon.com/wp-content/uploads/Liazon-White-Paper-Medical-Plan-Preferences-in-an-Environment-of-Choice-November-2014.pdf

49  CMS, "Online Provider Directory Review Report" (2018), p. 4.

BERKELEY RESEARCH GROUP

class actions against health insurers. As a result, health plans should be aware that, regardless of the nature of the error(s) in its provider directories, these inaccuracies present organizational risks, which are discussed further in the next section.

## 4.2  Risks to the Health Plan

In 2010, the Health Care Bureau of the New York Office of Attorney General (OAG) reached settlements with several health plans in the New York service area. These settlements were a direct result of complaints that the OAG received from health plan consumers alleging that the health plans' provider directories contained inaccurate information related to providers' information and participation status.

Per the terms of these public settlements, each health plan had to comply with several requirements, including paying a fine, verifying on an annual basis the participating provider information and participation status for every provider in its networks, offering restitution to members that had been billed out-of-network charges as a result of the inaccuracies, performing internal audits of their provider directories and reporting results to the OAG, and being monitored by an independent auditor. These settlements present a microcosm of the risks posed to health plans by inaccurate provider directory information. These risks and their associated burden to the health plan are discussed in greater detail below.

### 4.2.1 Financial Risks to the Health Plan

First, a **financial risk** is posed to a health plan by having inaccurate participating provider information in its provider directories. The federal regulations pertaining to MAOs allow CMS to impose intermediate sanctions and civil monetary penalties for reported provider directory deficiencies. The intermediate sanctions may include suspension of:

- The MA[O]'s enrollment of Medicare beneficiaries
- Payment to the MA[O] for Medicare beneficiaries enrolled after the date CMS notifies the organization of the intermediate sanction
- All marketing activities to Medicare beneficiaries by an MA[O][50]

The sanctions can continue "until CMS is satisfied that the deficiencies that are the basis for the sanction determination have been corrected and are not likely to recur."[51]

CMS may also impose civil monetary penalties on MAOs for each deficiency that is identified. The regulations take many factors into account when determining the amount of the penalty, such as the nature of the deficiency, the degree of "culpability" of the MAO, the financial condition of the MAO, and the MAO's history of prior offenses.[52] If a deficiency has "directly adversely affected (or has the substantial likelihood of adversely affecting) one or more MA[O] enrollees," then CMS may impose a civil monetary penalty of up to $25,000 for each determination.[53]

CMS may also impose civil monetary penalties on a QHP if it is determined that the QHP has engaged in an activity that has "adversely affected or has a substantial likelihood of adversely affecting one or more enrollees in the QHP offered by the QHP issuer."[54] These regulations contemplate mitigating factors similar to those for MAOs when determining the amount of the civil monetary penalties. The maximum penalty "for each violation is $100 for each day for each QHP issuer for each individual adversely

---

50  42 CFR 422 Subpart O.

51  42 CFR 422.750(a).

52  42 CFR 422.760(a).

53  42 CFR 422.760(b)(1).

54  45 CFR 156.805(a)(2).

affected by the QHP issuer's non-compliance."[55] Some states have established similar penalties. For example, health plans in New Mexico may be charged a "penalty for any material violation" of the state regulations governing provider directories.[56] Additionally, several states require that plans must make patients whole from extra expenses incurred due to directory inaccuracies.

Additionally, there has been recent activity at the state level, with state regulators fining plans in New York, Minnesota, California, and Washington for alleged inaccuracies in their provider directories.

### 4.2.2 Administrative Cost to the Health Plan

Second, there is the **administrative cost** of having to comply with increasingly onerous state and federal regulations. Since 2010, when the ACA was passed, nearly all of the states with state-specific provider directory guidelines have created or updated their provider directory–specific regulations.[57] Additionally, many other states are considering changes in provider directory provisions in their forthcoming regulatory agendas. These regulations often dictate specific requirements for how often a health plan must verify the participating provider information for its networks and how that verification is performed. Further, upon learning of a change in its network, a health plan is required to ensure that verified information is propagated to its provider directories within a specific timeframe. Also, several states require health plans to proactively notify members that providers have terminated or left their network. As a result, the health plan needs to develop a robust—and often costly—internal "infrastructure" with sufficient systems and processes to comply with these requirements.

