**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

Erin Angelo et al.,

        Plaintiffs,

    v.

Centene Management Company, LLC,
Celtic Insurance Company,
Superior HealthPlan, Inc., and
Centene Company of Texas, L.P.,

        Defendants.

Case No. 1:20-cv-00484-RP

District Judge Robert Pitman

ORAL ARGUMENT REQUESTED

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY
OF PLAINTIFFS' DAMAGES EXPERT, DR. SIMON HAEDER**

# Table of Contents

Preliminary Statement...................................................................................................................1

Background ....................................................................................................................................3

      A.     The relevant insurance ................................................................................................3

      B.     The provider database ................................................................................................3

      C.     The relevant law regarding provider databases .......................................................4

      D.     Dr. Haeder's Methodology .......................................................................................4

Legal Standard .............................................................................................................................8

Plaintiffs' Unreliable Damages Opinion Should Be Excluded.............................................9

I.     Dr. Haeder's Opinion Does Not Fit the Facts and Assumes Facts That Are Not True. ..........................................................................................................................9

II.    Dr. Haeder's Model Based on the Value of Network Breadth Does Not Fit Plaintiffs' Only Remaining Theory: Breach of Contractual Promise To Provide Accurate Directories. .............................................................................................10

III.   Dr. Haeder's Methodology for Determining the Degree of Inaccuracy Is Contrary to Law. ...................................................................................................................11

IV.   Dr. Haeder Does Not Know the Breadth of Superior's Network and Uses Speculative and Widely Varying Assumptions. ...............................................................12

V.    Dr. Haeder's Model Fails To Consider Supply-Side Factors. ..........................................13

Conclusion ...............................................................................................................................15

## Table of Authorities

### Cases

*Comcast v. Behrend*,
   569 U.S. 27 (2013)................................................................................................. 1, 10, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................................... 8, 9

*Earl v. Boeing Co.*,
   53 F.4th 897 (5th Cir. 2022) ........................................................................................ 13

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n*,
   213 F.3d 198 (5th Cir. 2000) ........................................................................................ 13

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
705 F.3d 518 (5th Cir. 2013) .......................................................................................... 14

*Great Am. All. Ins. Co.v. Sir Columbia Knoll Assocs. Ltd. P'ship*,
   2020 WL 5351035 (D. Or. Sept. 4, 2020) .................................................................. 10

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
   443 S.W.3d 820 (Tex. 2014)......................................................................................... 14

*In re Gen. Motors LLC Ignition Switch Litig.*,
   407 F. Supp. 3d 212 (S.D.N.Y. 2019).......................................................................... 14

*In re Silica Prods. Liab. Lit.*,
   398 F. Supp. 2d 563 (S.D. Tex 2005) .............................................................................. 8

*In re Volkswagen "Clean Diesel" Prod. Liab. Litig.*,
   500 F. Supp. 3d 940 (N.D. Cal. 2020) .......................................................................... 15

*Lloyd v. Conseco Finance Corp*,
   2001 WL 36097624 (C.D. Cal. Oct. 19, 2001)............................................................... 9

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269
   (5th Cir. 1998)............................................................................................................... 8, 9

*Sprint Comm's Co. L.P. v. Cox Comm's Inc.*,
   302 F. Supp. 3d 597 (D. Del. 2017).............................................................................. 12

*U.S. v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) ........................................................................................... 9

*Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*,
   516 F. Supp. 2d 802 (S.D. Tex. 2007) ........................................................................... 9

*Zakaria v. Gerber Prods. Co.*,
   2017 WL 9512587 (C.D. Cal. Aug. 9, 2017)................................................................ 15

**Federal Regulations**

45 C.F.R. 144.103 ............................................................................................................ 4

45 C.F.R. 156.230 ............................................................................................................ 4

**Texas Regulations**

Texas Ins. Code § 1451.504................................................................................................ 4

**Rules**

Federal Rule of Evidence 702.............................................................................................. 8

**Preliminary Statement**

Superior offers Affordable Care Act ("ACA") health insurance to Texans under the Ambetter Health brand.  Thousands of Texans benefit from Superior's ACA insurance, and 99.9% of Superior's customers have no complaint about its provider search engine—which is the sole issue left in this case.  Yet, Plaintiffs seek to certify a class of everyone who enrolled in Superior's ACA insurance since 2014—more than 400,000 people—ostensibly based on Superior's alleged breach of a contractual promise to provide a current provider directory.

