UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

_____

Erin Angelo, et al.,

      Plaintiffs,

   v.                        Case No.

Centene Management Company,      1:20-cv-00484-RP

LLC, Celtic Insurance Company,

Superior HealthPlan, Inc., and

Centene Company of Texas, L.P.,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF

DR. SIMON F. HAEDER

DATE:       Friday, February 3, 2023

TIME:       9:12 a.m.

LOCATION:   Texas A&M University

              School of Public Health

              212 Adriance Lab Road, Room #SPHA120

              College Station, TX 77843

REPORTED BY:  Cynthia Smith, Notary Public

JOB NO.:    5695547

Page 2

APPEARANCES

ON BEHALF OF PLAINTIFF ERIN ANGELO:

FRANCISCO GUERRA, ESQUIRE

Watts Guerra

4 Dominion Drive, Building 3, Suite 100

San Antonio, TX 78257

fguerra@wattsguerra.com

(210) 447-0500

ON BEHALF OF DEFENDANTS CENTENE MANAGEMENT COMPANY, LLC, CELTIC INSURANCE COMPANY, SUPERIOR HEALTHPLAN, INC., AND CENTENE COMPANY OF TEXAS, L.P.:

STEVEN CADY, ESQUIRE

Williams & Connolly LLP

680 Maine Avenue Southwest

Washington, DC 20024

scady@wc.com

(202) 434-5321

ALSO PRESENT:

Christopher Dolan, Videographer

Page 3

INDEX

EXAMINATION:                                    PAGE
    By Mr. Cady                    5
    By Mr. Guerra                  129


            EXHIBITS
NO.          DESCRIPTION                        PAGE
Exhibit 1    Haeder Expert Report 9/30/22    29
Exhibit 2    Haeder Rebuttal Report 12/30/22   56
Exhibit 3    Patient Preferences for Provider
             Choice by Broek-Altenburg       16
             (Exhibits attached.)


    DOCUMENTS REQUESTED
NO.          DESCRIPTION                        PAGE
1            Back-up for Tables              79

Page 4

PROCEEDINGS

THE REPORTER:  Good morning.  My name is Cynthia Smith; I am the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record.  The time is 9:12 a.m.

This is the deposition of Dr. Simon Haeder taken in the matter of Erin Angelo, et al., vs. Centene Management Company, et al., on February 3, 2023.

I am a notary authorized to take acknowledgments and administer oaths in Texas.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

This proceeding will be recorded via video technology by Christopher Dolan.

Page 5

At this time will everyone in attendance please identify yourself for the record.

MR. GUERRA:  Franc [ph] Guerra, on behalf of the plaintiffs.

MR. CADY:  Steve Cady on behalf of Defendants.

THE REPORTER:  Dr. Haeder, will you please raise your right hand, sir?

WHEREUPON,

SIMON F. HAEDER,

called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  All right, Counsel.  You may proceed.

EXAMINATION

BY MR. CADY:

Q   All right.  Good morning, Dr. Haeder.

A   Good morning.

Q   Will you introduce yourself to the jury, please?

A   Sure.  My name is Dr. Simon Haeder.

Q   Dr. Haeder, are you a medical doctor?

A   No.

Q   Do you have any --

2 (Pages 2 - 5)

Page 6

A    I --

Q    -- medical training?

A    I do not have medical training.

Q    What is your doctorate in?

A    I have a PhD in political science.

Q    Are you a paid witness in this case?

A    Can you explain?

Q    Sure.  Are you being paid to testify today in this case?

A    Yes.  I'm an expert witness.

Q    Who is paying you?

A    I'm paid on behalf of the plaintiffs.  I'm retained by Mr. Guerra's law firm, and a law firm in San Francisco.

Q    Who is -- have you sent bills to those law firms?

A    I have.

Q    And did those law firms write checks to you?

A    Yes.

Q    Which law firm writes a check to you?

A    Both of them.

Q    How much are you being paid to testify today?

A    My hourly rate is $300 per hour.

Q    How much have you billed those law firms for

Page 7

your work on this case?

A    So far, I've billed $36,094.84.

Q    How much have you worked but not yet billed?  So if you have accrued invoices --

A    I have a couple of invoices left here for the last quarter of 2022.

Q    All in, how much to date have you worked and expect to be paid by those law firms?

A    I would guess the amount is about 55 to 60,000 dollars.

Q    Do you have people working for you?

A    I do not.

Q    You've done all of the work to generate both of your reports yourself; is that right?

A    Yes.  That's correct.

Q    Okay.  Those law firms pay you directly to your personal account, or do you have a business that you run this through?

A    It is paid directly to my personal account.  Yes.

Q    Do you -- you've generated two reports in connection with this case; is that right?

A    That is correct.

Q    And your opinions, I take it, from reading the reports -- the opinions that you standby and are

Page 8

advancing in this case are in your rebuttal report; is that correct?

A    Yes.  That's correct.

Q    Okay.  The rebuttal report contains all of the relevant opinions that you're advancing in this case; is that correct?

A    Yes.  That's correct.

Q    Okay.  So there's no need for us to look at your original report today because the original report contains no opinions that you're still advancing that are not covered in your rebuttal report; is that correct?

A    I wouldn't go as far.

Q    Okay.  Tell me how you would --

A    I think, you know, the vast majority of my original report still stands.  I think the importance that I lay out in the original report about network adequacy -- how it -- our network -- providing network -- provider directory accuracy as well as what it means to consumers.  Those items still stand.

The assessment of the provider directories that I was provided by -- by Centene still stand.  The claims data that I was provided by Centene still stands.  The assessment of the inaccuracies still stands.  Those are the things I can think about --

Page 9

about right now.  There might be other items.

But yeah.  I think if -- if I were to think about it, it would be a combination of those two reports -- is where my opinion stands.

Q    In terms of your damages model.

A    Mm-hmm.

Q    Fair to say that the damages model that you support today is entirely contained in your rebuttal report; is that right?

A    I think that's correct to a degree.  I developed a damages model in the original report.  The only thing that was altered in the rebuttal report was the monetization of the damages.  So the development of the inaccuracies and all those kind of things still stand from the original report.  What was altered in the rebuttal report was how to monetize those damages.

Q    Okay.  Want to get into the first rules of the road.  You're an expert witness in this case being paid by law firms representing the plaintiffs; is that right?

A    That's correct.

Q    Okay.  And you know the rules are that all of your opinions need to be written in your expert reports; is that correct?

A    That's my understanding.  Yes.

3 (Pages 6 - 9)

Page 10

Q   I don't want to hear any new opinions today. I want to talk about the opinions that are written in your expert report.  You understand?

A   That is correct.  Thank you.

Q   Okay.  And so you would agree that the legal system requires on experts being truthful and honest with courts and juries; correct?

A   Yes.  Of course.

Q   Okay.  And you know it's important for an expert's credibility to be honest and straightforward about the expert's opinions; right?

A   Of course.

Q   And you know it would be inappropriate for an expert to have -- to shade their views or opinions just because they're being paid by a law firm in a case; is that right?

A   Yes.  Of course.

Q   Okay.  You recognize -- do you agree that jurors are vulnerable to expert witnesses that purport to have expertise in an area.  And so there's this area of danger that jurors could be misled by experts. Do you agree?

A   I'm not an expert on juries.  I've not read any studies on juries, so I don't -- I don't know that that is something I can -- can truthfully answer.

Page 11

That's outside the range of my expertise.

Q   Would you agree that a expert witness that is not straightforward and presents one-sided views could be a danger to the community in which the case is in front of?

MR. GUERRA:  Objection.  Form.

Go ahead, Doctor.

THE WITNESS:  Could you rephrase your question?

BY MR. CADY:

Q   Would you agree that an expert witness that presents a one-sided view could be a danger to the community in which the case is presiding?

MR. GUERRA:  Objection.  Form.

A   You know, I'm not an expert on -- on those subject matters, so I don't know if that's true or not true.  I haven't seen any empirical data on that issue so I don't think I can talk to it.

Q   Would you agree that a good expert is not influenced by the money that he or she is receiving in generating their opinions?

A   Yes.  That's correct.

Q   I want to talk about your damages model. First, I want to talk about what you didn't do in this case.  Can you tell me what were you hired to do in

Page 12

this case so we can figure out what work you didn't do, and we don't have to cover it today.

A   Sure.  I was asked to provide -- provide general background on the importance of providing networks and provider directories for consumers, which is a subject matter I've studied for -- studied for a very long time.  I was asked to analyze the provider directories that I was presented by Centene.

I was asked to analyze the claims data that I was presented by Centene, and I was asked to go to the academic literature and make an assessment of what damages the consumers of Centene in the State of Texas over the claims period -- I think it's 2016 to 2021 -- have occurred.

Q   Okay.  Fair to say that you did not analyze the insurance contract at issue to see if the contract had been breached?

A   I -- I don't recall looking at specific insurance contracts related to this.

Q   Okay.  Do you -- because you didn't look at insurance contracts in this case, I take it -- is it right that you have no view as to whether the insurance contracts in this case were violated?

A   I -- I would assume that is a legal question, and that is outside -- I am not a lawyer so

Page 13

my -- my expertise is related to provider networks and the effect they have on consumers.

Q   Okay.  It's true, though; right?  That you were not asked to look at the insurance contract at issue in this case?

A   That is correct.

Q   Dr. Haeder, were you asked to look at the regulations that govern provider directories in Texas?

A   I -- I was not.

Q   Okay.  I take it then you have no view as to whether the Superior provider directory complies with the regulations that govern that directory in Texas; correct?

A   Can you rephrase, please?

Q   Sure.  Because you were not asked to look at the regulations that govern provider directories in Texas, I take it you have no view as to whether those regulations were complied with by Superior; is that correct?

A   I -- I think that's an appropriate statement.

Q   Dr. Haeder, I've looked through both of the expert reports that you've written in this case and noted that they do not address whether Superior's network is adequate under the regulations; is that

4 (Pages 10 - 13)

Page 14

correct?

A   That is correct.

Q   Okay.  And you're not here to advance some new view that Superior's network is or is not adequate under the regulations; is that correct?

A   That's not a -- a task I was asked to perform.

Q   Okay.  And another task it looks like you were not asked to perform is to analyze whether doctors in Superior's network that did not bill a claim would refuse to see Ambetter members if the member presented themselves for service; is that correct?

A   I think that's correct.

Q   Okay.  Kind of want to talk about areas of focus that you -- things you did do in this case.  I think we have established what you didn't do.  One thing you did do -- and the primary thing you did, I think it's fair to say -- is create a damages model for this lawsuit; is that correct?

A   I wouldn't call it the primary thing.  I think it's also valuable -- the establishment of the provider directories as well as the claims data, because they underlie the inaccuracies which -- which underlie the -- the damages here.

Page 15

Q   Okay.  In terms of your damages model -- the operative model -- the model that you're advancing here today and to the jury -- is the model found in your rebuttal report; correct?

A   That's correct.

Q   Okay.  The rebuttal report damages model -- well, explain in simple terms how the damages model that you're advancing today works.

A   So, as -- as I -- as I laid out earlier, I looked at the provider directories that I was provided by Centene.  I -- I analyzed those.  Then I looked at the claims data that I was provided by Centene.  I basically compared the two.

I looked at which providers in a given year had filed at least one claim, and I determined -- I used that information to determine based on the academic literature at this point -- to determine whether these providers that Centene lists in the provider directory is actively seeing patients.

And then I used that information, again, based on the academic literature, to compare the -- the breadth of the network that was presented by Centene, and the breadth of the network that was actually experienced by consumers.  And then I used the academic literature to put a monetary value on

Page 16

that.

Q   Okay.  Yeah.  When you say you used the academic literature to put monetary value on that, you're referencing, I believe, an article written by Eline van den Broek-Altenburg that assigned a monetary value to a larger network; is that right?

A   Yes.  That is correct.

Q   Okay.  I'd like to mark that article as Exhibit 3.

(Exhibit 3 was marked for identification.)

Dr. Haeder, this is the article that you have reference that you've built your damages model on; is that right?

A   The monetization of it.  Yes.

Q   Okay.  And tell me how -- when you say monetization, explain to the jury what you mean.

A   Yes.  So I established -- prior to monetizing the damages, I established the degree of inaccuracies.  And then the question emerges, how -- how valuable are those inaccuracies?  Or how valuable is the difference to consumers between what they -- what they were able to access and what Centene promised them to access.

And then I used this article which developed

Page 17

the willingness to pay for provider networks breadth to then evaluate or put a number -- a monetary and dollar value on -- on the difference between what was presented and what was actually accessible to patients or consumers.

MR. CADY:  How are we doing on speed?  Are we okay?

THE REPORTER:  Oh, no.  You're okay.  We're good.

MR. CADY:  Oh.

BY MR. CADY:

Q   Can you point me -- well, are there any other articles that you were relying on to build this monetization model that you just discussed?

A   The -- are you referring to the assigning a dollar value to the difference?  Is that what you're specifically referring to?

Q   That's right.

A   Yes.  I'm using their model.  They use a really good methodological approach to establish this -- the value that consumers assign to network breadth.  That's why I rely on it.  Yes.

Q   Okay.  So the entire monetization theory of your damages model is described in this article -- this article by Eline van den Broek-Altenburg; is that

5 (Pages 14 - 17)

Page 18

right?

A   And Adam Atherly. Two -- two authors.

Q   Right. Is that correct?

A   Yes.

Q   Okay. Within this article, explain to the jury -- well, explain to the jury what from this article you're using to build your damages model?

A   Sure. The authors basically use a survey experiment, which is in line -- which would be recommended to establish these kinds of things. They present what's called a discrete choice experiment. Sounds very fancy. But basically they present different insurance plans. Travel to -- the distance to a provider. Premiums. You know?

They present these different information. They alter them slightly, and then they simply ask -- present two choices to the consumer and ask them, "Which one would you pick?"

And they do this a couple of times and then they back out how much people are willing to pay for providers that are in the network, or specifically whether their own provider is in their network. Travel distances. The breadth of provider networks and all those kinds of things.

Q   Would you agree that this experiment was

Page 19

looking to ascertain averages of consumers' preferences?

A   I think that's correct, and that's mostly in line with what academics would do. Yes.

Q   Would you agree that this experiment is a conjoint experiment?

A   I -- I assume that's what they did. Yes.

Q   Well, show me within this article where the actual monetization of the change in network size happens. What's the sentence or the paragraph you're relying upon?

A   Respondents -- this is on page E223. It is the paragraph on the left top that starts, "Holding all -- all other plan attributes constant."

And then if you go down to, "Respondents were willing to pay $72 for a plan that covered 30 percent more doctors in the area. 45 percent -- $45 to get a plan that would get them to see a doctor three days sooner. And $5 to have a doctor covered that would save them ten minutes of travel time."

