## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

Erin Angelo et al.,

        Plaintiffs,

    v.

Centene Management Company, LLC,
Celtic Insurance Company,
Superior HealthPlan, Inc., and
Centene Company of Texas, L.P.,

        Defendants.

Case No. 1:20-cv-00484-RP

District Judge Robert Pitman

ORAL ARGUMENT REQUESTED

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' DAMAGES EXPERT, DR. SIMON HAEDER**

**Table of Contents**

Preliminary Statement.................................................................................................................1

I.    Dr. Haeder's Model Does Not Fit the Facts of the Case. .....................................................2

II.   Dr. Haeder's Model Does Not Measure the Damages That Would Flow from an
      Inaccurate Directory.................................................................................................................3

III.  Dr. Haeder's Methodology for Determining the Degree of "Inaccuracy" Is
      Contrary to the Law. .................................................................................................................4

IV.   Dr. Haeder's Model Is Unreliable Because It Is Based on Speculative
      Assumptions About Superior's Network Breadth. ................................................................6

V.    Dr. Haeder's Model Fails To Consider Supply-Side Factors. ............................................8

Conclusion ...................................................................................................................................10

## Table of Authorities

### Federal Cases

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ...............................................................................................................................9

*Binh Hoa Le v. Exeter Fin. Corp.*, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019)........................2

*Brown v. State Farm Fire & Cas. Co.*, 2022 WL 875648 (N.D. Okla. Mar. 23, 2022) ...............................................................................................................................7

*Comcast v. Behrend*, 569 U.S. 27 (2013) ...................................................................................3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...............................................................3

*Earl v. Boeing Co.*, 2021 WL 3140545 (E.D. Tex. Jul. 26, 2021)...................................................9

*Earl v. Boeing Co.*, 53 F.4th 897 (5th Cir. 2022) .............................................................2, 7, 8, 9

*Eleven Line Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000) ...............................................................................................................................7, 8

*EMC Corp. v. Pure Storage, Inc.,* 154 F. Supp. 3d 81 (D. Del. 2016) ...........................................7

*In re Babcock & Wilcox Co.*, 274 B.R. 230 (E.D. La. Feb. 8, 2002)...............................................7

*In re Corrugated Container Antitrust Litig.*, 310 1981 WL 2093 (S.D. Tex. June 22, 1981) ...............................................................................................................................7

*In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019) ...............................................................................................................................9

*Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109 (W.D. Wash. 2012)...............................9

*Morales v. Kraft Foods Group, Inc.*, 2017 WL 2598556 (C.D. Cal. June 9, 2017) ........................9

*Sprint Comm's Co. L.P. v. Cox Comm's Inc.*, 302 F. Supp. 3d 597 (D. Del. 2017)........................4

*Total E&P USA, Inc. v. Marubeni Oil & Gas USA, Inc.*, 2018 WL 6386263 (S.D. Tex. Dec. 6, 2018)..............................................................................................................2

### Other Authorities and Articles

45 CFR § 156.230(b) ............................................................................................................4, 5

Federal Rule of Civil Procedure 23(b)(3) .................................................................................10

ii

Texas Ins. Code § 1451.504 (a) & (b) ...........................................................................4

Broek-Altenburg, et al., *Patient Preferences for Provider Choice A Discrete Experiment* ..................................................................................................................4

Drake, C, *What are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence from Covered California* .................................................................10

Drake, C., *What Are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence from Covered California* (2018)..................................................4

Ludomirsky, A., et al., *In Medicaid Managed Care Networks, Care is Highly Concentrated Among a Small Percentage of Physicians*.........................................6

Polsky, D., et al., *Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks*..................................4

Zhu, J., et al., *Phantom Networks: Discrepancies Between Reported and Realized Mental Health Care Access in Oregon Medicaid* ..........................................6

**Preliminary Statement**

Plaintiffs' primary contention that Defendants' motion to exclude the opinion of Dr. Simon Haeder raises fact questions for the jury is clearly incorrect. All five of Defendants' arguments go to Dr. Haeder's methodology and its lack of relevance and reliability, not merits issues for the jury. In particular:

- That Dr. Haeder's damages model improperly assumes that Superior made a promise that in fact is not contained in the relevant contracts, and which Plaintiffs do not allege is contained in those contracts, goes to whether his opinion is relevant and therefore meets the standards of Federal Rule of Evidence 702, which is an issue for the Court under *Daubert*.

