## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **ERIN ANGELO, NICHOLAS ANGELO, AND CYNTHIA WILSON, on behalf of themselves and all others similarly situated,** *Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§ | |
| **v.** | §<br>§ | **No. 1:20-cv-00484-RP** |
| **CENTENE MANAGEMENT COMPANY, LLC, CELTIC INSURANCE COMPANY, SUPERIOR HEALTH PLAN, INC., and CENTENE COMPANY OF TEXAS, L.P.,** *Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§ | |

## REPORT AND RECOMMENDATION AND ORDER
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiffs' Motion for Class Certification, Dkt. 62; Defendants' Motion to Exclude Expert Testimony, Dkt. 70; and all related briefing. After reviewing these filings, and the relevant case law, the undersigned denies Defendants' Motion to Exclude Expert Testimony and recommends that the District Court deny Plaintiffs' Motion for Class Certification.

## I.      BACKGROUND

This is a class action on behalf of all individuals in the State of Texas who from January 1, 2014, through December 31, 2021 (the "Class Period") were insured for health care under the Ambetter insurance policy sold and managed by Defendants.

1

Dkts. 62 at 1; 1, at 14. Plaintiffs allege that the lists of providers represented to be available to insureds were materially inaccurate in that they contained thousands of names of providers who were not available to provide medical care. Dkts. 62, at 1; 1, at 13. As a result, the premiums paid by class members were artificially inflated because policyholders were charged for access to providers who were not in fact available to them. Dkts. 62, at 1; 1, at  5, 14.  This class action seeks to recover the alleged overcharges. Dkts. 62, at 1; 1, at  5, 14, 26.

The health insurance policies at issue are offered under the Affordable Care Act and sold through the government's Affordable Care Act marketplace at healthcare.gov. Dkt. 63, at 7. The healthcare.gov listings for available policies list price, co-pay amounts, deductibles, and offer the ability to search the provider database—but the listings do not include the number of providers in the network. *Id.* However, Defendants are required to maintain "a network that is sufficient in number and types of providers [to] ensure that all services will be accessible without unreasonable delay." 45 C.F.R. §§ 156.230(a)(2), 156.230(a)(1)(ii).

Plaintiffs filed the pending motion for class certification seeking to certify a class of "all persons in the State of Texas who were insured by Defendants' Ambetter insurance product which was purchased through the [Affordable Care Act] HIE from the date on which the Ambetter policies were first sold in Texas to December 31, 2021," a class of more than 400,000 people. Dkts. 62, at 7; 1, at 26. Plaintiffs seek compensation for alleged overpayment of insurance premiums due to inflated insurance premium prices. Dkt. 62, at 1. The gravamen of Plaintiffs' complaint is the

theory that the defendant insurance companies misrepresented the accuracy, size, and availability of providers of their network since it was "not as robust as Defendants represent it to be" and therefore caused Plaintiffs to pay inflated insurance premiums. Dkt. 74, at 2. Plaintiffs ask the Court to conditionally certify this suit as a collective action. Dkt. 62, at 1.

Defendants responded and separately moved to strike the declarations included in the Plaintiffs' motion for class certification on the grounds that the Plaintiffs do not have Article III standing, and do not fulfill the Rule 23(b)(3) requirements of predominance and superiority. Dkt. 63, at 1. Further, Defendants also moved to exclude one of Plaintiffs' Class Certification Motion Experts on the grounds that the expert's methodology for measuring damages is unreliable, and thus that it does not pass the *Daubert* standard. Dkt. 70, at 1.

## II.   DEFENDANTS' MOTION TO STRIKE

Before turning to the class certification motion, the undersigned addresses Defendants' motion to strike Plaintiffs' expert testimony in support of class certification. Defendants object to the testimony of Plaintiffs' expert, Dr. Simon. F. Haeder, arguing that his testimony is unreliable and irrelevant, and therefore does not pass the standard set in *Daubert*. Dkt. 70, at 9. Defendants posit five reasons why Dr. Haeder's testimony should be excluded: (1) Dr. Haeder's damages model improperly assumes that Superior made a promise that is not contained in the relevant contract; (2) Dr. Haeder's model does not measure the harm that flows from an inaccurate directory; (3) Dr. Haeder's model is inconsistent with the governing

law; (4) Dr. Haeder relies on improper assumptions about Superior's network breadth; and (5) Dr. Haeder's model fails to account for supply-side factors.  Dkt. 76, at 2-9.