### 4.2.3 Litigation Risks to the Health Plan

Last, a health plan is at an **increased risk of litigation** when its provider directories have errors. These errors can result in members being charged out-of-network rates, potentially making the health plan responsible for paying the difference between these rates and the in-network rates. If a health plan network actually turns out to be "narrower" than what is indicated in its provider directories, it could be at risk of not meeting network adequacy requirements in its service area. Several class actions have been filed against health plans, all of which touch on these issues. These actions have also included "bait and switch" allegations that the provider network that is displayed in the directory during the enrollment period is not same as the network that is displayed once the plan year is underway. These actions are demanding that health plans pay restitution, damages (plus interest), and "such other and further relief as the Court deems just and proper" to the class members.[58] Several actions that were brought in California are discussed in the case study below.

The organizational risks posed to health plans by inaccuracies in their provider directories are significant, although they are not all to be treated equally. Clearly, penalties and sanctions imposed on a health plan are more easily quantified and, as a result, might appear to be most costly. However, the administrative burden of complying with state and federal regulations and addressing directory inaccuracies may provide a truer representation of the "costs" borne by a health plan. Finally, the uncertainties around litigation potentially pose the biggest risk of those discussed above.

---

55  45 CFR 156.805(c).

56  N.M. Admin. Code Sections 13.10.22–23.

57  See Appendix A.

58  *Cowart v. Blue Cross of California*, No. BC549438 (Cal. Super. Ct. Jun. 20, 2014), 12.

BERKELEY RESEARCH GROUP

## CASE STUDY: IMPACT OF PROVIDER DIRECTORY ERRORS IN THE STATE OF CALIFORNIA

California serves as an excellent example of the chain of events that can result from reported errors within a provider directory. California represents one of the largest health insurance markets in the world, with $162.5 billion in revenue in 2015,[59] and is highly regulated by agencies including the California Department of Insurance (DOI) and Department of Managed Health Care (DMHC).

In response to consumer complaints, the DMHC initiated off-cycle network adequacy compliance audits of health plan provider directories in 2014. The DMHC's review of Blue Shield of California and Anthem Blue Cross health plans found error rates within provider directories in the double digits.[60] In November 2015, DMHC fined Blue Shield of California $350,000 and Anthem Blue Cross $250,000 for inaccurate provider directories.[61] Both plans were required to reimburse enrollees who were negatively impacted by inaccurate provider directories, and Blue Shield reimbursed enrollees more than $38 million.[62]

Additionally, multiple class actions were filed against Blue Shield of California and Anthem Blue Cross related to these issues. Blue Shield of California reached a settlement in November 2017 and agreed to settlement funds of approximately $18 million.[63] Anthem Blue Cross settled in March 2016 for approximately $15 million.[64] Two other class actions—one against Cigna and once against Health Net— are in settlement discussions as of this writing.[65]

This activity led to the DOI commissioner "emergency action" to amend sections of the California Code of Regulations with the intent of strengthening network adequacy requirements, and the subsequent passage of California Senate Bill 137 in September 2015. The bill sets forth specific requirements for provider directories and requires insurers to:

- Update the directory weekly, when informed of change to provider information

- Develop an online platform for providers to update their information

- Reach out to providers every six months to verify provider information

- Reimburse an enrollee for costs incurred from out-of-network providers because of inaccurate provider directory

- Include National Provider Identifier number, California license number, languages spoken by provider and staff, and other information in provider directory[66]

---

59  Katherine Wilson, "California Health Insurers: Two Years After Reform," California Health Care Foundation (April 28, 2017), accessed at: https://www.chcf.org/publication/california-health-insurers-two-years-after-reform/

60  "Regulatory probe hits network adequacy," *Healthcare Finance* (November 20, 2014), accessed at: http://www.healthcarepayernews.com/content/regulatory-probe-hits-network-adequacy#.VK1z7CvF-4I

61  Department of Managed Healthcare, "DMHC Fines Blue Shield and Anthem for Inaccurate Provider Directories," press release (November 3, 2015), accessed at: http://www.dmhc.ca.gov/portals/0/abouttheDMHC/newsroom/2015/pr110315.pdf

62  Ibid.

63  https://harringtontalonacasettlement.com/Notice-Aviso

64  Harrington Talon ACA Settlement, accessed at: https://felseranthembluecrossacasettlement.com/

65  *Sheila Davidson et al. v. Cigna Health and Life Insurance Co. et al. and Rebecca Lehman & Heather Womick v. Health Net of California Inc. et al.*

66  California State Legislature, Senate Bill No. 137 (approved October 8, 2015), accessed at: https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB137

# 5. The Future of Provider Directory Policies

Provider directories will remain an area of focus for health plans, as well as for regulators at the federal and state levels. CMS has clearly signaled its intentions in its recent guidance by requiring QHPs and MCOs to make their provider directory information available in a machine-readable format. CMS believes that these files will "increase transparency by allowing CMS and other software developers to access provider data and create innovative and informative tools to assist consumers in understanding plans' provider networks."[67] In the report of findings from its second round of review of MAO provider directories, CMS says it is "encouraged by several ongoing pilot programs aimed at developing a centralized repository for provider data accessible to multiple stakeholders."[68] However, CMS acknowledges that such an approach "will take time and does not obviate the short-term immediate need of MAOs to improve directories."[69] As of this writing, CMS's third round of review of MAO online provider directories is underway.