The linchpin of Plaintiffs' attempt to certify this enormous putative class is Plaintiffs' class-wide damages model, a model proposed by Dr. Simon Haeder, a health-policy researcher.  Without a class-wide damages model, the class cannot be certified.  After Superior's expert, Brian Hoyt, pointed out flaws in Dr. Haeder's initial methodology, Dr. Haeder completely changed his method of calculating damages in his rebuttal report.  But Dr. Haeder's revised model still fails to meet the rigors for expert evidence in a federal case for five reasons:

*First*, it does not fit the facts, because it assumes things that are not true.  Most fundamentally, it assumes that Superior promised its customers a certain network "breadth"—defined as the number of in-network providers in proportion to the number of providers in the area—but Superior has never made any such promise.  Nor does Superior make any statements about its network breadth.  Dr. Haeder himself admits he does not know Superior's network breadth, either now or at any point during the putative class period.

*Second*, Dr. Haeder's model does not fit Plaintiffs' last remaining theory of liability: breach of a contractual promise to provide a current provider directory.  A current directory is not the same thing as a network of a certain breadth, and the damages that would flow from each of those things are not the same.  Dr. Haeder did not measure the damages from an inaccurate directory, and therefore his model fails the "fit" test under *Comcast v. Behrend*, 569 U.S. 27 (2013).

1

*Third*, Dr. Haeder's analysis of the "inaccuracy" of Superior's network is inconsistent with the governing law. Dr. Haeder focuses on "realized access," a term that policy advocates have used to describe situations in which the size of a provider network does not correspond to actual access to care, which may come about for a variety of reasons. Academics studying this issue have posited that providers who submit only a few claims per year are not providing "realized access," and Dr. Haeder borrows their basic technique of examining how many claims providers have submitted. But a failure to provide "realized access" is not the same thing as being out of network. Superior's legal and contractual obligation is to list all providers who have contractually agreed to provide care to Superior's Ambetter customers. By positing that some contracted providers should be excluded from the directory, Dr. Haeder's model contravenes Texas and federal law.

*Fourth*, Dr. Haeder's model centers on network breadth, yet he admits he does not know the breadth of Superior's network, now or at any point during the putative class period. Instead, he uses assumptions that are unconnected to Superior and thus completely speculative. He calculates damages based on three different assumptions—that Superior's directory includes 53 percent breadth, 31 percent breadth, and 9 percent breadth—but he has no basis to say that any of those is correct. Superior's number could be higher or lower, by a little or a lot; Dr. Haeder has no basis to say. And yet he uses these assumptions to generate an enormous range of damages from $204 million to $1.2 billion, which could not be helpful to a jury and would only invite improper speculation.

*Fifth*, Dr. Haeder's model is based on a study of consumer willingness to pay more for broader networks, but fails to take account of supply-side factors that would impact whether that preference actually corresponds to a difference in market value. A body of case law has rejected just such attempts to use demand-side-only studies to calculate damages based on market value.

2

This is because market price is a function of both supply *and demand*. Mr. Hoyt's attached declaration explains this flaw in more detail. *See* ECF 70-2 (Hoyt Declaration).

For these reasons, Dr. Haeder's purported class-wide damages model is unreliable and should be excluded.