Q   Okay. I see that sentence on page E223 of the article. And your focus from this article is on the portion of the sentence that says, "Respondents were willing to pay $72 for a plan that covered 30 percent more doctors in their area." Is that correct?

Page 20

A   Yes. They also lay this out on Table 4, which is on page E224. Where they say, "network breadth", in the table, on the "willingness to pay, WTP". Where it says $2.41. And that basically means for a 1 percentage point increase in network breadth, consumers are willing to pay $2.4 in monthly premiums.

Q   Okay. Now I've done the math on this, and I believe -- focusing on the sentence at page E223 -- consumers were given a choice to pay for a network that had 30 percent more doctors and on average they were willing to pay $72 per month for that choice. Is that your understanding of this article?

A   Can you rephrase that? Can you repeat that or rephrase that?

Q   My understanding from this article is that the article gave consumers a choice of a hypothetical insurance plan that had 30 percent more doctors and asked consumers if they were willing to pay 72 more dollars for that choice.

A   So the way it was presented, if you go to -- I don't know if the figure is labeled. But the figure is on page E221. And if you gives an example of how the information was presented. As you can see in the figure, they give you three examples, but they only presented two according to their -- to their write-up.

Page 21

They basically presented plan one, which would be four days, compared to -- to plan two, which had one day. They presented a situation where, for example, 80 percent of doctors were covered compared to 50 percent of doctors were covered.

They set some travel times. They indicated whether their personal doctor would be accepted, and then they presented a monthly premium for that specific plan.

Q   Okay. We're focusing on the chart at page E221 up at the top. And I do see where it looks like in this survey, the surveyors ask consumers about three hypothetical plans. One had what this calls, "80 percent doctors covered." And another had 50 percent doctors covered. Is that correct?

A   That's not correct. What they basically did, as I tried to outline earlier, is people take this survey. They get presented choice A, choice B. That looks something like plan one and plan two. They ask you which one would you pick. Consumers picked -- or respondents in this survey pick one. Then they get presented with a second set of choices.

Those are different from the first set of choices. And as they indicate here at the top of the figure, they varied the wait time between one, four,

6 (Pages 18 - 21)

Page 22

and seven days. They varied the -- the breadth of the provider network between 20, 50, and 80 percent.

They varied the travel time to the closest primary care provider in the network in minutes between 10, 20, and 30 minutes. They indicated -- or they offered choices whether the respondents' personal primary care doctor accepted this care plan as a yes or no. And they offered monthly premiums to the respondent of 320, 360, and 400 dollars.

Q   Okay. It sounds like consumers were presented with different options and were allowed to pick from a hypothetical plan that presented those options; is that right?

A   I think that's correct. Hypothetical, obviously, based on the understanding of what real consumers face in the real world. Because that's how these survey experiments are set up.

Q   Okay. Did you do any work to ascertain whether these hypothetical plans reflect actual plans that are offered to consumers in the marketplace?

A   Can you restate?

Q   Did you do any work to ascertain whether these hypothetical plans referenced in the article are similar to health insurance plans that are actually offered to consumers in the marketplace?

Page 23

A   Did I do specific work to ascertain whether these specific choices were presented? I think -- that is -- I can say no. But based on my work, it seems like that would be reasonable choices to present to consumers.

Obviously when you -- when you purchase an insurance plan, it doesn't tell you how much the wait time is in most cases; right? 'Cause that's when you seek care. But I think it's very much in line with what consumers in -- in their purchasing decisions would face.

Q   Fair to say that when consumers purchase insurance plans, it doesn't tell you, as you said, as to how much time they would take -- the wait time to see a doctor; correct?

A   That's correct.

Q   And fair to say when consumers purchase insurance plans, consumers aren't told the breadth of the doctor network; correct?

MR. GUERRA: Objection. Form.

A   You know, I -- I know that's what Mr. Hoyt alleged in his report, and I know him -- him and I seem to have a very strong disagreement on this matter. As you can see in my rebuttal report, it's specifically laid out that a -- consumers have lots of

Page 24

consumers about provider networks.

It's presented to them in a variety of forms that I laid out in the rebuttal report. It's on, you know, the insurer's website, Healthcare.gov, and the Centers for Medicare & Medicaid Services, as well as the Department of Health and Human Services. I encourage people to look into provider directories to learn about those when they make choices.

The ACA marketplaces, specifically, give you some information about provider networks as I lay out in my report. So consumers do know -- have the choice to know about provider network breadth. It is not something that is -- that would be hidden from them and they don't have access to.

It's actually a -- my understanding is it's a requirement that those -- those types of information be transparently displayed and also that CMS is collecting information from health plans on those issues and makes them available to researchers and everyone else.

Q   Okay. What is the provider network breadth of Superior's Ambetter product?

A   Can you be more specific.

Q   You just told me that consumers -- or you told the jury that consumers know the provider network

Page 25

breadth. I'm asking you what it is.

A   Can you rephrase?

Q   Tell me what you're having trouble with, and I'll help.

A   Well, I don't think your question is specific enough.

Q   Dr. Haeder, my question is, what is the provider network breadth of Superior's Ambetter product -- the product at issue?

A   In the State of Texas?

Q   In the State of Texas.

A   I can't tell you what it is today. I have not gone to the website and -- and looked at it today. It's a new plan year. 2023 is a new plan year. I couldn't tell you off-hand. It's not something that I looked into.

Q   When you wrote your report, did you look at the website to figure out what it was?

A   Yes. I looked at hundreds and hundreds of websites.

Q   What was it when you wrote your report?

A   What was it when I wrote -- wrote my report? I think your question is not specific enough.

Q   Okay.

A   Could you rephrase?

7 (Pages 22 - 25)

Page 26

Q   What was Superior's Ambetter provider network breadth at the time that you wrote your report?

A   I'm not sure I can answer this question right now.

Q   And why not?

A   I don't think that's something that I specifically analyzed.

Q   Okay.

A   At that point in time.

Q   Is there a difference between provider network breadth and network size?

A   Give me a second to think about this. I think the understanding is generally -- although they're being sometimes -- I would assume used interchangeably -- that breadth refers to a percentage, and size, probably, most often refers to a number. But I can see them used interchangeably, and I'm sure I've done it myself.

Q   Well, in your damages model that you're presenting to the jury today, do you use network breadth or network size as an important factor?

A   I use network breadth in the rebuttal report.

Q   Okay. And that's the only damages model

Page 27

you're presenting today, is the one in your rebuttal report; correct?

A   Yes.

Q   Okay. Is there a difference between network size and providers that are available to see customers?

A   Can you restate?

Q   Is there a difference between network size and providers that are available to see customers?

A   I think that's probably true.

Q   Okay. Can you explain that difference?

A   I think there's situations where providers are not able to see patients because their panel is full or they don't have any open appointments. They may be technically in the network, but they are full and can't see any patients. Don't accept any new patients.

Q   I want to go back a second to network breadth. I ask you what Superior's network breadth was at the time you wrote your report, and you couldn't answer that question. I want to ask you -- do you know Superior's network breadth in 2015?

A   That was not part of the data that I analyzed, so I couldn't tell you.

Q   Do you know Superior's network breadth in

Page 28

2016?

A   I cannot tell you the breadth. I can tell you the size. That's in my own original report. I cannot tell you exactly what the breadth would be.

Q   Do you know Superior's network breadth in 2017?

A   The same applies. I cannot tell you the breadth. I can tell you the size.

Q   Do you know Superior's network breadth in 2018?

A   I can tell you the size -- number of providers. And no. I can't tell you -- cannot tell you the breadth.

Q   Do you know Superior's network breadth in 2019?

A   Again, I can tell you the size. I cannot tell you the breadth.

Q   Do you know Superior's network breadth in 2020?

A   I can tell you the size. I cannot tell you the breadth.

Q   Do you know Superior's network breadth in 2021?

A   I can tell you the size. I cannot tell you the breadth.

Page 29

Q   Oh. What is Superior's network size in 2016?

A   If you -- it is Exhibit 1.

    (Exhibit 1 was marked for identification.)

Q   Okay. This is -- tell the jury what Exhibit 1 is?

A   Exhibit 1 is my expert report from September 30, 2022.

Q   Okay.

A   Table one, labeled "The Analysis of Provider Directory Data for 2016", lists the year and the month, and lists the provider directory listings that Centene provided to me.

    I did the analysis to determine how many unique NPI or provider address combinations there are, as well as how many unique NPIs there are. That is for 2016 for each month. And I --

Q   Okay. Tell the jury what page you're on when you're looking at it --

A   This is page 19.

Q   Okay. All right. I see that Dr. Haeder, page 19, is a table covering the year 2016, and you've got some columns here. And you prepared this table on page 19; correct?

8 (Pages 26 - 29)

Page 30

A   Yes -- yes.

Q   Okay.  Where did you get the data to prepare this table on page 19?

A   It was provided to me by counsel for the plaintiffs.

Q   Do you know whether this was data that customers who buy Superior's Ambetter product would have?

A   I do not know.

Q   Okay.  Did you look one way or another whether customers would have this data?

A   Based on my experience, I would know -- I would assume they have access to this data because they have access to provider directories.  And so they would see how many providers there are.  I -- that's one of the sources.  I don't know what else they would have access to.  I wouldn't be able to answer that question.

Q   Okay.  So is it your testimony to the jury that consumers that bought Ambetter's product would have the same information that Superior provided to you in this lawsuit with regard to the number of providers in the directory?

A   Can you restate that for me?

Q   Sure.  Is it -- well, let me frame it

Page 31

differently.  Do you know whether customers have this same data when they buy that Ambetter policy?

A   I know -- I don't know that consumers have access by law to a -- a provider directory.  And I assume all these providers are listed in the provider directory, so they would have that information.

Q   Do you know whether customers are presented with a account of how many providers are in a directory?

A   I don't have that answer.  I was unfortunately not provided -- by the provider directory that Centene produces for its consumers.

Q   Okay.  Say that again.  You were not provided with a copy of the provider directory that Superior provides to its Ambetter members; is that correct?

A   My understanding is that you did not provide this.  Yes.  Or Centene, your clients, did not provide this to -- for any of the years in question.

Q   Okay.  Do you know whether Superior makes its provider directory available on their website?

A   I've seen the Superior provider directories for several of their plans.  I've not -- I cannot go back in time so I don't know when they would provide this.  But when they have provided -- I know by law

Page 32

they have to provide it to consumers.

I was surprised then when I tried to look in -- in December that it was not provided.  Most other health plans that I've looked at do provide it directly and easily.

Q   Okay.  You're saying you had trouble finding Superior's Ambetter provider directory on the website?

A   At -- at the end of '22.

Q   Okay.  I don't understand your answer to that.  You looked at the end of 2022, and had trouble finding Superior's provider directory on the website?

A   The specific printout for 2022.  I could not locate it.

Q   Okay.  When you say specific printout for 2022, what do you mean, sir?

A   It's my understanding that depending, probably, on what regulatory environment and what state, you have to produce a written PDF copy, or printed copy, of the list of the providers that you claim -- or the insurance company claims is in their network and provide those to the consumers, and provide that on the website.

Q   Okay.  And you're saying you could not find for Superior's Ambetter product a printed directory of all providers in its network; is that right?

Page 33

A   In December of 2022, I could not.

Q   Do you know whether Superior's Ambetter customers were presented or were provided a printed copy of its provider directory?

A   I do not know.

Q   Does it change your opinion at all, one way or another, whether Superior's Ambetter customers are provided a copy of its provider directory?

A   I -- I don't think that's necessarily the case.  I think there's many other ways that consumers can get information about the breadth of the provider network -- or I should say the size of the provider network in many cases -- because they can use find -- I think it's called find -- find care.

I think it's what's specifically labeled on the -- on the Ambetter website to Google -- or not -- Google is not the right word -- to search for providers on the Ambetter search function.  It's called a provider online directory.  And the provider online directory would also provide the information.

More up to date, I assume, because Ambetter probably -- I don't know what the updating cycle is, but my understanding would be that it probably -- every few days -- every few weeks it would update the online version.

9 (Pages 30 - 33)

Page 34

Q   We were talking about how many providers are in Superior's Ambetter network in 2016, and you pointed me to this chart you created on page 19 of your original report.

A   Yes. I wish you would've let me finish.

Q   Go ahead.

A   I think, you know, Table 1 is -- is what I -- I analyzed as the provider directory data provided by Centene -- what I assume they post on their website. What I assume they post on paper directories that I -- that I referenced.

If you look at page 39 of the same document, Table 12, "The Analysis of the Accuracy of Provider Directory Listing in 2016". I think both tables ought to be read -- read together. As you can see here, the second column -- any practitioners, if you can see it -- translates over from Table 1 into Table 12.

And then as you know -- you've read the reports, I assume -- I conduct an analysis, which -- which I -- which was developed to address the assessment of provider networks in past years and apply it here.

And so table -- sorry -- page -- Table 12 on page 39 indicates then, using this analysis, which percentage of provider -- providers were actually

Page 35

available to consumers based on the claims data analysis.

Q   Do you know how many providers were in Superior's Ambetter network in 2017?

A   That would on page 20 of my report. Table 2, "Analysis of Provider Directory Data for 2017." Again, that's the starting point. It indicates for all the months that I had available, which are all for 2017. The number of provider directory listings. Unique NPI addresses.

As you can see, there's lots of duplicates, and then the unique NPIs. So unique providers listed in that directory.

Q   And where did you get the data that you used to create this table?

A   It was also provided to me by the counsel for the plaintiffs.

Q   Do you know whether customers who purchase Superior's Ambetter health insurance product have access to that data at the time they purchase the product?

A   Do I know this for certain? If it's years in -- in the past, I don't think I can directly speak to it. My assumption would be that this is the underlying data that gets posted on their website.

Page 36

And also the underlying data for their printed provider directories, or online PDF directories.

Q   Do you know whether customers are told -- strike that. Dr. Haeder, I know that provider count for each of these years -- 2016, 2017 -- I'm looking ahead to 2018, '19, '20, '21 -- changes from month to month. Is that correct, sir?

A   That's my understanding. I didn't specifically count but obviously, you know, the numbers are not static from month to month. Yes.

Q   Do you know why the number of providers in Superior's Ambetter directory changes from month to month?

MR. GUERRA: Objection. Form.

A   I think that would be a question for Centene, not for me.

Q   Do you know whether consumers are told how many providers are in the Superior Ambetter network?

A   My understanding is that -- and I'm sure you're referring the report that Centene or Ambetter or Superior HealthPlan specifically advertises. That -- I think the latest number they had was 90,000 providers in the provider network.

It's also in a indirect way presented, obviously, when you use the search for provider

Page 37

network function. I think it's called find care, as I -- I alluded to previously. And that -- that -- those would be numerous ways to find those numbers.