- That Dr. Haeder's model does not measure the harm from directory inaccuracy goes to whether his opinion fits Plaintiffs' only viable theory, another issue to be decided by the Court under *Comcast v. Behrend*.

- That Dr. Haeder's model is inconsistent with the governing law is clearly a question of law for the Court.

- That Dr. Haeder's use of widely varying assumptions of network breadth, which are unconnected to Superior, undermines the reliability of his methodology and its helpfulness to the jury, a core issue reserved to the Court in its gatekeeping function under *Daubert*.

- That Dr. Haeder's model fails to account for supply-side factors also goes to the reliability of his methodology, and is an issue that many other courts have decided under *Daubert*.

1

On all five of these points, Plaintiffs' Opposition merely underscores the fatal flaws in Dr. Haeder's approach.[1]

## I.      Dr. Haeder's Model Does Not Fit the Facts of the Case.

Despite Plaintiffs' efforts to deny it, Dr. Haeder's model is based on the false assumption that Superior promised consumers a specific network breadth.  Superior made no such promise, and neither Dr. Haeder nor Plaintiffs point to any such promise.  As a result, Dr. Haeder's opinion is irrelevant and should be excluded.  *See Earl v. Boeing Co.*, 53 F.4th 897, 903 (5th Cir. 2022) (expert opinion insufficient where "the facts don't support the inference" on which it is based); *Binh Hoa Le v. Exeter Fin. Corp.*, 2019 WL 1436375, at \*19, \*31 (N.D. Tex. Mar. 31, 2019) (rejecting expert opinion that ignored the relevant contract provisions); *Total E&P USA, Inc. v. Marubeni Oil & Gas USA, Inc.*, 2018 WL 6386263, at \*3 (S.D. Tex. Dec. 6, 2018) (excluding expert opinion that was "contrary to the unambiguous language of the parties' contract").

Plaintiffs insist that Dr. Haeder's model "is not premised on a promise of network breadth."  Opp. at 12.  But his model necessarily assumes such a promise.  As Plaintiffs explain, the underlying premise of Dr. Haeder's opinion is that "[c]onsumers selected their plans and paid the premiums based on access to a provider network of the *size represented on Centene's website*."  *Id*. at 12 (emphasis added).  Dr. Haeder purports to compare the value of the "provider network of the size represented on Centene's website" with the value of a narrower network Centene and Superior allegedly provided, assessing $2.41 in damages for every one percent of breadth that he says was promised but not delivered.  Necessary to this model is a representation or promise about

---

[1]  Dr. Haeder has submitted a new declaration (Exhibit 1 to Plaintiffs' Opposition), but the Opposition does not even mention it, much less explain how it could change the result here.

the size of Superior's network.  Because Superior made no such representation or promise, Dr.

Haeder's opinion is not relevant to the case and should be excluded.  *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 591 (1993).

**II.     Dr. Haeder's Model Does Not Measure the Damages That Would Flow from an Inaccurate Directory.**

Dr. Haeder's model should also be excluded because it does not fit Plaintiffs' only remaining

theory of liability—that Superior breached its promise to deliver an accurate provider directory.

*Comcast v. Behrend*, 569 U.S. 27, 35–36 (2013).  Rather than the damages associated with an

inaccurate directory, which might include customers having to pay out-of-network claims, Dr.

Haeder's model purports to calculate a discount that all customers should receive from their policy

premiums.  As Defendants' Motion explained, these are self-evidently different things—and Dr.

Haeder's model purports to measure the wrong one.