### A.    Legal Standard

Federal Rule of Evidence 702 sets the standard for the admissibility of expert testimony.  The gatekeeping function identified in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Rule 702 provides that:

> A witness who is qualified as an expert ... may testify ... in the form of an opinion ... if
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

 Under *Daubert*, expert testimony is admissible if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity

and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Watkins*, 121 F.3d at 989. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "To trigger a *Daubert* inquiry, an expert's testimony, or its 'factual basis, data, principles, methods, or their application,' must be 'called sufficiently into question.'" *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quoting *Kumho*, 526 U.S. at 149).

District courts are to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (internal quotations and citations omitted). "A party seeking to introduce expert testimony must show '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (internal quotations omitted).

At class certification, *Daubert* review is "limited to [an expert] opinion's reliability and relevance to the requirements of class certification." *Cone v. Vortens, Inc.*, No. 4:17-CV-00001, 2019 WL 4451146, at *2 (E.D. Tex. Sept. 17, 2019). The

standard for measuring reliability is relatively low. *McManaway v. KBR, Inc.*, No. H-10-1044, 2012 WL 13059744, at *3 (S.D. Tex. Aug. 22, 2012) ("Although a trial judge's discretion should be supported by adequately supported findings, the trial judge must not apply the reliability factors too stringently and transform a *Daubert* hearing into a trial on the merits."). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.    Analysis

Plaintiffs have designated Dr. Haeder as an expert to testify on the purported damage to Plaintiffs caused by Defendants' allegedly inflated premium rate. Dkt. 75, at 1. Defendants challenge the damages model Dr. Haeder utilizes to arrive at his suggested damages number. *Id.*

Defendants first claim Dr. Haeder's report should be excluded because his damages model is unreliable. Dkt. 70, at 3. They argue that it does not fit the facts of the case because it assumes facts that are not true; namely, it assumes that Superior promised its customers a certain network breadth, *i.e.*, a certain number of network providers in proportion to the number of providers in the area. *Id.* at 9. However, Defendants contend, Superior never made promises about its about its network breadth. *Id.* Defendants thus contest the basis or source that the Plaintiffs' expert's model rests on.

Defendants also propose that Dr. Haeder's model does not fit Plaintiffs' theory of recovery, a breach of the contractual promise to provide a current provider directory. Dkt. 70, at 10. Defendants posit that a current directory and a network of a certain size are not synonymous, and thus the damages that would flow from claims arising from each would be different. *Id.* at 1. Since Dr. Haeder did not measure damages from an inaccurate directory, according to Defendants, his model fails the "fit" test under *Comcast v. Behrend*, 569 U.S. 27 (2013). *Id.* Defendants next argue that courts reject expert opinions, like Dr. Haeder's, where the "evidence of actual injury impermissibly consists of estimates based on assumptions that are based on estimates and assumptions." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000).

Here, Defendants are contesting the basis of the Dr. Haeder's opinion in that they contest the assumptions underlying his findings, (as well as, in some cases, the sources of his opinions). These issues go to the weight of and not admissibility of Dr. Haeder's testimony. *Viterbo*, 826 F.2d at 422. The undersigned finds that given that the standard for measuring reliability at this stage is relatively low and grounds for exclusion is limited to an inquiry as to relevance to class certification requirements, Dr. Haeder's testimony should not be excluded. Therefore, Defendants' motion to exclude Dr. Haeder's testimony in support of class certification is denied.

### III.     MOTION FOR CLASS CERTIFICATION

Plaintiffs seek to certify their class under Rule 23(b)(3). Dkt. 62, at 13. Defendants object, arguing to Plaintiffs cannot fulfill Rule 23(b)(3)'s predominance

and superiority requirements of Rule 23(b)(3). *Id* at 8. Defendants, however, contend that the Court need not address the merits of Plaintiffs' class-certification arguments because Plaintiffs lack the requisite standing to sue in the first place. As standing is a constitutional threshold that Plaintiffs themselves must first meet before obtaining certification on behalf of the proposed class, the undersigned addresses that issue first.