State regulators will continue to focus on provider directories as well. Several states are defining provider directory requirements, either through state legislatures, departments of insurance, or other working groups. For example, the Massachusetts Division of Insurance (MA-DOI) regulation on Managed Care Consumer Protections and Accreditation of Carriers indicates that provider directories must contain, among other information, "the effective date, date of issue and [an] expiration date, if applicable."[70] The penalty for noncompliance with these requirements can be up to $5,000 per incident per day.[71] Further, the MA-DOI commissioner can suspend the "carrier's authority to do new business" and/or suspend or revoke the carrier's accreditation if the carrier is found to be noncompliant.[72] Oregon convened a Provider Directory Advisory Group in early 2014 to "provide guidance to the Oregon Health Authority on the scope, functions and parameters for developing a state-level provider directory."[73] Additionally, in October 2017, "the development of a new statewide provider directory utility" was announced in California, spearheaded by, among others, Blue Shield of California. The goal is to "ensure [that] consumers throughout California have the most up-to-date and accurate information about providers when choosing a plan."[74]

Finally, a number of startups have sprung up in the last few years that provide healthcare transparency tools, including provider directories. These companies have attracted increasingly significant investor attention. As shown in Figure 2, the money



**FIGURE 2:**

**Private Funding of Healthcare Transparency Companies ($ in Millions)**

Source: Crunchbase

---

67 CMS, "Draft 2017 Letter to Issuers in the Federally-facilitated Marketplace" (December 23, 2015).

68 CMS, "Online Provider Directory Review Report" (2018), p. 9.

69 Ibid.

70 211 CMR 52.15(4).

71 211 CMR 52.17.

72 Ibid.

73 Oregon Health Authority, Provider Directory Advisory Group, Office of Health Information Technology, accessed at: http://www.oregon.gov/oha/HPA/OHIT/Pages/Provider-Directory-Advisory.aspx

74 Blue Shield of California, "Blue Shield of California and Integrated Healthcare Association announce development of statewide provider directory utility," press release (October 2, 2017), accessed at: https://media.blueshieldca.com/2017/10/02/statewide-provider-directory-utility/

BERKELEY RESEARCH GROUP

raised by these companies has increased from approximately $20 million in 2009 to more than $1 billion in 2017. These companies are capitalizing on the demand from healthcare stakeholders—including regulators, providers, health plans, and consumers—for complete and accurate information as they interact with the healthcare system.

## 6.  Conclusion

Provider directory inaccuracies represent a growing and significant risk to both consumers and health plans. Regulators at the state and federal levels continue to review and establish new methods of ensuring network adequacy and protecting consumers' access to affordable care, and provider directories are factoring more prominently into these efforts. Health plans should be proactive about achieving and ensuring provider directory accuracy, despite the operational challenges involved in doing so. Given an environment that is increasingly regulatory, litigious, investigative, and putative, health plans should deploy organizational resources at a level that is commensurate with the level of risk that these inaccuracies can present.

## About the Author

**Brian E. Hoyt** is a Managing Director in BRG's Heath Analytics Practice in Washington, DC and is an expert in network adequacy and health plan provider directories. Mr. Hoyt has been selected as an independent monitor of enforcement decrees pursuant to both state and federal investigations in these areas. He also routinely works with health plans to proactively navigate the risks and complexities that these areas present, as well as to respond in the event of disputes and investigations. His expertise extends not only to the data and technology used in these areas, but also to the state and federal regulatory landscape in which plans operate.

## About Berkeley Research Group

Berkeley Research Group, LLC (www.thinkbrg.com) is a leading global strategic advisory and expert consulting firm that provides independent advice, data analytics, valuation, authoritative studies, expert testimony, investigations, transaction advisory, restructuring services, and regulatory and dispute consulting to Fortune 500 corporations, financial institutions, government agencies, major law firms, and regulatory bodies around the world. BRG experts and consultants combine intellectual rigor with practical, real-world experience and an in-depth understanding of industries and markets. Their expertise spans economics and finance, data analytics and statistics, and public policy in many of the major sectors of our economy, including healthcare, banking, information technology, energy, construction, and real estate. BRG is headquartered in Emeryville, California, with offices across the United States and in Asia, Australia, Canada, Latin America, the Middle East, and the United Kingdom.