## Background

### A.    The relevant insurance

Superior's Ambetter Health insurance is highly regulated insurance offered under the Affordable Care Act. It is sold through the government's ACA Marketplace, located at healthcare.gov. The insurance policies (i.e., contracts) at issue change each year, including based on input from the Department of Insurance, but generally promise that Superior will make available to customers a "listing of network providers" that a customer can search to "produce a list of providers based on your search criteria." *See, e.g.*, ECF 63-1 (2021 insurance contract) at 9. They state that the customer has a right to "[a] current list of network providers." *Id*. at 91. The policies do not, however, promise a specific number of in-network providers or a specific "network breadth." *See* ECF 63-2 (Hoyt Report) at 11; ECF 63-3 (Decl. of Michael Diel) ¶ 3.

### B.    The provider database

The provider guide is available at https://guide.ambetterhealth.com. *See* ECF 63-4 (Provider Guide). The insurance policies explain that the guide uses a search engine that customizes lists of in-network providers for each customer based on where the customer lives and what type of doctor the customer searches. The policies explain that the customer sees only a "list of providers" that are tailored to the customer's "search criteria" and location. *See* ECF 63-1 at 9:

> A listing of *network providers* is available online at Ambetter.SuperiorHealthPlan.com. *We* have plan *providers and hospitals* who have agreed to provide *you* with *your* healthcare services. *You* may find any of *our network providers* on *our* website. There *you* will have the ability to narrow *your* search by *provider* specialty, zip code, gender, languages spoken and whether or

3

not they are currently accepting new patients.  ***Your* search will produce a list of *providers* based on *your* search criteria** and will give *you* other information such as name, address, phone number, office hours, specialty and board certifications.

*Id.* (emphasis added).

### C.     The relevant law regarding provider databases

Federal regulations require health insurers to make available to consumers a list of all network providers.  *See* 45 CFR 156.230(b)(2) (requiring an "up-to-date, accurate, and complete provider directory").   Federal regulations define a "network plan" as "health insurance coverage of a health insurance issuer under which the financing and delivery of medical care (including items and services paid for as medical care) are provided, in whole or in part, through a defined set of providers *under contract with the issuer*."  45 C.F.R. 144.103 (emphasis added).  Texas law requires that "each physician and health care provider" be listed in the provider directory.  Texas Ins. Code § 1451.504(a) & (b).  Thus, Superior is required to include all providers under contract in its provider directory, and cannot follow the approach advanced by Dr. Haeder.

### D.     Dr. Haeder's Methodology

As relevant here, Dr. Haeder states that his damages methodology has two steps: (1) to "assess which percentage of providers listed in Centene's provider network directory are actually in-network" from 2016 through 2021 and (2) "to assess the reduction in value to consumers due to misrepresentations of provider networks to consumers," i.e., to put a dollar value on the alleged "misrepresentation" identified in step one.  ECF 62-2 (Haeder 1st Rep't) at 7.  Dr. Haeder has submitted two reports, and he substantially changed his approach to the second step in his rebuttal report.  *See* ECF 66-4 (Haeder 2nd Rep't).

The first step has remained the same in Dr. Haeder's two reports.  Notable at the outset is that although the contractual promise on which Plaintiffs are suing is to provide a current directory, and there are various ways a directory can be out-of-date, Dr. Haeder focuses on only one way:

the number of out-of-network providers included.  And although a directory could include not only errors of overinclusiveness (including providers not actually in-network) but also errors of underinclusiveness (omitting providers who are in-network), Dr. Haeder focuses only on the first of those.[1]  Then, his methodology strays from the relevant legal test—which requires that Superior list all providers under contract with it—by examining the number of providers who submitted claims during each year of the alleged class period regardless of contract status.   Dr. Haeder concludes that any provider who appears in Superior's directory during a particular year but whose individual national provider identifier (NPI) is not associated with a billed insurance claim in that year is "inaccurately listed" in the directory even if the provider was under contract with Superior and available to see patients.[2]

Dr. Haeder borrows this claims-based approach from academic literature addressing a topic known as "realized access."  These academic sources concede that providers "seeing fewer … patients could still be in network and technically available to patients."[3]  But they reflect concerns that "existing standards do not always translate" to what these academics see as "acceptable levels

---

[1] Although Dr. Haeder appears to have counted providers whose health insurance claims were accepted as in-network by Superior without regard to whether they were listed in the directory, he made no effort to ascertain if some providers billed no claims because they were inadvertently omitted from the directory and thus saw no patients.  The sources Dr. Haeder cites recognize that directories are sometimes also underinclusive.  *See* Jane M. Zhu et al., *Phantom Networks: Discrepancies Between Reported and Realized Mental Health Care Access in Oregon Medicaid*, 41 Health Affairs 1013, 1019 (July 2022).