Q   Let's focus on the online directory.

A   Mm-hmm.

Q   Are you telling the jury that through the online directory, consumers are told how many providers are in Superior's Ambetter network?

A   The way the online provider directory works is you search for providers and you can basically -- you put in primary care providers or providers. It spits back. You put in an address. For example, zip code -- county, I think is on -- on Ambetter's website, and it spits back a list of providers to you.

Q   Okay. So that didn't quite answer my question. My question to you is, do you know whether Superior's Ambetter customers are told how many providers are in the Ambetter network through that online directory?

A   I don't think I can answer that question. I don't think I have the information to answer that question.

Q   Okay. Have you seen any place in the Superior Ambetter directory where consumers are told

10 (Pages 34 - 37)

Page 38

how many providers are in a directory at any one time?

A   Could you tell me when you refer to directory, what specifically you're referring to?

Q   Sure.  The Superior's Ambetter online provider directory.

A   To my understanding, it is not specifically listed.  You would put it in the search function, and it provides you with the number of providers.

Q   Okay.  Is it your testimony to the jury that even though consumers are not told how many providers are in the provider search engine, that consumers could figure it out on their own?

MR. GUERRA:  Objection.  Form.

A   I don't think I have enough information to make that assessment.  My understanding would be that it's quite possible, but I -- I can't speak -- I don't have -- I haven't done any research on this issue, so I don't think I can speak to it.

Q   Did you try to figure out on your own -- without regard to the information that the lawyers here in this case provided you, but just find out on your own through Superior's Ambetter website -- how many providers are in the Ambetter directory?

A   I have used the Ambetter website in multiple states for research projects.  I don't -- I have not

Page 39

specifically used it to determine the network size in this case.

Q   Did you try and do that, or is that not work that you undertook in this case?

A   Did I -- can you rephrase?

Q   Sure.  Did you try to figure out, through Superior's Ambetter online directory, how many providers are in the Ambetter network?

A   I did not.

Q   Do you know whether that's information that Ambetter customers could figure out on their own through the Ambetter provider directory online?

A   Do -- do I know?  I imagine they could.  Do I -- have I tested this myself?  No.  I've looked at a lot of the -- specifically to this case?  No.  But I've looked at a lot of online provider directories.  It provides you a number of providers in the -- in the provider -- in the -- in the networks after you put in the search.  So I would say it's possible.

Q   Normally I wouldn't want you to speculate, but would you tell the jury how -- you said you imagine it's possible for an Ambetter customer to figure this out through the search engine.  Can you tell the jury what you're imagining, and how would they do that?

Page 40

A   They would go search for a provider.  It would tell them how many providers -- put in a provider and it would tell them how many providers.  If there's a -- it lists specific providers as well as the number of providers.

Q   And you have to enter a zip code when you search in the online provider search engine; right?

A   I'm not exactly sure what Ambetter does.  Different insurance companies do it quite differently.  I can't remember off the top of my head what -- what Ambetter does on their website.

Q   Okay.  Well, walk me through the -- you were imagining how a consumer might do this.  And you would enter in a type of provider.  Is that where you started?

A   It -- I cannot specifically off the top of my head what you have to do with the Ambetter website.  But you can hit the -- I don't know if you can directly hit the search button or whether you need to specifically type in a type of provider, but that's usually how it goes, and that's how we do it for our research.

Q   Would it change your opinions that you're presenting to the jury at all whether you could just hit the search button, or whether you had to type in a

Page 41

criteria to see results in the provider directory?

A   I don't think it would.

Q   Okay.  Why is that?

A   The -- it's a question I need to think about some more I think.  I -- I'm not 100 percent sure, as I said, how Ambetter does it.  Yeah.  I don't -- I don't -- I don't know that I have a good answer on this question.  I'd have to -- I think I'd have to do some more thinking about it.

Q   Would it change your opinion that you're presenting to the jury at all whether consumers knew how many providers were in the Ambetter provider network?

A   Can -- can you say that again?

Q   Sure.  Does it change your opinion that you're presenting to the jury at all whether consumers know or don't know how many providers are in the Ambetter network?

A   I'm not sure that it would.

Q   Okay.  Why is that?

A   My understanding, and the way my analysis was conducted, is that consumers pay for a certain product.  In this case, an insurance product presented by Ambetter.  Ambetter presents a certain amount of value to consumers, and consumers assume that they can

11 (Pages 38 - 41)

Page 42

access this value.

We know that consumers value broader networks compared to narrow networks. I think that's well-established in the literature. What they purchase is based on my analysis here, and not what the actual value of the product is. And so the value of the product I actually purchase is lower and should probably be adjusted downward.

Q    Okay. Would it change the opinions you're presenting to the jury at all whether consumers know or don't know Superior's Ambetter network breadth?

A    I think the answer would be analogous. The damage is established as a product that was sold, and the product is not as valuable as -- as the one that it was priced for, based on my analysis of the claims data.

The product is not as valuable as that's what it was sold for. And so my understanding would be that the downward adjustment would still be applicable.

Q    Okay. When you say "what it was sold for", would you tell the jury what you mean?

A    The premiums that insurance -- I mean, consumers paid on the marketplaces to obtain the coverage.

Page 43

Q    Okay. Does it change your analysis at all whether consumers knew the Ambetter network breadth when they decided to purchase the Ambetter product?

A    Say that -- could you repeat that?

Q    Does it change the opinions you're presenting to the jury today at all whether consumers know or don't know the Ambetter network breadth when they purchase the Ambetter health insurance product?

A    You know, I -- I thought about this a lot, obviously. Academically, not just, you know, for the purpose of this -- this court case. I think that consumers -- as I mentioned before -- and as mentioned in the paper and several other papers that try to establish how much consumers are willing to pay for broader networks -- consumers value broader networks.

They're willing to pay for broader networks. There's a strong association between broader networks and narrower networks on the ACA marketplaces.

And so my understanding would be that consumers who purchased these products and then don't get the full value of the product they purchased, the premium should've been adjusted downward, and they still didn't get quite the value that they purchased.

Q    In this case we're talking -- there's a certain period of years that are applicable in this

Page 44

case. Are you aware of that, sir?

A    My understanding is that it's 2016 through 2021.

Q    Well, all of the -- my questions that I'll ask today relate to those years unless I indicate otherwise. Do you understand that?

A    Yes.

Q    And all of the answers that you've provided so far today -- are they applicable to those damages years at issue here, 2016, to 2021?

A    Yes.

Q    Dr. Haeder, do you know whether consumers are presented with options when purchasing the Ambetter health insurance product, to pay more for a larger network?

A    My understanding is that when people purchase policies in the ACA marketplaces, they get a select choice of plans offered to them. Different carriers. Different levels of insurance coverage or actual value. Different deductibles. Different premiums. Different networks. And they get to select among those.

I cannot specifically tell you which plans Ambetter specifically offers at any point in time. I'd have to go, you know, look at the data.

Page 45

Q    You know that the Ambetter health insurance plan is an Affordable Care Act insurance plan; right?

A    Ambetter policies. I -- it's one of -- I -- I am not sure they sell on any other markets, but they for sure sell on the ACA marketplaces.

Q    And you know that the ACA marketplace is an online shopping website run by the government through which consumer, or customers, can purchase different ACA health insurance plans; right?

A    Yes. That's correct.

Q    You know that customers have different preferences which is probably why one customer purchases one plan, and another purchases another plan; right?

A    I think that's a general statement. Consumers -- everyone has different preferences. I know that's a -- that's a fair statement to make.

Q    Is it fair to say that some customers would value a larger network more than other customers?

MR. GUERRA: Objection. Form.

A    I don't think I can speak to that, 'cause I don't think I have seen an empirical study that specifically answers that question.

Q    Have you seen any studies that suggests otherwise? That all customers would value a network

12 (Pages 42 - 45)

Page 46

size similarly?

A   I don't think that -- that I have.

Q   Let's talk about regulations.  You know that the Affordable Care Act market is highly regulated; correct?

A   I -- I think that's the case.  That's a fair statement.

Q   Are you a lawyer, sir?

A   I'm not a lawyer.  No.

Q   Are you familiar with the regulations that govern the Affordable Care Act health insurance products?

A   I would say I'm certainly not familiar with all of them.  I have written about some of them.  I know some of them.  But I'm not a lawyer, as you -- you rightfully pointed out.

Q   You would agree, would you not, that Superior Ambetter products should follow the regulations that apply to it; correct?

A   I would imagine.  That's correct.  Yes.  Everybody should follow the regulations that apply to them.

Q   You would agree that to the extent that your opinions advocate for a position that would violate the regulations, obviously, your opinions should be

Page 47

ignored and the regulations should be followed; correct?

A   Can you restate?

Q   You agree, sir, do you not, that if your opinions would advocate for a position that violates the regulations, your opinion should be ignored and the regulation should be followed?

A   I think that's probably a fair statement, although I'm not sure that I'm speaking directly to regulations because I'm not a lawyer.

Q   Did you do any work to ascertain or understand whether your opinions would advocate for a position that violates regulations that apply to the Affordable Care Act health insurance plans?

A   I did not.

Q   Do you know whether regulations that apply to affordable health -- strike that.  Do you know whether regulations that apply to affordable health insurance plans require that all contracted providers be listed in provider directories?

MR. GUERRA:  Objection.  Form.

A   I don't think I can answer that question.

Q   Why not?

A   'Cause I don't think I have the legal background to make a statement in that regard.

Page 48

Q   Dr. Haeder, is it true that you advocate for a position in this case that would have Superior's Ambetter health insurance plan delete from its directory providers that are under contract for the Ambetter health insurance plan?

A   I don't think it's fair to say that I would advocate.  The analysis that I conducted -- we're trying to assess -- to establish which providers in Ambetter's provider directories are actually seeing patients.

Which means, which ones are actively accessible to patients.  And to do so, I relied on a -- a method that's been presented in academic literature.

Q   And you go one step further than that, and you advocate -- is it correct -- that Superior should delete from its directory providers who did not bill a claim in the last 12 months; is that right?

A   Again, I would say I'm not advocating.  My analysis presented in the report presents a retrospective analysis to assess which providers listed in Ambetter's provider directory are likely to be not in -- in-network and -- or actively have not seen any patients and are thus likely not in-network.

Q   Are you presenting a view to the jury, one

Page 49

way or another today, whether providers should be deleted from Superior's Ambetter directory is they did not bill a claim in the last 12 months?

A   I'm not advocating.  Again, my understanding would be that provider directories are a source of information to consumers.  They should be accurate.  Consumers should know who they can go to for a variety of reasons when they make choices about health plans as well as when they make choices about healthcare decisions.

I think it should be accurate.  And so my -- the position that I hold, and I'm sure would be -- although I'm not a lawyer -- in line with the legal -- the legal requirements -- is that if -- if a provider is -- is not in-network, it should be deleted.

Q   Okay.  My question to you is if the provider is in-network, should that provider be listed in the Ambetter directory?

A   If a provider is in-network and accessible to patients -- let me rephrase.  I think patients should know whether providers are in their network and whether they're actively accessible to them when they need medical care.

Q   Okay.  Do you agree that Superior should list in its Ambetter directory all providers that are

13 (Pages 46 - 49)

Page 50

under contract for Ambetter?

MR. GUERRA: Objection. Form.

A   Can you restate that question?

MR. CADY: Do you -- what specifically is the objection?

MR. GUERRA: Okay. Lack of foundation. Calls for legal conclusion. Assumes facts not in evidence.

BY MR. CADY:

Q   Do you agree that Superior should list in its Ambetter directory all providers that are under contract for Ambetter?

MR. GUERRA: Objection. Form.

A   Are you asking me on a legal opinion? Because that I cannot provide.

Q   Okay. Do you have a view that you're presenting to the jury, one way or another today, as to whether Superior should list in its Ambetter directory all providers that are under contract for Ambetter?

MR. GUERRA: Objection. Form.

A   I -- that seems to me to be a legal question that I'm not --

Q   Okay. Are you advocating that Superior should delete from its directory any provider that is

Page 51

under contract for Ambetter?

MR. GUERRA: Objection. Form.

A   As I stated previously, I would say Ambetter should delete providers from its directory that are not part of the -- part of its network.

Q   Okay. How do you define whether a provider is part of a health plan's network?

A   Oh. That's a very good question. For -- I think there's multiple perspectives here. I don't think I can fully speak to it because I'm not a -- a legal expert. I'm not a lawyer.

Q   You know that one way to know whether a provider is in a health plan's network is whether they're under contract with that health plan; correct?

A   That is certainly the approach that has been presented by Mr. Hoyt.

Q   You're not advocating to the jury today that any providers that are under contract with Ambetter be deleted from the Ambetter directory; are you?

MR. GUERRA: Objection. Form.

A   I don't think I'm advocating on anything specifically.

Q   Okay. I'm not sure that answered my question. Let me ask it a little bit differently. Is it your opinion that Ambetter should delete from its

Page 52

directory any providers that are under contract with Ambetter?

MR. GUERRA: Objection. Form.

A   I think that's also a legal question that I cannot speak to.

Q   Okay. So you're not presenting to the jury one way or another a view on that question; is that correct?

A   I believe that would be a legal question to answer, and it's not really in line with the -- the things that I was asked to assess in my report.

Q   Do you know -- strike that. Your report analyzes and looks to find out which providers have not billed a claim in the last 12 months; is that correct?

A   For a respective year? Yes.

Q   That's right. For any -- for each respective year, your report tried to analyze and find providers that did not bill a claim in the prior 12 months; is that correct?

A   That's correct.

Q   Are you advocating that providers for each respective year that did not bill a claim in the proceeding 12 months be deleted from Superior's Ambetter directory?

Page 53

A   I don't think I'm advocating.

Q   Do you know of any -- well, strike that. I assume, sir, that you've studied health plans outside of Superior. You're familiar with other health plans as well?

A   Yes. That's correct.

Q   Do you know of any health plan anywhere in the country that deletes from its directory providers that did not bill a claim in any given year, but didn't bill a claim in the prior 12 months from that year?

A   I don't think I can speak to it. I would certainly say that health plans have no incentive to delete anyone from the provider directories.

Q   Let me ask that question again. Do you know of any health plan anywhere in the United States that deletes from its directory providers that did not bill a claim in the proceeding 12 months?

A   I -- not to my knowledge. I can't speak to that.

Q   Are you here advocating to the jury today that Superior's Ambetter health plan should delete from its directory providers that did not bill a claim --

A   That's --

14 (Pages 50 - 53)

Page 54

Q   -- from the proceeding 12 months?

A   That's not part of the analysis I was asked to conduct, so I'm not speaking to that, and I'm not advocating anything.  My analysis focused on assessing, most likely, which providers were in-network using the established method -- method, and the papers that I cite.  And those are the results.