Moreover, Plaintiffs do not contest that Dr. Haeder's model fails to account for the

provider directory potentially being underinclusive, i.e., advertently excluding providers who are

available to see Superior's customers because they have entered into a contract with Superior.

Mot. at 11.  Nor does Dr. Haeder's model address Superior's contractual promise to make

customers whole if they incurred costs because of a directory inaccuracy.  Mot. at 14 n.12.[2]

Such calculations would be necessary to any reliable estimation of damages resulting from an

inaccurate provider directory.

Plaintiffs do not address these points.  Instead, they simply assert that "Dr. Haeder's

damages model measures damages that result from an inaccurate provider directory, and does so

in a manner endorsed by peer-reviewed academic literature."  Opp. at 13.  But none of the

---

[2]  In his declaration, Dr. Haeder states that this policy is "unlikely to be sufficient for consumers," but there is no basis in the record for that assertion.  Opp. Ex. 1 at 8.

literature cited in Dr. Haeder's Report or Rebuttal Report attempts to quantify the damages associated with an inaccurate provider network.  Rather, each examines the value consumers place on broader provider networks versus narrower networks.[3]  None of these studies address the cost to consumers of an inaccurate directory network.

Because Dr. Haeder did not measure the damages from an inaccurate directory, his model fails the "fit" test under *Comcast*, and his model is irrelevant to the case and must be excluded.

### III.    Dr. Haeder's Methodology for Determining the Degree of "Inaccuracy" Is Contrary to the Law.

Dr. Header's methodology also must be excluded because it is contrary to state and federal regulations, and Dr. Haeder admits that he knows of no health insurance company in Texas that follows his approach.  *See, e.g., Sprint Comm's Co. L.P. v. Cox Comm's Inc*., 302 F. Supp. 3d 597, 619 (D. Del. 2017); ECF 70-1 (Haeder Dep.) at 53:7–54:7 ("I -- not to my knowledge.  I can't speak to that. . . . I'm not speaking to that, and I'm not advocating anything.").  Plaintiffs do not contest that Superior is required to list all providers who are available to see Superior's customers.  Opp. at 15.  *See* 45 CFR § 156.230(b)(2) (requiring an "up-to-date, accurate, and *complete* provider directory") (emphasis added); Texas Ins. Code § 1451.504 (a) & (b) (requiring that "each physician and health care provider" be listed in the provider directory).

---

[3] *See*, *e.g.*, Polsky, D., et al., *Marketplace Plans With Narrow Physician Networks Feature Lower Monthly Premiums Than Plans With Larger Networks*, 35 Health Affairs 1842-48, 1842(2016) (using data from plans offered in the health insurance exchanges "to estimate the association between the breadth of a provider network and plan premiums."); Dafny, L., et al., *Narrow Networks On The Health Insurance Marketplaces: Prevalence, Pricing, and The Cost of Network Breadth*, 36 Health Affairs 1606-14, 1606 (2017) ("[W]e studied the prevalence of narrow networks and quantified the association between network breadth and premiums."); van den Broek-Altenburg, et al., *Patient Preferences for Provider Choice A Discrete Experiment*, 26 American J. of Managed Care e219-e224, e224 (2020) (evaluating price elasticity of changes in network breadth); Drake, C., *What Are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence from Covered California*, 3 (2018) ("[E]stimating willingness to pay for physician network breadth in an ACA Marketplace.").

4

This requires Superior to list all providers that have entered into a provider contract with Superior, because providers enter into such contracts so they can see Superior customers. If a provider under contract with Superior were to change their mind and no longer want to see Superior customers, they could simply terminate their contract with Superior and they would be removed from Superior's provider directory search engine. Alternatively, Superior would terminate the relationship and remove the provider from the provider directory search engine. If Superior were to exclude a contracted provider from its directory simply because they had not billed a claim in a year, as Dr. Haeder proposes, Superior would be eliminating a provider who had agreed to see Superior patients and in doing so would violate federal law—as well as make it more difficult for customers to find care. Dr. Haeder admits that he knows of no health insurance company in the United States that follows his approach. *See* ECF 70-1 (Haeder Dep.) at 53:7–54:7 ("I -- not to my knowledge. I can't speak to that. . . . I'm not speaking to that, and I'm not advocating anything.").[4]