### A.    Legal Standard

Standing is a fundamental requirement imposed by Article III. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). A plaintiff "must demonstrate standing with the 'manner and degree of evidence required at the successive stages of litigation.'" *Id.* at 2208 (quoting *Lujan v. Defenders of Wildlife*, 540 US. 555, 561 (1992)). The "irreducible constitutional minimum of standing contains three elements": injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 560-61. Injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. The causal connection between the injury and the conduct complained of' must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* at 561. Finally, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

A named plaintiff must have standing to represent a class of other allegedly injured persons. *See Warth v. Seldin*, 422 U.S. 490, 501-02 (1975). If the class

8

representative presents a standing problem, that issue must be addressed prior to deciding class certification. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "After all, if the class representative lacks standing, then there is no Article III suit to begin with—class certification or otherwise." *Id.* In addition, even if the named plaintiffs have standing, the presence of an overwhelming number of uninjured persons within the putative class also raises Article III concerns and counsels against certification. *See TransUnion*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").

**B.     Discussion**

Defendants focus their standing challenge on the first element, arguing that Plaintiffs cannot demonstrate an injury in fact. Defendants cite three reasons in support of this contention: (1) Plaintiffs' class-wide theory of injury from an alleged promise regarding the number of providers cannot confer standing; (2) Plaintiffs' expert's class-wide damages model hinges on a promise that was not made and that does not fit the facts of the case; and (3) the presence of uninjured persons in the putative class defeats class standing. Dkt. 63, at 8-13.

Plaintiffs respond that they have suffered an injury in fact in that each policyholder was overcharged when they paid for a policy they believed would grant access to "a robust network of providers, when in fact the network of providers available to treat them was materially smaller than represented." Dkt. 66, at 7. Plaintiffs plead what the Fifth Circuit has called an "overcharge-by-fraud" theory of injury, a theory under which plaintiffs "seek[] to recover for a purported economic

injury rather than any risk of physical injury" and allege that an inflated price was set for a service than otherwise could have been obtained, absent misrepresentation. *See Earl v. Boeing Co.,* 53 F.4th 897, 902 (5th Cir. 2022).[1]

While purely economic injuries can give rise to standing, typically Plaintiffs asserting overcharge injuries plead facts sufficient to demonstrate plausible expectations or affirmative misrepresentations as the basis of their injury. *See Martone v. Robb,* 902 F.3d 519, 522 (5th Cir. 2018) (observing in class action involving employee stock purchases the plaintiff pleaded that throughout the period he was purchasing stock, Whole Foods was "report[ing] enormous growth of its sales revenues, net income, new stores and stock price" and made representations "about its integrity and reputation"); *Cole v. Gen. Motors Corp.,* 484 F.3d 717, 722 (5th Cir. 2007) (plaintiffs alleged that they contracted to purchase DeVilles with side impact

---

[1] In *Earl*, plaintiffs alleged that airline ticket prices they paid were inflated because the actual value of those tickets for most passengers was zero where Defendants concealed defects in the MAX 8 plane that posed serious risks of injury or death. 53 F.4th at 902. Plaintiffs claimed that had they known about the defects, "demand for tickets on routes flying the MAX 8 would have dropped, so the airlines would have been forced to lower ticket fares and plaintiffs would have paid less for their tickets." *Id.* The Fifth Circuit found this theory of injury untenable because it relied on the unlikely inference that MAX 8 planes would have been allowed to fly even with public knowledge of the defect. *Id.* In reality, if there "was widespread public knowledge" of the MAX 8 defect, airlines "would have offered zero MAX 8 flights" and "ticket fares would have likely gone up because the airlines' useable fleets would have been smaller in the meantime." *Id.* Ultimately, the Fifth Circuit found that plaintiffs did not plausibly allege "that they were any worse off financially" since, had the "defect been widely exposed earlier, the MAX 8 flights plaintiffs chose would have been unavailable and they'd have had to take a different, more expensive (or otherwise less desirable) flights instead. *Id.* at 903.

air bags that would deploy only under certain circumstances involving a side impact but claimed that they received DeVilles with air bags that could "deploy unexpectedly, without a crash"); *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449, 451 (5th Cir. 2001) (putative class action plaintiffs claimed they contracted to buy all-fiberglass boats and relied on sellers' representations to that effect, but instead received a less valuable, wood-fiberglass hybrid). The undersigned agrees with Defendants that Plaintiffs have not pleaded facts sufficient to show that they had reasonable expectations with respect to the size of the provider network such that the prices paid for access to the network were inflated.