[2] Dr. Haeder admits he does not know if providers who did not bill claims were available to see patients.  *See* Ex. 1 (ECF 70-1) (Haeder Dep.) at 93, 97:8–25 ("Q: Did you do anything to determine whether those providers were willing to see Ambetter members if asked?  A: I did not. I also would not know how to do it, 'cause it occurred in the past.").  Dr. Haeder's approach also fails to account for variations in providers' billing practices, and thus, mistakenly counts providers who are listed individually in the provider network but submit claims under a practice group as out of network even though they may have been actively seeing patients.  *See* ECF 63-2 (Hoyt Report) at 19–20.

[3] Zhu, *Phantom Networks*, at 1015.

of access."[4] Thus, these academics examine claims data because this data "may help policy makers measure more directly how provider networks and access to care intersect."[5] Based on this policy-focused work addressing "realized access," Dr. Haeder adopted this approach, even though he knows of no health insurance company in the United States that follows this approach. *See* Ex. 1 (ECF 70-1) (Haeder Dep.) at 53:7–54:7 ("I -- not to my knowledge. I can't speak to that. . . . I'm not speaking to that, and I'm not advocating anything.").

The second step of Dr. Haeder's analysis—the actual calculation of damages—is the aspect he has completely revised in his rebuttal report. He admits that he changed his analysis because he was alerted by Superior's expert report that he had "accidentally misinterpreted" the sources on which he relied and that his original damages methodology was "not appropriate." ECF 66-4 (Haeder 2nd Rep't) at 47; Ex. 1 (ECF 70-1) (Haeder Dep.) at 76:9–15. He now bases his calculation on a single article that attempted to assess consumer preferences for greater "breadth" of provider networks. ECF 66-4 (Haeder 2nd Rep't) at 48–49 (citing Eline M. van den Broek-Altenburg et al., *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, 26 Am. J. Managed Care e219 (July 2020) (the "van den Broek-Altenburg article")) (attached as Ex. 3 (ECF 70-3)).

"Breadth" is defined in the article as "the percentage of primary care doctors in the [relevant] service area that accept the health insurance plan,"[6] as opposed to size of the network measured by the number of providers. The van den Broek-Altenburg article used a form of market research known as "conjoint" analysis. Ex. 1 (ECF 70-1) (Haeder Dep.) at 19:5–7. According to

---

[4] Jane M. Zhu et al., *Characteristics of Specialty Mental Health Provider Networks in Oregon Medicaid*, Psychiatric Services, appi. ps. 202100623, at 2.

[5] Zhu, *Characteristics*, at 3.

[6] van den Broek-Altenburg, at e220 (*see* Ex. 3 (ECF 70-3)).

the article, consumers are willing to pay $2.41 per month for each percent of greater network breadth,[7] but the article does not address any supply-side factors—such as the costs to insurers of including more providers—that would affect whether consumers' preferences would actually impact market prices at which insurance is available.[8]  The article, which appeared under the rubric "Policy," acknowledged that prior studies (including the ones Dr. Haeder relied on in his original report) had shown that "network breadth/valuation is not tightly linked to plan pricing," and made clear that its aim was different: to present a more "complete picture of patients' preferences regarding provider choice [to] help in formulating a better definition of network adequacy" than is included in current regulations.[9]

Despite the fact that the van den Broek-Altenburg article did not address insurance price or market value, Dr. Haeder then attempted to apply the findings of that article to calculate benefit-of-the-bargain damages based on network "breadth."  But he encountered a fundamental problem: he does not know what Superior's network breadth is now or was at any point in the putative damages period.  Ex. 1 (ECF 70-1) (Haeder Dep.) at 26:1–28:25 (repeatedly states: "I cannot tell you the breadth.").  Dr. Haeder admits that Superior "does not provide information on the breadth of the network."  *Id.* at 56:23–57:2.  Superior does not make any statements about breadth on which he could base his calculations.  So instead, he simply chose three assumptions, based on an article concerning average network breadth in the industry.  *Id.* at 57:3–24.

---

[7] Although, as Dr. Haeder admits, "everyone has different preferences," Ex. 1 (ECF 70-1) (Haeder Dep.) at 45:11–46:2, and neither he nor the article he cites accounted for that.

[8] As one article cited by Dr. Haeder confirms, "provider network breadth reflects known trade-offs between access and cost containment."  Zhu, *Characteristics*, at 6.

[9] van den Broek-Altenburg, at e220 (*see* Ex. 3 (ECF 70-3)).

Those assumptions were 9% breadth, 31% breadth, and 53% breadth.  ECF 66-4 (Haeder 2nd Rep't) at 48–49.[10]  But Dr. Haeder did not assume that Superior's network actually included any of these breadths, but rather that Superior *represented* these amounts of breadth (despite the fact that Superior did not represent any breadth).  He then reduced these assumed figures by the amount of inaccuracy he determined in the first step of his analysis.  In other words, under his 53% assumption, if he had determined that 50% of the providers in Superior's directory were not in network, then he would conclude that the actual breadth was 26.5% (50% of the assumed 53% average).  Or maybe it was 15.5% (50% of the assumed 31% breadth).  Or maybe it was 4.5% (50% of the 9% breadth assumption).  Dr. Haeder does not know if it was any of these.

## Legal Standard

Pursuant to the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *see also In re Silica Prods. Liab. Lit.*, 398 F. Supp. 2d 563, 620 (S.D. Tex 2005).  Federal Rule of Evidence 702 ("Rule 702") is the "primary locus of this obligation."  *In re Silica*, 398 F. Supp. 2d at 620.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the United States Supreme Court provided the analytical framework for courts to utilize under Rule 702.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993);

---

[10] According to Dr. Haeder, 53% is the national average network breadth of ACA silver-level plans; 84% of plans offer at least 31% breadth; and 98% of plans offer at least 9% breadth.  ECF 66-4 (Haeder 2nd Rep't) at 48–49.

*see also U.S. v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).  Under this framework, district courts "act as gate-keepers overseeing the admission of scientific and non-scientific expert testimony." *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 583 (5th Cir. 2004) (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  This role includes ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  Plaintiffs bear the burden of establishing the admissibility of Dr. Haeder's opinion. *Hicks*, 389 F.3d at 525.

**Plaintiffs' Unreliable Damages Opinion Should Be Excluded**

**I.      Dr. Haeder's Opinion Does Not Fit the Facts and Assumes Facts That Are Not True.**

An expert opinion must fit the facts of the case, *Daubert*, 509 U.S. at 591, and "incorrect assumptions critical to an expert's opinion make that opinion unreliable."  *Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 816–17 (S.D. Tex. 2007) (*citing Moore*, 151 F.3d 269).  *See also Lloyd v. Conseco Finance Corp*, 2001 WL 36097624, at *5 (C.D. Cal. Oct. 19, 2001) (to satisfy *Daubert*'s relevancy requirement, the proffered expert testimony must be "sufficiently tied to the facts of the case that it will assist the jury in resolving the issues before them").  Here, Dr. Haeder's opinion wrongly assumes that Superior promised consumers a specific network breadth (defined as the proportion of the available primary-care providers that are included in the network).  Superior made no such promise, and neither Dr. Haeder nor Plaintiffs point to any such promise.

The gist of Dr. Haeder's revised damages opinion is his unsupported assumption that consumers are willing to pay more for greater network breadth—specifically, $2.41 more per each additional percent of network breadth.  Even leaving aside the vast methodological problems with that approach, *see infra*, it fails as a measure of breach-of-contract damages because Superior did not promise any percentage of breadth.  That it does not do so is evident from the fact that Dr.

9

Haeder admits he does not know the breadth of Superior's network, now or at any point in the past.[11]  The proper interpretation of a contract is a question of law for the Court to decide, and because Dr. Haeder's model is not consistent with the language of the contract (*see* ECF 63-1), his opinion is irrelevant to issues in the case and should be excluded.  *See Great Am. All. Ins. Co.v. Sir Columbia Knoll Assocs. Ltd. P'ship,* 2020 WL 5351035, at *4–5 (D. Or. Sept. 4, 2020) (excluding expert opinion that relied on erroneous interpretation of a contract term as irrelevant).

## II.     Dr. Haeder's Model Based on the Value of Network Breadth Does Not Fit Plaintiffs' Only Remaining Theory: Breach of Contractual Promise To Provide Accurate Directories.

Another aspect of the same problem discussed above is that Dr. Haeder's model does not fit Plaintiffs' remaining theory of liability—namely, that Superior breached its promise to deliver an accurate provider directory.  An expert's theory must "fit" with plaintiff's theory of the case. *Comcast*, 569 U.S. at 35–36 (2013).  Plaintiffs insist that theory is not that Superior promised a specific network size or breadth.  *See* ECF 66 (Plts' Reply re Mot. for Class Cert.) at 1 ("A promise of any particular or specific number of providers is simply not at issue here.").  If that is true, then Dr. Hader's model does not fit their theory, because his model does depend on supposed differences in value of greater versus narrower network breadths.

Dr. Haeder attempts to apply a benefit-of-the-bargain approach to damages.  *See* ECF 66-4 (Haeder 2nd Rep't) at 4 (stating that he "assessed the reduction in value to consumers due to misrepresentations of provider networks to consumers").  Applying that approach, he purports to compare the value of a broader network with the value of a narrower network—and assesses $2.41

---

[11] In opposing Plaintiffs' motion for class certification, Superior focused on Dr. Haeder's opinion at that time, which was also based on something Superior did not promise—a specific size of the network (measured by number of providers).  *See* ECF 63.  Because Dr. Haeder has revised his model to focus on network breadth (percentage of potentially available providers included) rather than absolute network size, Superior is also filing a Surreply as to class certification.

in damages for every one percent of breadth that he says was promised but not delivered.  As is evident from this description, the premise of his model is that Superior promised a particular percentage of breadth to its customers but delivered a smaller percentage.  If the Court credits Plaintiffs' statements that their case is not based on a promise of a specific breadth, then there is a fundamental disconnect between their theory and Dr. Haeder's damages model.

Indeed, even before Plaintiffs' recent descriptions of their theory, the disconnect was already evident from the Complaint.  It alleges that Superior breached its contractual commitment to provide an accurate provider list.  *See* ECF 19 (1st Am. Compl.) ¶ 96.  But instead, Dr. Haeder's model addresses the value he says consumers place on greater network breadth.  Those are self-evidently different things—like the difference between an inaccurate menu and a shortage of food.  A directory could be inaccurate in many ways, including by being underinclusive, i.e., inadvertently excluding providers who are under contract with Superior.  Dr. Haeder admits he studied none of those other ways, and his damages model makes no attempt to value them.

Thus, Dr. Haeder's model is not tethered to the Complaint's theory of liability, which the *Daubert* analysis requires, because it measures the wrong thing: the purported price difference between an insurance policy with greater breadth of providers versus one with less breadth, rather than the price difference between a policy with an accurate provider directory versus one with an inaccurate directory.  Plaintiffs are not entitled to "damages that are not the result of the wrong." *Comcast*, 569 U.S. at 37.

## III.    Dr. Haeder's Methodology for Determining the Degree of Inaccuracy Is Contrary to Law.

Dr. Haeder's method of determining how many providers were in Superior's network at the relevant time was not to identify providers who have contractually agreed to provide care to Superior's Ambetter customers, as specified by current law, but rather to examine how many

11

insurance claims providers billed.  He concluded that any provider who did not submit an insurance claim under their own individual ID during a year was out-of-network, without regard to whether the provider had a contract with Superior, and even if the provider billed claims in earlier and later periods or under their practice group ID.  This approach is based on academic consideration of the topic of "realized access," i.e., the concern that existing measures of network size and breadth might not accurately capture the degree to which consumers can easily access care.  But "realized access" is not consistent with current law governing ACA health insurance, which requires ACA health plans to list all providers who have a contract with the insurer in their provider network search engines or directories.  *See supra* at p. 4.  Because the premise of Dr. Haeder's opinion is contrary to law, it must be excluded.  *See, e.g., Sprint Comm's Co. L.P. v. Cox Comm's Inc*., 302 F. Supp. 3d 597, 619 (D. Del. 2017).

As described above, current regulations require Superior to list all providers under contract with it, even if the provider does not bill a claim during a year.  Dr. Haeder admits he did not consider current regulations in forming his opinion.  Ex. 1 (ECF 70-1) (Haeder Dep.) at 47:11–25 ("I did not.").  Academics, including Dr. Haeder, may be right to be concerned about "realized access" to care.  But there are many reasons why particular providers may bill few claims in a given period, and this industry is highly regulated.  If there is a real problem with realized access to care, it can and should be addressed by regulators.  Current law does not consider "realized access," and Superior is not free to violate current regulations governing its provider directory in favor of what Dr. Haeder may desire as a beneficial future change in public policy.

**IV.    Dr. Haeder Does Not Know the Breadth of Superior's Network and Uses Speculative and Widely Varying Assumptions.**

Remarkably, despite premising his entire damages model on the notion that Superior promised but failed to deliver a certain amount of network breadth, Dr. Haeder admits he does not

12

know what the breadth of Superior's network was during any of the periods in question. Ex. 1 (ECF 70-1) (Haeder Dep.) at 26:1–28:25 (repeatedly states: "I cannot tell you the breadth."). Instead, he has made various assumptions, based on industry-wide averages with no specific connection to Superior. Those assumptions result in widely ranging damages figures from $204 million to $1.2 billion. Because this opinion is speculative and could not assist a rational jury, it must be excluded.

Dr. Haeder uses network-breadth assumptions of 9% breadth, 31% breadth, and 53% breadth. But Dr. Haeder has no basis to say which, if any, of these is correct. He has no basis to exclude any other possible figure, higher or lower. And in fact, he does not even assume that these figures correspond to the actual breadth of Superior's network, but rather to what Superior *represented* (even though Superior makes no representation about breadth).

Courts reject expert opinions, like Dr. Haeder's, where the "evidence of actual injury impermissibly consists of estimates based on assumptions that are based on estimates and assumptions." *Eleven Line, Inc. v. N. Texas State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000). Recently, in *Earl v. Boeing Co*., the Fifth Circuit rejected a conjoint analysis like Dr. Haeder's because it was based on "unsupportable inferences" and thus amounted to "no plausible theory of economic harm." 53 F.4th 897, 903 (5th Cir. 2022). The same conclusion applies here.

V.      **Dr. Haeder's Model Fails To Consider Supply-Side Factors.**

Dr. Haeder's proposed model cannot be used as a basis for calculating the purported classwide damages because it is based on a single article addressing "average" consumer preferences, with no consideration of supply-side factors that could impact market prices, which are a function of *supply* and demand. At best, his analysis would only measure consumers' willingness to pay for greater network breadth. Consumers' willingness to pay, however, is not the same thing as a difference in value—Plaintiffs' theory of damages. As courts have found,

13

expert damages analyses that measure only consumer preferences cannot determine an actual difference in market price or value.  This is because market price and value are determined by *both* consumer preferences and willingness to pay ("demand-side factors"), *and* a seller's (*i.e.*, Superior's) pricing decisions, and competition between firms ("supply-side factors").  *See* Ex. 2 (ECF 70-2) (Hoyt Decl.) at 5.

Under Texas law, market value is determined by the interaction of *both* supply *and* demand.  *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 521 (5th Cir. 2013) (noting that, under Texas law, "[m]arket value is the amount a willing buyer, who is under no obligation to buy, would pay to a willing seller, who is under no obligation to sell"); *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) (observing that an "offer price does not, alone, tend to establish the property's market value at the time it was made. [An] offer is some evidence of what a willing buyer will pay, but it is not, alone, evidence of what a willing seller will accept").  Evidence that fails to account for both phenomena is not evidence of market value.[12]

For this reason, the court in *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019), applied Texas law and rejected a damages theory based on a conjoint survey of consumer preferences, like Dr. Haeder's model here.  The plaintiffs' expert there used the same approach as the van den Broek-Altenburg article—"asking survey respondents about their relative preferences for certain combinations of product features."  *Id*. at 234.  The court concluded that

---

[12] An additional problem in Dr. Haeder's model is that it does not take account of Superior's policy to make customer whole if they incur out-of-pocket costs to directory inaccuracies.  *See* ECF 63-3 (Diel Dec.) ¶ 5; Ex. 2 (Hoyt Decl.) at 4.  Superior's policy, which Dr. Haeder ignores, mitigates the potential harm that was the focus of the Complaint: customers seeing an out-of-network provider because of an error in the provider directory.  *See, e.g.*, ECF 19 (1st Am. Compl.) ¶ 46.

because the survey measured only consumers' willingness to pay, and not market value, it "d[id] not provide competent proof of Plaintiffs' damages."  *Id*. at 236.

Many other courts have reached similar conclusions.  *See, e.g., In re Volkswagen "Clean Diesel" Prod. Liab. Litig*., 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (rejecting conjoint analysis because it "ignore[d] the 'supply' part of the supply/demand curve"); *Zakaria v. Gerber Prods. Co.*, 2017 WL 9512587, at *17–21 (C.D. Cal. Aug. 9, 2017) (decertifying a damages class because a conjoint analysis that measured only consumer willingness to pay "does not present a reliable method for determination of the price premium" and "does not reflect the actual difference, if any, between the amount paid for [the product] and its value in the market").

Because Dr. Haeder's model does not account for supply-side factors that influence pricing of health insurance, it is not relevant to Plaintiffs' damages theories here and it is therefore inadmissible.  For this reason, too, Dr. Haeder's opinions should be excluded.[13]

## Conclusion

For the foregoing reasons, the Court should exclude Dr. Haeder's opinion.

Dated:  March 1, 2023                              Respectfully submitted,

                                                   WILLIAMS & CONNOLLY LLP

                                                   By:   */s/ Steven M. Cady*
                                                   Steven M. Cady (admitted *pro hac vice*)

---

[13] In his initial report, Dr. Haeder cited two articles which discussed price differences in the health insurance market.  While these authors saw *correlation* between network breadth and prices, neither established a *causal* link between breadth and premiums.  *See* ECF 63-2 (Hoyt Report) at 23–27 (explaining Dr. Haeder's error).  The first article, Dafney, states: "we could not establish a causal effect of changes in [network] breadth on premiums."  ECF 63-6 (Dafney) at 1609 (emphasis added).  That article also states that "the correlations we measured might not reflect a causal relationship between premiums and provider network breadth."  *Id.* at 1610–1611 (emphasis added).  The second article, Polsky, had similar limitations, noting that the "estimated relationship of network size and premiums might have picked up unmeasured and correlated factors" and that "premiums might reflect not only the size of the network but also the quality of the providers in the network."  ECF 63-7 (Polsky) at 1844.

15

680 Maine Avenue SW
Washington, DC 20024
T: (202) 434-5321
F: (202) 434-5029
scady@wc.com

– and –

Lorinda G. Holloway
Texas Bar No. 00798264
Timothy P. Ribelin
Texas Bar No. 24091055
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701-4093
Telephone:  (512) 479-1149
Facsimile:  (512) 479-1101
lorinda.holloway@huschblackwell.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing.

By:   */s/ Steven M. Cady*
Steven M. Cady

16