Q   I think we established a bit earlier that one way to know whether a provider is in-network is whether they have a contract with the health plan; correct?

A   I'm not sure we established this.  But yes. Mr. Hoyt has established that in his report.  Yes.

Q   Do you disagree with the notion that one way to know whether a provider is in-network is whether they have a contract with the health plan?

A   I would assume that having a contract with the health plan is a prerequisite.  I wouldn't say it's -- it's a minimum requirement for that to be in place.

Q   Can you tell me what it means to be in-network with a health plan?

A   Are you asking me as a legal definition or asking me as my professional opinion as a health services researcher?

Page 55

Q   Well, I'm asking you if you know.  Can you tell the jury what it means to be in-network with a health plan?

A   My understanding of a provider that is in-network is a provider that has established a contractual relationship with a managed care organization and is willing to accept patients from that insurance company or insurance carrier to treat them for medical services.

MR. GUERRA:  Whenever you're at a breaking point --

MR. CADY:  Well, why don't we go off the record at 11:15 a.m. [sic]?

THE VIDEOGRAPHER:  All parties agree with going off the record?

MR. CADY:  Okay.

THE VIDEOGRAPHER:  We are going off the record at 10:15 a.m.

(Off the record.)

THE VIDEOGRAPHER:  We are now going back on the record at 10:26 a.m.

BY MR. CADY:

Q   Dr. Haeder, the damages model that you're presenting to the jury today is captured in your rebuttal report; is that correct?

Page 56

A   Yes.  That's correct.

Q   And we've marked that as Exhibit 2.

(Exhibit 2 was marked for identification.)

We've put it in front of you, sir.

A   Yes.

Q   I'd like you talk us through the monetization, I think, as you called it, damages that you've outlined in your report.  I believe, sir, that starts at page 49 or so of your rebuttal report; is that right?

A   I think 48.  The bottom of 48 into 49.  Yes.

Q   Okay.  Just at a high level, will you explain to the jury how you calculate damages in this case?

A   Yes.  I'd be happy to.  As you may remember, I used the provider directory data provided by Centene as the starting point.  And I basically looked at the number of providers -- actually, let me rephrase this. I was -- the data I was provided by Centene -- as we've established earlier -- provides information on the size of the network.

It does not provide information on the breadth of the network.  And there is no easy way for me, without additional data from Centene, and

Page 57

potentially other sources, to establish the breadth of the network.

So the approach that I take here is I use data from national studies that say, basically, the average plan in the ACA marketplaces has a breadth of this many providers.  And then I also look at examples where the network breadth is very narrow.  So I provide you a range, as I'm sure you know, because you read the report.

So I'm using -- because I don't have the detailed information on Centene's network, I'm using Centene -- I'm giving them an -- an average network, and I'm giving them a very, very narrow network.

And what I do then is I look at these networks in the different parts of the state, and I look at the local inaccuracies that I've established using the comparison between provider directories and claims data.

And basically if I look at a network, say, that is -- I -- I can't remember exactly what I used for the national average, but say it's 50 percent, and the inaccuracy or -- in -- in my findings using claims data and provider directories, I found that 50 percent of those providers were not actively seeing patients. Then I look at the difference between 50

15 (Pages 54 - 57)

Page 58

percent of providers and 25 percent of providers, and as you know -- as we discussed earlier from the article from the American Journal of Managed Care, a percentage-point increase is valued at $2.41.

That gives me the monetary value for those differences. Basically go around, look where individuals live, collect those differences, add them all together -- add them all together on a yearly basis -- add them all together globally for the -- for the period from 2016 to 2021.

Q   Okay. For the monetization component of that, we're looking, again, at this article we've marked as Exhibit 3, by these two authors. And that article is titled Patient Preferences for Provider Choice, a Discrete Choice Experiment; is that correct?

A   Let me get to -- yeah. That seems to be the title. Yes.

Q   Okay. Yeah. And you'll agree, sir, that this article does not undertake that same exercise you just described to figure out which providers are billing claims, and not billing claims, and delete providers that are not billing claims from the network breadth analysis; correct?

A   That's correct. All they provide us is basically with a number from the economics

Page 59

literature -- cost-benefit analysis kind of literature about willingness to pay, like, WTP, what it's called. What are people willing to pay for broader networks.

And so I used methods from additional papers that I cite in the -- in the rebuttal report to reference the provider directory to claims data analysis. And then I used this -- this number to establish the monetary value of the breadth of networks.

Q   Okay. In this article -- this article, though, does not do that analysis you just described; is that right?

A   No. It is not the task of the article. It simply establishes the value consumers assign to breadth of network. As well, as -- as you know from our earlier discussion, additional variables.

Q   Okay. And fair to say you're combining a couple of different concepts to get the result that you're advocating to the jury in this case; correct?

A   I wouldn't say combining a bunch of different concepts is the right approach this is. I used economic peer-reviewed literature to establish inaccuracies. That's the first step. And then I used peer-reviewed literature to establish the value of those inaccuracies to consumers.

Page 60

Q   Okay. This article, when it presents network breadth, it offers two options. One is a network with 80 percent of doctors covered, or the second option is 50 percent of doctors covered. It is not conveying to the consumer which portion of those doctors are actively seeing a patient within the last 12 months; is that right?

A   That's my understanding. Yes.

Q   Okay.

A   Simply presented with the percentage of providers that are allegedly in their -- in their hypothetical choice of plans. Yes.

Q   Okay. And so what you've done is you've taken this article and you've added the concept of deleting doctors that did not bill a claim within the last 12 months; is that right?

A   I -- I wouldn't say I'm adding a concept. I'm using two different -- I -- I'm analyzing two different things, I would say. As I've mentioned previously, I'm establishing the inaccuracies based on the methods in the articles that I cite in my -- in my reports.

And then I use this to assign a monetary value, which is quite common -- cost-benefit analysis and everything else that is related to the literature.

Page 61

Q   You would agree, sir, that there are no damages in this case if it is wrong that providers should be deleted from a provider directory, if they did not bill a claim in the last 12 months; correct?

MR. GUERRA: Objection. Form.

A   That's a convoluted question. Would you mind just restating?

Q   Would you agree that there are no damages in this case if it is wrong that providers should be deleted from a provider directory, if they did not bill a claim in the last 12 months; correct?

MR. GUERRA: Objection. Form.

A   I'm still not quite sure I understand your question. Would you mind splitting it? It seems to me there's multiple questions in here. Would you mind splitting it up for me?

Q   Sure. I think you told me you're not advocating --

A   No. I'm not advocating. No.

Q   And you're not telling the jury that Superior's Ambetter directory should not include doctors that didn't bill a claim in the last 12 months; is that right?

A   I'm not advocating. I'm simply assessing. Comparing provider directories to claims data based on

16 (Pages 58 - 61)

Page 62

academic methods. Yes.

Q It is not your position that Superior's Ambetter directory should not include providers that did not bill a claim in the last 12 months; correct?

A That's a lot of negatives in there. Can you restate that again?

Q Is it your position that Superior's Ambetter directory should not include providers that did not bill a claim in the prior 12 months?

A I don't think I can speak to that. It's not something that I was asked to evaluate.

Q Okay. I know you've told me you're not advocating for that, but let me just ask you directly. Again, are you advocating that Superior's Ambetter directory not include providers that did not bill a claim in the prior 12 months?

MR. GUERRA: Objection. Form.

A I -- I don't think I'm advocating. I was asked to do an analysis about what likely providers were in-network at the time of 2016 through '21, compared to the provider directories. No.

Q Would you agree that if Superior's Ambetter directory includes all providers that are under contract with Ambetter, that there are no damages in this case?

Page 63

MR. GUERRA: Objection. Form.

A Could you define what you mean by under contract?

Q Sure. You're aware that health plants contract with providers, like doctors?

A Mm-hmm.

Q Medical doctors? To perform services for health plan members; right?

A Mm-hmm.

Q And those --

A Yes. Sorry. I wanted to make sure you had a verbal answer.

Q And those contracts are often called preferred provider agreements, or a network agreement; correct?

A I'm not sure that that is the case, but okay.

Q Do you agree that Ambetter should list in its directory all providers that it has a network contract with?

A I'm not sure I can speak to that.

Q Okay. Why not?

A That seems to me a question that's outside the reach of my expert report.

Q Okay. Do you agree that if the answer to

Page 64

that question is yes, that then there are no damages in this case?

MR. GUERRA: Objection. Form.

A Again, that's not something I was asked to evaluate, so I don't think I can speak about hypotheticals related to it.

Q Okay. Let's turn back to page 50 of your rebuttal report.

A Which is -- what exhibit is that?

Q That's Exhibit No. 2.

A Okay. And what page did you --

Q Page 50.

A Okay. What table are you referring to?

Q I'm looking at the -- let's look at the top table. And this has -- this is called Table 2.

A Mm-hmm.

Q And sir, did you prepare this table?

A Yes. I did.

Q Okay. I want to try and understand where these numbers come from. There's, it looks like, four columns in this table. First is year. I think I understand that. And then the second, third, and fourth are network, breadth, and it has different assumptions.

A Sure.

Page 65

Q Is that right?

A That's correct. Yes.

Q Okay. And is that because you don't know what the network breadth for Superior's Ambetter product is in Texas; correct?

A That's correct, because I was not provided sufficient data to establish that reliably.

Q Okay. If you don't know the network breadth for Superior's Ambetter product in Texas, is it fair to assume that customer don't know either?

MR. GUERRA: Objection. Form.

A I don't think I can speak for customers.

Q Does it change your opinions that you're presenting to this jury at all whether customers know Superior's Ambetter network breadth?

A My understanding, or my -- my opinion is that customers of Superior bought a certain product with a certain network attached to it, or a certain number of providers attached to it. The actual number of providers that are seeing Ambetter customers is substantially lower, as you read from my report, than the ones that are listed in provider directories.

My understanding from the academic literature is that that's an -- an appropriate way to assess true provider network size in -- in past years.

17 (Pages 62 - 65)

Page 66

And so the value that consumers receive for the premiums they pay, whether they knew about it or not, is lower than the value they actually received.

Q   Okay.  You're not telling this jury, sir, are you, that consumers knew network breadth and made a willingness to pay decision based on that information, are you?

MR. GUERRA:  Objection.  Form.

A   I don't think I can -- as -- as previously -- I don't think I can speak for consumers.

Q   You're not telling this jury, are you, sir, that consumers knew how many providers were in the Ambetter network, and made a willingness to pay decision based on that information, are you?

A   I don't think I can speak for consumers.

Q   Okay.  Are you telling the jury that consumers did know Superior's network breadth?

MR. GUERRA:  Objection.  Form.

A   That's also -- I cannot speak to.

Q   Are you telling this jury that consumers did know Superior's Ambetter network size?

MR. GUERRA:  Objection.  Form.

A   Size as defined by the number of providers?  I cannot speak to.

Q   Well, walk me through on page 50, how you

Page 67

get the numbers here.  And maybe --

A   What table are you referring to?

Q   Dr. Haeder, you tell me.  I'm thinking the right way to do this is at Table 3, because the number of people enrolled in the Ambetter product is a critical component.  But tell me if I'm wrong.

A   Yes.  It obviously matters, because the damages were established for the number of enrollees at that premium.  So obviously that's important.

Q   Okay.  Will you tell me how the math works -- and maybe the right way to do this is just the first line at Table 3, which is 2016 -- it looks like the third month.

A   Yes.  March.  That's the first month I was provided by Centene.

Q   Okay.  And how does the math work to get these various numbers generated?

A   Sure.  I was provided information by Centene about the individual premiums paid, as well as the location of the individual premium payers.  Maybe we should take a step back, because you seem unclear on -- on Table 3.  Maybe we should cover that so you fully follow here.

On Table -- Table 2, titled, "Yearly and Total Estimates for Damages Under Various Assumptions

Page 68

of Network Breadth for Superior HealthPlan", as you rightly stated, there are four columns.  The first column indicates the year.  And we had this discussion a little bit earlier.

Because I was not provided enough information by Superior to assess the true network breadth, I had to make some assumptions.  The assumptions I described earlier -- at the very right-hand side here where the network breadth is 50 percent -- 53 percent -- that is the average network sold across the United States on ACA marketplaces.

The average network size.  53 percent of providers are contained in the average plan across the United States.  So it's a conservative approach; right?  I could assume -- I don't know -- Centene has the broadest network ever.  You know?

They're stating clearly, as you see, I think, on their -- on their -- on their website, just the facts, that they have 90,000 providers and that one of their -- you know, broad network.  Lots of providers.  All those kinds of things; right?

So I'm making a conservative estimate where I'm saying, basically, if Centene was just the average plan across the entire United States, what would this look like?  What would the damages look like?  And

Page 69

then I go a step in the conservative direction.  I walk one standard deviation.  I walk a step backwards.

And I assume simply, let's assume Centene just has a narrower network than most plans.  Let's just assume this; right?  Narrower.  I don't know.  Could be.  Likely.  Conservative approach.  And then let's take a further step back and just assume they're one of the narrowest -- most narrow networks present in the entire country.

In this -- the 9 percent -- so 9 percent.  Only 9 percent of providers would be in these networks.  Let's just do this.  So these are the assumptions.  That's my range.  I don't have the full answer.

I find them to be conservative assumptions because, especially on the left-hand when we get to the 9 percent, the vast -- vast majority of plans in the United States sold in the ACA marketplaces would be broader than what Centene -- what I assume for Centene to have.  Did you follow me so far?

Q   Understood.

A   Very good.  Then the question is how do I apply it?  As I alluded earlier, I establish the inaccuracies based on the method I previously described to you a couple of times, comparing provider

18 (Pages 66 - 69)

Page 70

directory entries to claims data.

Okay. So that's -- that's established. And so I know on a regional basis -- on a rating area basis, if you will, how inaccurate provider directories are for that specific region; right? That's established. And so let's assume for example's sake here that in region A, accuracy is 50 percent.

So let's say Centene said there's 100 providers. Claims data analysis showed there's only 50 providers; right? At the 9 percent, that would mean -- I assume they had 9 percent, but in reality they only have 4 and a half percent. That establishes, then, that specifically. I do this for all the regions in the state.

I look where people live, and then I adjust the premiums accordingly by multiplying the difference for these enrolled people in the different rating areas by 2.41 for each percentage point difference. Does that -- does that make it clear?

Q   Yeah. That is clear. Thank you.

A   Very good.

Q   Do I understand correctly that the damages model that -- well, are you advocating this damages model to the jury today?

MR. GUERRA:  Objection.  Form.

Page 71

A   I don't think I'm advocating anything, based on my -- again -- again, on my expertise. I think this is an appropriate way to determine damages based on the data that are on hand -- data that's available. And I think it makes reasonable sense. Yes.

Q   Okay. Is damages the word you would use, or is there another word you're more comfortable with?

A   I think damages is appropriate. My understanding is that people paid a premium for a certain value. The value was not what it was supposed to be. It was lower because in all cases that I analyzed, provider networks had fewer providers than using claims data analysis -- or fewer providers than listed in provider networks.

So the value is lower than what they actually purchased, and so I think it's fair to just define the difference between the value one obtains and the value one thought -- one -- one paid for as a damage. I think that's an appropriate -- appropriate term for that.

Q   Okay. Would you agree, sir, that if Superior's Ambetter directory -- well, strike that. I think your claims analysis determined that roughly half of the providers in Superior's Ambetter directory had not billed in a claim in the prior 12 months of

Page 72

any given date; correct?

A   I think that was the chart representation. Yes.

Q   Would you agree, sir, that if the other half of those providers were available to see an Ambetter member when needed, that there's no problem here?

MR. GUERRA:  Objection.  Form.

A   I think my assessment as I, you know, just laid out just a minute here ago is all the Ambetter policy members paid for a certain value. And the value they received, based on the claims data analysis, is distinctively less, consistently.

The value for them, whether they saw a provider, or they had problems seeking a provider -- it doesn't matter. They paid more than they should've paid for the value of what they obtained. And so that's -- that's the position I take on this issue.

Q   Okay. That didn't answer my question exactly. Let me ask it again.

A   Go ahead.

Q   Would you agree, sir, that if the half of providers that didn't bill a claim in any one 12-month period -- if that half was available to see an Ambetter member when they needed care, then there's no

Page 73

problem here, and no damages in this case?

MR. GUERRA:  Objection.  Form.

A   Well, in my report I was asked to use a method to determine what the likely provider network looks like. As I've laid out in my report, it's a challenge to do it because it's in the past. What we academics, including myself, do to determine it in the current period is we do what's called a secret shopper's survey.

We do a secret shopper's survey where we basically call -- present with insurance -- ask whether providers accept this insurance, and then we take that information. Clearly this all happened in the past. It's not possible to do this.

The method that's been proposed and used extensively in academic literature is to use -- to basically do to determine who's in-network and not in-network, because we all know insurance companies have challenges keeping their provider directories up to date -- the method that's been established to do it in past years because I have no -- no other method to do this reliably -- is to compare provider directories to claims data.

This is the method I have used here. My understanding is that it's an appropriate way to do

19 (Pages 70 - 73)

Page 74

this based on the academic literature. Based on the individuals that have used this method. Based on the peer-review process, it's an accepted method to do this in the academic literature.

Q   Do you know of any health plan in the United States that manages their directory as you've just described?

A   As described specifically how?

Q   By deleting providers that didn't bill a claim in the prior 12 months?

A   Do I personally know of one? I've heard of at least one.

Q   Which health plan is that? Is that in Texas?

A   I'm not sure I can speak about it.

Q   Okay. And why would you not be able to speak about this one health plan that you've heard follows the methodology that you're advocating today?

A   Because it's confidential information that I signed an agreement not to share.

Q   Can you tell the jury whether this one health plan that has this confidential agreement with you is located in Texas?

MR. GUERRA: Excuse me. Let me -- let me give you an instruction. To the extent that he's

Page 75

asking you questions that are -- that for which your responsive answer would reveal information that you believe violates the confidentiality order, I'm instructing you not to answer those questions if you believe it does.

If you don't believe it violates the confidentiality order, then you can answer the question. Do you understand my instruction?

THE WITNESS: I do. Thank you.

MR. GUERRA: Okay. Please proceed.

THE WITNESS: You understand my hesitation. It's not in the State of Texas.

BY MR. CADY:

Q   Okay. Do you know of any health plans within the State of Texas that follow the methodology that you're advocating here today?

A   I do not.

Q   Dr. Haeder, you've changed your methodology from your original report to your rebuttal report. And my question to you is, why did you change that methodology for, I think as you described it, monetizing this difference?

A   Yeah. As you know -- you know, I -- I review all the information about -- that's given to me in any given time, including the report provided by

Mr. Hoyt. As I had previously -- I think the damages model relies on two components.

The first component is the establishment of the inaccuracies using provider directory, claims data -- all the stuff that we've talked about. I did not change any of those kind of things. Inaccuracy is still the same. Nothing was changed on -- in this model.

Reviewing Mr. Hoyt's report, I noticed that there is a more appropriate way for me to make the assessment. There's a more appropriate way for me to make these assessments. I diligently reviewed the comments that Mr. Hoyt had. I went back to the literature, did some more work, and found this article that I previously had not seen.

And I found that the approach they proposed is really ideal for these kind of approaches -- or these kinds of situations. And so I -- I adjusted based on these new facts and the new understandings of my methodology here to basically adjust the tail-end of the analysis.

Q   Okay. Do you -- I tried to get the math to work on this table -- Table 3, on page 50.

A   Sure.

Q   And I've had a bit of trouble. Neither you

Page 77

nor I are math majors, I take it, but can you walk me through how this works?

A   Sure.

Q   Maybe with your -- if you've got a calculator --

A   I'm not a math major, but I'm -- I'm a trained methodologist.

Q   Okay.

A   So I'm -- I'm happy to oblige. I did not rely on any new information that was not provided -- expert. As I mentioned, the only thing I did was use the previously established inaccuracies to work these -- to -- to assess these three scenarios.

The 9 percent network breadth, the 31 percent network breadth, and the 53 percent network breadth. What I did, basically, is I looked at which of the -- of these enrollees for Centene in a year, or in a month -- in March of 2016, are enrolled in region one, or region A. Whatever you want to title it here.

What are the inaccuracy rates in that? If the inaccuracy was 20 percent, I multiply it for each individual, 20 by $2.41, and that gets you this sum. And you sum it up across all the regions for March 2016. That gets you to those different numbers.

Q   Do you have your -- do you have your cell

20 (Pages 74 - 77)

Page 78

phone? A calculator on the cell phone to just show me how you got the numbers in, let's say, this first row, or the last row, or whatever row you want to pick --

A   I don't think I can show it to you on a calculator. That's the analysis of files that I provided to Mr. Hoyt.

Q   Oh, I actually didn't get any analysis files for your rebuttal report. Do those exist?

A   I -- all the underlying data files was provided to the -- the only thing that was adjusted as I mentioned was the $2.4 -- $2.41 for the -- each percentage point of inaccuracy.

Q   Okay. Well, I had asked for, actually, the back-up for this table, and was told there is no back-up for the table. Is that wrong?

A   I don't know what you understand as a back-up.

Q   Well, is there anything I need to know to understand the math at this table that is another file? Or can I understand the math from this table just with a calculator?

A   You cannot understand it with a -- a calculator.

Q   I cannot. Is that right?

A   No.

Page 79

Q   Okay. Where is the back-up that I would need to understand this table?

A   It's on my computer, I imagine.

Q   Okay. Is that something you'd be willing to give to the lawyers so we can take a look at it?

A   Yeah.

Q   Okay. Well let's go ahead and do that. Is there -- well, you know, why can't I figure this out just with a calculator? I mean, I've tried, and I can't.

A   You're being silly.

Q   Well, I'm not. I'm not, actually. It doesn't work. And I'm trying to figure out why. And I understand maybe there is a secret sauce behind it that I wasn't provided.

A   There's no secret -- no. There is no secret sauce.

Q   Well -- not know why?

A   Because there's a -- think about it this way. Think of a spreadsheet. 404 -- no -- 41,131 rows.

Q   Right.

A   Each individual enrolled; right?

Q   Okay.

A   We know what region they're in. We know the

Page 80

inaccuracy in the region because of the claims data to provider directory analysis. We make the assumption it's 9 percent. We adjust for the inaccuracies. For each individual, we adjust for the inaccuracies of 31 percent. We adjust for the inaccuracies of 53 percent. And then we add it all together.

Q   Okay. We've got -- so in the first row -- I'm not being silly. Actually, I asked for this material because it matters. You understand it would matter?

A   I -- I understand that. Yes.

Q   Okay. And if it's something that I can't do myself without more information, do you understand why I'd want the more information? Right?

A   Yes.

Q   And you understand why I would ask for that; right?

A   I imagine. Yes.

Q   Okay. And so I'm having trouble understanding why I'm here today without it, if I need it. Do you understand that?

A   I can't answer that question.

Q   Okay. Is that material you've provided to these lawyers that hired you? Or you've just had that on your computer, and you haven't given it to anyone

Page 81

else?

A   I don't think I was asked to provide it at this point.

Q   Okay. The lawyers didn't ask you to provide any back-up material for your rebuttal report; is that correct?

A   I think I was asked to provide the data files. I don't think I was asked to provide the coding files.

Q   Okay. Did you provide the data files to the lawyers that are paying today?

A   Yes. And I uploaded them, I think, to your file-sharing software --

Q   Now is that -- are you switching gears on me? I'm talking about the rebuttal report on page 50 here.

A   The only thing --

Q   I'm trying to understand the math.

A   The underlying data files are the same. There is a code file -- a programming file.

Q   Okay.

A   That creates -- generates these reports.

Q   And what about this other file that's on your computer that you were going to provide. Is that --

21 (Pages 78 - 81)

Page 82

A    That's the programming file that I just referenced.

Q    Okay.  So do I already have that file, or this is a new file?

A    My understanding is that you probably don't have it.

Q    Okay.  So I don't already have the file that I need to understand this; is that right?

A    Probably.

Q    Okay.

A    It sounds like it.

Q    Did the lawyers ask you to provide that file -- this file that I actually need?

A    I don't recall that I was asked about it.

Q    Okay.  And as you sit here today, you think you have not provided that file and it's just on your computer; is that right?

A    That's probably true.  Yes.

Q    Okay.  As a matter of math, I can take a calculator, though, and I can multiply -- just looking at this first line here -- 41,000 members times -- it looks like if we've got a network breadth of 9, and you're saying half of that is inflated, you would have 4 and a half points -- 4 and a half so-called inflation points?

Page 83

A    That's true.  Yes.  Obviously the inaccuracies vary by region.

Q    Why does that matter, Dr. Haeder?  The inaccuracies vary by region?  Is that something that is weighted differently, or is all of this weighted the same because we're just averaging everything?

A    The -- as I indicated on my initial report, I drew a 60 mile buffer around each marketplace region to account for travel that consumers certainly undertake to access medical care.  Sixty miles is common, acceptable travel distance.

And so the inaccuracies for each region, basically, are the inaccuracies in a 60-mile buffer radius that includes those regions.

Q    Okay.  Now when you do 60-mile buffers, there's going to be a lot of overlap; right?

A    Yes.

Q    Okay.  Now how do you account for inaccuracies where there's overlap?  One 60-mile region overlaps with another one?

A    From the consumer perspective, it doesn't matter.  If you're a consumer in, say -- in this area here, you look at your inaccuracies.  And if you're a consumer in this area here, well, look at your inaccuracies.  It doesn't matter for them.  The

Page 84

overlap has no implication for the consumer.

Q    What implication does the overlap have for the math that's presented at page 50 in your table?

A    I don't understand your question.  Would you rephrase?

Q    Well, I'm trying to understand why the overlap is important to the math.  So if it doesn't matter --

A    -- I -- I would assume it's -- the way I look at it, I don't think it's important.

Q    Okay.  Why is it, Dr. Haeder, that I can't just multiply in the top row here, 41,000 members times, let's say, 4 and a half inflation points, times $2.41 per inflation point?  Why wouldn't that math get me there?  What am I missing?

A    As I've laid out previously, the inaccuracy rates based on the provider -- claims data directory analysis differ across the state.  Some regions are more inaccurate than others.

It's reasonable to assume that the most important experience for consumers is a 60-mile radius, although that's not true, as you know from the claims filed here -- that the -- Angelo actually had to travel more than four hours, which is obviously way more than 60 miles.  It's a reasonable approximation

Page 85

of the general experience of consumers.

And so you need, in my analysis -- which I think is an appropriate way to do it -- it counted for the most accessible providers to these consumers.  Mr. Hoyt only did analysis at the county level.

I think that's not broad enough, because of travel distance, as I lay out in my rebuttal.  My analysis accounts for the providers close to consumers.

Q    You're right about cell phone service.

A    Welcome to College Station.

Q    It's only this building though; right?

A    College Station is generally challenging.  This building is terrible.

Q    It's interesting.  It's like that in Silicon Valley, which is the most counterintuitive thing.

A    You wonder if it's on purpose.

Q    Yeah.

A    It's good and bad.  It keeps you focused on work, but also bad when you miss the important phone calls.

Q    Are you picking that up?  Do you know who's in the next room?

A    The lawyer -- he's a loud talker.

MR. CADY:  Okay.  Can we go off the

22 (Pages 82 - 85)

Page 86

record for a second?

THE VIDEOGRAPHER: Both lawyers in agreement with going off the record? We're going off the record at 11:02 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are going back on the record at 11:05 a.m.

BY MR. CADY:

Q Dr. Haeder, when we left off, we were looking at page 50 of your rebuttal expert report. And in particular, Table 3 that you created.

A Yes.

Q Do you have that in front of you?

A Yes -- yes. I do.

Q My question to you is on this third column over that says, "Monthly damages for network breadth equals 9 percent."

A Mm-hmm.

Q Can you tell the jury how the math works on this? You found that certain providers that didn't bill a claim should be deleted from the directory; is that correct?

A I don't think that's what I state.

Q Okay. Tell me what you state.

A My understanding is that in order to assess

Page 87

which providers were likely part of the Centene network at a given point, I relied on an academic method to assess whether consumers -- or what the providers are billing in a certain calendar.

I then compared that to the provider directory, and that's how I got to the inaccuracies. Yes.

Q So you are not advocating -- I think I hear you say this consistently -- you're not advocating that providers be deleted from the directory; is that right?

MR. GUERRA: Objection. Form.

A You're right. I'm not advocating for anything. I'm simply -- I simply completed the task that I was asked to do.

Q Okay. Is it your opinion that Ambetter's directory should delete providers that did not bill a claim in the prior 12 months?

A I don't think I have an opinion on the issue.

Q Okay. Here in this table where it says, "Network breadth equals 9 percent."

A Mm-hmm. Yes.

Q Does that mean that you're assuming the network breadth is 9 percent, and then you deduct

Page 88

providers that didn't bill a claim in the prior 12 months, and end up at 4 and a half percent? Or does that mean we really started at 15 percent, and end up at 9 percent?

A It's the former. We started 9, and then we make deductions from 9.

Q Okay. I understand that the deduction -- any maybe this is the issue -- at a high level, the deduction is 49 percent that you've used; is that right?

A Yes.

Q And in the spreadsheet that's on your computer only, it's a little more nuanced because sometimes it's 49 percent -- sometimes it's 59 percent, and sometimes it's 39 percent; is that right?

A I think that's an accurate representation.

Q Okay. And so we're doing a little too much averaging if I say, well, we start at 9 percent, we deduct 49 percent, and now we end up at 4 and a half percent. What you've done is a little more nuanced than that; is that right?

A I think that's probably true. That's an appropriate representation.

Q Okay. If we were going to just use the 49 percent, so I understand the math, we'd start at 9

Page 89

percent. We'd deduct half. We would end up at 4 and a half percent; is that right?

A I didn't do the analysis. I probably would want to take some time to make sure I get it all correctly for you. But something in -- in -- that seems reasonable. I -- I would have to think about it more. I don't want to, you know, go on the record as stating something I didn't do.

Q Okay. Just for -- and I understand it's overly simplified -- but can we agree that 49 percent of something is about half of that something?

A I think that's a reasonable assumption.

Q Okay. So if we start at 9 percent network breadth and we look at it -- we take half of that -- we're at 4 and a half percent network breadth; is that right?

A That seems right.

Q Okay. And then the way you've monetized this is you take that 4 and a half percent reduction from 9, and you multiply it by this monetization number of $2.41 per percent; is that right?

A I -- I'm not -- I'm not sure I feel comfortable walking you through this hypothetical example without doing it all myself.

Q Okay. I'm really not trying to do a

23 (Pages 86 - 89)

Page 90

hypothetical example or a got you. I'm just trying to understand the math, and this is my time to ask you about it.

A   I -- I apologize that you didn't get the file in advance. I wasn't aware of this.

Q   Do you feel comfortable -- I'm not trying to make you do math. I really am trying to understand this. Half of nine is four and a half; right?

A   Yes.

Q   Okay. And so you were deducting 4 and a half percent -- you were deducting 4 and a half network breadth points here in the first line of your Table 3; right?

A   Yes.

Q   Okay. And then you are monetizing those 4 and a half points by multiplying them times $2.41; right?

A   I think it's a percentage point increase, but I have to review my notes on it. Especially -- I would have to review my notes, exactly how I did it.

Q   Okay. When you say you think it's a percentage point increase, can you tell me what you mean?

A   The -- how should I say this? I -- I'd have to review my notes. I'm happy to review them over

Page 91

sometime, and then answer your question. But I'd have to read my notes on this.

Q   Okay. Are we -- okay. This would -- I'm looking at it. Table 3 -- this is the key chart where you summarize the damages that you're telling the jury are relevant to this case; is that right?

A   Yes.

Q   Okay. And I understand what you're telling me is as we sit here today at your deposition, you can't walk me through the math to tell me how you got those damages; is that right?

MR. GUERRA: Objection. Form.

A   I don't think that's correct. I'm just asking for you -- I'm not -- I would -- I would -- I need -- I would -- I would like to show you the files. I can show you and walk you through it accurately. I don't want to make -- I don't want to get -- I don't want to get it wrong.

So I want to exactly walk you through, because you're asking very precise questions. I want to show you how it's done, if that's okay with you.

Q   Okay. Well, let's do that. I appreciate getting the file so we can look at it. And are you telling me that without that file, it's not going to be possible for you to explain the damages that you

Page 92

were presenting to the jury today?

A   It's a complex -- it's a complex approach; right? It's -- yes. I -- I would like the file just to make sure I get it correct.

Q   Okay. When you generated this report, Dr. Haeder, did you know that there was a back-up file that would be necessary to understand it?

A   Can you rephrase this?

Q   When you -- you wrote this report; right?

A   Yes.

Q   Well, when you wrote this report, did you know that there was a back-up file that would be necessary to understand it?

A   My understanding at the time I submitted the report was that with the existing files that I had provided to you and the written adjustment in the plan, you should be able to -- to make the -- to understand what I was doing.

Q   Okay. That was your understanding at the time you wrote this report in --

A   It was December.

Q   A month ago?

A   That sounds about right.

Q   Okay. What's your understanding as you sit here today?

Page 93

A   It seems that you clearly would benefit from having the file.

Q   Okay. You have abandoned using the .29 percent price adjustment model that you used in your original report; correct?

A   I don't know if it was 2.9 -- yeah. I think it was 1.9. But I can't remember the exact number. But yes. I moved on from those.

Q   Okay. Dr. Haeder, did you do anything in the course of your work for the law firms on this case to ascertain whether the providers in Superior's Ambetter directory that didn't bill a claim in the prior 12 months would be willing to see an Ambetter member if asked?

A   I was not asked to do that.

Q   Okay. Did you do that -- not withstanding that you weren't asked to do that?

A   It was not part of my job tasks. No.

Q   Do you agree that that would be a relevant analysis to figure out whether the provider would be willing to see an Ambetter member if asked?

MR. GUERRA: Objection. Form.

A   The only way to found out at this point would obviously be talking to 2023 providers. I don't think that would be helpful to the relevant court

24 (Pages 90 - 93)

Page 94

period at this point.

I also don't think it's generally relevant because of the -- as I alluded to earlier -- Ambetter policy holder purchased certain -- a certain product as in the analysis established would be less valuable to them than what they -- what they actually purchased.

Q   Okay.  Would you agree that Ambetter policy holders purchased a product that had certain providers under contract with Ambetter?

A   Can you rephrase that?

Q   Would you agree that when Ambetter policy holders purchased a product, there were certain contractors under --

A   Mm-hmm.

Q   Or certain providers under contract with Ambetter?

A   I'm sure that's true.

Q   Would you agree that the relevant analysis as to whether customers got what they purchased is whether the providers under contract are actually under contract?

MR. GUERRA:  Objection.  Form.

A   Can you restate?

Q   Sure.  Would you agree that the relevant

Page 95

analysis to determine whether customers got what they purchased is whether providers that are listed in the directory are under contract with Ambetter?

MR. GUERRA:  Objection.  Form.

A   I don't think I can answer that question.

Q   Okay.  Why not?

A   Can -- it's a complicated question.  I don't quite -- I don't -- I don't feel I quite get it -- what you're trying to ask me.  Would you restate it one more time for me?

Q   Sure.  Would you agree that the relevant analysis is whether Ambetter customers are able to access providers that are under contract with Ambetter?

MR. GUERRA:  Objection.  Form.

A   I think the relevant analysis is the one I conducted here, and that looked at trying to ascertain what providers were in-network at Ambetter's policy in -- in -- Ambetter policy holders in a given period of time based on the method I used.  And so I think that's the relevant analysis here.

Q   When you say -- you're trying to ascertain which providers are in-network.  Can you tell the jury what you mean?

A   Yes.  As I've established previously in

Page 96

this -- in this deposition, it is hard to determine past provider networks because they're in the past and we can't really go back in time and do a lot of the things we would do in the present.

One appropriate way from the academic literature to do that is get provider directories and compare them to claims data, and that's what I did here.

Q   You're not alleging, are you, sir, that providers that didn't bill a claim in any 12 month period are not under contract with Ambetter, are you?

MR. GUERRA:  Objection.  Form.

A   What I'm doing is using a method from the academic literature that has been vetted in peer reviewed literature in some of the best journals in our fields that uses provider data -- claims data -- and tries to ascertain whether providers are in-network that way.

Q   You're not alleging, are you, sir, that Superior's Ambetter directory should not contain any providers that did not bill a claim in the prior 12 months, are you, sir?

MR. GUERRA:  Objection.  Form.

A   I don't think I can speak to that.

Q   Why not?

Page 97

A   That seems outside the scope of what I was asked to do here.

Q   In your analysis, I believe you found that there are thousands, if not tens of thousands of providers, that fell into this bucket of having not billed a claim in any 12-month period; is that right?

A   That's probably correct.  Yes.

Q   Did you do any thing to determine whether those providers were willing to see Ambetter members if asked?

A   I did not.  I also would not know how to do it, 'cause it occurred in the past.

Q   Okay.  Did you do -- do you agree that it's unreasonable to assume that there are thousands of providers under contract with Ambetter who would refuse to see an Ambetter member if asked?

MR. GUERRA:  Objection.  Form.

A   Can you restate the question for me?

Q   Do you agree that it would be unreasonable for someone to assume that there are thousands of providers under contract with Ambetter who would refuse to see an Ambetter member if asked?

MR. GUERRA:  Objection.  Form.

A   I'm not -- I'm not sure that I'm willing to make assumptions.

25 (Pages 94 - 97)

Page 98

Q   Do you have an opinion one way or another whether it's reasonable to assume that there are thousands of providers under contract with Ambetter who would refuse to see an Ambetter member if asked?

MR. GUERRA: Objection. Form.

A   I -- I don't think I can speak to it 'cause I don't have the data to assume.

Q   Are you familiar with any academic research regarding the portion of providers who refused to see members despite the fact that they're under contract with the health plan?

A   I don't think that I do have a specific study in mind that would answer that very specific question.

Q   Would you agree that fundamentally, your analysis that you're purporting to -- that you're putting in front of the jury today -- assumes that about half of the providers in Superior's Ambetter directory would refuse to see an Ambetter member if asked?

A   Could -- could you restate that question?

Q   Do you agree that fundamentally, the opinion you're putting in front of the jury today assumes that about half of the providers under contract with Ambetter would refuse to see an Ambetter member if

Page 99

asked?

A   I don't think that speaks to the period in review in my analysis from -- from 2016 through 2021. It's 2023 now. I don't think I can speak to dates that I didn't analyze.

Q   Okay. Well, let's talk about the dates you did analyze. Are you telling this jury that you believe in 2016, about half of the providers under contract with Ambetter would refuse to see an Ambetter member if asked?

A   Let me -- let me start by saying, I'm not sure. I do not know whether everybody listed in Ambetter's provider directory is under contract with them. I do not have that information, so I cannot state. And I -- I cannot answer that question specifically.

Q   I assume the same answer for 2017 through 2021?

A   Yes. I don't have information about the connection between provider directory and contracts.

Q   Would you agree, sir, that it would be bad policy for Superior to delete from its directory a provider that did not bill a claim in the prior 12 months because it'd make it harder for members to find that provider in the next 12 months?

Page 100

MR. GUERRA: Objection. Form.

A   I -- I don't think I'm in the business of giving advice to Centene. I don't think I can. I don't think that's appropriate for me. That's not the task I was asked to do in this -- in this report.

Q   How about to the jury? Can you tell the jury whether you think it'd be good or bad policy for a health plan to delete doctors from its directory that didn't bill a claim in the prior 12 months because it might be harder to find those doctors in the next 12 months?

MR. GUERRA: Objection. Form.

A   My -- my understanding is that provider directories should be accurate, and they should reflect accurately who consumers are able to access. Who is in -- in their network. I don't think I can answer the rest of the question. Whether it would be appropriate or good policy.

Q   How do you -- in the healthcare world, how do you know whether a provider is someone that a health plan member can access?

A   Can you restate the beginning of the question especially?

Q   Sure. Well, you know that contracts govern relationships between providers and health plans;

Page 101

right?

A   Yes.

Q   And those contracts govern whether a provider is available to see a health plan customer; right?

MR. GUERRA: Objection. Form.

A   I assume there's a lot more than contracts that play into it.

Q   Sir, I want to focus on the 49 percent of --

A   Okay.

Q   -- the Superior directory that -- I don't want to put words in your mouth. Will you tell the jury what the 49 percent of the Ambetter directory represents?

A   It's basically using the provider directories -- using the claims data over the -- over the period -- an average number -- the average number of providers who were listed in provider directories and who were not -- who did not appear in claims data -- or listed in claims data as not contracted -- is 41 -- 49 percent.

Q   Got it. Sir, you know now, after looking at Mr. Hoyt's report, that that 49 percent includes some providers who did see Ambetter members; right?

A   Can you specifically point to the sections

26 (Pages 98 - 101)

Page 102

in Mr. Hoyt's report?

Q   Sure.  Let's just do a reasonability test.  You know that the 49 percent of providers in your list of 49 percent includes all vision providers in-network with Ambetter?

A   That's something that Mr. Hoyt stated in his report.  Yes.

Q   You're not telling this jury that all vision providers didn't bill a claim in the prior 12 months of any prior -- over any one period; right?

A   What I'm telling the jury is that I was provided with provider directories by Centene that I assumed to be complete.  I think that's a reasonable assumption.  I don't think -- I don't think -- is it a reasonable assumption for me to assume that Centene gives me full access to their data, and Centene provided me with data for their claims?

Also a reasonable assumption that they would provide me with data for all of their claims.  But they did not provide me with full -- complete access to the data that's appropriate to do this analysis, then I obviously reserve the right to make any adjustments.

But I think it's a reasonable assumption for me to rely that everything that Centene gives to me is

Page 103

complete an appropriate.

Q   After learning that your analysis led you to conclude that every eye doctor was out of network, did you do anything to make adjustments?

A   My understanding is that it's not -- every eye doctor was not listed.  I think that's what Mr. Hoyt stated in his report.  I did make an adjustment to the report saying -- stating that if Centene were to provide me with additional data, I believe I would be able to make any adjustments.

But given the data that Centene provided, which I assume to be complete and appropriate, I cannot make any adjustments.

Q   When compiling your list of 49 percent of providers that did not bill a claim in any 12-month period, did you notice that it included all eye doctors?

A   I did not specifically look at the taxonomy of the providers, 'cause I assumed reasonably that if you give me provider directories for all of your providers, you would give me claims data for all of your providers.

Q   Did you notice that your 49 percent list includes all dentists in the directory?

A   As I mentioned, I did not review the

Page 104

taxonomy of the providers.  I looked at the overall number of providers listed in the provider directories, and I looked at the providers listed and the claims data, and specifically focused on their NPIs to identify them.

Q   And that's because the sole criteria you used to determine whether a provider is out of network is whether they billed a claim in the prior 12 months; correct?

A   Yes.  Based on the academic literature, that's the approach I followed.

Q   Okay.  And you've made that determination -- that a provider is out of network -- without regard to whether that provider has a contract to be in-network; is that right?

A   My --

MR. GUERRA:  Objection.  Form.

Go ahead, sir.

THE WITNESS:  My analysis focused on comparing provider networks.  Provider directory data to provider claims data.

MR. CADY:  Okay.

BY MR. CADY:

Q   You know, there are some problems with just looking at provider claims data.  We've talked about

Page 105

the eye doctors and the dentists, but what about the fact that some providers bill claims not under their individual NPI number, but under a group NPI number, or someone else's.  Are you familiar with that?

A   I'm familiar with that.

Q   Do you agree that that is an aspect of your analysis that doesn't work?  If a provider bills a claim under a different NPI number than their own, your analysis is then flawed; right?

MR. GUERRA:  Objection.  Form.

A   Well, let me answer this.  Providers bill under their own NPIs, and they may also bill under group NPIs, I think, is what you're alleging.  Mr. Hoyt pointed this out in his report.  He did not provide any scientific studies to back up what the -- what the percentage -- or why to expect this.

He does not cite any academic literature.  I -- when I prepared for this deposition, I did notice that one of the articles -- I believe we both cite -- Dr. Zhu's article -- mentions that 95 -- I think 95 percent of providers billed under the -- in the dataset they are using -- that I use for the analysis here, or as a reference for the analysis here.

Indicated that 95 percent of providers bill

27 (Pages 102 - 105)

Page 106

under their own NPI, and not under the group NPI. It's a reasonable assumption. So the margin that this would contribute is -- is likely very, very small, although we cannot be absolutely correct, because Centene did not provide, neither to me or to Mr. Hoyt, enough data to get to an absolute conclusion here.

I would also like to point out that, as I've previously shown you, I've been very, very conservative in a lot of the things I did here precisely to account for some of these issues that we really can't account, because we can't go back in time and look at all those kinds of things.

And what I specifically pointed out to you earlier, I think in my original report -- I think it was Table 1 -- I don't want to tell you -- tell you anything wrong -- it was Exhibit 1. Table 1. Just to give you an example, the provider directory -- or the product that's listed -- has -- yeah. Table 1 on page 19. Oh, sorry. I should have waited for you.

Q    Thank you. Okay. I'm there.

A    As you can see here, one of the ways I'm conservative is, I'm not even looking at the 31,524. I'm not even looking at their unique address, NPI combination, which should be 23,784. I'm only looking at the backend of this -- the 12,698, which is very,

Page 107

very small, as you can see here.

It's 40 -- 40 percent of the actual listings; right? So that's a massive decrease. Basically a massive slack already allowed to Centene, if you will, or Ambetter in this case. And as you can see, the numbers even increase as we go down the line.

And so at December 2016, I'm only, you know, looking at what's basically a quarter of what Centene actually presents as its provider directory because of the duplicates and the address NPI combinations.

And so compared to already giving them a slack, if you will, of 75 percent, these small numbers -- or the small number that's specifically a potential 5 percent -- we -- we can't really know how big it is -- seems reasonable to not negatively affect the ability to estimate what -- what it would look like in terms of inaccuracies.

Q    You would agree, sir, would you not, that if you have a large network of providers, it might be the case that some of those providers might not be performing services for a certain health plan member space in a certain 12-month period?

MR. GUERRA: Objection. Form.

A    I don't think I can speak to that. That would be a question for a health plan.

Page 108

Q    When providers -- strike that. When a health plan's customer sees an out-of-network provider, one of the risks is that that customer will have to pay the health claim themselves; is that right?

A    That depends what insurance coverage they have, but yes.

Q    And you know, do you not, sir, that for Superior's Ambetter insurance, that's not a risk that those customers have, because Superior's Ambetter insurance pays out-of-network claims if the member went to that out-of-network doctor because of a directory error; right?

A    I'm not 100 percent sure I can fully speak to it, but it is my understanding from reading some of the other depositions and the documents that were provided that the members have to actively file to get that adjusted.

Q    Okay. You know, sir, that not all health plans pay out-of-network claims like that; right?

A    I -- I don't think I'm able to speak to the -- the policies of other health plans. No.

Q    You would agree, sir, that Superior's policy of paying out-of-network claims that are generated by an error in the directory protects Superior's Ambetter

Page 109

members from those errors; correct?

MR. GUERRA: Objection. Form.

A    It mitigates the effects of having to pay out-of-network bills if consumers fully understand the process and are able to move through the process to achieve that. It's also -- since, I think, last year -- a national requirement, actually.

Q    Dr. Haeder, you'd agree that provider directories are constantly changing; correct?

A    I think if you ask me as a health policy expert -- I think that's an accurate statement.

Q    And there is nothing in a contract between a health plan and a doctor that requires a doctor to continue seeing -- well, continue to remain in the health plan's network; is that right?

MR. GUERRA: Objection. Form.

A    I don't think I can speak to that. I don't think I've reviewed provider contracts between a health plan and a health provider, so I don't think I can adequately speak to it.

Q    You know that doctors are free to retire or move at any time in this country?

A    That's obviously true.

Q    And when they do, they would no longer be in the health plan's network; is that right?

28 (Pages 106 - 109)

Page 110

MR. GUERRA: Objection. Form.

A   I can't speak to that. It would be a question for Centene.

Q   I know you didn't look at the contract at issue in this case, but are you familiar with just any health plan contract with customers that guarantee that the doctor that's in-network on day one would remain in-network on day two?

A   I don't think I'm able to fully speak to this, but it would be my understanding.

Q   What would be your understanding?

A   As a health policy expert, I don't -- I can't -- no. I really shouldn't speak to it. I don't know what's specifically in the contracts between consumers and providers. I know that -- as you pointed out, based on this analysis alone, that provider directories change.

I don't think about -- directly to the issue at hand that you're referring with -- between health plans and consumers -- what's presented or not. I don't think I can adequately address those issues.

Q   You're not aware of any promise that Superior makes to its Ambetter members that doctors won't leave its network; right?

A   I don't -- I'm not aware. I don't think I

Page 111

can fully speak to it, because I obviously haven't reviewed all of the documents.

I do understand that, you know, from the documents I reviewed provided by Centene -- the brochures and all those kinds of things -- it speaks highly of -- or it emphasizes that it would provide access to services as a general statement. But whether it specifically presents that I can't -- I can't speak to.

Q   I think you told us earlier that you've looked at Superior's Ambetter online provider search engine; right?

A   That's correct. Yes.

Q   And can you tell the jury your understanding of how an Ambetter customer would use that search engine if they were looking for, let's say, a primary care physician?

A   I'm not 100 percent sure I can fully recommend -- fully -- I apologize for the misspoke. I can fully recollect everything that's going on. I do a lot of research, so I -- I look at lots of online provider directories. I can talk to you about it in general terms.

I would have to look at the website to tell you anything that's not specific -- appropriate to

Page 112

Ambetter. But generally you go to a website. So there's a find doctor, find care -- you know, one of those kind of functions. And you generally are able to search for providers based on a number of criteria that you're interested in.

Q   We talked earlier about -- well, strike that. Because it's a search engine, you would agree that the results are customized for whatever the Ambetter customer types in; right?

MR. GUERRA: Objection. Form.

A   I -- I wouldn't be able to speak to that. That's a question for Ambetter and their contractor, or their own in-house people.

Q   You know, sir, do you not, that when an Ambetter customer searches for a provider on the search engine, the results that are displayed are the providers near them?

A   I think that's generally true, but it allows you to extend the radius.

Q   So it's correct, is it not, that in each search generates a unique set of search results based on what the customer types into the search engine; right?

A   Unique in terms of that specific provider location combination? I suppose. Yes.

Page 113

Q   Okay. Let's talk about supply-side factors. Different Affordable Care Act insurance plans offered on the Healthcare.gov marketplace.

A   Okay.

Q   Have you analyzed Healthcare.gov to figure out how customers buy Affordable Care Act health insurance?

A   I have looked, obviously, at Healthcare.gov. I have not conducted a study that would analyze how consumers use Healthcare.gov.

Q   Do you -- have you shopped for Affordable Care Act health insurance on Healthcare.gov?

A   I -- I don't know what the appropriate term would -- I have attempted to shop for academic purposes. I have not purchased, if that makes sense to you.

Q   Yeah. You don't have Affordable Care Act health insurance; is that right?

A   That is correct. I have it through the university.

Q   Have you analyzed the information presented to consumers on Healthcare.gov when consumers are on that website to buy insurance?

A   Can you clarify?

Q   Sure. Have you -- let me simplify.

29 (Pages 110 - 113)

Page 114

A   Mm-hmm.

Q   Have you analyzed what information is presented to consumers on Healthcare.gov?

A   I have reviewed Healthcare.gov. As a proxy shopper, I've looked at -- what is presented -- what information is presented. Yeah. That's correct.

Q   Okay. What information is presented to consumers?

MR. GUERRA: Objection. Form.

BY MR. CADY:

Q   On Healthcare.gov?

MR. GUERRA: Objection. Form.

A   We should walk through the website if you're really interested in that, because that's a lot of information that I wouldn't want to talk on the top of my head on and forget something. I don't think that's appropriate.

Q   I think that's totally fair. Dr. Haeder, did your analysis take into account the differences between Ambetter's customers? Where some might have had trouble finding a healthcare provider. Some didn't. Some might have had out-of-network claims, and some didn't. Is that something you analyzed?

A   I did not specifically analyze the experience of individual customers. I did not.

Page 115

MR. CADY: Let's take a break and go off the record. I've got -- we can go off the record at 11:44.

THE VIDEOGRAPHER: Both parties agree with going off the record? We are going off the record at 11:44 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are going back on the record at 12:11 p.m.

MR. CADY: Can we go back off the record?

THE VIDEOGRAPHER: All parties agree with going off the record?

We are going off the record at 12:11 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are going back on record at 12:12 p.m.

BY MR. CADY:

Q   Dr. Haeder, can you define "directory inaccuracy"?

A   As it refers to provider directories, I assume you're talking about?

Q   Yeah. I should -- what does a provider directory inaccuracy mean in your report?

Page 116

A   Sure. A provider -- let's -- I think it makes sense to briefly define "provider directory". It's basically a representation of what a provider network looks like to consumers so they can make choices about choosing health plans as well as what medical care to access.

If you do not -- picking someone that's contracted with your -- if you go into a medical provider who is not contracted with your medical plan, as we established earlier, you would risk out-of-network charges. Doesn't count towards your deductible or co-insurance. Bad financial decision in the long term.

A provider directory inaccuracy is any reason why the information presented in the provider directory does not reflect the reality.

This may include the wrong specialty being listed, dead providers being listed, wrong addresses, wrong phone numbers, or providers who do not accept the insurance coverage that's presented in the -- in the provider directory.

Q   Okay. And in your expert report, you analyzed whether providers billed claims. And you identified providers that didn't bill claims in the prior 12 months as being inaccurately listed in the

Page 117

directory; is that right?

A   To follow you -- there's a lot of -- what I did -- let me just state it in my own words and -- and make sure I -- absolutely covers what -- what I'm saying. I looked at provider directories. I looked at claims data. Identified whether a provider in any given calendar year filed a specific -- at least one claim under their own NPI as we've established.

And then I also looked at whether -- as I had written in my report -- whether in the claims data they were specifically identified as non-contracted and all those kinds of things. So basically that's what I did. Yes.

Q   Okay. And any provider that was listed in the directory that did not bill a claim in the prior 12 months, you have identified as being inaccurately listed; correct?

A   I think that's correct.

Q   We talked earlier that you have abandoned the .29 percent, or whatever it was, multiplier in terms -- for your monetization purposes; correct?

A   Mm-hmm. That's correct.

Q   And why did you abandon that multiplier?

A   So as I stated previously, the assessment is basically an assessment of the inaccuracies, which is

30 (Pages 114 - 117)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 118

then used to establish the damages. As I reviewed information, you know, including the report presented by Mr. Hoyt, I updated my -- my thinking about that issue and I adjusted the tail-end of this analysis.

I didn't adjust any of the inaccuracies -- any of the provider directory or claims data analysis. I updated -- I went back to the literature, as I stated earlier, and found a study that I thought was a very, very good match to the needs of -- of the analysis here, and I -- I used that study that we previously did talk -- discussed from the American Journal of Managed Care to establish the damages.

Q You would agree, would you not, sir, that the .29 percent monetization multiplier you used in your initial report would generate a damages model that is hundreds of millions of dollars less than the new monetization model you used in your rebuttal report; correct?

A I don't think I can -- I don't think I -- can you rephrase?

Q Sure.

A I'm not exactly sure what you're asking.

Q Sure. In your rebuttal report, you use a different monetization model.

A Mm-hmm.

Page 119

Q $2.41 per percentage point change; correct?

A Mm-hmm. Yes.

Q In your initial report, you use a multiplier premium of .29 percent; correct?

A That is correct.

Q If you applied the .29 percent premium adjustment to the analysis you use in your rebuttal report, it would result in a damages model of hundreds of millions of dollars less; correct?

A I'm not sure I can fully speak to it, but I don't think that's -- that's correct, because it would have to -- the analysis in the initial stage specifically relied on the premiums paid.

And as -- as I laid out in the report, obviously -- as I stated, after reviewing the literature and after reviewing Mr. Hoyt's report, I determined that the other approach would be a better one, and so I think that's the appropriate way to update your assessment to be in line with, you know, best practices. And that's what I did here.

Q In your initial report you looked at network size, rather than network breadth; right?

A That is correct.

Q And you determined that the network size was inflated by 49 percent; right?

Page 120

A Yes.

Q And so you multiplied premiums times .29 percent, times 49 percent, to come up with the damages model where you asserted 1.2 billion dollars in damages; right?

A Well, if I -- if I remember correctly, I think that's -- if -- if I remember this correctly. I obviously didn't review it fully because I moved on from it for this today. But yes. I -- I think that sounds about right.

Q If you -- in your rebuttal report, you have a different methodology where you look at network breadth.

A Mm-hmm.

Q And at the biggest number you're proposing -- strike that. In your rebuttal report, you look at network breadth; right?

A That's correct. Yes.

Q And --

A -- keep going.

Q Yeah. And the top -- the biggest breadth is 53 percent that you estimate -- you say it could be 53 percent?

A Mm-hmm. That's correct. That's the maximum -- that's the average network breadth of ACA

Page 121

plans in the country.

Q Half -- or if you reduce 53 percent by half -- or your 49 percent -- you're left with about a 26, 27 point change; right?

A I think that's correct math.

Q If you were to apply the .29 percent multiplier to 26 or 27 percentage points, you would -- the outcome would be about half of your initial damages model; right?

A I'm not sure I can make statements about stuff that I didn't personally estimate, so I -- I'd rather not.

Q Okay.

A It's just not good practice for me.

Q Totally fair. Do you have -- sitting here today, do you have a high-level instinct as to whether the damages model in your rebuttal report is about twice as much as the model -- would be the result if you used the .29 percent multiplier?

A I would -- I don't feel comfortable speculating. I don't think that's appropriate. I'm happy to talk about anything that I did, not what I could have -- would have done. I think it's --

Q Dr. Haeder, how many times have you been hired to work on lawsuits?

31 (Pages 118 - 121)

Page 122

A    How many times have I been -- worked on lawsuits? I would say this is my third time.

Q    What are the other prior lawsuits you've been hired to --

A    I can't give you the exact names of them. I apologize. I'm not -- not a lawyer. One dealt with Medicaid coverage in the State of West Virginia. There was an insurance company -- I can't remember exactly the name -- that was selling addon coverage to Medicaid beneficiaries.

And basically the allegation was that they were defrauding consumers because of the structure of the Medicaid program means that if you have Medicaid and you have additional coverage that pays you, it automatically goes to the state. So there was no benefit for the consumers to have this coverage. I was not deposed.

All I did was I wrote an expert report on the issue. And I can't tell you how it ended. That was it. I've also been retained by attorneys for the City of San Diego, but I have not done any work with them.

Q    In the Medicaid case, who hired you?

A    It was the attorneys for the plaintiffs.

Q    In the San Diego case, who hired you?

Page 123

A    The City of San Diego and their lawyers.

Q    What does the San Diego case relate to?

A    Provider networks.

Q    Have you written an expert report in that case?

A    I have done nothing except initial conversations. I have not billed an hour.

Q    Has there ever been a Daubert motion, or motions practiced before a court about whether your opinions are admissible?

A    No.

Q    In the Medicaid case -- the first one you referenced -- do you know whether that case is ongoing?

A    Can you repeat that? Sorry.

Q    Do you know whether that case is ongoing?

A    I'm -- I'm sure it's concluded, but I wouldn't know.

Q    What year did you work on the Medicaid case?

A    I want to say 2017. It should be on my resume is my guess, but about that time.

Q    And what year did you work on the San Diego case?

A    I started -- I wouldn't call it working, but I did sign a contract in, I think, 2021, maybe.

Page 124

Q    Have you ever been deposed before?

A    I have not.

Q    Have you ever testified at a trial or arbitration, or other legal proceeding?

A    I have not.

Q    Dr. Haeder, can you -- I'm sorry. Go ahead.

A    I was trying -- do you need an exact date on the West Virginia case I was trying to find for you?

Q    I think it's on -- yeah. It is on your CV, so --

A    I think it's on my CV, so I don't know if you had -- would you like me to read --

Q    Oh, no. Thank you.

A    Okay. Got it.

Q    Okay. We talked at the break about the damages model in your rebuttal report.

A    Yes.

Q    And you've got this data export that is back-up to the figures in Table 2 and Table 3 of your rebuttal report. And you have that in front of you; is that right, sir?

A    Yeah. I'm just grabbing it right now.

Q    Can you tell the jury what the data file you're looking at is, and give a little explainer as to how we would use that data file to understand Table

Page 125

2, and Table 3 in your rebuttal report?

A    Sure. For all my analysis presented in the report, I used a statistical software called STATA, which is actually built here in College Station. It's a statistical software that facilitates the analysis of data -- particularly large amounts of data.

It allows you estimate models, provide descriptives, clean -- you know, clean data. Read-in data. All those kinds of things. And so what I did is -- for all my analyses -- the spreadsheets I was provided or the CSV files that I was provided from Centene -- I read them into STATA.

I provided those data files to you as well previously, and then I wrote, basically, programming code -- but basically that's the analyses for me. And so it's replicable and easily accessible should the need arise. Does that cover your question?

Q    It does. Now, can you describe what that STATA file does? How would we use that STATA file --

A    Sure.

Q    -- to try to --

A    Yeah. Basically what it does -- it says -- it references the data file. If you will, it pulls in the data file into the statistic -- statistical analysis software, and then it performs

32 (Pages 122 - 125)

Page 126

some operations.

Like looking, you know -- the -- the Excel file, for example, will tell you that an individual enrolled on December 10th, and they were covered until, you know, obviously, the end of the month -- till December 30th. So I do the analysis to prorate it; right?

Just tell it that they were not covered for the first nine days. They were covered for the next 21 days, or something like that.

So you basically -- all you need to do is adjusting the full -- the structure of the reference -- the directory reference structure -- you can replicate the results that are presented in the report, which is why I created the files in the first place.

Q   Got it. And by looking at that file, we should be able to understand how in Table 2 and Table 3, you were able to get from --

A   Yes.

Q   And just looking at the first line in Table 3, 41,000 enrollees, to these various alleged damages numbers for --

A   Yes. You should be able to replicate everything I do.

Page 127

Q   Okay.

A   Which is why I created it.

Q   Right. Got it. And I think you've committed that you're going to send that to both Counsel on this case, and we can review it?

A   Yes. If you provide me an email. I can share it with Franc [ph], and Franc [ph] can forward it to you guys.

Q   Perfect.

MR. CADY: And Counsel, I think we all have an agreement that we'll be able to review that after this deposition. If there's a need to come back and have a -- continue this deposition to talk about the file, that we'll be able to do that; correct?

MR. GUERRA: Agreed.

BY MR. CADY:

Q   Dr. Haeder, are there any -- is there any work that you began on this case that you didn't complete?

A   Can you be more specific?

Q   Sure. Are there any projects or lines of work on this case that you were asked to undertake, or you wanted to undertake, that you weren't able to complete and report on in your reports?

A   No. I don't think so.

Page 128

Q   Okay. Did you ask for any files or information from the lawyers that hired you that were not provided to you?

A   I did ask if there was a provider directory -- the PDF version we previously talked about -- available from Centene, and they stated that Centene never provided it.

I also have asked whether Centene would be willing to provide, I believe, more detailed claim data, including rendering physician as well as organizational NPI, and my understanding is that Centene provided, I think, a month or so of those data, but was not willing to provide the rest of the data.

And so I guess the summary files that I described in the report and that we've previously discussed about at length.

Q   Is there -- I know you reviewed your reports before testifying here at your deposition today. Is there -- well, that's right; isn't it?

A   Yes.

Q   Is there anything in your rebuttal report that you want to or feel you need to change or update?

A   No. I don't think so.

Q   Is there anything in your original report

Page 129

that you want to or feel you need to change or update, other than the updates you've made described --

A   Nothing in addition to what I did in the rebuttal report at -- at this point in time. Yes.

MR. CADY: Dr. Haeder, I have no further questions. We'll continue the deposition so we can look at the file, and might have more questions on that basis. But no further questions today, and thank you for your time.

EXAMINATION

BY MR. GUERRA:

Q   Doctor, I just have a few questions about your education, your experience, and then your methodology. Okay?

A   Mm-hmm.

Q   First so the jury understands, tell us a little bit about your education, how you progressed along the educational system, and eventually how you became a professional here at Texas A&M University?

A   Sure. I'd be delighted. I started out in -- I mean, this is a long story, I suppose. But I started in junior college, and then got into a state university in California. I got a degree in political science. I worked in -- in politics on the side for a little while.

33 (Pages 126 - 129)

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 130

I also then completed a master's degree in international relations, and then was accepted a -- into a fellowship at the University of Oklahoma at the -- at the doctorial level. I took a bunch of courses at the University of Oklahoma. A lot of methods courses -- statistical analysis. Those kinds of courses.

But then decided to move back to California and work in the healthcare sector for a while. I worked at a -- at a legal aid society for -- for several months before I joined a healthcare nonprofit that specifically dealt with supporting underserved populations.

And one of the big projects at the firm was to enroll -- to enroll individuals into health insurance coverage. Both public assistance -- public coverage, like Medicaid, or the CHIP program, as well as private coverage like Kaiser Permanente. I did that for a while and then decided -- well, I -- I went to -- to -- back to school.

I got a master's of public administration. And then I went to the University of Wisconsin to get a PhD. My degree is technically in political science. Most of my work at the University of Wisconsin was done at the LaFollette School of Public Affairs which

Page 131

is one of the premiere public affairs -- public policy schools in this country.

Most of the work I did -- most of the courses I took there -- if I had to guess, probably 15 -- 15 to 20 courses were about methodology and statistical analysis. I minored in applied economics in the Agriculture and Applied Economics Department at the University of Wisconsin, which is also one of the best in the country.

I also minored in political methodology, which again is a -- is -- is training in statistical analysis -- data analysis methods and all those kinds of things. And then upon graduation I was hired at the University of -- or West Virginia University. I moved on to Penn State a few years later.

And I'm now here -- I was at the School of Public Policy at Penn State. And now I'm here in the School of Public Health at Texas A&M University. Yeah. I think that's my academic career. It's a good -- good kind of overview.

Q   Okay. So the jury is clear -- to the extent you have been retained an expert in this case -- what would you define as your realm of expertise in this case?

A   My work focused extensively -- my academic

Page 132

work -- my teaching -- my research focuses on issues related to health policy as well as health services research. And my focus here, specifically, is on access to care.

Almost 90 percent, I would say, of the work that I do is focused on how and whether consumers have access to -- have access to medical care. I do it from a variety of perspectives. I do it from a political policy perspective, but I also do it from a very health economic -- health services research approach.

I've published, I think -- I haven't counted -- 40 to 50 articles in journals among a variety of disciplines. Leading health policy and health services research journals, like the American Journal of Managed Care. Health Affairs. I've published in the Journal of the American Medical Association.

I continue to work this -- I hold several grants that focus on specifically how provider networks and provider directories affect access to care for consumers. The funding is from the Robert Wood Johnson Foundation, which is the biggest healthcare funder in the country, as well as the Commonwealth of Pennsylvania.

Page 133

Which specifically focuses work on plans that are sold in the ACA marketplaces. I've done a lot of work -- I've done a lot of work on healthcare -- health -- provider networks specifically.

I would have to guess but I would assume that probably 20 -- 25 of my articles have focused on specifically provider networks as well as provider directory issues.

Including among them, I would have to -- probably five or six papers that specifically use the secret shopper methodology to determine whether providers are in-network, out-of-network -- what the inaccuracies are. The data contained are probably two million or more phone calls that were conducted for these surveys.

I also conducted a number of studies that relied on the methodology that I talked about here a lot using claims data, specifically, to determine network size and use those kind of information. I've published, I would say, probably four or five articles using that methodology as well.

Q   Okay. Final point for the deposition, then we'll discuss this more at trial. But I want the jury to understand a little bit about the methodology that

34 (Pages 130 - 133)

Page 134

you followed. Okay? So starting at point A, we hire you.

A    Mm-hmm.

Q    We provide you all of the data that we provided to you.

A    Mm-hmm.

Q    We assigned to you a question to answer.

A    Mm-hmm.

Q    And then we get the final answer questioned in your reports. Explain to the jury the methodology that you followed to get from point A, to the point of producing your report and arriving at opinions.

A    Yeah. I'm happy to. I was provided -- as I laid out earlier -- data on the provider directories by Centene. These were Excel files. You know, basically, these are the providers we share with our consumers that are -- are in our network and are seeing patients.

I was also provided summary level claims data which means provider X, as well as their NPI, has had in the -- in the -- in the month of April of 2017 -- has had four claims filed. And -- and, you know, I use those kind of data.

What I did then, when I was presented with the data at hand, I looked at the literature.

Page 135

Specifically, I looked at a paper -- or two papers by Dr. Zhu -- that includes a lot of renowned scholars, including Dan Polsky, who's now at Johns Hopkins. The scholars do basically what I do in this case.

They looked at claims data and they looked at provider network data -- or provider directory data. And they followed exactly the same methodology I did here. And so to establish how inaccurate the provider directory is and what the network is that is available to consumers.

I then reviewed the literature again to determine whether there is a methodology at-hand to assess the value of those damages. Clearly, you know, the first part of the methodology established whether there were any inaccuracies and whether there were any damages.

The problem, of course, then, is how to monetize those damages. And that's not often straightforward. My initial search produced an article that worked reasonably well in my eyes.

And upon further review and especially, you know, upon reviewing the rebuttal report that I received from the expert, I went back to the literature to determine if there's anything else that I had potentially previously not read. The literature

Page 136

is very large.

And I happened to come across this great article which is an appropriate methodology to establish willingness to pay, which is exactly the approach that's used for cost benefit analysis across the world, really. It seemed like a better fit to what I'm trying to do with the data at hand. And so I adjusted my methodology at that point.

Q    Okay. And is that an accepted methodology in your field, to your knowledge?

A    It is, to my knowledge, yes.

Q    Doctor, have you understood my questions?

A    I have.

Q    Have your responses to my questions been based on your education and your training and experience?

A    Yes.

Q    Have your responses to my questions been based on a reasonable degree of probability?

A    Can you say that again?

Q    Have your responses to my questions been based on a reasonable degree of probability?

A    Yes.

MR. GUERRA:  Okay. I pass the witness. And we're holding it open?

Page 137

MR. CADY:  We'll hold it open.

And thank you for your time today.

THE WITNESS:  You got it.

THE REPORTER:  Mr. Guerra, would you like to read and sign, sir?

MR. GUERRA:  So, Doctor, you have the option of getting a copy of the transcript and reviewing it for accuracy and making any changes. Or you can waive that, which means that you feel certain that she wrote down exactly what you said. I mean, it's your option.

You seem a little anal, but I don't know if you have that much time. And so whichever one you want.

THE WITNESS:  I think I can trust you. I want to be trusting.

MR. GUERRA:  So you're waiving?

THE WITNESS:  Yes -- yes. I'm waiving.

THE REPORTER:  Okay. And would you like a copy, sir?

MR. GUERRA:  Me? Yes.

THE REPORTER:  Okay.

THE VIDEOGRAPHER:  All parties in agreement with going off the record? This concludes the deposition of Simon Haeder on Friday, February 3,

35 (Pages 134 - 137)

Page 138

2023.  We're going off the record at 12:38 p.m.
(Signature waived.)
(Whereupon, at 12:38 p.m., the
proceeding was concluded.)

---

Page 139

CERTIFICATE OF DEPOSITION OFFICER

I, CYNTHIA SMITH, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Cynthia Pommie Smith*

CYNTHIA SMITH
Notary Public in and for the
State of Texas

---

Page 140

CERTIFICATE OF TRANSCRIBER

I, RYAN SHARP, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Ryan Sharp*

RYAN SHARP

---

Page 141

FURTHER CERTIFICATION UNDER RULE 203 TRCP

I, CYNTHIA SMITH, the officer before whom the foregoing proceedings were taken, do hereby certify:

That the deposition transcript was submitted to the witness or to the attorney for the witness for examination and signature on _____; or

[x]examination and signature was waived;

That the transcript [ ]was/[ ]was not returned by the witness, and if so, on _____;

That, if returned, the attached Changes and Signature page contains any changes and the reasons therefor;

That the transcript was delivered in accordance with Rule 203.3;

That the amount of time used by each party at the deposition is as follows:

Mr. Cady     - 02 HRS: 38 MIN
Mr. Guerra    - 00 HRS: 08 MIN

That $ _____ is the deposition officer's charges to the _____ for preparing the original deposition transcript and any copies of exhibits;

That a copy of the certificate was served on

---

36 (Pages 138 - 141)

Page 142

all parties on _____, and filed with the Clerk.

       Certified this _____ day of _____, 202___.




*Cynthia Pommier Smith*
CYNTHIA SMITH
Notary Public in and for the
State of Texas
Veritext Firm Registration No. 571

37 (Page 142)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.