Despite the fact that Dr. Haeder's model would require Defendants remove providers who are available to see Superior's customers from the provider directory search engine, Plaintiffs argue that his model is admissible for two reasons: (1) Dr. Haeder's model is based on "peer-reviewed papers" and (2) Defendants' expert, Brian Hoyt, allegedly testified that he agreed with Dr. Haeder's methodology. Neither is persuasive.

---

[4] Of course, contracted providers may choose to stop accepting new patients at some point. Plaintiffs assert for the first time in their Opposition that Superior is in violation of 45 CFR § 156.230(b)(1) which requires health plans to "identify providers that are not accepting new patients." Opp. at 15. Plaintiffs offer no evidence to support this accusation and, in fact, Superior's provider search engine does indicate for each listing whether the provider is accepting new patients. *See* Exhibit 1 (ECF 76-1) (example of directory listing indicating whether provider is accepting new patients, located at https://guide.ambetterhealth.com).

First, the academic literature on which Dr. Haeder relies uses claims data to measure "realized access" to care, not to determine whether a provider is in-network. The articles expressly recognize that relying on claims data alone to determine network status is insufficient to determine a provider's network status and may exclude providers who are available to treat patients. *See*, *e.g.*, Zhu, J., et al., *Phantom Networks: Discrepancies Between Reported and Realized Mental Health Care Access in Oregon Medicaid*, 45 Health Affairs 1013-22, 1015 (2022) ("[A]lthough we used a threshold of five [claims] in the observation period to identify in-network providers, those seeing fewer [than five] patients could still be in network and technically available to patients."); Ludomirsky, A., et al., *In Medicaid Managed Care Networks, Care is Highly Concentrated Among a Small Percentage of Physicians*, 45 Health Affairs 760–768, 760 (2022) (acknowledging that there are several reasons an in-network provider might not bill a claim in a given year, including patient preference).

Second, Plaintiffs take an excerpt of Mr. Hoyt's testimony out of context to suggest that he agrees with Dr. Haeder's approach for determining whether a provider is available to see patients. Opp. at 10. In fact, Mr. Hoyt testified that while he doesn't disagree with using claims data as a datapoint (i.e., a provider who billed claims is obviously actively seeing patients), he does not think it is "sufficient to determine [a provider's] network status." Hoyt Dep. (ECF 75-2) at 157–58. As Mr. Hoyt stated at his deposition and in his report, "Dr. Haeder's methodology suffers from multiple flaws, each of which renders his analysis unreliable and not supported by the facts." Hoyt Rept. (ECF 63-2) at 14.

## IV. Dr. Haeder's Model Is Unreliable Because It Is Based on Speculative Assumptions About Superior's Network Breadth.

Plaintiffs do not contest that Dr. Haeder does not know what Superior's network breadth is (proving that Superior made no promise in this regard), nor do they dispute that his model

utilizes industry averages to estimate damages.  Opp. at 15.  Nor do Plaintiffs contest that Dr.

Haeder's assumptions result in a range of damages from $204 million to $1.2 billion.[5]  *Id.*

Instead, Plaintiffs ask the Court to rely on Dr. Haeder's model because, they say, his assumptions

about Superior's network breadth are "conservative."  Opp. at 15.  However, Plaintiffs offer no

information from which this Court can evaluate whether the assumptions are *actually*

"conservative."  Dr. Haeder has no idea how Superior's network breadth compares to the average

health insurance plan in the United States.  Haeder Dep. (ECF 70-1) at 26:1–28:25 ("I cannot tell

you the breadth.").  His estimates may underestimate or overestimate network breadth—he does

not know.  The Court should not accept unsupported assumptions merely because Dr. Haeder

asserts that they are "conservative."  *See In re Babcock & Wilcox Co.*, 274 B.R. 230, 252–54

(E.D. La. Feb. 8, 2002) (rejecting the plaintiffs' expert's damages model despite the expert's

assertion that its underlying assumptions were "conservative.").

The Fifth Circuit rejected expert damages models based on unsupported assumptions like

those utilized by Dr. Haeder in *Eleven Line Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d

198 (5th Cir. 2000), and *Earl*, 53 F.4th at 903.  For example, the *Eleven* court rejected the use of

the average profit of plaintiffs' business ventures as a benchmark to determine the lost profits of

---

[5]  Plaintiffs cite a number of cases for the proposition that experts may "offer a range of possible damages for a consideration by the jury."  Opp. at 16 n. 8.  However, none of the cases cited involved ranges derived from industry averages that were unrelated to the defendants' actual business. *See In re Corrugated Container Antitrust Litig.*, 310 1981 WL 2093 (S.D. Tex. June 22, 1981) (allowing plaintiffs to present a range of damages that varied based on the year the plaintiffs' damages accrued); *Brown v. State Farm Fire & Cas. Co.*, 2022 WL 875648 at *7 (N.D. Okla. Mar. 23, 2022) (finding that the defendant's motion to exclude plaintiff's expert report was moot because the court excluded the high end of the experts estimated damages on the ground that it was "excessive and far outside the scope of the…guidelines"); *EMC Corp. v. Pure Storage, Inc.,* 154 F. Supp. 3d 81, 119 (D. Del. 2016) (rejecting the defendants' challenge to the expert report because experts are not required to select a specific number for damages).

another business owned by the plaintiff. The court reasoned that this is like arguing "that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average." *Eleven*, 213 F.3d at 208–09. The Court concluded that these assumptions, which "find no support in the actual facts of the case," "cannot support a verdict." *Id.* Dr. Haeder's model here is even more unreliable, because he does not even purport to state a view on Superior's actual network breadth, but instead offers up three widely divergent figures— 9% or 31% or 53%. That is unreliable.

Plaintiffs argue that these controlling Fifth Circuit precedents are inapposite because the district courts in those cases determined that the expert reports were admissible. Opp. at 7. But both of those decisions were reversed. *See Eleven*, 213 F.3d at 208-09; *Earl*, 53 F. 4th at 903. In *Eleven*, the Fifth Circuit reversed a jury award precisely because the plaintiffs' expert was unreliable. 213 F.3d at 207–09. In *Earl*, the Fifth Circuit reversed the district court's holding on class certification and dismissed the case in its entirety. In doing so, it expressly found that the plaintiffs' expert report, which relied on "two unsupportable inferences," failed to establish that plaintiffs had established economic injury. 53 F.4th at 903.

**V. Dr. Haeder's Model Fails To Consider Supply-Side Factors.**

Dr. Haeder's damages model does not consider supply-side factors that affect insurance premiums, and this error is a separate and independent reason that his model should be excluded. In his deposition, Dr. Haeder agreed that "the entire monetization theory of [his] damages model is described in this article by Elaine van den Broeck Altenberg." Haeder Dep. (ECF 70-1) at 17– 18. That article concludes that consumers are willing to pay $2.41 per month for each percent of greater network breadth, but it does not address any supply-side factors—such as the costs to insurers of including more providers—that would affect whether consumers' preferences would

8

actually impact market prices at which insurance is available.  Absent these considerations, van den Broeck Altenberg, and by extension Dr. Haeder, cannot reliably determine the impact of a broader network on insurance premiums.  Hoyt Decl. (ECF 70-2) at 4–6.

Plaintiffs argue that "courts regularly accept expert-offered conjoint analyses, whether or not such 'supply side factors' are considered."  Opp.at 19.  In support of their argument, Plaintiffs rely on *Earl v. Boeing Co.*, 2021 WL 3140545 (E.D. Tex. Jul. 26, 2021), but that decision was reversed in its entirety by the Fifth Circuit, which, as noted above, expressly rejected the plaintiffs' expert's conjoint analysis as a basis for establishing injury.  *See Earl*, 53 F.4th at 902–03.  The other cases that Plaintiffs cite do not address whether a damages model properly included supply-side factors in determining market value because the litigants did not raise the issue.  *See*, *e.g.*, *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328, at *17 (N.D. Cal. Feb. 25, 2014); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119–20 (W.D. Wash. 2012); *Morales v. Kraft Foods Group, Inc.*, 2017 WL 2598556, at *16, *19 (C.D. Cal. June 9, 2017).[6]

Plaintiffs also seek to distinguish Dr. Haeder's model from the expert report rejected in *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019), because, according to Plaintiffs, van de Broek Altenberg's conjoint analysis which was "developed based on real world choices."  Opp. at 19.  Plaintiffs' characterization is incorrect.  *See* Hoyt Decl. (ECF 70-2) at 3–4.  The authors of that study presented participants with two hypothetical insurance plans with five attributes, including "breadth of doctor network."  Van de Broek

---

[6] Although the *Morales* court did not exclude the plaintiff's expert opinion, it did rely on the fact that the demand-side-only conjoint survey the evidence provided by Plaintiffs about their "potential willingness to pay a premium" was "insufficient to establish a basis for calculating restitution," and it therefore decertified the class and granted partial summary judgment for the defendant.  2017 WL 2598556, at *24–26.

9

Altenberg (ECF 70-3) at e221.  As Superior's expert explained in his declaration, these choices "do not resemble any choices that consumers would face in the real-world ACA market," where "it is not feasible for customers to determine network 'breadth' on their own or make purchasing decisions based on network 'breadth.'"  Hoyt Decl. (ECF 70-2) 3–4.  This is evident, too, from Dr. Haeder's own inability to determine Superior's network breadth.  *See supra.*

Recognizing that the van den Broek Altenburg study does not examine the necessary supply-side factors, Plaintiffs assert for the first time in their opposition brief that Dr. Haeder's model is supported by a different article, Drake, C, *What are Consumers Willing to Pay for a Broad Network Health Plan?: Evidence from Covered California*, Journal of Health Economics, 65, 63–77.  Opp. at 18.  But this post hoc emphasis on the Drake article is not credible.  Dr. Haeder agreed in his deposition that "the entire monetization theory of [his] damages model is described in this article by Elaine van den Broeck Altenberg."  Haeder Dep. (ECF 70-4) at 17–18.  Moreover, in his Report and Rebuttal, Dr. Haeder cites Drake only for the broad proposition that "consumers value broader networks."  Haeder Rebuttal (ECF 66-4) at 47; *see* Haeder Report (ECF 62-2) at 10.  Dr. Haeder appears to have made no further use of the article.[7]

### Conclusion

For the foregoing reasons, the Court should exclude Dr. Haeder's model.

Dated:  April 14, 2023                                          Respectfully submitted,

                                                                          WILLIAMS & CONNOLLY LLP

---

[7] Notably, Drake, like Van den Broek, acknowledges "large heterogeneity in willingness to pay" for greater network breadth, which indicates that the study cannot support class certification under Rule 23(b)(3).  Drake at 4.  The Drake article also notes that the literature "suggests that, conditional on a household's physician being included in a network, households are less concerned about the overall breadth of the network. Since some Covered California consumers enroll with pre-existing physician relationships, tastes for broader networks may be a result of broader networks having a higher probability of including these households' doctors."  *Id*. at 35.

By: ___*/s/ Steven M. Cady*___
Steven M. Cady (admitted *pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
T: (202) 434-5321
F: (202) 434-5029
scady@wc.com

– and –

Lorinda G. Holloway
Texas Bar No. 00798264
Timothy P. Ribelin
Texas Bar No. 24091055
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701-4093
Telephone:  (512) 479-1149
Facsimile:  (512) 479-1101
lorinda.holloway@huschblackwell.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing.

By: ___*/s/ Steven M. Cady*___
Steven M. Cady

11