Plaintiffs' theory of their overcharge injury rests on the counterfactual assumptions that insureds were promised (or that Defendants represented) that a provider network of a certain size would be available and that provider network size, in any event, is static. Plaintiffs claim that the "lists of providers represented to be available to Centene's insureds were materially inaccurate in that they contained thousands of names of providers who were in fact not available to provide medical care" and "the provider directories were at least fifty percent smaller than represented." Dkt. 62, at 7-8.

However, Plaintiffs have not pleaded any facts supporting the claim that they had reasonable expectations of network size. Defendants state that its insurance policy does "not specify the number of providers in [its] network." Dkt. 63, at 12. Further, neither the Health Insurance Marketplace, nor  Defendants' Plan Documents and contracts state a set number of providers. Dkt. 63-2, at 13. As

Defendants explain, they couldn't have stated a set number of providers or advertised a set network size, "because the size changes frequently." Dkts. 63, at 12; 63-2, at 13 (stating "provider networks change frequently as providers retire and new providers join"). Indeed, Defendants affirmatively advise consumers, "[t]hroughout the year, the providers available in-network may change." *See* Dkt. 63-5 (Provider Guide Notice). Plaintiffs' expert, Dr. Haeder, even alludes to factors affecting variable network size including medical providers discontinuing practice. Dkt. 62-2, at 13 (stating "a large number of providers listed in Centene's provider directory are not actively providing medical care to consumers").

Plaintiffs have also not adequately pleaded that they were overcharged or that they overpaid for the policies they purchased. The assumption underlying Plaintiffs' overcharge theory is that network size meaningfully accounts for higher premiums. Dkt. 62, at 12. Plaintiffs' expert Dr. Haeder reports that the network provider list (provided to him by Defendants) contains, on average, 49% more practitioners than are actually available to policyholders. Dkt. 62-2, at 13. Dr. Haeder also modeled the relationship between network size and policy premiums and concluded that every 1% change in network size corresponds to a .29% change in policy premium cost resulting in a calculable measure of overpayment. *Id.* at 8, 13.

Defendants respond that this relationship demonstrates correlation, not causation. Dkt. 63, at 15. The undersigned agrees. In attempting to rebut Defendants' assertion, Plaintiffs merely reiterate Dr. Haeder's conclusion that "the health services literature has established that health plans with narrower networks are provided at

12

lower premiums than those with broader networks" without substantively addressing what other factors account for the cost of premiums. Dkt. 66, at 7; 66-4, at 45. Dr. Haeder's report, however, suggests other factors that bear on the cost of premiums, including "hospital network breadth[] and hospital network quality" as well as factors such as wait times, travel times, and personal doctor coverage for the doctors in a patient's given geographical area. Dkt. 66-4, at 45, 49. Plaintiffs have not adequately established that the value of the service for which they paid is measured primarily by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size.

The undersigned finds that Plaintiffs' have not plausibly pleaded an injury in fact in pleading that they paid inflated prices for coverage under Defendants' insurance policies. Plaintiffs, therefore, lack standing to bring their claim. Because this suit does not present a justiciable case or controversy under Article III, the undersigned does not reach the class-certification question.

## IV.    RECOMMENDATION AND ORDER

The undersigned **DENIES** Defendants' Motion to Exclude Expert Testimony, Dkt. 70. Further, based on the foregoing discussion the undersigned **RECOMMENDS** that the District Court **DENY** Plaintiffs' Motion for Class Certification, Dkt. 62, for lack of standing.

## V.    WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to

which objections are being made. The district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED August 4, 2023.

---

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE